STATE OF MICHIGAN

IN THE 3RD CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
        Plaintiff,           Hon. Mariam S. Razzi
V                           Cir. Ct. #12-009631-FC
ROBERT ANTHONY SMITH-BEY
        Defendant,

_____/

## MOTION FOR NEW TRIAL

Defendant, Robert Smith-Bey, moves this Court pursuant to MCL 770.1 and Brady v Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963), to order a New Trial, stating the following:

1. Defendant was sentenced on March 28, 2013, for 4-counts of MCL 750.83, 23 to 50yrs; 1-count of MCL 750.110A2, 26yrs 8mos. to 50yrs; 1-count MCL 750.84, 20 to 50yrs; 1-count MCL 750.349B, 20 to 50yrs; 2-counts MCL 750.226, 20 to 50yrs; 2-counts of MCL 750.224f, 20 to 50yrs; 1-count MCL 750.234a, 10 to 15yrs; and 2-counts of MCL 750.227b, 2yrs.

2. Defendant appealed his sentence and convictions as of right and on March 12, 2015, the Michigan Court of Appeals affirmed his convictions and sentence. (see this court's docket).

3. Defendant sought leave to appeal from the Michigan Supreme Court, and in lieu of granting leave, on April 14, 2016 the Michigan Supreme Court remanded Defendant's case to the Wayne County Circuit Court, pursuant to People v Lockridge. (see this court's docket).

4. On June 8, 2016, the trial court rendered an opinion in violation of the Federal and State Constitution, concluding that defendant was on collateral review. (see this court's docket).

5.   On November 18, 2016, defendant sought leave to appeal the trial court's 6-8-16 opinion and order, and on March 29, 2017, the Michigan Court of Appeals vacated the trial court's order and remanded defendant's case back to the Wayne County Circuit Court for consideration of defendant's sentence. (see, attached copy of COA order, Exh. 1-A).

6.   Neither the People or defendant sought further appellate review in the Michigan Supreme Court.

7.   This Court regained jurisdiction over the defendant's case fifty-six (56) days after March 29, 2017, or on May 24, 2017.

8.   In September of 2017, defendant received evidence of criminal acts committed by defendant's arresting officer's Jelani Dew and Adrian Singleton. As a direct result of the officer's criminal conduct, Mr. Robert Dwayne Hill lost his life. (see, attached Defendant's Sworn Affidavit, Exh. 1-B).

9.   For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumlative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result possible on retrial. People v Cress, 468 Mich 678, 692; 664 NW2d 174 (2003).

10.   The state failed to disclose to the defense material information concerning the officer's crimes such that defendant's due process rights under Brady v Maryland, have been violated, as follows:

A. Officer's Jelani Dew and Adrian Singleton's criminal activities seriously undermines their credibility both as key testifying witnesses for the State during defendant's criminal trial and as the arresting officers.

B. Had defendant received this critical exculpatory information defendant would have been acquitted of the charges of assault with the intent to commit murder (AWIM) against him.

C. The prosecution suppressed favorable evidence in violation of Brady. The criminal activities engaged in by officer's Dew and Singleton and their bias and motive to lie during defendant's trial were known by the State but were not disclosed to the defense. This information was material, prejudicial and denied defendant his fundamental due process rights. People v Chenault, 495 Mich 142, 150; 845 NW2d 731 (2014).

11. Defendant did not raise the Brady claim on direct appeal because he did not become aware of the information necessary to form the basis of the claim until he was preparing his New Trial motion, at which time he learned of the allegations made against Officer's Dew and Singleton. (see, attached Defendant's Sworn Affidavit, Exh. 1-B).

12. A conviction will be set aside for a Brady violation where the defendant shows: "(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the

defense, there is a reasonable probability that the outcome of the proceedings would have been different." Brady v Maryland, supra.

13.   Here in the Sixth Circuit, there is a Brady violation, and a New Trial is warranted if three conditions are met: "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued," Strickley v Greene, 527 U.S. 263, 281-82; 119 S.Ct. 1936, 144 L. Ed. 2d 286 (1999).

### RELIEF REQUESTED

WHEREFORE, defendant Robert Smith-Bey, in the interest of Justice, respectfully requests this Honorable Court GRANT this motion and order a New Trial with the provisions set forth under Brady v Maryland, 373 U.S. 83, together with the arguments set forth more fully in defendant's accompanying supporting brief.

DATE: DECEMBER 12, 2017          Respectfully Submitted,

Robert Smith-Bey #365581
E.C. Brooks Corr. Fac.
2500 S. Sheridan Drive
Muskegon Heights, MI 49444

-4-

EXHIBIT 1-A

# Court of Appeals, State of Michigan

## ORDER

People of MI v Robert Anthony Smith

Kurtis T. Wilder
Presiding Judge

Docket No.     335797

Kirsten Frank Kelly

LC No.     12-009631-01-FC

Michael J. Riordan
Judges

Pursuant to MCR 7.205(E)(2), the Court orders that the trial court's June 8, 2016 order is VACATED because our Supreme Court has already ordered the trial court to reconsider defendant's sentence in light of *Lockridge*.[1] *People v Smith*, 499 Mich 896; 876 NW2d 825 (2016). The trial court is bound to obey that order. *People v Russell*, 149 Mich App 110, 115; 385 NW2d 613 (1985). Further, contrary to the trial court's ruling, defendant's sentencing challenge was not a collateral attack, but was instead premised on an order entered during his direct appeal. *People v Howard*, 212 Mich App 366, 369; 538 NW2d 44 (1995) ("a collateral attack occurs whenever a challenge is made to a judgment in any manner other than through a direct appeal"). Accordingly, we REMAND this case for consideration of defendant's sentence as required by *Smith*, 499 Mich at 896.

The "motion for order to show cause," is GRANTED to the extent defendant requests that the register of actions be updated, but DENIED to the extent defendant requests this Court to show cause the court reporter. See *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 582; 808 NW2d 578 (2011) (the gravamen of a claim rather than the party's choice of labels determines the nature of a request); MCR 6.435(A) ("Clerical mistakes in . . . parts of the record and errors arising from oversight or omission may be corrected by the court any time on its own initiative or on motion of a party . . . .). This Court's review of the current register of actions has revealed a demonstrable pattern of error concerning the docketing of actions in this case. Specifically, despite recent updates, the register of actions still omits many of the motions identified in defendant's "motion for order to show cause." Also problematic, the register of actions contains several orders corresponding to motions that were not docketed. Accordingly, on remand, we direct the Wayne County Court Clerk to update the register of actions consistent with the requirements of MCR 8.119(D)(1)(c). If the existing record does not permit a complete update, the trial court shall allow defendant to refile any previously undocketed motions, which the clerk shall docket *nunc pro tunc*. See MCR 6.435(C) ("If a dispute arises as to whether the record accurately reflects what occurred in the trial court, the court, after giving the parties an opportunity to be heard, *must resolve the dispute and, if necessary, order the record to be corrected*") (emphasis added). Any orders entered on those outstanding motions likewise shall be docketed in accordance with this order.

The motion to waive fees is GRANTED and fees are WAIVED for this case only.

This order is to have immediate effect. MCR 7.215(F)(2).

---

[1] *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

**EXHIBIT A**

**EXHIBIT-3**
**2 of 2**

A copy of this order shall be transmitted to Third Judicial Circuit Court Criminal Division Presiding Judge Timothy M. Kenny.

This Court retains no further jurisdiction.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

**MAR 2 9 2017**
_____
Date

_____
Chief Clerk

EXHIbiT 1-B

## SWORN AFFIDAVIT IN BEHALF OF

## MR. ROBERT SMITH-BEY

STATE OF MICHIGAN )
                ) ss.
COUNTY OF MUSKEGON )

    I ROBERT SMITH-BEY #365581, being first duly sworn, solemnly disposes and saith, I am a natural born Citizen of The City of Detroit, State of Michigan, in The United States of America.

    1.  AFFIANT also attest that he is completely innocent of the charges of assault with the intent to commit murder, that he was tried and convicted for.

    2.  I have made several attempts to investigate Police Corruption involving my arresting officers, Adrian Singleton and Jelani Dew.

    3.  On 2-5-14, I received a copy of a United States District Court order denying summary judgment; Hill v Dew, 2011 U.S. Dist. Lexis 122640; involving on the part of Dew and Singleton: violation of §1983-unreasonable search and seizure, unlawful use of deadly force; violation of §1983, §1985-conspiracy and Gross negligence, Assault and Battery and Wrongful Death, pertaining to the unlawful shooting of Mr. Robert Dwayne Hill.

    4.  I have been litigating my direct appeal in Pro Per, since April of 2014, without the assistance of counsel.

    5.  I have limited access to the research sites within the law libraries of the Michigan Department of Corrections.

    6.  I have filed innumerable pleadings with the trial court in an attempt to prove my innocence.

    7.  In December of 2014, I filed my Pro Per supplemental brief

on appeal with an affidavit explaining that I had been unable to obtain the necessary documents to properly prepare and file said brief.

8. All of my pleadings requesting documents have went unfiled and unanswered in the trial court.

9. In June of 2017, I began corresponding with Ms. Tonya Scott, by way of United States Postal Service and J-Pay, pertaining to her researching case #2:10-cv-11427, Hill v Dew.

10. She was able to obtain exculpatory and impeaching evidence pertaining to officers Dew and Singleton's unlawful shooting of Mr. Robert Dwayne Hill.

11. In September of 2017, I began receiving the information of Dew and Singleton's criminal activities.

12. With the assistance of Ms. Scott and my Grandmother, Mrs. Dorothy Collier, I received the last of the materials that Ms. Scott was able to obtain on December 6, 2017.

13. Those materials reveal a pattern of Police Corruption and Brutality by Dew and Singleton.

14. The information that was obtained by Ms. Scott and is now in my possession is exculpatory and impeaching in nature.

15. That information was never disclosed to my Defense counsel before, during or after trial.

16. That information was in the possession of both Dew and Singleton.

17. That information was suppressed by the prosecution during trial.

AFFIANT has been engaged in a futile attempt to prove his

innocence and to clear his name.

Pursuant to <u>MCI 750.422</u> et. seq., AFFIANT ROBERT SMITH-BEY
#365581, declares under the penalty of perjury that the
abovementioned is true & honest to the best of my knowledge &
belief.

Further, AFFIANT saith not.

Subscribed And Sworn To Before Me,

This 12th day, Of Dec 2017

Sincerely Yours,

Robert Smith-Bey #365581
DATE: Dec. 12, 2017

_____
Notary    Public

C. PATRICIO
Notary Public, State of Michigan
County of Muskegon
My Commission Expires 8-3-28
Acting in the County of Muskegen

CC: file

STATE OF MICHIGAN

IN THE 3RD CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
           Plaintiff,           Hon. Mariam S. Bazzi

V                             Cir. Ct. #12-009631-FC

ROBERT ANTHONY SMITH-BEY
           Defendant,

_____/

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL
### DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE DEFENDANT'S RIGHT TO A FAIR TRIAL MANDATED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WAS VIOLATED PURSUANT TO BRADY v MARYLAND.

STANDARD OF REVIEW

    Brady claims ultimately present a question of law reviewed de novo. United States v Tarwarter, 308 F.3d 494, 515 (6th Cir. 2002).

ARGUMENT

    Due process is not satisfied if defendant's conviction is secured and his liberty is deprived through a deliberate deception of the court and jury, the Supreme Court in Brady v Maryland, 373 U.S. 83; 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963), extended those principles to hold that due process is likewise violated when a prosecutor-- whether in good faith or bad faith-- withholds material evidence favorable to the accused. Brady v Maryland, supra. The Brady Rule protects the defendant's rights to a fair trial mandated by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. U.S. v Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L. Ed. 2d 342 (1976).

    There is an affirmative duty on the prosecution to reveal any evidence that is material either to guilt or to punishment,

irrespective of the good or bad faith of the prosecution. Brady v Maryland, supra. This duty covers "[i]mpeachment evidence...as well as exculpatory evidence." United States v Bagley, 473 U.S. 667, 676; 105 S.Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985). The Brady Rule applies to evidence possessed by the prosecution team which includes both the investigators and prosecutors. United States v Meros, 866 F.2d 1304, 1309 (11th Cir. 1989).

A conviction will be set aside for a Brady violation where the defendant shows: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceeding would have been different.

Here in the Sixth Circuit, a New Trial is warranted if three conditions are met: "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickley v Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L. Ed. 2d 286 (1999).

On April 4, 2010, a complaint was filed by Mary E. Hill, as a personal representative of the Estate of ROBERT DWAYNE HILL, deceased, and Albert Bursey. The complaint names Officer's Jelani Dew and Adrian Singleton.

There are factual allegations pertaining to the shooting death of Mr. Hill on the night of July 18, 2008. As a direct and proximate result of criminal acts committed by Dew and Singleton, Robert Hill suffered violations of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from unreasonable search and seizure of his person; loss of life; conscious/physical pain and suffering; and to be free from the use of excessive force against his person. (see, attached complaint, Exh. 1-A).

In Count I: following the unlawful and unconstitutional shooting of Mr. Hill, Dew and Singleton conspired to ratify their acts by developing, articulating and agreeing upon a plan to cover-up their unlawful action to devise a falsified version of events which would exculpate them from their acts, which includes providing a false and fictitious story alleging that Mr. Hill "produced a weapon and pointed it at the officers," prompting Dew and Singleton to shoot Mr. Hill "in fear of their safety." Dew and Singleton agreed to destroy and taint evidence, file false reports regarding how and why they discharged their weapons and to involve other police in the conspiracy.

In Count II: The conspiracy between Dew and Singleton includes agreeing to destroy and taint evidence, file false reports, intimidate witnesses and to misdirect the investigation away from them to cover-up the fact that they improperly, maliciously and with deliberate indifference discharged their weapons at or in the direction of Mr. Hill.

In Count IV: The acts of Dew and Singleton constitute gross

negligence; willful wanton misconduct; assault and battery;
intentional infliction of emotional distress and wrongful death.

Testimony was offered regarding the allegations alleged in
the complaint by officer Jelani Dew on April 25, 2011; officer
Adrian Singleton on April 28, 2011 and by Albert Bursey on June
24, 2011. (see, attached Depositions of Dew, Singleton and Bursey,
Exh. 1-B). The offered testimony revealed contradicting and
conflicting testimony on the part of Dew and Singleton. Officer's
Dew and Singleton claimed that their use of deadly force against
Robert Hill was in self defense because Mr. Hill was pointing
a gun at them, claiming to have shot Mr. Hill in the front, center
mass. However, the autopsy identified five gunshot wounds on
Robert, all entering through the back-side of Robert's body. (see,
attached Plaintiff's Statement of Material Facts, Exh. 1-C).

On July 25, 2011, Dew and Singleton moved for summary judgment
on the grounds that there was no genuine issue of fact. On October
24, 2011, United States District Court Judge Honorable Avern Cohn
issued a memorandum and order denying Dew and Singleton's motion
for summary judgment. Stating, inter alia:

> "[A] reasonable jury could conclude
> that Dew and Singleton shot at Hill
> who was not brandishing a gun at the
> time, and did so without announcing
> themselves as law enforcement...
> Police officers who demonstrate a
> reckless disregard or indifference to
> another's rights do not act in good
> faith...summary judgment is not
> warranted on plaintiff's assault and
> battery charge...The same is true on
> Plaintiff's claim for damages under
> Michigan Wrongful Death Statute."

> "For the reasons stated above. Defendant's

motion for summary judgment is DENIED."
(see, attached USDC order, Exh. 1-D).

Shortly before trial was scheduled, both parties agreed to
settle the case by way of arbitration. On May 14, 2012 the matter
proceeded to arbitration hearing, where both parties called
witnesses and submitted proofs, and on May 16, 2012, the
arbitrators renedered a unanimous decision in favor of the Estate
of Mr. Robert Dwayne Hill. (see, attached Plaintiff's Motion to
Approve Settlement and Authority to Distribute Settlement Proceeds,
Exh. 1-E).

On July 9, 2012, just 19 days before defendant was shot by
Officer's Dew and Singleton, the Honorable Judge Avern Cohn issued
an order approving settlement. The order states:

> IT IS HEREBY ORDERED that the settlement
> of 1,400,000 proposed by the parties
> is approved after the Court having found
> that this settlement is in the best
> interest of the Estate of [Robert Hill].
> (see, attached USDC order, Exh. 1-F).

Defendant did not begin receiving this information until
September of 2017. Defendant has limited access to the legal
research sites within the law libraries of the Michigan Department
of Corrections. With the assistance of family and friends he was
able to obtain the above evidence of Dew and Singleton's criminal
activities. (see, attached Defendant's Sworn Affidavit Exh.1-G)

The evidence of Dew and Singleton's negligence, gross use
of force, police brutality and conspiracy to destroy/taint
evidence, falsify police reports and intimidate witnesses, would
have been favorable to the defense at least for impeachment
purpose. The evidence reveals that Dew and Singleton's modus

operandi is to conspire in filing false police reports, tainting and destroying evidence, improperly directing the investigation away from Dew and Singleton and intimidating, harassing and threatening witnesses to cover-up their criminal acts. Dew and Singleton's testimony was key to defendant's assault with the intent to commit murder (AWIM) convictions and exculpatory evidence favorable to defendant was known to Dew and Singleton.This evidence could have been used to impeach the testimony of both Dew and Singleton.

The evidence of Dew and Singleton's corruption was not in defendant's possession at trial, even with due diligence it could not have been discovered, because it was well concealed from defendant.

Even if neither the prosecutor himself nor anyone in his office knew of Dew and Singleton's illegal activities, does not end inquiry, Brady applies to exculpatory and impeachment information that is in the possession of the "prosecution team," which includes investigators and the police. Kyles v Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L. Ed. 490 (1995)(rejecting State's argument that evidence known only to police but not the prosecutor should escape Brady's disclosure requirements). United States v Antone, 603 F.2d 566, 569(5th Cir. 1979)(finding information known only to two investigators should be imputed to prosecutor: noting that "this Court has declined to draw a distinction between different agencies under the same government").

The State's Brady disclosure obligation does not end with the prosecutor's own personal knowledge, see Kyle v Whitley, supra.

Dew and Singleton as arresting officers (and key testifying witnesses for the State), were members of the prosecution team and their knowledge of their own criminal conduct is therefore properly imputed to the prosecution team.

Further, Dew and Singleton's past misconduct is related to the issues that defendant was tried and convicted for. There is a demonstrable pattern of misconduct and a willful disregard for human life on the part of Dew and Singleton. Dew and Singleton were intimately connected to the defendant's conviction, as arresting officers and eye witnesses. Their testimony was material to the decisions reached by the court and the jury. Absent the officer's testimony the verdict would have been different.

The nature of the information known to Dew and Singleton about their own contemporaneous illegal involvement in filing false police reports, tainting and destroying evidence, improperly directing investigations away form Dew and Singleton and intimidating, harassing and threatening witnesses to cover-up their unlawful use of deadly force, by claiming that a gun was pointed at them was the same as the nature of the testimony the prosecutor needed and secured from Dew and Singleton to convict defendant a trial of AWIM. It was Dew and Singleton's ability to justify their use of deadly force that was the key to the prosecution's AWIM conviction against defendant. Dew and Singleton were clearly key members of the prosecution team whose information and testimony was vital to secure the conviction for AWIM against defendant. (TT 3-5-13 pp4-20); (TT 3-7-13 pp19-47 & 88-102); (TT 3-11-13 pp4-12) and (TT 3-12-13 pp23-39 & 69-79).

When an arresting officer (and key witness) willfully and intentionally conceals material information, regardless of...the otherwise proper conduct of the State attorney, the policeman's conduct must be imputed to the state as part of the prosecution team. Freeman v Georgia, 599 F.2d 65, 69 (1979). "[T]he police are also part of the prosecution and the taint on the trial therefore is no less if they, rather then the state's attorney, were guilty of the nondisclosure." Id. (citations omitted). "[T]he duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of material information, the state's failure is not on the account excused." Id at 70. Dew and Singleton's knowledge of their own criminal conduct, constituting evidence that would be favorable to the defense, demonstrates that the prosecution both possessed favorable evidence, and suppressed exculpatory or impeachment evidence.

Had the favorable evidence been disclosed to the defense, there is a reasonable probability that the result of the proceeding would have been different. The prosecutor placed great emphasis on the credibility of Dew and Singleton. (TT 3-12-13 pp23-39 & pp 69-79). Evidence which would tend to impugn Dew and Singleton's credibility would be particularly probative. Defendant's trial counsel attempted to highlight discrepancies between Dew and Singleton's testimony and the physical evidence. (TT 3-12-13 pp40-69). By the verdict the jury very likely credited Dew and Singleton's testimony.

These circumstances raise a significant possibility that,

had the jury known about Dew and Singleton's own criminal actions
and other criminal activities, which resulted in a substantial
Wrongful Death Settlement, just 19 days before defendant was shot,
Dew and Singleton's testimony likely would have been discredited
by the jury who would have been unlikely to put much stock in
the words of a corrupt officer. Dew and Singleton's testimony
offered as justification for shooting defendant would have been
scrutinized more closely and the physical evidence might well
have been accorded more weight. The prosecutor would have been
disabled from portraying Dew and Singleton as a paragon of
credibility and virtue. The evidence concerning Dew and Singleton's
crimes are material. Dew and Singleton's criminal conduct is in
fact the very same kind for which defendant was arrested and
prosecuted. There is no way to independently prove defendant's
guilt of AWIM separate from Dew and Singleton's testimony, to
prove each element of AWIM rest solely on Dew and Singleton's
credibility.

The question is not whether the defendant would more likely
than not have received a different verdict with the evidence,
but whether in its absence he received a fair trial, a trial
resulting in a verdict worthy of confidence. Could the favorable
evidence be taken to put the whole case in such a different light
as to undermine confidence in the verdict. Kyles, 514 U.S. at
434, 435.

A prosecutor's culpability is irrelevant for purposes of
demonstrating a procedural due process violation based on a Brady
nondisclosure. A defendant establishes a Brady violation whenever

he can show that favorable evidence material to his case was not disclosed to the defense, "irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. at 1197(emphasis added); see Strickley v Greene, 527 U.S. 263, 288, 119 S.Ct. 1936, 1952, 144 L. Ed. 2d 286 (1999)("[u]nder Brady an inadvertent nondisclosure has the same impact on the fairness of the proceeding as deliberate concealment"). If favorable, material evidence exclusively in the hands of the prosecution team fails to reach the defense and the defendant is subsequently convicted, the prosecution is charged with a Brady violation, and the defendant is entitled to a new trial.

### SUMMARY AND RELIEF SOUGHT

THEREFORE, based on the above arguments and facts that are supported by material evidence that is attached as an exhibit, Defendant, Robert Smith-Bey, asks this Honorable Court to GRANT this motion with accompanying brief and provide an order for New Trial.

DATE: December 12, 2017    Respectfully Submitted,

Robert Smith-Bey #365581
Defendant
E.C. Brooks Corr. Fac.
2500 S. Sheridan Drive
Muskegon Heights, MI 49444

EXHIBIT 1-A

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARY E. HILL, As Personal Representative
of the Estate of ROBERT DWAYNE HILL,
Deceased, and ALBERT BURSEY,

        Plaintiffs,

-vs-

POLICE OFFICER JELANI DEW,
POLICE OFFICER ADRIAN SINGLETON,
and POLICE OFFICER SHAWN GERAUD
In Their Individual Capacities,

        Defendants.

_____/

Case No. *10-CV-11427*

Hon. *Avern Cohn*

ROBERT M. GIROUX (P-47966)
Attorney for Plaintiffs
19390 W. Ten Mile Road
Southfield, MI 48075
(248) 355-5555

_____/

## COMPLAINT AND REQUEST FOR JURY TRIAL

There is no civil action between these parties arising out of the same transaction or
occurrence as alleged in this complaint pending in this court, nor has any such action been
previously filed and dismissed or transferred after having been assigned to a judge, nor do
I know of any other civil action between these parties arising out of the same transaction
or occurrence as alleged in this complaint that is either pending, or was previously filed and
dismissed, transferred, or otherwise disposed of after having been assigned to a judge in
this court.

Now Comes Plaintiff, Mary E. Hill, as Personal Representative of the Estate of

Robert Dwayne Hill, Deceased, and Plaintiff ALBERT BURSEY, by and through their

attorneys, Fieger, Fieger, Kenney, Johnson & Giroux, P.C., and for their Complaint

against the above-named Defendants, state as follows:

## JURISDICTION

1.     This action is brought pursuant to 42 USC §1983 and 1985(3).

Jurisdiction is based upon 28 USC §1331 and 1343 and the aforementioned

statutory provision. Plaintiffs further invoke the supplemental jurisdiction of this Court

to hear and decide claims arising under state law.

## PARTIES

2.     Plaintiff, Mary E. Hill, the duly appointed Personal Representative of

the Estate of Robert Dwayne Hill, Deceased, and Plaintiff Albert Bursey, are

residents of the City of Detroit, County of Wayne, State of Michigan.

3.     Defendant, Police Officer Jelani Dew (herein after referred to as Officer

Dew), is and was at all times relevant a City of Detroit police officer in the State of

Michigan and acting under color of state law. He is being sued in his individual

capacity.

4.     Defendant, Police Officer Adrian Singleton (herein after referred to as

Officer Singleton), is and was at all times relevant a City of Detroit police officer in

the State of Michigan and acting under color of state law. He is being sued in his

individual capacity.

5.     Defendant, Police Officer Shawn Geraud (herein after referred to as

Officer Geraud), is a City of Detroit Police officer in the State of Michigan and acting

under color of state law. He is being sued in his individual capacity.

-2-

Case 4:16-cv-13475-TGB-RSW ECF No. 13-18, PageID.1548 Filed 11/08/19 Page 25 of 184
2:10-cv-11427-AC-DAS Doc # 19-9 Filed 07/25/11 Pg 4 of 16 Pg ID 236
Case 2:10-cv-11 7-AC-DAS Document 1 Filed 04/05/10 Page 3 of 15

## COMMON FACTUAL ALLEGATIONS

6.     On or about July 18, 2008, at approximately 3:30 A.M., Robert Dwayne Hill, a 35-year old African-American male, was riding a bicycle in front of the apartment of Shaneica L. Fitzgerald, the girlfriend of his cousin, Plaintiff Albert Bursey, at 12816 Buena Vista in the City of Detroit.

7.     Robert Dwayne Hill was circling in front of said apartment on his bicycle, talking with Plaintiff Elbert Bursey.

8.     At approximately 3:33 A.M. Defendant Police Officers Dew and Singleton, riding in squad car #11 and without sirens or flashing police lights, intentionally ran their squad car into the back end of the bicycle being ridden by Robert Dwayne Hill, propelling him into the windshield of a parked car, and then proceeded to fatally shoot Robert Dwayne Hill in the back torso, hand, buttocks and thigh with five rounds. Prior to any contact with Robert Dwayne Hill, the Defendant Police Officers Dew and Singleton could see that Mr. Hill did not pose any threat of harm to said Officers Dew, Singleton, nor any other person.

9.     At all times relevant, Police Officers Dew and Singleton could plainly see that Robert Dwayne Hill never offered and/or demonstrated any manifestations of an intent to do bodily harm to Officers Dew, Singleton, or any other person.

10.     At no time did Robert Dwayne Hill confront, attack, threaten or approach Officers Dew, Singleton, or any other person. Indeed, at no time after the officer saw Robert Hill did he do anything that could be considered threatening to Officers Dew, Singleton, or any other person.

-3-

11. As Robert Dwayne Hill was propelled into the windshield of a parked vehicle by the squad car of Defendant Officers Dew and Singleton, the Officers exited their police vehicle and immediately began shooting the back side of Mr. Hill from behind their respective opened police car doors. Defendant Officers Dew and Singleton could plainly observe that Robert Dwayne Hill had no weapon drawn and posed no threat to any person.

12. The Defendant Police Officers, with knowledge that Robert Dwayne Hill posed no threat of harm to any person, fired their respective police issue guns five times into the backside of Robert Dwayne Hill while he was helplessly injured by the force of the Defendants' squad car that propelled him off of his bicycle and into the windshield of a parked car.

13. Prior to the police squad car colliding with Mr. Hills' bicycle and prior to the shooting, Robert Dwayne Hill never turned and/or confronted the Defendant Officers in any way.

14. The Defendant Police Officers Dew and Singleton never yelled anything to Mr. Hill, including, "get off the bike" or "put your hands up," or "get down on the ground," never communicated to Robert Dwayne Hill that they were going to use deadly force against him if he did not comply with a particular demand, and never employed reasonable alternatives including communicating with Robert Dwayne Hill, before shooting at the back of Robert Dwayne Hill.

15. One of the five shots fired by Defendant Officers Dew and Singleton went into Robert Dwayne Hill's back, ripped through the left lower lobe of his lung,

-4-

and fatally shattered the left ventricle of his heart before exiting his chest. Plaintiff Albert Bursey was grazed by one of the bullets.

16. Prior to the sustaining the fatal gunshot wound, Robert Dwayne Hill suffered fright, horror and shock and fear of impending death from the injuries inflicted by the colliding police squad car and the non-fatal bullet wounds. Plaintiff Robert Bursey feared for his life during the shooting, suffering fright, horror, shock and emotional distress from the gunfire in his vicinity.

17. Robert Dwayne Hill immediately laid motionless at the scene of the shooting from the bullets that were fired at him by Defendant Officers Dew and Singleton. Yet the Defendant Officers handcuffed the decedent at the scene while he laid mortally wounded. Another police squad car arrived at the scene, yelling at Plaintiff Albert Bursey to "freeze."

18. At no time before discharging their weapons did the Defendant Police Officers Dew and Singleton have an articulable basis to believe that Robert Dwayne Hill posed any threat to the safety of others. Indeed, after colliding with Robert Dwayne Hill on his bicycle injuring him, Defendants Dew and Singleton could plainly see that Robert Dwayne Hill was not in a condition to cause harm to anyone.

19. As a direct and proximate result of the said acts of the Defendant Police Officers Dew and Singleton, Robert Dwayne Hill suffered the following injuries and damages:

  a. Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable search and seizure of his person;

  b. Loss of his life;

-5-

c.     Conscious/physical pain and suffering;

d.     Fright, horror and shock;

e.     Emotional trauma and suffering;

d.     Economic damages related to any and all medical, funeral, burial and/or other consequential costs; and

f.     Plaintiff and the other members of the Plaintiff's Decedent's Estate, including, but not limited to, the decedent's two surviving children, parents, siblings, suffered the untimely end of their relationships with Robert Dwayne Hill with corresponding loss of financial support, parental training, love, care and guidance, loss of household services, loss of society and companionship, and other economic and non-economic damages.

20.     The actions of the Defendant Police Officers violated the clearly established and well-settled federal constitutional rights of Robert Dwayne Hill, including but not limited to his freedom from the unreasonable seizure of his person and the freedom from the use of excessive, unreasonable and unjustified force against his person.

21.     Following the unlawful and unconstitutional acts of Defendants Dew and Singleton as described above, Defendant Police Officers Dew and Singleton together with Defendant Police Officer Shawn Geraud, conspired to ratify the acts of Defendant Police Officers Dew and Singleton and further to deny Robert Dwayne Hill and/or his Estate equal protection of law.

22.     Immediately following their unlawful and unconstitutional shooting of Robert Dwayne Hill, Defendants Dew and Singleton developed, articulated and agreed upon a plan to cover-up their unlawful actions and/or to devise a falsified

-6-

version of events which would in their hopes exculpate them from their acts and, consequently, deny Robert Dwayne Hill and/or his Estate certain constitutional rights.

23. The plan and/or conspiracy developed and agreed upon by the Defendant Officers Dew and Singleton included providing a false and fictitious story alleging that Robert Dwayne Hill "produced a weapon and pointed it at the officers," prompting the Defendant Officers to shoot Mr. Hill "in fear of their safety."

24. At the scene of their crime and thereafter, the Defendant Police Officers Dew and Singleton agreed to destroy and/or taint evidence, file false reports regarding how and why they discharged their weapons and involve other police officers in the conspiracy, including Defendant Officer Shawn Geraud.

25. Thereafter, Defendant Police Officer Shawn Geraud, agreed to conspire with Defendants Officers Dew and Singleton so as to deflect away any blame or liability that may be attributable to Defendants Dew or Singleton as a result of their unlawful actions.

26. The conspiracy between Defendants Dew, Singleton, and Geraud included, but is not limited to, agreeing to destroy and/or taint evidence, file false reports, intimidate witnesses and to misdirect the investigation which was to be conducted into the events described above.

27. The conspiracy between Defendants Dew, Singleton, and Geraud, as well as the acts that were subsequently committed to carry out the conspiracy, were done for the purpose of depriving, either directly or indirectly, Robert Dwayne Hill and/or his Estate and/or the persons belonging to his Estate of the equal protection of the laws, or of equal privileges and immunities under the laws.

-7-

Case 4:16-cv-13475-TGB-RSW  ECF No. 13-18, PageID.1553  Filed 11/08/19  Page 30 of 184
2:10-cv-11427-AC-DAS  Doc # 19-9  Filed 07/25/11  Pg 9 of 16  Pg ID 241

Case 2:10-cv-11427-AC-DAS  Document 1  Filed 04/09/10  Page 8 of 15

28.    The Defendants have in fact filed false reports, tainted evidence, attempted to influence witnesses and attempted to improperly misdirect the subject investigation, all in furtherance of the object of the conspiracy which was to direct blame away from Defendants Dew and Singleton, ratify their unlawful and/or constitutional acts, and deprive Robert Dwayne Hill and/or his Estate due process.

29.    As a result of the above-described conspiracy and the acts which have been committed in furtherance of the object of the conspiracy, Robert Dwayne Hill and/or his Estate have been injured and his person and/or property and/or Estate has been deprived of rights and privileges that are enjoyed by all of the citizens of the United States.

30.    At all times during the offense described above, the Defendant police officers were engaged in a joint venture.  The individual police officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during the said events.

## COUNT I
## SECTION 1983 AGAINST DEFENDANTS DEW AND SINGLETON

31.    Plaintiffs incorporate by reference their allegations contained in Paragraphs 1 through 30 are incorporated herein by reference as though fully set forth herein.

32.    Plaintiff, Mary E. Hill, as Personal Representative of the Estate of Robert Dwayne Hill, Deceased, and Plaintiff Albert Bursey claims damages for the injuries set forth herein under 42 USC §1983 against the Defendant Officers Dew and Singleton, for violation of Robert Dwayne Hill's and Plaintiff Albert Bursey's constitutional rights under color of law.

-8-

33.   At all times relevant, pursuant to 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution, Robert Dwayne Hill and Plaintiff Albert Bursey had a right to be free from an unreasonable search seizure of his person and/or the use of excessive and/or deadly force against his person.

34.   At all times relevant, pursuant to 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution, Defendants Dew and Singleton had a duty and/or were required to avoid the use of unnecessary, unreasonable, excessive and/or deadly force against Robert Dwayne Hill and Plaintiff Albert Bursey as an innocent bystander.

35.   At no time during the events described herein did Robert Dwayne Hill pose a threat to the safety of Defendants Dew or Singleton or others.

36.   At all times relevant, Defendants Dew and Singleton failed to keep their weapons holstered, de-escalate any alleged situation, engage in alternative measures to avoid gunfire and/or to see and observe what was apparent regarding Robert Dwayne Hill.

37.   Defendants Dew and Singleton improperly, maliciously and/or with deliberate indifference discharged their weapons at or in the direction of Robert Dwayne Hill who at all times relevant hereto was helpless and injured from the actions of the Defendants in purposefully colliding with his bicycle and propelling him into the windshield of a parked car.

38.   Defendants acted with deliberate indifference to Robert Dwayne Hill's and Plaintiff Albert Bursey's constitutional rights under the Fourth and Fourteenth Amendments when said Defendants aimed their guns at Robert Dwayne Hill's back

and without cause or justification, shot Robert Dwayne Hill in the back and grazed

Plaintiff Albert Bursey.

    39.   By these actions, Defendants have caused Plaintiff Mary E. Hill,

Personal Representative of the Estate of Robert Dwayne Hill and Plaintiff Albert

Bursey to suffer damages thereby entitling Plaintiffs to compensation for the

following:

    a.     Reasonable medical, funeral and burial expenses (Plaintiff Estate only);

    b.     Emotional distress;

    c.     Loss of personal freedom and liberty;

    d.     Pain and suffer;

    e.     Fright and shock;

    f.     Horror, outrage and indignity;

    g.     Economic damages including lost wages and/or loss of earning
            capacity and loss of support (Plaintiff Estate only);

    h.     Exemplary damages;

    I.     Loss of love, society and companionship for the members of Robert
            Dwayne Hill's Estate (Plaintiff Estate only);

    j.     Loss of services, gifts and/or gratuities (Plaintiff Estate only);

    k.     Compensation for punitive damages; and

    l.     Reasonable attorney fees and costs.

    40.   By these actions, Defendants have deprived Robert Dwayne Hill and

Plaintiff Albert Bursey of the rights secured by the Fourth and Fourteenth

Amendments to the United States Constitution.

WHEREFORE, Plaintiffs Mary E. Hill and Albert Bursey requests the following

relief;

A.     Compensatory non-economic and economic damages including but not
       limited to all damages recoverable under the United States Constitution
       and/or 42 USC §1983 and/or the laws of the State of Michigan, including,
       but not limited to, the Wrongful Death Act;

B.     Punitive damages;

C.     Reasonable attorney fees, costs and interest; and

D.     Such other and further relief as appears reasonable and just under the
       circumstances.

### COUNT II
### 42 USC §1983 AND 1985(3) - ALL DEFENDANTS

41.     Plaintiffs incorporate by reference their allegations contained in

Paragraphs 1 through 40 are incorporated herein by reference as though fully set forth

herein.

42.     After Defendant Officers Dew and Singleton unlawfully shot Robert

Dwayne Hill in the backside several times and grazed Plaintiff Albert Bursey, Defendant

Officers Dew, Singleton and Geraud conspired among themselves to deprive Robert

Dwayne Hill and/or the persons of his Estate, constitutional rights of due process, equal

protection of the laws and/or of equal privileges and immunities under the laws.

43.     Alternatively, Defendants conspired so as to ratify the unlawful and

unconstitutional shooting of Robert Dwayne Hill and Plaintiff Albert Bursey by

Defendants Dew and Singleton.

44.     The acts agreed to and committed by Defendants Dew, Singleton and

Geraud in furtherance of the object of the conspiracy include, but are not limited to,

-11-

filing false reports, tainting and/or destroying evidence, improperly directing the

investigation away from Defendants Dew and Singleton and intimidating, harassing

and/or threatening witnesses.

45.     By these acts, Defendants have violated 42 USC §1983 and 1985(3).

WHEREFORE, Plaintiffs requests the following relief;

A.      Compensatory non-economic and economic damages including but not
        limited to all damages recoverable under the United States Constitution
        and/or 42 USC §1983 and/or 1985(3);

B.      Punitive damages;

C.      Reasonable attorney fees, costs and interest; and

D.      Such other and further relief as appears reasonable and just under the
        circumstances.

<div align="center">

**COUNT III**
**GROSS NEGLIGENCE AND/OR WILLFUL AND WANTON MISCONDUCT AND/OR**
**ASSAULT AND BATTERY AND/OR INTENTIONAL INFLICTION OF EMOTIONAL**
**DISTRESS CLAIM AS TO PLAINTIFF ALBERT BURSEY**

</div>

46.     Plaintiffs incorporate by reference their allegations contained in

Paragraphs 1 through 45 are incorporated herein by reference as though fully set forth

herein.

47.     The acts and conduct of Defendants alleged in the above-stated cause of

action when considered under the laws of the State of Michigan, constitute gross

negligence and/or willful and wanton misconduct and/or assault and batter and/or

intentional infliction of emotional distress and/or outrageous conduct rendering said

Defendants liable to the Plaintiff.

48.    This Court has supplemental jurisdiction to hear and adjudicate the said

state law claims.

WHEREFORE, Plaintiff requests the following relief:

A.    Compensatory non-economic and economic damages including but not
limited to all economic and non-economic damages recoverable under the
laws of the State of Michigan, including pain, suffering, mental anguish,
emotional distress and physical/emotional injury;

B.    Punitive damages;

C.    Exemplary damages;

D.    Hedonic damages;

E.    Reasonable attorney fees, costs and interest; and

F.    Such other and further relief as appears reasonable and just under the
circumstances.

<div align="center">

**COUNT IV**
**GROSS NEGLIGENCE AND/OR WILLFUL AND WANTON MISCONDUCT AND/OR**
**ASSAULT AND BATTERY AND/OR WRONGFUL DEATH**
**AS TO PLAINTIFF'S ESTATE**

</div>

51.    Plaintiffs incorporate by reference their allegations contained in

Paragraphs 1 through 50 are incorporated herein by reference as though fully set forth

herein.

52.    The acts of the Defendants as described above constitute gross

negligence and/or willful and wanton misconduct and/or assault and battery and/or

intentional infliction of emotional distress and Wrongful Death.

53.    Robert Dwayne Hill died as a result of Defendants acts.

54.     Plaintiff Mary E. Hill, Personal Representative of the Estate of Robert

Dwayne Hill, Deceased, claims damages for the wrongful death of Robert Dwayne Hill

and for his conscious pain and suffering, loss of his financial support/income, loss of

household services, loss of society and companionship, loss of parental training and

guidance, loss of gifts and gratuities and for funeral and burial expenses and all other

economic and non-economic damages under the law of Michigan and the Michigan

Wrongful Death Statute.

WHEREFORE, Plaintiff requests that this Court award the following relief:

A.     Compensatory damages to Plaintiff against the Defendants;

B.     Costs of this action to the Plaintiff;

C.     Reasonable attorney's fees and costs to the Plaintiff; and

D.     Such other and further relief as this Court may deem appropriate.

Respectfully submitted,

/s/Robert M. Giroux
ROBERT M. GIROUX (P-47966)
Attorney for Plaintiffs
19390 West Ten Mile Road
Southfield, MI 48075
Phone: (248) 355-5555
Fax: (248) 355-5148
rgiroux@fiegerlaw.com
sstipanovich@fiegerlaw.com

Dated: April 8, 2010

EXHIBIT 1-B

1          IN THE UNITED STATES DISTRICT COURT
2             EASTERN DISTRICT OF MICHIGAN
                 SOUTHERN DIVISION

3   MARY E. HILL, As Personal
    Representative of the Estate
4   of ROBERT DWAYNE HILL, Deceased,
    and ALBERT BURSEY,
5
             Plaintiffs,
6   vs.                              Case No. 10-cv-11427
                                     Hon. Avern Cohn
7   POLICE OFFICER JELANI DEW,
    POLICE OFFICER ADRIAN SINGLETON,
8   and POLICE OFFICER SHAWN GERAUD,
    in their individual capacities,
9
             Defendants.
10  _____/

11       The deposition of Jelani Dew, taken before
    Dione L. Torkelson, Notary Public in the County of
12  Macomb, State of Michigan, at 660 Woodward Avenue, Suite
    1650 Detroit, Michigan, on the 25th day of April, 2011,
13  commencing at 10:06 a.m., pursuant to the Michigan Court
    Rules.
14
    APPEARANCES:
15
        ROBERT M. GIROUX (P47966)
16      FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX
        19390 West Ten Mile Road
17      Southfield, Michigan 48075
        (248) 355-5555
18
            Appearing on behalf of the plaintiff,
19          Mary E. Hill, as personal representative of the
            estate of Robert Dwayne Hill, deceased, and
20          Albert Bursey.

21      JANE KENT MILLS (P38251)
        CITY OF DETROIT LAW DEPARTMENT
22      660 Woodward Avenue, Suite 1650
        Detroit, Michigan 48226
23      (313) 237-5060

24          Appearing on behalf of the defendant,
            Police Officer Jelani Dew, Police Officer
25          Adrian Singleton, and Police Officer Shawn
            Geraud, in their individual capacities.

```
 1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DIVISION

 3   MARY E. HILL, As Personal
     Representative of the Estate
 4   of ROBERT DWAYNE HILL, Deceased,
     and ALBERT BURSEY,
 5
              Plaintiffs,
 6   vs.                        Case No. 10-cv-11427
                                Hon. Avern Cohn
 7   POLICE OFFICER JELANI DEW,
     POLICE OFFICER ADRIAN SINGLETON,
 8   and POLICE OFFICER SHAWN GERAUD,
     in their individual capacities,
 9
              Defendants.
10   _____/

11        The deposition of Jelani Dew, taken before
     Dione L. Torkelson, Notary Public in the County of
12   Macomb, State of Michigan, at 660 Woodward Avenue, Suite
     1650 Detroit, Michigan, on the 25th day of April, 2011,
13   commencing at 10:06 a.m., pursuant to the Michigan Court
     Rules.
14
     APPEARANCES:
15
          ROBERT M. GIROUX (P47966)
16        FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX
          19390 West Ten Mile Road
17        Southfield, Michigan 48075
          (248) 355-5555
18
              Appearing on behalf of the plaintiff,
19            Mary E. Hill, as personal representative of the
              estate of Robert Dwayne Hill, deceased, and
20            Albert Bursey.

21        JANE KENT MILLS (P38251)
          CITY OF DETROIT LAW DEPARTMENT
22        660 Woodward Avenue, Suite 1650
          Detroit, Michigan 48226
23        (313) 237-5060

24            Appearing on behalf of the defendant,
              Police Officer Jelani Dew, Police Officer
25            Adrian Singleton, and Police Officer Shawn
              Geraud, in their individual capacities.      1
```

```
 1                  TABLE OF CONTENTS

 2
     WITNESS:
 3
     JELANI DEW
 4
          Direct Examination by Mr. Giroux          3
 5

 6
     EXHIBITS:
 7
     1    Handwritten Map                          76
 8
     2    Preliminary Complaint Record            109
 9

10
     ALSO PRESENT:
11
     Adrian Singleton
12
```

```
 1               Detroit, Michigan

 2               Monday, April 25, 2011

 3               * * * * * *

 4               JELANI DEW

 5   after having been first duly sworn to tell the

 6   truth, the whole truth, and nothing but the truth,

 7   was examined, and testified as follows:

 8               DIRECT EXAMINATION

 9   BY MR. GIROUX:

10   Q.   Please state your full name for the record.

11   A.   Jelani Dew.

12   Q.   It's Officer Dew, correct?

13   A.   That's correct.

14   Q.   Officer Dew, have you had your deposition taken

15        before?

16   A.   Yes, I have.

17   Q.   How many times?

18   A.   I can't recall.

19   Q.   More than one?

20   A.   Yeah, more than one.

21   Q.   More than two?

22   A.   Maybe five or six —

23   Q.   Okay.

24   A.   — approximately.

25   Q.   When was the last time you were deposed?     3
```

```
 1   A.   It's been awhile, say maybe three or four years

 2        ago.

 3   Q.   Have you been sued before?

 4   A.   Yes.

 5             MS. MILLS:  Objection to relevance.  You

 6        can answer.

 7   BY MR. GIROUX:

 8   Q.   How many times?

 9   A.   Directly, you're saying sued directly, or as a

10        witness to it?

11             MS. MILLS:  Where you're a defendant.

12             THE WITNESS:  Where I'm a defendant?

13             MS. MILLS:  Mm-hmm.

14   BY MR. GIROUX:

15   A.   Just one.

16   Q.   Okay.  When was that?

17   A.   I want to say maybe 2005 —

18   Q.   All right.

19   A.   — I believe.

20   Q.   Do you know who sued you?

21   A.   It was a lady.  I can't remember her name.

22   Q.   Okay.  Do you remember the lady's attorney?

23   A.   No.

24   Q.   Okay.  Was it while you were working with the city

25        of Detroit?                                  4
```

1 A.   Yes.

2 Q.   What was the accusation against you?

3 A.   That I hit her.

4 Q.   Okay. And that's the only time you've ever been

5      sued for police brutality?

6 A.   Yes.

7 Q.   Okay. Has anybody ever accused you of police

8      brutality prior to that?

9 A.   Yes.

10 Q.  How many times?

11         MS. MILLS:  When you say accused, I don't

12     know if you mean a formal citizen complaint, or

13     what exactly your question is.

14         MR. GIROUX:  Okay.

15         MS. MILLS:  Is that what you're asking?

16         MR. GIROUX:  I'm just asking how many

17     times he's been accused of engaging in police

18     brutality.

19         MS. MILLS:  You can answer.

20 BY MR. GIROUX:

21 A.   There has been complaints from citizens, written

22     complaints.

23 Q.   How many?

24 A.   I don't know.  I'd say maybe three or four.

25 Q.   Were any of those complaints investigated?

                                                    5

1 A.   Yes.

2 Q.   How many?

3 A.   All of them.

4 Q.   And what happened to them?

5          MS. MILLS:  Continue my objection to

6      relevance.  You can answer.

7 BY MR. GIROUX:

8 A.   They were all cleared.

9 Q.   All right.  Have you ever been suspended?

10 A.  Yes.

11 Q.  How many times?

12         MS. MILLS:  Objection to relevance.  You

13     can answer.

14 BY MR. GIROUX:

15 A.   Once.

16 Q.   When?

17 A.   It was in 2008.

18 Q.   For what?

19 A.   I was arrested for domestic violence.

20 Q.   Were there charges brought?

21         MS. MILLS:  Continue my objection to

22     relevance.  You can answer.  Do you mean

23     departmental charges or criminal charges?

24         MR. GIROUX:  Both.

25         MS. MILLS:  You can answer.

                                                    6

1 BY MR. GIROUX:

2 A.   Yes.  There were criminal charges and departmental.

3 Q.   What happened to the criminal charges?

4          MS. MILLS:  You can answer, over my

5      objection.

6 BY MR. GIROUX:

7 A.   It was a plea agreement.

8 Q.   What was the plea?

9 A.   Disorderly conduct.

10 Q.  What was the sentence?

11 A.  Probation, a year.

12 Q.  Okay.  And that's over?

13 A.  Yes.

14 Q.  Do you know if it was — your plea of disorderly

15     person or disorderly conduct was taken under

16     advisement while you served your probation, after

17     which it went away, or if it's still part of your

18     criminal record?

19 A.  They said it was taken under advisement.

20 Q.  Okay.  And the departmental charges, what happened

21     to those?

22 A.  I was suspended for eight days.

23 Q.  Forty days?

24 A.  Eight.  Eight days.

25 Q.  Eight days.

                                                    7

1          MS. MILLS:  Eight days or a day?

2          THE WITNESS:  Eight.  Eight days.

3 BY MR. GIROUX:

4 Q.   Okay.  Is that the only time in your police career

5      where you have been suspended?

6 A.   Yes.

7 Q.   Have you ever been reprimanded without suspension?

8          MS. MILLS:  Objection to relevance.  You

9      can answer.

10 BY MR. GIROUX:

11 A.  Yes.

12 Q.  How many times?

13 A.  Maybe once or twice.

14 Q.  For what?

15 A.  Various things, like once not showing up for a

16     Garrity hearing.  I believe —

17 Q.  When —

18 A.  — I believe it was both times.

19 Q.  Both times?

20 A.  Yeah.

21 Q.  Okay.  When were those occasions?

22 A.  It was awhile so, yeah, probably 2000, 2001.

23 Q.  Okay.  Have you ever been disciplined in any other

24     way, other than the reprimands you disclosed and

25     the suspension?

                                                    8

**Page 9**

```
 1         MS. MILLS: Objection to relevance. You
 2    can answer.
 3 BY MR. GIROUX:
 4 A.   No.
 5 Q.   The other times when you were testifying as a
 6    police officer, were you just a witness relative to
 7    something that happened involving another police
 8    officer?
 9 A.   As far as —
10 Q.   You said you were deposed approximately five to six
11    times, the last one was about three to four years
12    ago, but that you've only personally been named in
13    a suit one time. Do you remember that testimony?
14 A.   Yes.
15 Q.   So the other times, the other four to five times,
16    would those be you're just a witness to something
17    that was pending against another police officer?
18 A.   That's correct.
19 Q.   Okay. Was the city ever sued because of your
20    conduct, but you weren't named in the suit?
21         MS. MILLS: Objection, calls for
22    speculation. You can answer.
23 BY MR. GIROUX:
24 A.   No. I was only a witness to the matter.
25 Q.   On all the other occasions?
                                                    9
```

**Page 11**

```
 1    record, so I need you to actually say the words.
 2    You'll forget, because everybody does. I'll remind
 3    you. Don't take offense, okay?
 4 A.   Okay.
 5 Q.   Next, you'll know what my question is before I get
 6    all the words out, because you're an intelligent
 7    man, and you know why I'm here, and why I'm asking
 8    questions. So you'll know your answer before I get
 9    completely done with my question. Wait, however,
10    until I'm done speaking before you start to
11    respond, because if we talk over each other, the
12    court reporter is not going to get us both down,
13    okay?
14 A.   Okay.
15 Q.   It will happen from time to time, again, just
16    because it's a normal, natural thing. I'll remind
17    you or the court reporter will. Again, please
18    don't take offense.
19 A.   Okay.
20 Q.   And then lastly, if I ask you a question that is
21    confusing or you don't understand, stop. Don't
22    answer it. Ask me to clear up whatever is
23    confusing to you, and I will do my best to do so,
24    okay?
25 A.   I understand.
                                                    11
```

**Page 10**

```
 1 A.   Yep.
 2 Q.   Okay. Have you ever been a party to any lawsuit,
 3    either as a plaintiff or a defendant, in any
 4    context or subject matter?
 5 A.   No.
 6 Q.   Have you ever been convicted of any other crimes,
 7    besides the plea that occurred in the domestic
 8    violence that turned into a disorderly person?
 9         MS. MILLS: Objection to relevance and
10    inadmissible. You may answer.
11 BY MR. GIROUX:
12 A.   No. That's the only — that's the only — that's
13    the only one.
14 Q.   Okay. Now, there are a couple of ground rules that
15    go along with these deposition; just to make sure
16    we have an accurate record when we're done.
17    They're honestly not meant to give you a hard time.
18    You may recall them from your prior deps, you may
19    not. I'll just go over them briefly.
20         First, I need you to answer all of the
21    questions that I ask you verbally, meaning with
22    words, as opposed to or in addition to any shrugs,
23    or nods, or gestures you may make. The most common
24    one is where you say uh-huh for a yes, or uh-uh for
25    a no. Those don't come out very clear on the
                                                    10
```

**Page 12**

```
 1 Q.   Where did you go to high school?
 2 A.   Murray-Wright High School, Detroit, Michigan.
 3 Q.   And when did you graduate?
 4 A.   1995.
 5 Q.   And did you go to college after that?
 6 A.   Yes.
 7 Q.   Where?
 8 A.   Just Wayne County. Wayne County Community College.
 9 Q.   Okay. Did you get an associate's degree?
10 A.   No.
11 Q.   Okay. How many years did you go to Wayne County
12    Community College?
13 A.   Just a year.
14 Q.   Okay. Did you ever get any type of certificate or
15    degree?
16 A.   No.
17 Q.   What did you study?
18 A.   Basically, I was just taking the — the basics.
19 Q.   General studies?
20 A.   Yeah. General studies.
21 Q.   Okay. Did you have any schooling after you stopped
22    going to Wayne County Community College?
23 A.   No.
24 Q.   Okay. At Murray-Wright did you play any sports?
25 A.   Yes.
                                                    12
```

1 Q.  What did you play?

2 A.  Basketball and football.

3 Q.  Okay.  Did you play after high school in any form

4     or format?

5 A.  No.  No.

6 Q.  What did you do after you stopped going to

7     community college in terms of schooling, or

8     employment, or anything?

9 A.  Working two different jobs.

10 Q.  Okay.  What two different jobs?

11 A.  Well, one was a security guard —

12 Q.  Okay.

13 A.  — at a nursing center.  The other was at JCPenney.

14 Q.  Both security guard?

15 A.  No.  It was stock.

16 Q.  Okay.  What was the nursing home?

17 A.  It was called Fairlane Nursing Center.  It was on

18     Joy Road and Greenfield.

19 Q.  Okay.  How long did you work there?

20 A.  Not long.

21 Q.  Okay.

22 A.  Maybe eight months, because I was accepted to the

23     police department at the time.

24 Q.  All right.  So sometime during your employment as a

25     security guard, you applied to the city of Detroit

13

1     for a job?

2 A.  Yes.  That's correct.

3 Q.  As a police officer?

4 A.  Yes.

5 Q.  And did you go through an interview process?

6 A.  Yes.

7 Q.  Okay.  And a screening process?

8 A.  Yes.

9 Q.  And testing?

10 A.  Yes.

11 Q.  All right.  After completing that, you were

12     accepted?

13 A.  That's correct.

14 Q.  All right.  When was that approximately?

15 A.  When everything was finished?

16 Q.  Yeah.

17 A.  I think I'm going to say around September of 1998.

18 Q.  Okay.  When did it start?

19     MS. MILLS:  When did the testing start?

20 BY MR. GIROUX:

21 Q.  When did the whole process start?  When did you

22     apply?  When did you hear back?

23 A.  It took about six months, I believe.  So I want to

24     say by like, March of '98.

25 Q.  All right.  And were there any issues that you had

14

1     to deal with?  In other words, did they have any

2     questions that you had to follow up on, any

3     additional testing, any letters of recommendation

4     that they needed?

5 A.  Yes.  They needed all that, recommendation letters,

6     testing, physical tests.  I did everything during

7     that six-month period.

8 Q.  Okay.  Did you have to speak to a counselor, or a

9     therapist, or psychiatrist?

10 A.  Yes.

11 Q.  Okay.  Did they have to have you follow up with

12     anybody after your testing in that regard?

13 A.  I think that was the last stage of it, when we

14     talked to a psychiatrist.  That was the very last

15     stage.

16 Q.  Do you know who you talked to?

17 A.  I can't remember his name.

18 Q.  Okay.  Have you been employed with the city of

19     Detroit ever since?

20 A.  Yes.

21 Q.  All right.  Could you describe for me what was your

22     first position or role with the police department?

23 A.  A patrol officer.

24 Q.  Okay.  Has that changed since — well, up till

25     today's date, have you still always been on patrol?

15

1 A.  Yes.

2 Q.  Did you get any certifications or specialized

3     training?

4 A.  I worked other units.

5 Q.  Okay.  What other units have you worked?

6 A.  Plain clothes unit, thirty series.

7 Q.  It was plain clothes and what?

8 A.  It's called thirty series.

9 Q.  Thirty series?

10 A.  Yes.

11 Q.  What's thirty series?

12 A.  It's a plain clothes unit, kind of answer high

13     priority runs.

14 Q.  All right.  How long were you working plain clothes

15     thirty series?

16 A.  Off and on, maybe four years.

17 Q.  Do you know what four years?

18 A.  About — you said what four years?

19 Q.  Yeah.

20 A.  Not exactly.  I'd say it was the off and on.  I

21     think maybe around 2000, 2001, 2002, pick back up

22     probably 2003, 2000 — 2004, 2005.

23 Q.  All right.  And was that just a normal rotation

24     that everybody did, or did you not like it, or —

25 A.  No.  It was something you had to be picked for.

16

1  Q.   Something you had to be picked for?

2  A.   Yeah.  It was a specialized unit.

3  Q.   All right.  Were you picked for it?

4  A.   Yeah.

5  Q.   Okay.  Why didn't you stay with it?

6         MS. MILLS:  Objection to relevance.  You

7  can answer.

8  BY MR. GIROUX:

9  A.   We were kicked off.

10 Q.   Okay.  Why were you kicked off?

11 A.   It was someone else's opinion.  It really wasn't

12 anything formal.  It was just when you worked that

13 unit —

14 Q.   Yeah.

15 A.   — whoever the supervisor is, they can pick their

16 own people.

17 Q.   Who was the supervisor?

18 A.   At that time it was Lieutenant Brown, and we were

19 kicked off.  It was a different supervisor when we

20 were brought up.

21 Q.   Supervisor Lieutenant Brown kicked you off?

22 A.   Yes.

23 Q.   Okay.  Who was the supervisor who put you in place?

24 A.   It was Sergeant Coleman.

25        MS. MILLS:  Coleman?

17

1         THE WITNESS:  Coleman, yes.

2  BY MR. GIROUX:

3  Q.   Lieutenant Brown, how I do know that name?  What's

4  he known for?

5  A.   He's a — he's an inspector.  He's an inspector

6  now, or the head of gang squad or narcotics.

7  Q.   What happened to Coleman?

8  A.   He's still on the job.

9  Q.   What's his role, position, title?

10 A.   Still sergeant.

11 Q.   Did Lieutenant Brown give you any reasons when he

12 told you you weren't going to be on that duty

13 anymore?

14 A.   Nope.  No, he —

15 Q.   He just said good-bye?

16 A.   Yep.

17 Q.   Thank you, don't let the door hit you?

18 A.   He didn't even say thank you.  He just said

19 good-bye.

20 Q.   All right.  You said we, was it you and others?

21 A.   Yeah.  We — at the time, you would still have

22 plain clothes units still working under the

23 umbrella of thirty series.  But we were working a

24 specialized unit at the time, that we were rolling

25 with four people in a unit, one sergeant and three

18

1  POs, and he — he disbanded all of us.

2  Q.   Okay.  Who was the sergeant?

3  A.   Sergeant Thornton.

4  Q.   And who were the three POs?

5  A.   Myself, Officer Adrian Singleton, and Officer James

6  Johnson.

7  Q.   Is Officer James Johnson still with the force?

8  A.   Yes.

9  Q.   So you guys worked as a group?

10 A.   Yes.

11 Q.   Under Sergeant Thornton?

12        MS. MILLS:  Let's go off the record for a

13 second.

14 BY MR. GIROUX:

15 A.   Yes.

16        (A brief recess took place off the record

17        at 10:26 a.m.)

18 BY MR. GIROUX:

19 Q.   How many other persons were working the thirty

20 series, at the time that you were working it?

21 A.   I mean — I mean —

22 Q.   Is it like a hundred?

23 A.   No.

24 Q.   Is it —

25 A.   I would say somewhere between fifteen maybe,

19

1  fifteen, eighteen.

2  Q.   Okay.  So four people off of it is a sizeable

3  number, considering it was only about fifteen to

4  eighteen people?

5  A.   Yes.

6  Q.   Were you replaced?

7  A.   Eventually, yes.

8  Q.   Okay.  What about all the other people who were

9  working the thirty series, did they stay, did they

10 go?

11        MS. MILLS:  Objection to relevance.  You

12 can answer.

13 BY MR. GIROUX:

14 A.   Some people — actually everyone who used to work

15 with us no longer works it, but during that period

16 of time, yes.  Eventually everyone left.

17 Q.   Were you accused of doing anything wrong, you or

18 anybody else in your group?

19 A.   Not at all, no.

20 Q.   Were you in any other positions other than patrol,

21 during your entire career with the Detroit Police

22 Department?

23 A.   No.  That's it, just patrol.

24 Q.   Okay.  Did you ever any other — strike that.

25        Do you have certifications in any

20

```
 1      particular area?
 2 A.   No.  Nothing --
 3 Q.   Have you ever been a field training officer, or a
 4      supervisor for anybody?
 5 A.   No.
 6 Q.   You went to the police academy obviously?
 7 A.   Yes.
 8 Q.   When?
 9 A.   That was in -- I started in '98 December, December
10      of '98.
11 Q.   And finished when?
12 A.   May or June, I can't -- I can't remember.
13 Q.   Okay.  Have you ever been sent for retraining on
14      any issue, or because of any incident?
15 A.   Not because of something I've done directly or
16      indirectly, but just departmental training.
17 Q.   Okay.
18 A.   They trained us.
19 Q.   How often do you go for retraining?
20 A.   The way they're doing it now, we go yearly.  Once a
21      week, you know, once a -- or twice, I think it's
22      twice a week, a year.
23           MS. MILLS:  I'm sorry.  I'm confused by
24      your answer.
25 BY MR. GIROUX:
                                              21
```

```
 1 Q.   Have you ever had to have anger management?
 2 A.   Yes.
 3 Q.   Okay.  How many times?
 4 A.   Just during the period when I was locked up for
 5      domestic violence.
 6 Q.   How long were you locked up?
 7 A.   Just a day.
 8 Q.   Okay.  Was that with the city of Detroit, or was
 9      that with the jail system?
10 A.   The jail system.  It happened in Southfield.
11 Q.   Your anger management class was in Southfield?
12 A.   Yes.
13 Q.   Okay.  You've only been to one?
14 A.   It was during the period of my probation and it
15      was, I want to say it was six, six classes that I
16      had to go to.
17 Q.   Okay.  What was the name of the place?
18 A.   Actually, no, I'm wrong.  It was my probation
19      office was in Southfield.  They sent me to Royal
20      Oak.
21 Q.   Okay.
22 A.   I believe on like Twelve Mile.  I can't remember
23      the name of the place.
24 Q.   Twelve Mile and what, Woodward?
25 A.   Might have been.
                                              23
```

```
 1 A.   We go -- I'm sorry.  It's two weeks we go
 2      throughout the year.
 3 Q.   Okay.
 4 A.   It was in two separate times.
 5 Q.   So every year you go for two weeks?
 6 A.   Right.
 7 Q.   Okay.  Any other retraining besides that?
 8 A.   No.
 9 Q.   Have you ever been sent back to a therapist, or
10      psychologist, or psychiatrist for any issue while
11      you've been a police officer?
12           MS. MILLS:  Objection to relevance.  You
13      can answer.
14 BY MR. GIROUX:
15 A.   Just on a shooting incident.
16 Q.   Which shooting incident?
17 A.   The one that we're having the deposition on now.
18 Q.   Okay.  The shooting of Mr. Hill?
19 A.   That's correct.
20 Q.   All right.  Other than that, have you been -- ever
21      been to -- back to see a therapist, or a
22      psychiatrist, or a psychologist for any other
23      occurrence or any other issue, since you've been a
24      police officer?
25 A.   No.
                                              22
```

```
 1 Q.   Well, Woodward is a pretty big road.  It can't be
 2      confused with any other road out there.
 3 A.   Like I say, it -- I can't recall.  I can't recall
 4      in its entirety.
 5 Q.   Okay.  Other than that, have you ever had any other
 6      anger management?
 7 A.   No.
 8 Q.   Were you angry about something?
 9           MS. MILLS:  Objection to relevance.  You
10      can answer.
11 BY MR. GIROUX:
12 A.   No.
13 Q.   Okay.  In other words, did you feel like it was
14      just something you had to go through as part of
15      your probation, because probably everybody in
16      domestic violence situations has to go through?
17 A.   Yes.  That's how I felt.
18 Q.   Okay.  So I assume it didn't help you in your mind,
19      because there was nothing to help you with?
20           MS. MILLS:  Objection to relevance.
21 BY MR. GIROUX:
22 A.   If you're kind of asking me if I wanted to go
23      through the program, no.  But you know, I mean,
24      having talked with people there, you know, I found
25      it beneficial.
                                              24
```

1 Q.  Okay. You know, I've been forgetting while I'm
2     asking these questions, that your partner is here.
3     If I ask you something that's too private and you
4     don't want to say anything in front of him, and
5     I'll extend to him the same courtesy, just let me
6     know. I'll talk to your attorney about some way,
7     how to — how to deal with that, okay?
8 A.  Okay.
9 Q.  I apologize for not saying that sooner. To your
10    knowledge, is there anything else in your employee
11    file relative to disciplines, reprimands, problems,
12    issues, insubordination, anything at all that you
13    can think of?
14 A.  No, not at all.
15 Q.  We have covered everything?
16 A.  That's correct.
17 Q.  Okay. How many times have you yourself shot
18    another person?
19 A.  Just once.
20 Q.  Okay. That would be Mr. Hill?
21 A.  That's correct.
22 Q.  Okay. How many times have you been with a partner
23    who has shot another person, besides Mr. Hill?
24 A.  You mean like if they — are you asking me if they
25    ever had an incident of a shooting or —
                                               25

1     someone who is drunk?
2 A.  Meaning as in their behavior?
3 Q.  Yes.
4 A.  Yes.
5 Q.  What about high?
6 A.  Yes.
7 Q.  Okay. Prior to the date of the shooting, did you
8     have any knowledge as to who Mr. Hill was?
9 A.  No.
10 Q.  Had you ever met him before, to your knowledge?
11 A.  Never.
12 Q.  Did you share any common acquaintances to your
13    knowledge?
14 A.  That I know of, no.
15 Q.  Okay. You had not been familiar with his face or
16    his name?
17 A.  That's correct.
18 Q.  Were you dispatched to the area of the shooting?
19 A.  Yeah.
20 Q.  By the — by police dispatch?
21 A.  Yes.
22 Q.  Were you the only car dispatched, to your
23    knowledge?
24 A.  Yes.
25 Q.  Okay. Was there backup coming to your knowledge,
                                               27

1 Q.  No. While you were there.
2 A.  While I was there? No, never. None.
3 Q.  Have you discharged your weapon at somebody, at any
4     time in your career, and not hit them?
5 A.  No.
6 Q.  Do you drink alcohol?
7          MS. MILLS: Objection to relevance.. You
8     can answer the question.
9 BY MR. GIROUX:
10 A.  Only occasionally.
11 Q.  Okay. Have you ever been drunk?
12         MS. MILLS: This is irrelevant and
13    bordering on harassing, but I will allow you to
14    answer that question.
15 BY MR. GIROUX:
16 A.  Yes, I have.
17 Q.  Have you seen drunk people hundreds, maybe
18    thousands of times?
19 A.  Yes.
20 Q.  Do you believe that as a police officer, you're
21    trained to notice those types of things?
22         MS. MILLS: To notice when someone is
23    drunk?
24 BY MR. GIROUX:
25 Q.  To notice those things that are exhibited by
                                               26

1     before you arrived?
2 A.  To my knowledge, no.
3 Q.  Okay. You would know that by listening on the
4     radio, and you hear another unit saying, I'm
5     responding to, or words to that effect?
6 A.  That's correct.
7 Q.  Okay. To your knowledge, that did not occur on
8     this occasion, prior to your arrival at the scene?
9 A.  That's correct.
10 Q.  All right. And what was the communication that was
11    made to you for the dispatch?
12 A.  We were notified by dispatch at Buena Vista and
13    Steel, that there was a male on a bicycle. He was
14    armed with a weapon, and he had a backpack that had
15    weapons in it also.
16 Q.  Okay. And to your knowledge, where did that
17    information come from?
18 A.  You asked me the 911 call?
19 Q.  Yes.
20 A.  I have no idea.
21 Q.  Okay. Were you driving or riding? I don't know
22    what they call it.
23 A.  I was the passenger.
24 Q.  Okay. Were you doing the radio communications?
25 A.  Yes.
                                               28

1 Q.   Okay.  You obviously let dispatch know that you
2       were en route?
3 A.   That's correct.
4 Q.   All right.  Did you do anything else, other than
5       sit as a passenger and drive to the scene?
6 A.   Yeah.  I was the passenger, yeah.
7 Q.   Right.
8 A.   Yeah.
9 Q.   I mean, did you — did you make any other radio
10      communications?  Did you get ready in any way,
11      shape, or form?  Did you look anything up, in terms
12      of history, or maps, or anything?
13 A.  No.
14 Q.  Okay.  So you just sat as a passenger, while your
15      partner drove to the scene?
16 A.  That's correct.
17 Q.  Okay.  Were you running lights and sirens?
18 A.  No.
19 Q.  Okay.  Were you running stealth?
20 A.  Stealth as in?
21 Q.  I don't know.  Police officers have used that term
22      before.  I really don't know.
23 A.  No.
24 Q.  Okay.  Do you know what stealth means, enough to
25      answer the question?
                                                    29

1 A.  As I take it in as meaning, riding stealth is
2      approaching kind of quietly, approaching with no
3      lights on, in that manner.
4 Q.  Okay.  When you — strike that.
5          Before you arrived, did you talk to your
6      partner at all?
7 A.  Always.
8 Q.  Do you remember anything that was said between the
9      two of you?
10 A.  Nothing I can recall, no.
11 Q.  Okay.  Is there anything that is protocol?
12 A.  For us talking?
13 Q.  Yes.
14 A.  No.
15 Q.  Okay.  Before I leave what's going on in your car,
16      I just want to make sure I cover all my bases, and
17      all the possible areas of information.  Is there
18      anything else that is said or done by you that you
19      can recall, either between you and your partner,
20      you and dispatch, you and anybody before you get to
21      the scene?
22 A.  No.
23 Q.  Okay.  You arrive at the scene, and before the car
24      comes to a stop, I assume you see a person doing
25      something?
                                                    30

1 A.  Yes.  That is correct.
2 Q.  Who do you see?
3 A.  I see Mr. Hill on a bicycle, as described in the
4      run, and as we approached seeing a weapon with a
5      holster on his right side.
6 Q.  Okay.  All right.  Is he standing, walking, riding,
7      what?
8 A.  He's seated on the bike, facing two other people.
9 Q.  All right.  Is he moving or stationary?
10 A.  At the time, he's stationary.
11 Q.  Okay.  Is he kind of — you know how you sit on a
12      bike seat, but you lean on one leg that's holding
13      you up?
14 A.  I believe he was, yes.
15 Q.  Okay.  Was he leaning to the right or leaning to
16      the left?
17 A.  I can't recall.
18 Q.  Okay.  Is his side to you, or is his face to you,
19      or his back to you?
20 A.  His side.
21 Q.  Okay.  Right side or left side?
22 A.  His right side.
23 Q.  All right.  Where did you see the weapon?
24 A.  On his right side.  It was in a holster.
25 Q.  Okay.  It was in the holster?
                                                    31

1 A.  Yes.
2 Q.  Okay.  Did you see any other weapons?
3 A.  On him?
4 Q.  Yes.
5 A.  No.
6 Q.  Did you see a backpack?
7 A.  Yes.
8 Q.  Where?
9 A.  It was on his back at the time.
10 Q.  Okay.  What were the two people doing?
11 A.  They were facing Mr. Hill —
12 Q.  Yes.
13 A.  — while he was on the bike.
14 Q.  Yes.
15 A.  It appeared they were talking.
16 Q.  Okay.  Did it appear calm at the time?
17 A.  My focus wasn't directly on what they were saying,
18      but just how they — how they were standing in
19      position, it appeared they were talking.
20 Q.  Okay.  Calmly?
21 A.  I didn't hear any yelling —
22 Q.  Okay.
23 A.  — or anything like that.
24 Q.  And you didn't see any hand gestures or body
25      language, that indicated that they were in some
                                                    32

1    sort of a fight; is that true?
2 A. Not — not at that time.
3 Q. Okay. So it appeared to be a calm situation when
4    you approached?
5 A. Very.
6 Q. Okay. So you're approaching him from the side.
7    He's on his bike. He's kind of standing up while
8    seated on his bike, using one leg to keep him up,
9    right?
10 A. I can't recall if he was doing that per se. I know
11    he was seated on the bike. I don't know if he had
12    the kickstand down or if he was on one leg, that I
13    can't recall.
14 Q. Okay. Is he on a parking spot? Is he on pavement?
15    Is he on a sidewalk? Is he on grass? Is he on
16    dirt?
17 A. He's in the street, all three of them kind of in
18    the middle of the street.
19 Q. Okay. What street?
20 A. It was on Buena Vista, right off of Steel.
21 Q. Okay. Is it near the intersection, but still on
22    Buena Vista?
23 A. Yeah. Still on Buena Vista, just off Steel, in
24    between Appoline and Steel.
25 Q. Okay. What does your car do, relative to him?
                                                        33

1 A. What do you mean by that? I mean —
2 Q. Did you approach him? Did you stop at some point?
3    Did you hit him? Did you go near him? Did you
4    take up a location behind, so you could monitor and
5    observe? What did you do? I know you're not
6    driving the car, but you're there watching what the
7    car is doing. So I'm just going to ask you, what
8    did you see the car do, relative to this person on
9    the bike?
10 A. Well, what I did is I exited the vehicle.
11 Q. Okay. So —
12 A. That's what I did.
13 Q. So the car came to a stop, so you could exit?
14 A. No.
15 Q. Did you jump out while the car was rolling?
16 A. Yes.
17 Q. How fast was the car going when you jumped out?
18 A. No more than five miles an hour.
19 Q. It was five miles an hour?
20 A. Approximately, yeah.
21 Q. Okay. So five miles an hour, you jump out of the
22    car, passenger seat, front seat, right?
23 A. Yes.
24 Q. Okay. How far away from the man on the bike were
25    you when you jumped out of the car?
                                                        34

1 A. Maybe five to six feet.
2 Q. Okay. How do you land when you jump out?
3 A. It was like a hop, you know, so I'm hopping out on
4    my feet.
5 Q. Okay.
6 A. I'm not really —
7 Q. So you stay on your feet as you jump out?
8 A. Yes.
9 Q. Okay. Is your gun drawn or not yet?
10 A. It's drawn.
11 Q. Okay. You drew it in the car?
12 A. Yes.
13 Q. And jumped out and landed on two feet, in kind of
14    like a hop?
15 A. That's correct.
16 Q. Okay. And then as soon as you get your balance and
17    you're standing there, do you see the police car
18    continue to move?
19 A. Yes.
20 Q. What's it doing? What does it do?
21 A. The police car?
22 Q. Yes.
23 A. It continued to move, and it stopped right near the
24    curb near his bike, where he dropped his bike.
25 Q. Okay. Does it make contact with the bike?
                                                        35

1 A. I wasn't paying attention to see if it did, but
2    that was —
3            MS. MILLS: Don't speculate if you don't
4    know.
5 BY MR. GIROUX:
6 A. Yeah, I can't. I don't remember.
7 Q. Okay. It looked like it was close enough that it
8    could have hit the bike?
9            MS. MILLS: Objection, calls for
10    speculation. Lack of foundation.
11 BY MR. GIROUX:
12 Q. But you don't know; is that a correct statement?
13 A. Yeah. It appeared it was — it was near, or like
14    — it looked like it was over the top of the bike.
15 Q. Okay. Let's make sure this is clear. You're
16    saying you saw the car, the front of the car, come
17    close to the bike. You don't know how close. Can
18    we agree to that statement?
19 A. That's correct.
20 Q. Okay. It could have struck the bike, you just
21    weren't in a position to see it; is that correct?
22 A. That is correct.
23 Q. Okay. Afterwards you saw that the bike was
24    underneath the front of the car?
25 A. Yes.
                                                        36

1 Q.  Agreed?

2 A.  Yes.

3 Q.  Okay.  The person on the bike when the police car

4     came that close to it, was he still on it?  Did he

5     jump off, did he fall off, or did you not see any

6     of that?

7 A.  He had jumped off the bike.

8 Q.  He jumped off the bike?

9 A.  That's correct.

10 Q.  Prior to any contact, if there was contact, between

11    the police car bumper and the bike?

12 A.  Yes.

13 Q.  Okay.  Was it a close, like miss?  Was it -- was it

14    -- I mean, did he jump off when you were five or

15    six feet away, while you were jumping out of the

16    car, or did he jump off at -- like at the last

17    second?

18 A.  No.  He jumped off well before the car came near

19    the bike.

20 Q.  Was it while you were jumping out of the car?

21 A.  No.  Because he didn't move at first, until I got

22    out (sic) the vehicle, and then that's when he

23    turned his bike and moved towards the curb.  And

24    that's when he jumped off his bike and then pulled

25    his weapon.

                                          37

1 Q.  He didn't move until he jumped off the bike, right?

2 A.  What are you asking me?

3 Q.  His first movement, was it jumping off the bike?

4 A.  No.

5 Q.  What was his first movement, as you're approaching

6     him?

7 A.  As I exit the scout car, he turned away from me and

8     went north, straight towards the curb, and as he

9     went and got --

10 Q.  Still on his bike?

11 A.  Still on his bike.  And as he got to the curb,

12    that's when he jumped off his bike.

13 Q.  Okay.  So now you're facing the back of him?

14 A.  As he rode north, yes.

15 Q.  Okay.  So his back tire is now the closest thing to

16    the police car?

17 A.  I'm not positioned in the police car at that time.

18 Q.  What do you mean?

19 A.  You asked me if his back tire was close to the

20    police car.

21 Q.  Yeah.  If you're like -- you're looking at me, and

22    pretend I'm on a bike, and right now if I'm on my

23    bike, the closest thing to you is my front tire,

24    right?

25         MS. MILLS:  Let me object.  The officer

                                          38

1     testified that he wasn't in the police car when

2     this is going on, so I think the question is

3     confusing.

4 BY MR. GIROUX:

5 Q.  Do you understand me?

6 A.  Not in its entirety, no.

7 Q.  Okay.  Pretend I'm on a bike.  I'll even use my

8     hands like this, just to give you a visual.

9 A.  Okay.

10 Q.  Can we agree that I'm facing you?

11 A.  Yes.

12 Q.  Can we agree that the closest thing to you is my

13    front tire?

14 A.  That's correct.

15 Q.  On my imaginary bike?

16 A.  Yeah.

17 Q.  Okay.  Now, if I turn around and start to ride away

18    from you, the closest thing to you is my back tire?

19 A.  That's correct.

20 Q.  Okay.

21        (A brief discussion took place off the

22    record at 10:49 a.m.)

23 BY MR. GIROUX:

24 Q.  So while the car is still moving towards this

25    person, and as he turns and starts to pedal away as

                                          39

1     you described, is the closest thing to the police

2     car the back tire of the bicycle?

3         MS. MILLS:  Let me object.  Lack of

4     foundation.  I don't believe he's testified that

5     the car was moving toward the person.  You can

6     answer the question, if you understood it.

7 BY MR. GIROUX:

8 A.  You're asking me what position was the bike in

9     toward the vehicle?

10 Q.  No.  I think you said that he turned and started to

11    pedal away.

12 A.  Away from myself --

13 Q.  Right.

14 A.  -- not -- not the vehicle.

15 Q.  I understand.

16 A.  So are you asking me what position from myself or

17    from the vehicle, because I was not in the vehicle

18    at that time.

19 Q.  But you said you were five to six feet from him

20    when you jumped out?

21 A.  When I exit the vehicle, but he --

22 Q.  The vehicle is still moving as you're jumping?

23 A.  That's correct.

24 Q.  Okay.

25 A.  Right.  I'm just trying to get to understand it,

                                          40

1    because you -- it's like you're asking me what
2    position he was in from me or from the vehicle?
3 Q.   Well, I understand he was driving or he was
4    pedaling away from both you and the vehicle,
5    because you're still side-by-side, you and the
6    vehicle, aren't you?
7      MS. MILLS:  And my objection is lack of
8    foundation.  He did not testify to that fact.
9 BY MR. GIROUX:
10 Q.   You can answer.
11 A.   He turned away from myself.
12 Q.   Okay.  And you're side-by-side with the vehicle?
13 A.   I wouldn't say really side-by-side, because when I
14    jumped out, I moved away from the car.
15 Q.   How far away?
16 A.   I would say a couple feet, maybe four feet, four or
17    five feet.
18 Q.   Okay.  So you jump out of the car while it's
19    moving, at approximately five miles an hour.  You
20    land on your feet, and you continue to move
21    approximately to a point where you're four to five
22    feet to the side of the vehicle while the vehicle
23    is still moving.  Did I say that correctly?
24 A.   That was correct.
25 Q.   Okay.  Now you're facing the person on the bike,

41

1    jumped off his bike, pulled his weapon and brought
2    his weapon up, toward myself and my partner.
3 Q.   Okay.  So are you saying that the bike is on the
4    ground before the police car gets there?
5 A.   Before the police car gets where?
6 Q.   Overtop of it.
7 A.   Yes.
8 Q.   How many seconds after he jumped off the bike did
9    the police car end up on top of it, or overtop of
10    it?
11 A.   By intention -- or my attention was not toward the
12    vehicle at the time.  My attention was toward Mr.
13    Hill and him pointing the weapon at me.  So I don't
14    know how long it took the scout car to get to his
15    bike, as his bike was on the ground.  I really
16    don't know.
17 Q.   Okay.  How fast did he pedal away?
18 A.   Away from me?
19 Q.   Yes.
20 A.   He pedaled, he pedaled pretty hard, then he jumped
21    off the bike.
22 Q.   Why did you jump out of the car?
23 A.   Why did I jump out of the car?  Because he had a
24    weapon.
25 Q.   In a holster?

43

1    right?
2 A.   Well, he's -- I'm looking at him.
3 Q.   Right.
4 A.   But he was still --
5 Q.   I'm just talking about your -- your positioning,
6    you're facing him?
7 A.   As I'm -- as I'm looking at him?
8 Q.   Yes.
9 A.   I see his right side, yes.
10 Q.   Yeah.  Your -- but your face, and chest, and body
11    is facing a person on a bike?
12 A.   That's correct.
13 Q.   You're still seeing his right side, which is what
14    you saw in the car?
15 A.   Yes.
16 Q.   Okay.  You're now to the -- you're to the side four
17    to five feet of the police vehicle.  You see the
18    man turn away from you and start to pedal away?
19 A.   That's correct.
20 Q.   Okay.  If he's pedaling away from you, the closest
21    thing to you, relative to him and his bike, would
22    be his back tire?
23 A.   To me, yes.
24 Q.   Okay.  And what happens next?
25 A.   As he rode away from me, as he got to the curb, he

42

1 A.   Yes.
2 Q.   And he was talking calmly with two people?
3 A.   Correct.
4 Q.   Why did you jump out of the car?
5      MS. MILLS:  Objection, asked and answered.
6    Do you want to rely on your previous answer?
7      THE WITNESS:  Yes.
8 BY MR. GIROUX:
9 Q.   You have no other explanation for jumping out of
10    the car, other than you saw a gun in a holster on
11    his body?
12 A.   Well, he had a gun in his holster, and I exited the
13    vehicle to detain him.
14 Q.   To detain him?
15 A.   That's correct.
16 Q.   Why didn't you wait for your car to stop?
17 A.   Because he had a weapon.
18 Q.   Okay.  Is that your only explanation for jumping
19    out of a car moving five miles an hour?
20 A.   Is that he had a weapon?
21 Q.   Yes.
22 A.   Yes.
23 Q.   Okay.  That he had a weapon in a holster on his
24    side?
25 A.   That's correct.

44

1 Q.   Okay.  Did you tell your partner you were jumping
2      out of the car?
3 A.   No.
4 Q.   How long before you jumped out of the car did you
5      unholster your weapon?
6 A.   My weapon was unholstered while I was in the
7      vehicle.
8 Q.   So before you even made the scene?
9 A.   Yes.
10 Q.  Okay.  So you were holding it kind of in your lap,
11      waiting to arrive at the scene?
12 A.  No.  I had it in my right hand
13 Q.  Right.  I mean, your right hand I assume was
14      resting on your thigh, or you're not just holding
15      it up like this?
16 A.  No.
17 Q.  Okay.  So you're resting it on your thigh, or your
18      leg, or something?
19 A.  Possibly, yes.
20 Q.  Okay.  Can you think of any other position you had
21      it in?
22 A.  No.
23 Q.  Okay.
24 A.  Not offhand.
25 Q.  Did you have it out for a couple minutes or a
                                                    45

1      minute?
2 A.   Right when we were pulling up to the location.
3 Q.   So a matter of thirty seconds or so?
4 A.   Approximately.
5 Q.   Okay.  Had you seen the man yet, before you
6      unholstered it?
7 A.   We seen the reflectors of his bike.
8 Q.   Okay.  You didn't see anything else though?
9 A.   No.
10 Q.  Was the area well lit?
11 A.  Yes.
12 Q.  Was there anybody else around, besides the person
13      on the bike and the two people he was talking
14      calmly to?
15 A.  I didn't see anyone else.
16 Q.  Okay.  Did you see any other bicycles around?
17 A.  No.
18 Q.  Okay.  You said you believed that this person
19      matched the description that you got from dispatch,
20      right?
21 A.  I didn't say that.
22 Q.  Oh, okay.  You weren't sure?
23 A.  If he was matching the description?
24 Q.  Yes.
25 A.  He was on a bicycle.
                                                    46

1 Q.   Right.
2 A.   And that's what was given to us by dispatch, that
3      he was armed with a gun, and the person was on a
4      bike.
5 Q.   Okay.  So did you believe that this was the person
6      that dispatch had called about?
7 A.   When we seen the bike, yes.
8 Q.   Okay.  Were you positive, or you just thought it's
9      a possibility this might be the guy?
10 A.  It's always a possibility.
11 Q.  Okay.  So likely it's him, not for sure it's him,
12      agreed?
13 A.  Right, I agree.
14 Q.  Okay.  I mean, obviously you've come upon other
15      scenes where multiple people had guns?  You've been
16      a police officer a long time?
17 A.  Yeah.
18 Q.  Right?
19 A.  Yeah.
20 Q.  Okay.  And you've made multiple scenes where
21      multiple people have had guns?
22 A.  That's correct.
23 Q.  Okay.  You've made many scenes where it didn't turn
24      out to be what dispatch said it was in the
25      beginning?
                                                    47

1            MS. MILLS:  Objection to relevance.  You
2      can answer.
3 BY MR. GIROUX:
4 A.   What do you mean by that?
5 Q.   Sometimes they don't get all the information,
6      meaning dispatch, sometimes they don't get the
7      correct information, meaning dispatch?
8 A.   That is correct.
9 Q.   Okay.  Sometimes you think you're rolling up on
10      something, and it turns out to be something
11      different?
12 A.  Yes.  That's correct.
13 Q.  Okay.  And, again, much of what they're giving to
14      you is something that they've gotten from another
15      party altogether?
16 A.  That's correct.
17 Q.  Okay.  And every time you pull up to any scene, you
18      know it might be different than what is dispatched?
19 A.  It's a possibility, yes.
20 Q.  Okay.  As an officer, you have to be aware of that
21      fact, and you have to take it into consideration?
22 A.  That's correct.
23 Q.  All right.  The person on the bike, did you ever
24      see him handle the weapon before he jumped off the
25      bike?
                                                    48

1 A.    As he jumped off the bike, that's when he pulled
2       his weapon.
3 Q.    Okay. But before that, did you ever see him handle
4       that weapon?
5 A.    No.
6 Q.    Okay. Did he ever fire any shots?
7 A.    No.
8 Q.    Was the weapon loaded?
9           MS. MILLS: Objection, calls for
10      speculation and lack of foundation.
11 BY MR. GIROUX:
12 A.   I — I don't know if the weapon was loaded or not.
13      I didn't touch it.
14 Q.   Did you check it?
15 A.   No. We're not allowed to.
16 Q.   Okay. Did you check his backpack?
17 A.   No.
18 Q.   Were there any other weapons found at the scene?
19          MS. MILLS: Objection, calls for
20      speculation. You mean by him?
21          MR. GIROUX: By anybody.
22          MS. MILLS: Okay. Then again, it calls
23      for speculation.
24 BY MR. GIROUX:
25 A.   I don't know if there were any other weapons found
49

1       by investigations at the scene, but I didn't find
2       any other weapons.
3 Q.    Didn't you go through a review board for the
4       shooting?
5 A.    Yes.
6 Q.    Okay. Weren't you given information regarding what
7       was found at the scene?
8 A.    Yes.
9 Q.    Okay. Did anybody give you any information that
10      there were any other weapons found?
11 A.   I believe they found magazines, but I don't think
12      they found any other weapons.
13 Q.   What kind of magazines?
14          MS. MILLS: Calls for speculation. Lack
15      of foundation.
16 BY MR. GIROUX:
17 Q.   If you know.
18 A.   I don't know. I don't know.
19 Q.   Okay. So to your knowledge, there were no other
20      weapons in — in the vicinity?
21          MS. MILLS: Objection, calls for
22      speculation.
23 BY MR. GIROUX:
24 Q.   Again —
25 A.   To my knowledge?
50

1 Q.    Yes, sir.
2 A.    To my knowledge, no.
3 Q.    I think I asked this, but how long after he jumped
4       off the bike did the car end up on top of it?
5 A.    I answered that question before, and I don't know.
6 Q.    Okay. Can you say if it was just a matter of a
7       second or two?
8           MS. MILLS: Objection, calls for
9       speculation.
10 BY MR. GIROUX:
11 A.   I'm not sure. Like I said, my focus was not on,
12      you know, the vehicle moving or the position of his
13      bike during that time.
14 Q.   Okay. Did you fire any shots before the car
15      stopped moving?
16 A.   Before the start — car stopped moving?
17 Q.   Yes, sir.
18 A.   Like I said, I was away from the vehicle. I was
19      out of the vehicle. I don't know when the vehicle
20      stopped. Yeah, I did fire shots. Approximately in
21      relation to when the vehicle stopped that I fired
22      my shots, I'm not sure.
23 Q.   Okay. Do you believe you fired your shots as the
24      car was stopping?
25          MS. MILLS: Objection, calls for
51

1       speculation.
2 BY MR. GIROUX:
3 A.    It's a possibility.
4 Q.    I just want to know what your recollection is. I
5       mean, the car is not completely out of your scene.
6       It's right there in your peripheral, off to your
7       left, and you're only four to five feet to the side
8       of it. And if you're stopped while you're holding
9       your gun, the car is still moving to some degree,
10      it's getting even closer and closer to your direct
11      vision —
12          MS. MILLS: Are you asking him to agree
13      with that? Because if you are, he's already
14      testified he wasn't looking at the car.
15          MR. GIROUX: If you don't stop, we're just
16      going to go to court. I'm going to ask the judge
17      to stop it.
18          MS. MILLS: You can call the court.
19          MR. GIROUX: You understand the rules.
20          MS. MILLS: Call the judge right now.
21      Because you've asked this question previously, and
22      he told you he wasn't looking at the car, so let's
23      call the judge and get some assistance. Do you
24      think it will help?
25          MR. GIROUX: Sure.
52

1 MS. MILLS: Okay. We have Judge Cohn.
2 I'll get a bar journal. Excuse me for a second.
3 Okay. Judge Cohn.
4 MR. GIROUX: Just wait. I'd like to
5 develop a better record before I call the judge, so
6 I can give him three or four of your speaking
7 objections. So we'll just continue and see how
8 long I can take it.
9 MS. MILLS: Would you read back the last
10 question please?
11 THE REPORTER: Sure.
12 MR. GIROUX: I'll withdraw it, and re-ask
13 it.
14 MS. MILLS: Let's see, hear what it is, so
15 I know whether it's been asked before.
16 MR. GIROUX: I withdraw it. I'll re-ask
17 it. You ready?
18 THE REPORTER: Mm-hmm.
19 BY MR. GIROUX:
20 Q. Is it your testimony that you don't see the car at
21 all, either in your peripheral or in your direct
22 vision, after you jump out of the car?
23 A. No.
24 Q. Okay. You can see the car in your peripheral to
25 some degree, agreed?

53

1 A. I can see it somewhat, yes.
2 Q. Okay. I mean, it's always in your peripheral
3 vision, right?
4 A. Always, no.
5 Q. It's not?
6 A. No.
7 Q. Okay. When is it out of your peripheral vision?
8 A. As I start to move.
9 Q. Start to move where?
10 A. Started to move east, the same direction that the
11 suspect was moving, Mr. Hill.
12 Q. Okay. Does the car then come into your peripheral
13 while you're shooting?
14 A. I was not shooting at that time.
15 Q. Okay. So it comes into your peripheral before you
16 start to shoot?
17 A. The car was in my peripheral vision as I exit the
18 vehicle.
19 Q. Right.
20 A. And when I fire my shots, I could see the car.
21 Q. You could?
22 A. A little bit.
23 Q. Yeah.
24 A. Right.
25 Q. Okay. It's off — it's in front and to your side,

54

1 right?
2 A. It was — yes.
3 Q. It's in front of you and to your left side; is that
4 correct?
5 A. That's correct.
6 Q. Now, when you're shooting, could you describe how
7 you're standing? Are you standing still or moving?
8 A. I'm standing still.
9 Q. Okay. And are you using two hands to hold the
10 weapon?
11 A. That's correct.
12 Q. Okay. Are you holding it up at eye level?
13 A. Correct.
14 Q. Okay. And you discharge your weapon in that
15 fashion?
16 A. That's correct.
17 Q. And your gun is not quite arm's length away from
18 your face, correct?
19 A. That's correct.
20 Q. All right. Is there a name for that position?
21 A. If there is, I can't recall what it is.
22 Q. Okay. Were you using the sight on the gun?
23 A. No.
24 Q. Okay. What type of gun?
25 A. A Glock.

55

1 Q. Can you describe it any more accurately than that?
2 A. It's a Glock 22, .40 caliber.
3 Q. All right. And what type of ammunition did you
4 have in it?
5 A. A .40 caliber —
6 Q. Okay.
7 A. — Winchester.
8 Q. You're on the street while you're shooting?
9 A. Yes. I'm in the street.
10 Q. Buena Vista?
11 A. Yes.
12 Q. Okay. So the car enters your peripheral before you
13 start to fire the first shot, agreed?
14 A. I could see — like I said, I could see the vehicle
15 still as I exit the car.
16 Q. That was the first time?
17 A. Right.
18 Q. I understand, but that's —
19 A. As he — as he rode away and pulled his weapon, I
20 could still see the vehicle —
21 Q. Yes.
22 A. — at that time. And I think the question you were
23 asking me is when, what time frame did I see the
24 vehicle either hit the bike or come onto the bike.
25 I never seen that, because as Mr. Hill started

56

1    moving back east, I started moving east, and the
2    vehicle, and the bike and everything was not my
3    focus, and it was no longer in my view.
4 Q.  I understand. But you said that as you were
5    standing there getting ready to shoot, you saw the
6    car in your peripheral?
7 A.  That's correct.
8 Q.  Okay.
9 Q.  So my question is, did the car come to a stop
10    before you fired that first shot?
11 A.  I never seen the vehicle come to a stop, no.
12 Q.  Okay. When was the first time you noticed the car
13    was stopped?
14 A.  Probably when everything was said and done —
15 Q.  Okay.
16 A.  — and the incident was over.
17 Q.  How far away from you was the vehicle when you
18    started shooting?
19 A.  How far is the vehicle away from me?
20 Q.  Yes.
21 A.  I don't know. I'm saying no more than about ten
22    feet maybe.
23 Q.  Okay. And it's forward and to your left?
24 A.  Yeah. That's correct.
25 Q.  Okay. How far away is Mr. Hill when you fire the
                                                        57

1    first shot?
2 A.  About twelve feet.
3 Q.  Okay. Why did you shoot him?
4 A.  Because he had a weapon and he was about to shoot
5    us.
6 Q.  Okay. Was he —
7 A.  Myself and my partner.
8 Q.  Was he pointing at you and your partner?
9 A.  That's correct.
10 Q.  Okay. Did your partner jump out of the car too?
11 A.  Yes.
12 Q.  He jumped out of the driver's seat?
13 A.  Yes.
14 Q.  While it was rolling?
15 A.  I assume, yes.
16 Q.  Is that what you saw?
17 A.  Yes. He exited the vehicle, yes.
18 Q.  Okay. While it was moving?
19 A.  Yes.
20 Q.  Both of you jump out of a moving police vehicle
21    before shots are fired?
22 A.  Yes.
23 Q.  Okay. And the car, when you jumped out of it, was
24    headed in the direction of Mr. Hill on his bike?
25 A.  I observed the car come into view, yes, and the car
                                                        58

1    was going towards the bike where he had dropped it.
2 Q.  Okay. But before that you were approaching
3    directly at him?
4 A.  As we turned the corner?
5 Q.  Yes.
6 A.  As we're approaching him and two other persons,
7    yes.
8 Q.  Okay. Do you — was he jumping out at about the
9    same time you were jumping out?
10 A.  Who?
11 Q.  Your partner.
12 A.  No. No.
13 Q.  After you jumped out?
14 A.  If you're asking me like a time proximity when he
15    jumped out?
16 Q.  Yeah, in relation to you.
17 A.  I don't know. I know it was after me, and it
18    was —
19 Q.  Okay.
20 A.  — during the time Mr. Hill pulled his weapon, and
21    was pointing it at us.
22 Q.  Okay. So within a second or so of you jumping out?
23 A.  Approximately, yes. yeah.
24 Q.  Okay. What did the other two people do?
25 A.  I observed both of them start running east also,
                                                        59

1    down Buena Vista.
2 Q.  Same direction as the guy on the bike?
3 A.  Yes.
4 Q.  How close, were they still approximately the same
5    distance apart?
6 A.  No. Because Mr. Hill moved away from them, and
7    they were a few feet to my right, and then they
8    started moving east towards Appoline.
9 Q.  Okay. But I thought you said the guy on the bike
10    was moving east too?
11 A.  That's correct.
12 Q.  Okay. So they were all moving east?
13 A.  Yes.
14 Q.  All right. How close did they stay together?
15 A.  They — they weren't together at that point.
16 Q.  Okay.
17 A.  Mr. Hill, while he was on his bike, moved away from
18    them and away from myself, towards the curb.
19 Q.  Okay. When you first roll up upon them, they were
20    a conversation distance apart, right?
21 A.  That's correct.
22 Q.  Okay. Like you and I are now?
23 A.  Yes.
24 Q.  Okay. So about six feet away, five feet?
25 A.  It may — it may have been — been even closer.
                                                        60

1 Q. Okay.
2 A. Yeah.
3 Q. So one to five feet; does that seem accurate?
4 A. My focus wasn't on how close they were, but they
5   were pretty close, which did appear, you know, they
6   knew each other. They were all looking at each
7   other, and it appeared they were talking with —
8 Q. Okay. How far apart did they get in terms of
9   side-by-side?
10 A. You're asking me as he rode away, or while they all
11   stood there talking?
12 Q. As he rode away.
13 A. I mean, he was a distance of about ten to twelve
14   feet away from me.
15 Q. Right.
16 A. And they were still, you know, a little bit on the
17   side of me, so I would say approximately fifteen
18   feet.
19 Q. Okay.
20 A. They were still — because I was in the middle of
21   the street, so approximately fifteen feet.
22 Q. They were fifteen feet apart from the guy on the
23   bike?
24 A. From Mr. Hill.
25 Q. Yes.

61

1 A. Yeah.
2 Q. Okay. Did they have weapons?
3 A. Not —
4         MS. MILLS: Objection, calls for
5   speculation. You can answer.
6 BY MR. GIROUX:
7 A. Not to my knowledge, no.
8 Q. Okay. You didn't see them have any weapons?
9 A. That's correct.
10 Q. Okay. Did you and your partner say anything to
11   each other before either one of you jumped out of
12   the car?
13 A. I believe I stated he's got a gun.
14 Q. Okay. And then you jumped out, right?
15 A. As I was getting out, I stated that.
16 Q. Okay. Did he say anything to you?
17 A. Mr. Hill or my partner?
18 Q. No, your partner.
19 A. No. Not that I can recall, no.
20 Q. Okay. Have you talked to him about this shooting
21   since the shooting occurred?
22 A. In what manner?
23 Q. Like what did you do? This is what I thought.
24   What did you think?
25 A. No.

62

1 Q. Did you ever say, why did you jump out of a moving
2   car?
3 A. No.
4 Q. Did he ever ask you, why did you jump out of a
5   moving car?
6 A. It's something we routinely do, just being police
7   officers.
8 Q. I'm just asking you, did he ever say to you, why
9   did you jump out of the car, man?
10 A. I'm saying no. He didn't ask me that, because it's
11   something we routinely do —
12 Q. Okay. Did he ever ask you —
13 A. — being police officers.
14 Q. — why you did anything you did at the scene?
15 A. No.
16 Q. Did you ever ask him, why you did do anything he
17   did at the scene?
18 A. Not at all.
19 Q. Did you ever ask him if he hit the bike?
20 A. Mm-mm, no.
21 Q. Did you ever ask him if he ran over the bike?
22 A. No.
23 Q. Did you ever ask him what he saw?
24 A. Yes.
25 Q. What did you ask him?

63

1         MS. MILLS: And let me just caution you,
2   before you answer. If you are referring to things
3   said in the presence of your attorneys, I instruct
4   you not to answer, okay. Go ahead.
5 BY MR. GIROUX:
6 Q. I'm just talking about you talking to your partner.
7   I mean, I assume you talk to your partner all the
8   time.
9         MS. MILLS: Where your attorneys are not
10   present. Go ahead and answer the question.
11 BY MR. GIROUX:
12 Q. Did you ever ask your partner what he saw?
13 A. As in relation to what happened?
14 Q. Yeah.
15 A. Yeah.
16 Q. What did he say?
17 A. The same thing.
18 Q. Hang on. What did you say to him?
19 A. Basically that — what do you mean?
20 Q. How did you say to him, what did you see?
21 A. Not directly as in what did you see.
22 Q. Okay.
23 A. But more so, you know, his feelings on the matter.
24   You know, how he felt. You know, I mean, he's my
25   partner. We've been partners for a long time.

64

1 Q.  How long?

2 A.  God, closer to maybe eight, nine years.

3 Q.  Okay.

4 A.  Close to it, so I mean in relation to that, you

5     know, something like that happens, you know, we

6     care about each other, so I do ask him how he felt.

7 Q.  Okay.

8 A.  You know, and made sure he was okay.

9 Q.  What did he say?

10 A.  He said pretty much he was okay.

11 Q.  Okay.  Said he was okay?

12 A.  Yeah.

13 Q.  What did he say about the shooting?

14 A.  That we did what we had to do.

15 Q.  Okay.  That's what he said?

16 A.  I can't recall if he said that.  I'm not quoting

17    him, you know.

18 Q.  Just give me generally what he said.  What message

19    did he communicate to you?  I know you can't —

20 A.  That was — that was it.  That was the message.

21 Q.  The message to you was we did what we had to do?

22 A.  That's correct.

23 Q.  Okay.  And your message to him was basically the

24    same, we did what we had to do?

25 A.  Exactly.

65

1 Q.  The man who had been on the bike and jumped off, he

2     never fired at you, agreed?

3 A.  I agree.

4 Q.  And he never fired at your partner, agreed?

5 A.  I agree.

6 Q.  Okay.  Was he holding the weapon while you were

7     shooting him?

8 A.  Yes.

9 Q.  Okay.  Was he pointing it at you while you were

10    shooting him?

11 A.  At first, yes.

12 Q.  Okay.  Was he facing you while you were shooting

13    him?

14 A.  As I fired my shots, yes.

15 Q.  Okay.  How many shots did you fire?

16 A.  Approximately one to three, approximately.

17 Q.  Okay.  Well, you know now how many you fired,

18    right?

19 A.  Not — not exactly, no.

20 Q.  What were you told?

21 A.  I wasn't.

22 Q.  No one told you how many you fired at him?

23 A.  No.

24 Q.  And you don't know how many you fired at him?

25 A.  Approximately one to three, as I remember, as I

66

1     recall.

2 Q.  Okay.  The best of your recollection is, you fired

3     up to three shots at him?

4 A.  Yes.

5 Q.  Okay.  Were you taught to double tap?

6 A.  Yes.  We —

7 Q.  Were you taught to aim center mass and double tap?

8 A.  Yeah.

9 Q.  Were you taught to aim center mass, double tap,

10    evaluate the threat, if it still exists, double tap

11    again?

12        MS. MILLS:  Objection, compound.  You can

13    answer.

14 BY MR. GIROUX:

15 A.  We were always trained to stop the threat in its

16    entirety, so it doesn't necessarily have to be a

17    double tap.  It doesn't necessarily have to mean

18    you shoot one time, but we're trained to stop the

19    threat.

20 Q.  Well, I thought you said you were taught to double

21    tap.

22 A.  We have done it.  We have trained to double tap in

23    the academy, yes.

24 Q.  Okay.  Has anybody taught you with the department,

25    with the police department with the city of

67

1     Detroit, has anybody taught you not to double tap?

2 A.  No.

3 Q.  Okay.  Your first reaction while you're holding a

4     gun and facing a threat, an armed threat towards

5     you or your partner, is to double tap; is that

6     correct?

7 A.  You're saying like on all instances, all occasions,

8     you're saying that — is that — you're saying —

9     you're asking me that, is that protocol —

10 Q.  Yes.

11 A.  — to double tap?

12 Q.  On those occasions when you decide it's

13    appropriate, according to your training, to shoot,

14    are you — are you supposed to start the shooting

15    with a double tap?

16 A.  No.  There is no written rule about starting the

17    shooting with a double tap.

18 Q.  Okay.  You have not gotten your gun back, have you?

19 A.  No.

20 Q.  And you have not gotten your ammunition back?

21 A.  No.

22 Q.  Was there one in the chamber?

23 A.  Yes.

24 Q.  How many in the clip?

25 A.  Fourteen or fifteen.

68

1 Q.  Okay.  Why do you say fourteen or fifteen?

2 A.  Sometimes a magazine may — may jam with fifteen

3     in, so I leave one out.

4 Q.  Well, then there would be fourteen?

5 A.  Correct.

6 Q.  Okay.  So there were fourteen in the magazine, and

7     one in the chamber?

8 A.  I want to say I can't recall.  I say with the Glock

9     there are certain magazines where if you fill it up

10    to capacity of fifteen, some of them won't take

11    fifteen.  I know I had one that didn't.  So I can't

12    remember if that was the one, my revolver or the

13    one that was in my — in my holster.

14 Q.  Okay.  So you carried a revolver and a Glock?

15 A.  I'm sorry.  Well, in the — in the Glock.  I said

16    revolver but I meant my Glock.  I only carried one

17    weapon, my department-issued weapon.  The revolvers

18    don't even have magazines, the magazine itself.

19 Q.  I was going to ask.

20 A.  Yeah.  The magazine itself, sometimes they don't

21    hold fifteen so —

22 Q.  I understand.

23 A.  I had one that didn't.  So I can't recall if it was

24    the one in my weapon, or I have another duty

25    holster that holds two magazines, or if it was in

69

1     there.  I can't recall.

2 Q.  Well, are you back on patrol?

3 A.  Yes.

4 Q.  Okay.  Don't you know if you're missing the one

5     that doesn't hold fifteen?

6 A.  If I'm missing it?

7 Q.  Yeah, if it's still in custody.

8 A.  We don't even — you just asked me if I had that

9     weapon.  I don't even have that weapon.

10 Q.  Okay.

11        MS. MILLS:  Explain to him what — what

12    you have now.

13 BY MR. GIROUX:

14 A.  We have a different weapon altogether.  We don't

15    even have Glocks anymore.

16 Q.  Okay.  Whatever happened to the other magazines?

17 A.  They were all traded in, and they gave us new, or

18    not new, but replacement weapons the very same day,

19    so...

20 Q.  So while Mr. Hill is facing you, according to you,

21    pointing a gun at you, you fire up to three shots

22    at him, correct?

23 A.  That's correct.

24 Q.  Did you hit him?

25 A.  I'm not for certain.

70

1 Q.  Do you have any idea, as we sit here today, if you

2     hit him with any of your shots?  .

3 A.  I don't know.

4 Q.  Okay.  Did you see your partner fire shots?

5 A.  Yes.

6 Q.  Okay.  How many did he fire?

7 A.  I'm not sure.

8 Q.  Approximately.

9 A.  I don't know, more than five.

10 Q.  More than five?

11 A.  Yes.

12 Q.  Okay.  Did Mr. Hill go down at any time while you

13    guys were firing at him?

14 A.  Not as we were firing.  He went down right after

15    the fact.

16 Q.  Okay.  Did he go back down?  I mean, did he fall

17    backwards?

18 A.  Yeah.  The shooting — the shooting started.  He

19    started moving backwards a little bit.  Then he

20    turned and he started to run east, and then he

21    turned again and fell on his back.

22 Q.  Okay.  So you start shooting at him, and he's

23    facing you for all three shots, if there were three

24    by you, right?

25 A.  Correct.

71

1 Q.  Your partner is also out of the moving vehicle and

2     he's firing within a second or two of you firing,

3     right?

4 A.  Correct.

5 Q.  Your testimony is that Mr. Hill is facing both of

6     you, holding a weapon not firing it.  While you're

7     shooting at him he turns, starts to run, then he

8     turns toward you again, then turns again and falls

9     down?

10 A.  He didn't turn directly towards me.  As he jumped

11    off his bicycle, he first turned towards me with

12    his weapon and —

13 Q.  Yeah.  You said he was facing you, holding it and

14    firing — or not firing.  You said he was facing

15    you holding it?

16 A.  Right.  And then as he turned away from me, then he

17    turned and started to move back east.  And as I

18    recall, as I was moving east he — he turned again,

19    and threw the weapon over his head, and fell

20    backwards on his back, and that was in relation to

21    when the shooting had stopped.

22 Q.  So when the shooting stopped, at the very end of

23    the shooting, he threw the weapon over the top of

24    his head and fell backwards?

25 A.  Correct.

72

**Page 73**

1 Q. That's your testimony?

2 A. Yeah.

3 Q. How many times did he turn away from you?

4 A. I remember him turning away from me completely one

5     time, when he first drew the weapon. As I fired my

6     shots, he turned away from us.

7 Q. Okay. What did he do, did he run?

8 A. Yeah. He started running back east.

9 Q. Okay. So he turned and started running away from

10     you?

11 A. Yes.

12 Q. Did he ever turn back around and face you again?

13 A. I don't know. I was on the other side of the car

14     and I moved east, so I can't recall if he just

15     backpedaled, but he turned away from me at the

16     time. And when I see him at the end of the car,

17     that's when I seen him backwards and throw the

18     weapon over his head.

19 Q. What do you mean at the end of the car?

20 A. The fall backwards. There was another vehicle

21     parked there, and he moved on one side of the

22     vehicle after the shot — after I fired my shots,

23     and I moved on the other side of the vehicle.

24 Q. Okay. So you jump out of this moving vehicle, you

25     face him, he's facing you, you fire up to three

**Page 74**

1     shots, he's facing you, then he turns and runs?

2 A. That's correct.

3 Q. Is that your testimony?

4 A. Correct.

5 Q. Okay. You stop shooting when he turns?

6 A. Yes.

7 Q. Okay. You never shoot again?

8 A. No.

9 Q. Correct?

10 A. Correct. That's correct.

11 Q. Okay. Why did you stop shooting?

12 A. Because he wasn't in my sight.

13 Q. He wasn't in your sight?

14 A. Correct.

15 Q. What was blocking your view of him?

16 A. A vehicle.

17 Q. What vehicle?

18 A. It was another vehicle that he pulled in front of.

19     When he jumped off his bike, there was a vehicle

20     right there. And as he jumped off his bike, and

21     turned towards me, and I fired my shots, he moved

22     away from me onto the side of that vehicle.

23 Q. Can you draw it?

24        MS. MILLS: Draw what?

25        MR. GIROUX: The scene.

**Page 75**

1 BY MR. GIROUX:

2 A. I'm not a —

3 Q. It's not to scale. I can —

4 A. I can't draw.

5 Q. Just do your best. I've just got to understand

6     where this car is, so that I know how it's blocking

7     your view. You can try as many times as you want.

8     We'll destroy any one that you decide to give up

9     on.

10 A. That was approximately how the scene looked as he

11     jumped off the bike. That's Mr. Hill.

12 Q. Mm-hmm.

13 A. This is myself.

14 Q. Okay.

15 A. And that's the vehicle.

16 Q. Okay. Where is the police vehicle?

17 A. The police vehicle is about here.

18 Q. Where is your partner?

19 A. I believe my partner is about here.

20 Q. Okay. Just make a stick figure like you did for

21     you. Okay. All right. Just sign that and date it

22     at the bottom.

23        MS. MILLS: No, right on the paper.

24 BY MR. GIROUX:

25 Q. Right there on the paper.

**Page 76**

1 A. You're going to show my drawing in front of

2     everybody like that, stick people and everything?

3 Q. Mine won't be any better, trust me.

4        MS. MILLS: Today is the 25th.

5        THE WITNESS: All right.

6        MR. GIROUX: Let's mark that as Exhibit 1

7     please.

8        (Deposition Exhibit Number 1 was marked

9        for identification).

10 BY MR. GIROUX:

11 Q. All right. Officer Dew, marked as Exhibit Number 1

12     is a very rough freehand drawing that you've made

13     using only rectangles, and stick figures, and a

14     bike that you drew right there; is that correct?

15 A. Correct.

16 Q. Okay. And what I asked you to do is draw the scene

17     as Mr. Hill was running away from you, such that he

18     was getting behind a vehicle, and that's what you

19     tried to do?

20 A. Yes.

21 Q. Okay.

22 A. Yeah, that's correct.

23 Q. So this drawing represents your approximate — and

24     I know this is all approximate, but your

25     approximate location, Hill's approximate location,

| | |
|---|---|
| 1 | the bike's approximate location, your partner's |
| 2 | approximate location, and the two vehicles' |
| 3 | approximate locations, at the time where you just |
| 4 | finished shooting in his direction and he's running |
| 5 | away from you, agreed? |
| 6 A. | This would be as the shooting took place. |
| 7 Q. | Okay. |
| 8 A. | This is right when I know I fired my shots directly |
| 9 | at him. |
| 10 Q. | Okay. So Exhibit 1 represents the location of all |
| 11 | of those items that I mentioned, at the time that |
| 12 | you're shooting at Mr. Hill? |
| 13 A. | That's correct. |
| 14 Q. | Okay. Now, would you then just use your pen, and |
| 15 | draw from the stick figure that represents Mr. |
| 16 | Hill, just draw what direction he runs, as far as |
| 17 | you can see, because I think you said at some point |
| 18 | he gets out of your vision. |
| 19 A. | He ran back in this direction. |
| 20 Q. | Okay. And that's the dotted line next to the |
| 21 | vehicle, right? |
| 22 A. | Correct. |
| 23 Q. | Okay. Did the bike ever touch that vehicle? |
| 24 A. | I can't recall. |
| 25 Q. | Okay. How close did the police vehicle come to |

77

| | |
|---|---|
| 1 Q. | Very close, right? |
| 2 A. | Yes. |
| 3 Q. | Could you fit a person in between them? |
| 4 A. | I didn't go back and examine it. I'm not sure. |
| 5 Q. | Okay. Just your estimate. Was it too tight to |
| 6 | have a person fit in between the two cars? |
| 7 | MS. MILLS: Objection, calls for |
| 8 | speculation. |
| 9 BY MR. GIROUX: |
| 10 A. | Honestly, I'm not sure. |
| 11 Q. | Okay. How did the police vehicle come to a stop? |
| 12 A. | Like I say, I didn't go back and look at any of |
| 13 | this. As it appeared to me, I think it stopped |
| 14 | like near the curb. |
| 15 Q. | No, no, no. How? |
| 16 A. | How? |
| 17 Q. | No one was driving it anymore. |
| 18 A. | I'm not sure. I'd say we — we weren't going — |
| 19 | the speeds weren't — weren't great. We weren't |
| 20 | going no more than five miles an hour — |
| 21 Q. | I see. And you think it just came to a rest on its |
| 22 | own? |
| 23 A. | — and it just came to a rest, yeah, or near the |
| 24 | curb, or if it hit the curb or hit the bike, I'm |
| 25 | not for certain. |

79

| | |
|---|---|
| 1 | that vehicle? |
| 2 A. | It came right all the way up on it, near here. I |
| 3 | think it stopped right near the curb, near the |
| 4 | bike. |
| 5 Q. | Okay. So it was within just a few feet of the |
| 6 | vehicle? |
| 7 A. | The bike? |
| 8 Q. | No. Your police vehicle. |
| 9 A. | Re-ask that. You're saying — |
| 10 Q. | I know the police vehicle ended up overtop of the |
| 11 | bike, right? |
| 12 A. | Yeah. It stopped about — yeah. |
| 13 Q. | Okay. |
| 14 A. | Close to it. |
| 15 Q. | And the bike looks to be close to the other |
| 16 | vehicle, right? |
| 17 A. | Correct. |
| 18 Q. | So how close did the police vehicle get to the |
| 19 | other vehicle? It had to be within a couple of |
| 20 | feet. |
| 21 A. | Yeah. |
| 22 Q. | Okay. |
| 23 A. | As it ended, they were all close. |
| 24 Q. | Right. |
| 25 A. | Correct. |

78

| | |
|---|---|
| 1 Q. | Okay. So somehow the car came to a rest on its |
| 2 | own? |
| 3 A. | Correct. |
| 4 Q. | Because it was still in drive? |
| 5 A. | As far as I know, yes. |
| 6 Q. | Okay. And, again, you're just testifying based |
| 7 | upon your observations from that night, right? |
| 8 A. | Right. |
| 9 Q. | So that's the best that you could tell, based upon |
| 10 | observing everything as it's occurring? |
| 11 A. | Right. |
| 12 Q. | Okay. After you jumped out of the police car, you |
| 13 | looked at Mr. Hill, you started discharging your |
| 14 | weapon within a second or two, right? |
| 15 A. | I don't — really don't — I can't recall the time |
| 16 | frame itself. It was a second to — it was a |
| 17 | couple seconds, is all I can say — |
| 18 Q. | Okay. |
| 19 A. | — from the time that he rode away from me, and |
| 20 | pulled his weapon, and the shots fired. |
| 21 Q. | So it was within a second or two? |
| 22 A. | Approximately, yes. |
| 23 Q. | Okay. That's the best of your recollection? |
| 24 A. | Yep. |
| 25 Q. | And then even if you shoot three times, it's less |

80

1    than that second, or less than two seconds
2    certainly, right?
3 A.  It can be, yes.
4 Q.  It's — I mean, did you go pow, pow, pow, whatever
5    it was, two or three?
6 A.  Yes.
7 Q.  Okay.  And then what do you do after you stop
8    shooting, do you run at him?
9 A.  No.  I didn't run directly at him, but as he was
10    moving in this direction, I started moving in this
11    direction here.
12 Q.  Okay.  You run on the opposite side of the vehicle?
13 A.  That's correct.
14 Q.  From him?
15 A.  Yeah.
16 Q.  What kind of vehicle was that, that he's running
17    next to?
18 A.  I can't remember.  It was a blue vehicle, as I
19    recall.  I don't —
20 Q.  But it was big enough to block your vision of him?
21 A.  Yes.
22 Q.  Okay.  So as he's running away from you, he has his
23    back right side to you; is that right?
24 A.  I can't recall.
25 Q.  In other words, his right shoulder is closest to

81

1    shooting.  He turns and he runs.  If you lose sight
2    of him, you don't know if he turns around again, do
3    you?
4 A.  I don't — I don't know if he — like I say, I
5    don't know if he turned all the way around
6    completely or not, but I know he turned away from
7    me.
8 Q.  To run away?
9 A.  Right.
10 Q.  Okay.
11          MS. MILLS:  Objection, calls for
12    speculation.
13 BY MR. GIROUX:
14 A.  It appears he turned, right.
15 Q.  Okay.  And then the next time you see him, while
16    you're on the opposite side of the vehicle, is when
17    he is to the back of the vehicle, and you're to the
18    back of that vehicle in your drawing, Exhibit 1,
19    and at that point he's now falling backwards,
20    throwing the gun over his head?
21 A.  At the back of the vehicle, yes.
22 Q.  Okay.  And what direction does he throw the gun?
23 A.  Threw it over his head, the gun, we're kind of a
24    little just north of him.
25 Q.  Okay.  Can you make a drawing of that, like a

83

1    that vehicle that he's running next to, right?
2 A.  As he's running this way?
3 Q.  Yeah.  Where the dotted line is on your drawing.
4          MS. MILLS:  Let me object that it calls
5    for speculation.
6 BY MR. GIROUX:
7 Q.  Just based upon what you saw.
8 A.  I can't really say.  I know he turned away from me
9    here.
10 Q.  I understand, and that he ran.
11 A.  As he turned — yeah, he started moving this way.
12 Q.  Again, in the direction of the dotted line?
13 A.  Right.
14 Q.  Okay.
15 A.  So as I'm moving this way, I don't know if he was
16    backpedaling here, if he — if he turned all the
17    way completely or what.
18 Q.  Okay.
19 A.  As I observed over here, in this position, he was
20    falling backwards, and that's when he threw his gun
21    over his head, and he was still facing this
22    direction.
23 Q.  Okay.
24 A.  I seen him here.
25 Q.  All right.  So he's facing you when you start

82

1    little — a little something?  Okay.  Did you ever
2    identify what kind of gun it was?
3 A.  No.
4 Q.  What did you do after you saw him falling down to
5    the ground, throwing the gun over his head?
6 A.  He fell to the ground.  I detained him.
7 Q.  You detained him?
8 A.  Yes.
9 Q.  Did you talk to him?
10 A.  No.
11 Q.  Did you read him his rights?
12 A.  No.
13 Q.  Was he responsive?
14 A.  He was — he was trying to say something.
15 Q.  What was he trying to say?
16          MS. MILLS:  Objection, calls for
17    speculation.
18 BY MR. GIROUX:
19 A.  I don't know.
20 Q.  Was he moving?
21 A.  He was moving a little, yes.
22 Q.  Was your partner still shooting?
23 A.  No.
24 Q.  How many — how long had it been since any shots
25    were fired?

84

1 A.  As relation to?
2 Q.  Him falling to the ground.
3 A.  A matter of seconds.
4 Q.  Okay.
5 A.  If that.
6 Q.  So it was a matter of some seconds after the shots
7     stopped, before he fell to the ground, and you're
8     seeing him fall to the ground?
9 A.  If -- if that, yeah.  That's my --
10 Q.  Two to three seem accurate?
11 A.  It could have been instantaneous.  It could have
12     been at the same time.  The shooting could have
13     stopped the exact same time he fell to the ground.
14 Q.  I just want to see what you remember, in terms of
15     hearing it and seeing him fall.
16 A.  I can't recall completely.
17 Q.  Okay.  Just give me the best of your recollection.
18 A.  As I believe, when he threw the weapon, the
19     shooting had stopped.
20 Q.  Had stopped?
21 A.  What -- yeah.  What time frame it stopped, had just
22     -- just stopped, you know, at that point.
23 Q.  So a second or so?
24 A.  Approximately, yeah.  I'm not for certain.
25 Q.  Okay.  Just give me the best of your recollection,
85.

1     if you can.
2 A.  Oh, I would say I'm not -- I'm not for certain.
3 Q.  Okay.
4 A.  I'm really not.
5 Q.  So you're not sure if they were stopped for a
6     second, or two, or three, or if they were still
7     going while he was throwing the gun?
8 A.  Yeah.  I'm not for certain.
9 Q.  Okay.  When you went to him to detain him, did you
10     cuff him?
11 A.  Yes.
12 Q.  Why?
13 A.  Because he may still have some weapons on him, and
14     still be a threat to myself and my partner.
15 Q.  So he was still moving?
16 A.  Yes.
17 Q.  Okay.  What was he moving?  Show me or tell me what
18     -- what things he did.
19 A.  He was moving his hands, trying to speak.
20 Q.  Which hands, both of them?
21 A.  I believe both of them, yeah.
22 Q.  Okay.  And was he laying on his back, or his front,
23     or his side?
24 A.  He was laying on his back.
25 Q.  Okay.  Laying on his back face up then?
86

1 A.  Correct.
2 Q.  Okay.  And he was moving both of his hands out in
3     front of his body somehow, some way, right?
4 A.  As I recall, yeah.  I remember him moving and --
5 Q.  Okay.
6 A.  -- trying to speak.
7 Q.  All right.
8 A.  My first mindset was to detain him.
9 Q.  Were his hands reaching for anything?  Were they
10     reaching for you?  Were they rubbing him, like a
11     wound or something?  What were the -- his hands
12     doing, to the best of your recollection?
13 A.  I can't recall exactly, you know, what his hands
14     were doing or what they were --
15 Q.  Okay.
16 A.  -- you know, doing at the time.
17 Q.  Did he still have his backpack on?
18 A.  I can't recall.
19 Q.  Okay.  Did you ever see him drop his backpack?
20 A.  No.
21 Q.  Did you ever see him throw his backpack?
22 A.  No.
23 Q.  Okay.  So it's possible it was still on him, you're
24     just not sure as we sit here today?
25 A.  Yeah.  I can't remember if the backpack was on him
87

1     or not.
2 Q.  All right.  What did you notice about him, besides
3     the fact that both of his hands were moving?
4 A.  Like I said, just that he was trying to talk.
5 Q.  Okay.
6 A.  He was trying to say something.  I don't know.
7 Q.  Could you describe what he was saying or attempting
8     to say?
9 A.  No.
10 Q.  Was there a sound coming out?
11 A.  Yes.
12 Q.  Okay.  Were his eyes open?
13 A.  Yes.
14 Q.  Okay.  Did you notice anything else about him?
15 A.  No.
16 Q.  How long did that go on?
17 A.  How long did what go on?
18 Q.  That he was moving his hands, trying to talk,
19     making some sort of sound, looking at you.
20 A.  I can't recall.  I'd say minutes.
21 Q.  Okay.  Did you ask him anything?
22 A.  No.
23 Q.  Did you -- well, instead of me just guessing at
24     things, why don't you just tell me what happens now
25     for the next couple of minutes.  Describe the
88

1    sequence.
2 A.  Guessing at what?  You're —
3 Q.  I'm going to change the way I'm asking questions.
4 A.  Oh.
5 Q.  Just kind of walk through what happens now, in
6      terms of what you do, and what you see your partner
7      do, and what Mr. Hill does for the next few
8      minutes.
9 A.  As opposed to when he's on the ground?
10 Q.  No.  Right now, while he's on the ground.
11 A.  Mm-hmm.
12 Q.  Okay.  Describe -- you said he's — he's laying on
13      his back?
14 A.  Right.
15 Q.  He's moving his hands.  He's trying to say
16      something.  There is a sound coming out, but it's
17      not words that you can distinguish, right?
18 A.  Right.
19 Q.  Okay.  His eyes are open.  This goes on for a
20      couple minutes?
21 A.  Right.
22 Q.  I assume something happens next, because I know
23      someone puts cuffs on him.  I know something
24      happens at the scene.  I just want you to walk
25      through what happens for the next two or three

89

1    minutes.
2 A.  Well, during that time frame, my partner radioed in
3      for a — a, you know, emergency unit supervisor,
4      additional units.  And myself, like I told you, I
5      detained Mr. Hill by placing the cuffs on him, and
6      I gave him a brief pat down, to see if he had
7      anymore weapons or anything on his person.
8 Q.  Okay.  Did your partner go to the body with you to
9      handcuff it?
10 A.  No.
11 Q.  Okay.  Did he ever come close to the body like you
12      did?
13 A.  Not to my knowledge, no.
14 Q.  Okay.  Did he ever come within five feet of the
15      body to your knowledge?
16 A.  I think he — he stayed near the weapon, as I — as
17      I recall, he stayed near the weapon.  I think so.
18 Q.  I'm sorry?
19 A.  He stayed near the weapon.  Near the weapon, the
20      gun.  The weapon is —
21 Q.  Well, he couldn't have stayed near the weapon, if
22      he went back to the police car and radioed for more
23      help.
24 A.  He didn't.  He used his — his hand-held mic.
25 Q.  Oh, on his shoulder?

90

1 A.  Yes.
2 Q.  What's that called?
3 A.  Prep.  Prep radio.
4 Q.  Prep radio?
5 A.  Yes.
6 Q.  Okay.  Did you have prep radio that night?
7 A.  Correct.
8 Q.  Okay.  Did you have a cell phone that night?
9 A.  Yes.
10 Q.  Okay.  Did he have a cell phone that night?
11 A.  Who?
12 Q.  Your partner.
13 A.  I believe — I know he has one.  I don't know if
14      had it on him.
15 Q.  Okay.  Do you use your cell phone during work?
16 A.  Sometimes, yes.
17 Q.  Okay.  Do you use it for police business?
18 A.  Yes.
19 Q.  Okay.  Do you use it for personal business?
20 A.  Sometimes, yeah.
21 Q.  Okay.  That's all allowed, right, on-duty?
22 A.  Yes.
23 Q.  So he radioed dispatch with his prep radio.  You
24      saw him do that, right?
25 A.  Correct.

91

1 Q.  Okay.  Did you ever use the prep radio, your prep
2      radio?
3 A.  No.
4 Q.  Okay.  And he stayed by the weapon until someone
5      else arrived, right?
6 A.  Yes.
7 Q.  How long till someone else arrived?
8 A.  Another unit pulled up kind of within — in seconds
9      almost, from me cuff — handcuffing Mr. Hill,
10      another unit pulled up.
11 Q.  So the other unit, whatever unit was next, they
12      pulled up while you were cuffing Mr. Hill?
13 A.  I wouldn't say exactly, but it seemed rather
14      quickly that they pulled up.
15 Q.  Okay.
16 A.  At the time —
17 Q.  So either while you were cuffing him or just after?
18 A.  Just after, just shortly after.
19 Q.  Okay.
20 A.  Yeah.
21 Q.  While you patted him down, was he still moving his
22      hands?
23 A.  No.  I had cuffed him first.
24 Q.  You cuffed him, then you patted him down?
25 A.  Correct.

92

1  Q.  Okay.  When you rolled him over, did he make any
2      noise or sounds?
3  A.  He may have, yes.
4  Q.  Well, what do you recall?
5  A.  Like I said, it appeared he was trying to speak,
6      you know, with sounds he was making.  I can't
7      recall exactly what, but he was, you know, making
8      noises.
9  Q.  Did he seem --
10 A.  When I looked directly at him, it seemed like he
11     was trying to speak.
12 Q.  But he could not?
13 A.  Nothing came -- mumbled, you know, not -- a lot of
14     moans and mumbling, but nothing that I could make
15     out.
16 Q.  Okay.  He was not a threat on the ground, agreed?
17 A.  When I handcuffed him?
18 Q.  Yeah.
19 A.  After I handcuffed him, you know, he's handcuffed
20     at that point.
21 Q.  How about before, for the couple of minutes that
22     you're watching him trying to speak, and he can't
23     even speak?
24 A.  He could be.
25 Q.  Was he a threat?

93

1      The only thing I can recall, he kept trying to say
2      something.
3  Q.  Did he ever move his legs?
4  A.  He may have.
5  Q.  Did he ever appear to reach for something?
6  A.  No.
7  Q.  Okay.  When you patted him down, did he have his
8      backpack on?
9  A.  I can't really recall.
10 Q.  And that would have been something you would have
11     checked right away, right?
12 A.  If he had it on.
13 Q.  Yeah.
14 A.  More than likely, yes.  Yeah.
15 Q.  Okay.  In fact, you would have had to get it off --
16     off of him before you handcuffed him, right?
17 A.  Maybe, maybe not.  I mean, I would probably
18     handcuff him with it still on, but just with my
19     safety and my partner's safety, you know, more than
20     likely if he had it on, I probably would have
21     removed it or, you know, made sure he didn't have
22     access to it.
23 Q.  I would think that it would be police procedure to
24     remove a backpack before you handcuff somebody, to
25     make sure that there is nothing in there.

95

1  A.  Could be.
2  Q.  How?
3  A.  He could have another weapon on him.
4  Q.  Where?
5  A.  I mean, I don't know, anywhere on his person.  I've
6      seen guns hidden in a lot of obscure places.
7  Q.  Okay.  Was he having difficulty breathing?
8         MS. MILLS:  Objection, calls for
9      speculation.  You can answer.
10 BY MR. GIROUX:
11 A.  I'm not too sure.  Like I say, he was trying to
12     speak.  You know, he was still, you know, kind of
13     mumbling, so he -- I don't know.  I guess I really
14     didn't think about -- think about how long.
15 Q.  You've seen people have difficulty breathing
16     before, they can't catch their breath, the wind is
17     knocked out of them or something?
18 A.  Mm-hmm.
19 Q.  Right?
20 A.  Yes.
21 Q.  Okay.  Was he like that, like he couldn't catch his
22     breath, like he couldn't breathe?
23 A.  You know, I didn't -- I didn't see him gasping or
24     anything like that, that he was gasping for air.
25     It just seemed like he -- he was trying to speak.

94

1  A.  It depends on the -- you know, the threat itself,
2      and whether it's imminent.  I mean you, you know,
3      can say you'll remove a backpack before you
4      handcuff somebody, but you may have to handcuff
5      them beforehand.  I mean, you know --
6  Q.  Okay.
7  A.  -- you never know exactly.
8  Q.  So your testimony is that you handcuffed Mr. Hill
9      while he was laying on the ground, because you
10     believed he was still a threat?
11 A.  Correct.
12 Q.  Okay.  And that was a couple of minutes after you
13     were talking to him, and he was apparently trying
14     to talk to you, right?
15 A.  I wasn't talking to him.  I could see that he was
16     trying to say something, but it wasn't --
17 Q.  Well, did you ever check on it?
18 A.  It was not a conversation or anything like that.
19     You said I talked to him.  It was not a
20     conversation.
21 Q.  Don't you usually ask, you know, do you have any
22     weapons?  I mean under arrest.  I mean, don't you
23     make statements to them that you're supposed to
24     make when you apprehend somebody?
25        MS. MILLS:  Let me object.  I believe he

96

1    testified this is the first shooting he's been
2    involved in, so usually talked to them, assumes
3    facts not in evidence.
4 BY MR. GIROUX:
5 Q.   You can answer.
6 A.   No. I didn't ask him any questions at all.
7 Q.   Do you talk to people when you arrest them?
8 A.   Depending on the situation, yes.
9 Q.   How many times have you arrested somebody?
10 A.   A lot.
11 Q.   Yeah. Don't you say --
12 A.   A lot of times.
13 Q.   -- you're under arrest?
14 A.   Sometimes.
15 Q.   Don't you read them their rights?
16 A.   No.
17 Q.   Okay. Did you read Mr. Hill his rights?
18 A.   No.
19 Q.   Did you tell him he was under arrest?
20 A.   No.
21 Q.   Why?
22 A.   We -- you know, we don't have to inform someone,
23    you know, that they're under arrest, you know, and
24    give Miranda rights, if you're interrogating a
25    person, so I -- you know, no, I don't.
    97

1 A.   Yeah.
2 Q.   Okay. Did you know how many times he had been
3    shot?
4 A.   No.
5 Q.   Did you know where he was shot?
6 A.   No.
7 Q.   Did you try to figure out where he was shot, and if
8    he needed immediate medical attention?
9 A.   No. I didn't try to figure out where he was shot,
10    but we did -- my partner did call for medical, a
11    medic unit.
12 Q.   Okay. But you did not?
13 A.   No.
14 Q.   Okay. What else did you do, besides flip him over
15    and handcuff him?
16 A.   Like I say, I just pat him down, made sure he had
17    no additional weapons on him.
18 Q.   How did you handcuff him? Could you describe that
19    process for me please?
20 A.   He was on his back, then I rolled him over, cuffed
21    him with one hand, and then I cuffed the other
22    hand.
23 Q.   Okay. Was he still able to breathe, after you
24    rolled him over?
25 A.   Yeah. I rolled him back on his -- on his back. He
    99

1 Q.   Okay. Did you ever check him to see if he was
2    okay?
3 A.   Yes.
4 Q.   You checked his pulse?
5 A.   No. No. No, I did not.
6 Q.   You never checked his pulse?
7 A.   No.
8 Q.   Did you ever check anything about him?
9 A.   No.
10 Q.   Did you check his pupils?
11 A.   No. I could see his eyes but, no, I didn't examine
12    him or anything like that, no.
13 Q.   Okay. Did you check his wounds, any of them?
14 A.   No.
15 Q.   Did he have wounds?
16      MS. MILLS: Objection, calls for
17    speculation.
18 BY MR. GIROUX:
19 A.   I can't say I actually seen like -- like bullet
20    wounds, or anything like that, but I did see blood.
21    You know, there was blood.
22 Q.   Okay.
23 A.   He was bleeding, but I can't recall any bullet
24    wounds per se.
25 Q.   Did you know he was shot?
    98

1    was still laying on his back after I handcuffed
2    him.
3 Q.   When you rolled him over on his face, did he move
4    his head?
5 A.   Yep.
6 Q.   He moved it to the side?
7 A.   Yeah.
8 Q.   Okay. And then when you rolled him back over onto
9    his back and he was still cuffed, was he moving his
10    head?
11 A.   I don't think he was.
12 Q.   Did you check him then for vitals or anything else?
13 A.   No.
14 Q.   Did you ever check for a pulse?
15 A.   No.
16 Q.   At any time before EMS arrives, do you check his
17    wounds?
18 A.   No.
19 Q.   At any time before EMS arrives, did you try to
20    figure out where he was bleeding from, so as to
21    stop the bleeding?
22 A.   No.
23 Q.   Are you trained in first aid?
24 A.   Yeah. We have been trained in the academy.
25 Q.   Okay. Are you trained in CPR?
    100

1  A.   Yes.

2  Q.   Are you trained in being a first responder to a
3       trauma situation?

4              MS. MILLS:  As a medical person?

5              MR. GIROUX:  No, as a police officer.

6              MS. MILLS:  You can answer.

7  BY MR. GIROUX:

8  A.   We did have brief classes in the academy, twelve
9       some years ago, on how to conduct CPR.

10 Q.   Okay.  Were you trained on anything else?  How to
11      identify injuries, how to identify trauma, how to
12      deal with it?

13 A.   As far as, you know, medically attending to
14      someone?

15 Q.   No.  I mean, as a police officer, as a first
16      responder, as someone who might be there on the
17      scene first before medical arrives.  Were you
18      taught in that regard?

19 A.   Yeah.  Basically what we're taught in that position
20      is, you know, really — I mean, not really
21      something that you not render aid to someone, but
22      — can you ask the question again?

23 Q.   Yeah.  I was just asking if you were trained as a
24      first responder to somebody who has suffered
25      trauma, whether it be from a police action or

101

1       other.

2  A.   When you say trauma, is that like —

3  Q.   Could be a stab wound, could be a bullet wound,
4       could be a blunt force trauma, anything.  Were you
5       taught about these issues?  Were you taught about
6       trying to maintain a person's health until more
7       qualified medical help arrives?

8  A.   All right.  And like I say in that regard, the only
9       thing that we were really were trained, and that
10      was like in the academy, was CPR.  Anything else on
11      how to, you know, stop the bleeding, anything like
12      that, no.  We have not been trained on that.

13 Q.   Okay.  How about in your common experiences, I
14      mean, do you know how to stop bleeding?

15 A.   No.

16 Q.   No one has ever taught you to put pressure on a —

17 A.   Well, yeah, I mean —

18 Q.   — wound that's bleeding?

19 A.   Nothing I've been trained for though.

20 Q.   Did you know that you put pressure on a wound
21      that's bleeding, to try to slow down the bleeding?

22 A.   Yes.  I know you can do that.

23 Q.   Okay.  After you handcuff him, what happens next?
24      I know other officers arrive, right?

25 A.   Yep.

102

1  Q.   Then what happens?

2  A.   Another unit pulled up.  I believe it was a couple
3       people, a female and another male —

4  Q.   Okay.

5  A.   — was trying to approach them.

6              MS. MILLS:  I'm sorry.  These other — the
7       female and male, are these police officers, or
8       witnesses —

9              THE WITNESS:  They were —

10             MS. MILLS:  — or civilians?

11             THE WITNESS:  — one was one of the — one
12      of the guys who were — who was out there talking
13      to Mr. Hill, and then another female, she wasn't
14      there when the incident occurred, but she came up
15      later, and they were trying to approach them.  So I
16      believe at that point I kept them back, and then
17      when EMS arrived, and the supervisor arrived, EMS
18      took Mr. Hill.

19 BY MR. GIROUX:

20 Q.   All right.  Did you talk to the civilians on scene?

21 A.   I didn't have a conversation with them or anything,
22      but I did — the ones that were out there I did,
23      you know, keep them back.

24 Q.   Okay.  And — strike that.

25             Tell me everything you recall them saying

103

1       at any point on scene.

2  A.   I believe one of them was saying that's my cousin.
3       You know, they were cussing and hollering.

4  Q.   Tell me everything you recall them saying.

5  A.   I mean, I remember them cussing, saying what the
6       fuck, that's my cousin, a lot.

7  Q.   Just tell me everything you can recall.  I know
8       you're not going to remember everything, just tell
9       me everything you can recall.

10 A.   I remember them saying that for sure, at that time
11      let me know that they were — you know, that he
12      knew the person, they were family.  After that, you
13      know, he was doing a lot of cussing.  What exactly,
14      you know, I can't remember exactly what he was
15      saying.

16 Q.   Did he say, why did you shoot my cousin?

17 A.   He may have said that.  I can't recall exactly.

18 Q.   Does that sound familiar?

19 A.   Like I said, he — he said a lot.

20 Q.   Did he say what did you do that for?

21 A.   I really can't recall.  I mean —

22 Q.   Did he say, what's the matter with you?  You're
23      crazy, why are you doing that?  Anything like that?

24 A.   It's a possibility.  I mean, I — I can't remember
25      exactly what he said during that time.  I mean,

104

1 he —

2 Q. Again, I don't want it exactly. I just want the
3 general message.

4 A. Like I say, at first he did start hollering. He,
5 you know, started screaming and he said that that
6 was his cousin.

7 Q. Okay.

8 A. I remember him saying what the fuck.

9 Q. Right.

10 A. And as he tried to approach the scene, you know, we
11 made him get back, and at that point other officers
12 attended —

13 Q. Okay.

14 A. — to him so, you know, what exactly — I heard him
15 hollering and screaming. You know, I wasn't
16 pinpointing every word and everything that he was
17 — he was saying at that point.

18 Q. Okay. But you've told me everything you can
19 recall, as we sit here today, right?

20 A. As far as I remember, yes.

21 Q. Okay. And the general message was he knew the man,
22 right?

23 A. Yep.

24 Q. He was upset that you had shot him?

25 A. Yeah. He was pissed.
105

1 Q. And he didn't think you had a reason to shoot him?

2          MS. MILLS: Objection, calls for
3 speculation.

4 BY MR. GIROUX:

5 A. I don't know what went on through his mind.

6 Q. I'm asking you was that the general message; is
7 that how you understood it?

8 A. I understood that he was — yeah. He was upset,
9 and that that was his cousin, from what he said.

10 Q. Well, when someone says what the fuck, they mean
11 why did you do that, right?

12          MS. MILLS: Objection, calls for
13 speculation. You're asking him to speculate why he
14 said this?

15 BY MR. GIROUX:

16 Q. I'm just asking you what message it conveyed. Do
17 you agree that that was one of the messages he was
18 trying to convey?

19 A. Well, what the fuck could be taken in — in, you
20 know, many directions.

21 Q. Really, like —

22 A. I mean, I — I'm —

23 Q. — like what?

24          MS. MILLS: Like what the fuck is going on
25 here?
106

1 BY MR. GIROUX:

2 A. Yeah. I hurt myself sometimes and I say, ow, what
3 the fuck. You know, I mean, I don't know exactly
4 how he, you know, was pinpointing that. Like I
5 said, from what I got of it, that was his cousin,
6 you know, and I heard him scream and say what the
7 fuck.

8 Q. Okay. And that's all you remember him saying?

9 A. Yeah. Like I say, he said a whole lot more.

10 Q. I know. Got it.

11 A. What I don't — I can't remember.

12 Q. Right. And you don't remember the message he was
13 trying to convey?

14 A. He was upset. He was upset, you know, but he
15 wasn't talking to me at the time. That's what I
16 heard him say, and then the other officers moved
17 him back.

18 Q. Okay. And he never said, what did you do that for?

19 A. I can't recall that. I can't recall. He may have,
20 but I can't recall.

21 Q. Okay. Then what happened?

22 A. Like I say, EMS came. I believe when the EMS techs
23 removed his holster off of him, and then they —
24 off of Mr. Hill, and then they — then they took
25 Mr. Hill. Supervisors showed up, and then they
107

1 took us — took us up to homicide later on.

2 Q. All right. Did you give a statement?

3 A. Yeah.

4 Q. To whom?

5 A. Actually, just my — my report was made.

6 Q. Okay. Did you review anything before the
7 deposition today, documents, reports, things like
8 that?

9 A. Yes.

10 Q. Can you tell me everything you reviewed?

11 A. Yeah. My report, pictures.

12          MR. GIROUX: Can we see those, Counsel?
13          MS. MILLS: Sure. It's the homicide file
14 you were produced. And this copy is marked up, so
15 I pulled out his — the statements, but this is the
16 same file you were produced the other day.
17          MR. GIROUX: I just wanted a statement for
18 right now.
19          MS. MILLS: Give it back, and I'll give it
20 to you.
21          MR. GIROUX: Sure.
22          MS. MILLS: You know, I'm sorry. I gave
23 you Singleton's.
24          THE WITNESS: Yeah.
25          MS. MILLS: I meant Dew's. Sorry about
108

1    that.
2              MR. GIROUX: That's okay.
3  BY MR. GIROUX:
4  Q.   When was the date that you gave this statement?
5  A.   The same day.
6              MR. GIROUX: Can we mark this?
7              MS. MILLS: Sure.
8              MR. GIROUX: Do you want to make a copy
9  before we mark it?
10             MS. MILLS: No, you can —
11             MR. GIROUX: Because I'm just going to
12  give them to her.
13             MS. MILLS: No, that — you can give it to
14  her, that's fine.
15             MR. GIROUX: Okay.
16             MS. MILLS: I just highlighted his name so
17  we could see it through.
18             (Deposition Exhibit Number 2 was marked
19              for identification).
20  BY MR. GIROUX:
21  Q.   Sir, can you identify in your own words, what is
22       marked as Exhibit 2? In other words, describe what
23       the document is.
24  A.   It's a PCR, preliminary complaint report.
25  Q.   Okay. And what is a preliminary complaint report?
                                                   109

1  A.   This was not typed by me.
2  Q.   Okay. It's typed by somebody else?
3  A.   Correct.
4  Q.   And then you reviewed it for accuracy and
5       truthfulness?
6  A.   That's correct.
7  Q.   And then you signed it —
8  A.   Correct.
9  Q.   — indicating that it was accurate and truthful?
10  A.  Yes.
11  Q.  Okay. You said you reviewed some pictures. Can I
12      see those please? Thank you. You didn't take any
13      of these pictures?
14  A.  No.
15  Q.  You weren't there when they took the pictures?
16  A.  I don't think so, no.
17  Q.  Do you know who moved the police car?
18  A.  No.
19  Q.  Did your partner ever move the police car?
20  A.  After the incident —
21  Q.  Yes.
22  A.  — no.
23  Q.  Did he ever get back in the police car?
24  A.  No.
25  Q.  Did you ever get back in your police car?
                                                   111

1  A.   It's what we do when we make an arrest, or make a
2       police run. It's our synopsis on what happened.
3  Q.   Okay. Is it supposed to be true?
4  A.   Yes.
5  Q.   Is it required to be true, according to your police
6       officer oath?
7  A.   That's correct.
8  Q.   Okay. Is it supposed to be accurate, to the best
9       of your recollection, when you're making it?
10  A.  That's correct. Yes.
11  Q.  Okay. You are given some time to reflect over the
12      events that transpired, prior to creating that
13      report?
14  A.  All reports are done, you know, or should be done
15      soon after.
16  Q.  Right. But you're allowed to sit in your chair and
17      think about, okay, let me make sure I get all this
18      down, and I get it all accurately, as far as I can
19      recall?
20  A.  And get the facts correct, yes.
21  Q.  Okay. And did you do all that before you prepared
22      this PCR?
23  A.  Yes.
24  Q.  Did you prepare this or did somebody else prepare
25      it for you?
                                                   110

1  A.   No.
2  Q.   Did you review anything other than these
3       photographs that your attorney has handed me and
4       that report, before the deposition?
5  A.   That was about it.
6  Q.   All right. Well, I want to make sure I've got
7       everything, not about everything.
8  A.   There was another form, but it seems like —
9              MS. MILLS: I think it was the Rule 26
10      disclosure.
11             THE WITNESS: Yeah.
12             MS. MILLS: This?
13             THE WITNESS: Yep.
14             MS. MILLS: Which was just a listing of
15      the documents.
16  BY MR. GIROUX:
17  Q.   Anything else?
18  A.   That's it.
19  Q.   All right. You said there was an IA review?
20  A.   Yes.
21  Q.   Okay. And who ran that?
22  A.   I can't remember her name.
23  Q.   Did you testify?
24  A.   Yes.
25  Q.   Okay. Can you recall anything else about the
                                                   112

1    happening of this occurrence, that I haven't asked
2    you about or that you haven't told me about?
3 A.  No. Nothing at all.
4 Q.  Okay. You've told me all of your reasons for
5    shooting this person?
6 A.  To protect myself, yes.
7 Q.  Do you know if you were on a run prior to the
8    subject run?
9 A.  I think I recall we might — we might have been
10    clear.
11 Q.  Okay.
12 A.  Might not have —
13 Q.  Do you know what officers were the first ones to
14    arrive after the shooting?
15 A.  It was Officer Barrick and Officer Geraud.
16         MS. MILLS:  What was the first one?  I'm
17    sorry.
18         THE WITNESS:  Barrick.
19         MS. MILLS:  Barrick?
20         THE WITNESS:  Yeah.
21         MS. MILLS:  Okay.
22 BY MR. GIROUX:
23 Q.  Did you discuss anything with either of them?  Did
24    either of them walk up and say, what happened,
25    what's going on?

113

1 Q.  called internal affairs, is it?
2 A.  Yeah, is it.
3 Q.  It is?
4 A.  Yeah.
5 Q.  Okay.  You gave —
6         MS. MILLS:  Off the record.
7         (A brief discussion took place off the
8         record at 12:10 p.m.)
9 BY MR. GIROUX:
10 Q.  You said you testified, have you seen a transcript
11    of that testimony?
12 A.  No.
13 Q.  Okay.  You've given me your written report that you
14    signed, that was the night of the shooting,
15    right?
16 A.  Correct.
17 Q.  Or the day of the shooting, whatever it happens to
18    be.  Have you made any other statements, written,
19    recorded, or otherwise?
20 A.  No.
21 Q.  Did you make any use of gun report?
22 A.  No.
23 Q.  Do you know what a mission team report is?
24         MS. MILLS:  A what?  I didn't hear you.
25 BY MR. GIROUX:

115

1 A.  They asked if we were okay.
2 Q.  Okay.  No one asked what happened?
3 A.  Not one of them.
4 Q.  Okay.  So the first two officers on scene did not
5    ask you what happened, agreed?
6 A.  I don't recall, no.
7 Q.  I'm sorry?
8 A.  I don't think they did.  I believe all they — they
9    just asked if we were okay.  And at that point,
10    like I told you, the — the other witness was
11    hollering and screaming.  I believe they attended
12    to him.
13 Q.  Okay.  And that was the last you spoke to the two
14    officers who arrived?
15 A.  Correct.
16 Q.  And you haven't talked to them since about the
17    shooting?
18 A.  No.
19         THE REPORTER:  Is that a no, sir?
20         THE WITNESS:  That's a no.
21 BY MR. GIROUX:
22 Q.  Have you given any other written or recorded
23    statements, besides the one that's there in front
24    of you, and the one you gave to the internal
25    affairs?  What's internal affairs called?  It's not

114

1 Q.  Mission team report?
2 A.  Never heard of it.
3         MR. GIROUX:  Counsel, do you have his log,
4    activity log?
5         MS. MILLS:  I do not.  I asked for it, and
6    I'll give it to you when I get it, but I do not
7    have it.  I didn't see it in his file.
8         MR. GIROUX:  All right.  Do you have the
9    internal affairs or the use of force investigation
10    file?
11         MS. MILLS:  I do not.  As of this date,
12    the investigation is not complete.  It hasn't been
13    given to me.
14         MR. GIROUX:  Oh, it's not complete?
15         MS. MILLS:  It is not complete as of this
16    date.  I will provide you the activity log.  I
17    can't give up the force investigation report or
18    even claim the privilege for it until they're
19    finished.  They're not finished as we speak.
20         MR. GIROUX:  I don't have anymore
21    questions.  Thank you for your time.
22         MS. MILLS:  No questions.  Let's go off.
23         (Off the record at 12:13 p.m.)
24
25

116

I, DIONE L. TORKELSON, a notary public in and for the County of Macomb and State of Michigan, do hereby certify that JELANI DEW, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the above deposition, all pages inclusive, was recorded stenographically by me, and transcribed by me.

I further certify that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place specified.

I further certify that I am not a relative, or employee, or attorney or counsel of any of the parties, nor a relative, or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

[signature]

DIONE L. TORKELSON, CSR #5887
My Commission Expires: 10-19-12

<Dates>
'98 december, december 21:9
10-19-12 117:23
April 25, 2011 3:3
April, 2011 1:24
#5887 117:22
'98 14:24, 21:10
.40 56:2, 56:5

<1>
1 2:14, 76:6, 76:8, 76:11, 77:10, 83:18
10-cv-11427 1:11
109 2:16
10:06 1:25
10:26 19:17
10:49 39:22
12:10 115:8
12:13 116:23
1650 1:24, 1:43
19390 1:32
1995 12:4
1998 14:17

<2>
2 2:16, 109:18, 109:22
2000 8:22, 16:21, 16:22
2001 8:22, 16:21
2002 16:21
2003 16:22
2004 16:22
2005 4:17, 16:22
2008 6:17
22 56:2
237-5060 1:45
248 1:34
25th 1:24, 76:4
26 112:9

<3>
3 2:8
313 1:45
355-5555 1:34

<4>
48075 1:33
48226 1:44

<6>
660 1:23, 1:43

<7>
76 2:14

<9>
911 28:18

<A>
a.m. 1:25, 19:17, 39:22
able 99:23
above 117:6
academy 21:6, 67:23, 100:24, 101:8, 102:10
accepted 13:22, 14:12
access 95:22
according 68:13, 70:20, 110:5
accuracy 111:4
accurate 10:16, 61:3, 85:10, 110:8, 111:9
accurately 56:1, 110:18
accusation 5:2
accused 5:7, 5:11, 5:17, 20:17
acquaintances 27:12
action 101:25, 117:17
activity 116:4, 116:16
Actually 11:1, 20:14 23:18, 98:19, 108:5
addition 10:22
additional 15:3, 90:4, 99:17
Adrian 1:14, 1:49, 2:22, 19:5
advisement 7:16, 7:19
affairs 114:25, 115:1, 116:9
Afterwards 36:23
ago 4:2, 9:12, 101:9
agree 36:18, 39:10, 39:12, 47:13, 52:12, 66:3, 66:5, 10.:17
Agreed 37:1, 47:12, 53:25, 56:13, 66:2, 66:4, 77:5, 93:16, 114:5
agreement 7:7
ahead 64:4, 64:10
aid 100:23, 101:21
aim 67:7, 67:9
air 94:24
Albert 1:8, 1:39
alcohol 26:6
allow 26:13
allowed 49:15, 91:21, 110:16
almost 92:9
already 52:13
altogether 48:15, 70:14
ammunition 56:3, 68:20
anger 23:1, 23:11, 24:6
angry 24:8
answer 4:6, 5:19, 6:6, 6:13, 6:22, 6:25, 7:4, 8:9, 9:2, 9:22, 10:10, 10:20, 11:8, 11:22, 16:12, 17:7, 20:12, 21:24, 22:13, 24:10, 26:8, 26:14, 29:25, 40:6, 41:10, 44:6, 48:2, 62:5, 64:2, 64:4, 64:10, 67:13, 94:9, 97:5, 101:6
answered 44:5, 51:5
anybody 5:7, 15:12, 20:18, 21:4, 30:20, 45:12, 49:21, 50:9, 67:24, 68:1
apart 60:5, 60:20, 61:8, 61:22
apologize 25:9
apparently 96:13
appear 32:16, 61:5, 95:5
APPEARANCES 1:28
appeared 32:15, 32:19, 33:3, 36:13, 61:7, 79:13, 93:5
Appearing 1:36, 1:47
appears 83:14
applied 13:25
apply 14:22
Appoline 33:24, 60:8
apprehend 96:24
approach 34:2, 103:5, 103:15, 105:10
approached 31:4, 33:4
approaching 30:2, 33:6, 38:5, 59:2, 59:6
appropriate 68:13
approximate 76:23, 76:24, 76:25, 77:1, 77:2, 77:3
Approximately 3:27, 9:10, 14:14, 34:20, 41:19, 41:21, 46:4, 51:20, 59:23, 60:4, 61:17, 61:21, 66:16, 66:25, 71:8, 75:10, 80:22, 85:24
area 21:1, 27:18, 46:10
areas 30:17
arm 55:17
armed 28:14, 47:3, 68:4
around 14:17, 16:21,

39:17, 46:12, 46:16, 73:12, 83:2, 83:5
arrest 96:22, 97:7, 97:13, 97:19, 97:23, 110:1
arrested 6:19, 97:9
arrival 28:8
arrive 30:23, 45:11, 102:24, 113:14
arrived 28:1, 30:5, 92:5, 92:7, 103:17, 114:14
arrives 100:16, 100:19, 101:17, 102:7
assistance 52:23
associate 12:9
assume 24:18, 30:24, 45:13, 58:15, 64:7, 89:22
assumes 97:2
attempting 88:7
attended 105:12, 114:11
attending 101:13
attention 36:1, 43:11, 43:12, 99:8
attorney 4:22, 25:6, 112:3, 117:14, 117:16
attorneys 64:3, 64:9
Avenue 1:23, 1:43
Avern 1:12
aware 48:20
awhile 4:1, 8:22

<B>
backpack 28:14, 32:6, 49:16, 87:17, 87:19, 87:21, 87:25, 95:8, 95:24, 96:3
backpedaled 73:15
backpedaling 82:16
backup 27:25
backwards 71:17, 71:19, 72:20, 72:24, 73:17, 73:20, 82:20, 83:19
balance 35:16
bar 53:2
Barrick 113:15, 113:18, 113:19
based 80:6, 80:9, 82:7
bases 30:16
Basically 12:18, 64:19, 65:23, 101:19
basics 12:18
Basketball 13:2
beforehand 96:5
beginning 47:25
behalf 1:36, 1:47
behavior 27:2
behind 34:4, 76:18
believe 4:19, 8:16, 8:18, 14:23, 23:22, 26:20, 31:14, 40:4, 47:5, 50:11, 51:23, 62:13, 75:19, 85:18, 86:21, 91:13, 96:25, 103:2, 103:16, 104:2, 107:22, 114:8, 114:11
believed 46:18, 96:10
beneficial 24:25
besides 10:7, 22:7, 25:23, 46:12, 88:2, 99:14, 114:23
best 11:23, 67:2, 75:5, 80:9, 80:23, 85:17, 85:25, 87:12, 110:8
better 53:5, 76:3
bicycle 28:13, 31:3, 40:2, 46:25, 72:11
bicycles 46:16
big 24:1, 81:20
bit 54:22, 61:16, 71:19
bleeding 98:23, 100:20, 100:21, 102:11, 102:14, 102:18, 102:21
block 81:20
blocking 74:15, 75:6
blood 98:20, 98:21
blue 81:18
blunt 102:4
board 50:3
body 32:24, 42:10, 44:11, 87:3, 90:8, 90:11, 90:15
bordering 26:13
bottom 75:22
breath 94:16, 94:22
breathe 94:22, 99:23
breathing 94:7, 94:15
brief 19:16, 39:21, 90:6, 101:8, 115:7
briefly 10:19
brought 6:20, 17:20, 43:1
Brown 17:18, 17:21, 18:3, 18:11
brutality 5:5, 5:8, 5:18
Buena 28:12, 33:20, 33:22, 33:23, 56:10, 60:1
bullet 98:19, 98:23, 102:3
bumper 37:11
Bursey 1:8, 1:39
business 91:17, 91:19

<C>
caliber 56:2, 56:5
Call 28:18, 28:22, 52:18, 52:20, 52:23, 53:5, 99:10
called 13:17, 16:8, 47:6, 91:2, 114:25, 115:1
Calls 9:21, 36:9, 49:9, 49:19, 49:22, 50:14, 50:21, 51:8, 51:25, 62:4, 79:7, 82:4, 83:11, 84:16, 94:8, 98:16, 106:2, 106:12
calm 32:16, 33:3
Calmly 32:20, 44:2, 46:14
capacities 1:16, 1:50
capacity 69:10
care 65:6
career 8:4, 20:21, 26:4
carried 69:14, 69:16
cars 79:6
Case 1:11
catch 94:16, 94:21
caution 64:1
cell 91:8, 91:10, 91:15
Center 13:13, 13:17, 67:7, 67:9
certain 69:9, 70:25, 79:25, 85:24, 86:2, 86:8
certainly 81:2
certificate 12:14
certifications 16:2, 20:25
certify 117:4, 117:9, 117:13
chair 110:16
chamber 68:22, 69:7
change 89:3
changed 15:24
charges 6:20, 6:23, 7:2, 7:3, 7:20
check 49:14, 49:16, 96:17, 98:1, 98:8, 98:10, 98:13, 100:12, 100:14, 100:16
checked 95:11, 98:4, 98:6
chest 42:10
citizen 5:12
citizens 5:21
CITY 1:42, 4:24, 9:19, 13:25, 15:18, 23:8, 67:25
civilians 103:10, 103:20
claim 116:18
class 23:11
classes 23:15, 101:8

clear 10:25, 11:22, 36:15, 113:10
cleared 6:8
clip 68:24
Close 36:7, 36:17, 37:4, 37:13, 38:19, 60:4, 60:14, 61:4, 61:5, 65:4, 77:25, 78:14, 78:15, 78:18, 78:23, 79:1, 90:11
closer 52:10, 60:25, 65:2
closest 38:15, 38:23, 39:12, 39:18, 40:1, 42:20, 81:25
clothes 16:6, 16:7, 16:12, 16:14, 18:22
Cohn 1:12, 53:1, 53:3
Coleman 17:24, 17:25, 18:1, 18:7
College 12:5, 12:8, 12:12, 12:22, 13:7
comes 30:24, 54:15
coming 27:25, 88:10, 89:16
commencing 1:25
Commission 117:23
common 10:23, 27:12, 102:13
communicate 65:19
communication 28:10
communications 28:24, 29:10
Community 12:8, 12:12, 12:22, 13:7
Complaint 2:16, 5:12, 109:24, 109:25
complaints 5:21, 5:22, 5:25
complete 116:12, 116:14, 116:15
completely 11:9, 52:5, 73:4, 82:17, 83:6, 85:16
completing 14:11
compound 67:12
conduct 7:9, 7:15, 9:20, 101:9
confused 21:23, 24:2
confusing 11:21, 11:23, 39:3
consideration 48:21
considering 20:3
contact 35:25, 37:10
CONTENTS 2:1
context 10:4
Continue 6:5, 6:21, 35:18, 41:20, 53:7
continued 35:23
conversation 60:20, 96:18, 96:20, 103:21
convey 106:18, 107:13
conveyed 106:16
convicted 10:6
copy 108:14, 109:8
corner 59:4
correctly 41:23
Counsel 108:12, 116:3, 117:14, 117:16
counselor 15:8
County 1:22, 12:8, 12:11, 12:22, 117:3
couple 10:14, 41:16, 45:25, 78:19, 80:17, 88:25, 89:20, 93:21, 96:12, 103:2
Court 1:1, 1:25, 11:12, 11:17, 52:16, 52:18
courtesy 25:5
cousin 104:2, 104:6, 104:16, 105:6, 106:9, 107:5
cover 30:16
covered 25:15
CPR 100:25, 101:9, 102:10
crazy 104:23
creating 110:12
crimes 10:6
criminal 6:23, 7:2, 7:3, 7:18
CSR 117:22
cuff 86:10, 92:9
cuffed 92:23, 92:24, 99:20, 99:21, 100:9
cuffing 92:12, 92:17
cuffs 89:23, 90:5
curb 35:24, 37:23, 38:8, 38:11, 42:25, 60:18, 78:3, 79:14, 79:24
cussing 104:3, 104:5, 104:13
custody 70:7

<D>
date 15:25, 27:7, 75:21, 109:4, 116:11, 116:16
day 1:24, 8:1, 23:7, 70:18, 108:16, 109:5, 115:17
days 7:22, 7:23, 7:24, 7:25, 8:1, 8:2
deal 15:1, 25:7, 101:12
Deceased 1:7, 1:38
decide 68:12, 75:8
defendant 1:47, 4:11, 4:12, 10:3
Defendants 1:18
degree 12:9, 12:15, 52:9, 53:25
Department 1:42, 13:23, 15:22, 20:22, 67:24, 67:25
department-issued 69:17
departmental 6:23, 7:2, 7:20, 21:16
Depending 97:8
depends 96:1
deposed 3:28, 9:10
Deposition 1:21, 3:17, 22:17, 76:8, 108:7, 109:18, 112:4, 117:7, 117:10
depositions 10:15
deps 10:18
Describe 15:21, 55:6, 56:1, 88:7, 88:25, 89:12, 99:18, 109:22
described 31:3, 40:1
description 46:19, 46:23
destroy 75:8
detain 44:13, 44:14, 86:9, 87:8
detained 84:6, 84:7, 90:5
Detroit 1:24, 1:42, 1:44, 3:1, 4:25, 12:2, 13:25, 15:19, 20:21, 23:8, 68:1
develop 53:5
DEW 1:13, 1:21, 1:48, 2:6, 3:7, 3:14, 3:15, 3:17, 76:11, 108:25, 117:4
different 13:9, 13:10, 17:19, 48:11, 48:18, 70:14
difficulty 94:7, 94:15
DIONE 1:22, 117:2, 117:22
DIRECT 2:8, 3:11, 52:10, 53:21
direction 54:10, 58:24, 60:2, 77:4, 77:16, 77:19, 81:10, 81:11, 82:12, 82:22, 83:22
directions 106:20
Directly 4:9, 21:15, 32:17, 59:3, 64:21, 72:10, 77:8, 81:9, 93:10, 117:17
dirt 33:16
disbanded 19:1
discharge 55:14
discharged 26:3

discharging 80:13
disciplined 8:23
disciplines 25:11
disclosed 8:24
disclosure 112:10
discuss 113:23
discussion 33:21, 115:7
Discovery 7:9, 7:14, 7:15, 10:8
dispatch 27:20, 28:11, 28:12, 29:1, 30:20, 46:19, 47:2, 47:5, 47:24, 48:6, 48:7, 91:23
dispatched 27:18, 27:22, 48:18
distance 60:5, 60:20, 61:13
distinguish 83:17
DISTRICT 1:1, 1:2
DIVISION 1:3
document 109:23
documents 108:7, 112:15
doing 20:17, 21:20, 28:24, 30:24, 32:10, 33:10, 34:3, 35:20, 87:12, 87:14, 97:16, 104:13, 104:23
domestic 6:19, 10:7, 23:5, 24:16
done 10:16, 11:9, 11:10, 21:15, 30:18, 57:14, 67:22, 110:14
door 18:17
dotted 77:20, 82:3, 82:12
double 67:5, 67:7, 57:9, 67:10, 67:13, 67:20, 67:22, 68:1, 68:5, 68:11, 68:15, 68:17
down 11:12, 33:12, 60:1, 71:12, 71:14, 71:16, 72:9, 84:4, 90:6, 92:21, 92:24, 95:7, 99:16

102:21, 110:18
Draw 74:23, 74:24, 75:4, 76:16, 77:15, 77:16
drawing 76:1, 78:12, 78:23, 82:3, 83:16, 83:25
drawn 35:9, 35:10
drew 35:11, 73:5, 76:14
drink 26:6
driver 29:5, 60:4
driver 58:12
driving 28:21, 34:6, 41:3, 79:17
drop 87:19
dropped 35:24, 59:1
drove 29:15
drunk 26:11, 26:17, 26:23, 27:1
duly 3:18, 117:5
during 13:24, 15:6, 20:15, 20:21, 23:4, 23:14, 51:13, 59:20, 90:2, 91:15, 104:25
duty 18:12, 69:24
Dwayne 1:7, 1:38

<E>
E. 1:5, 1:37
east 54:10, 57:1, 58:25, 60:8, 65:10, 60:12, 71:20, 72:17, 72:18, 73:6, 73:14
EASTERN 1:2
effect 28:5
Eight 7:22, 7:24, 7:25, 8:1, 8:2, 13:22, 65:2
Eight, 7:24, 8:2
eighteen 20:1, 20:4
either 10:3, 30:19, 53:21, 59:24, 62:11, 92:17, 113:23, 113:24
emergency 90:3
employed 15:18

employee 25:10, 117:14, 117:15
employment 13:8, 13:24
EMS 100:16, 100:19, 103:17, 107:22
en 23:2
end 43:9, 51:4, 72:22, 73:16, 73:19
ended 78:10, 78:23
engaging 5:17
enough 23:24, 36:7, 81:20
enters 56:12
entire 20:21
entirely 24:4, 39:6, 67:16
Estate 1:6, 1:38
estimate 79:5
evaluate 67:10
events 110:12
Eventually 20:7, 20:18
everybody 11:2, 16:24, 24:15, 76:2
everyone 20:14, 22:19
everything 14:15, 15:6, 25:15, 57:2, 57:14, 75:2, 80:10, 103:25, 104:4, 104:7, 104:8, 104:9, 105:16, 105:18, 108:10, 112:7
evidence 97:3
exact 85:13
Exactly 5:13, 16:20, 65:25, 66:19, 87:13, 92:13, 99:7, falling 82:20, 83:19, 104:14, 104:17, 104:25, 105:2, 105:14, 107:3
EXAMINATION 2:8, 3:11
examine 79:4, 98:11
examined 3:10
Excuse 53:2

Exhibit 76:6, 76:8, 76:11, 77:10, 83:18, 93:18, 109:22
enjoy 22:16
exhibited 83:25
EXHIBITS 2:12
exists 67:10
exit 34:13, 38:7, 40:21, 54:17, 59:15
exited 34:10, 44:12, 58:17
experiences 102:13
Expires 117:23
Explain 70:11
explanation 44:9, 44:18
extend 25:5
eye 55:12
eyes 88:12, 89:19, 98:11

<F>
face 27:15, 31:18, 42:10, 55:18, 73:12, 73:25, 85:25, 100:3
facing 31:8, 32:11, 38:13, 39:10, 41:25, 42:6, 42:11, 65:12, 68:4, 70:20, 71:23, 72:5, 72:13, 72:14, 73:25, 74:1, 82:21, 82:25
fact 41:8, 48:21, 71:15, 88:3, 96:15
facts 97:3, 110:20
Fairlane 13:17
fall 37:5, 71:16, 73:20, 85:8, 85:15
83:19, 84:3, 85:2
falls 72:8
familiar 27:15, 104:18
family 104:12
far 9:3, 34:24, 41:15, 57:17, 57:19, 57:25, 91:8, 77:16,

<H>
hand 32:24, 45:12, 45:13, 99:21, 99:22
hand-held 90:24
handcuff 90:9, 95:18, 95:24, 96:4, 99:15, 99:18, 102:23
handcuffed 93:17, 93:19, 95:16, 96:6, 100:1
handcuffing 92:9
handed 112:3
handle 48:24, 49:3
hands 39:8, 55:9, 86:19, 86:20, 87:2, 87:9, 87:11, 87:13, 88:3, 88:18, 89:15, 92:22
Handwritten 2:14
Hang 64:18
happen 11:15
happened 6:4, 7:3, 7:20, 9:7, 18:7, 23:10, 64:13, 70:16, 107:21, 110:2, 113:24, 114:2, 114:5
happening 113:1
happens 42:24, 65:5, 66:24, 89:5, 89:22, 89:24, 90:5, 90:22, 91:6, 103:1, 115:17
harassing 26:13
hard 10:17, 43:20
head 18:6, 72:19, 72:24, 73:18, 82:21, 83:20, 83:23, 84:5, 100:4, 100:20
headed 58:24
health 102:6
hear 14:22, 22:4, 32:21, 63:14, 115:24
heard 105:14, 107:6, 107:16, 116:2
hearing 8:16, 65:15

help 24:18, 24:19, 52:24, 90:23, 102:7
hereby 117:4
hidden 84:6
High 12:1, 12:2, 13:3, 16:12, 27:5
highlighted 109:16
Hill 1:5, 1:7, 1:37, 1:38, 22:18, 25:20, 25:23, 27:8, 31:3, 32:11, 43:13, 54:11, 56:25, 57:25, 58:24, 59:20, 60:6, 60:17, 61:24, 62:17, 70:20, 71:12, 72:4, 75:11, 76:17, 76:25, 77:12, 77:16, 80:13, 83:2, 90:5, 92:9, 92:12, 96:8, 97:17, 103:13, 103:18, 103:20, 105:3, 105:16, 106:12, 108:11, 109:19
history 22:12
hit 5:3, 18:17, 26:4, 34:3, 36:8, 56:24, 63:19, 70:24, 71:2, 79:24
hold 55:9, 60:21, 70:5
holding 31:12, 45:10, 45:14, 52:6, 55:12, 66:6, 68:3, 72:6, 72:13, 72:15
holds 69:25
hollering 104:3, 109:4, 106:15, 114:11
holster 31:5, 31:24, 31:25, 43:25, 44:10, 44:12, 44:23, 44:25, 69:1, 69:25, 107:23
home 13:16
homicide 108:1, 108:13
Hon 1:12
Honesty 10:17, 116:9

intersection 33:21
interview 14:5
investigated 5:25
investigation 116:9, 116:12, 116:17
investigations 50:1
involved 97:2
involving 9:7
irrelevant 26:12
issue 21:14, 22:10, 22:23
issues 14:25, 25:12, 102:5

<I>
IA 112:19
idea 28:20, 71:1
identification 76:9, 109:19
identify 84:2, 101:11, 109:21
imaginary 39:15
immediate 99:8
imminent 56:2
inadmissible 110:10
incident 21:14, 22:15, 22:16, 25:16, 25:25, 57:16, 103:14, 111:20
inclusive 117:7
indicated 32:25
indicating 115:9
indirectly 21:16, 117:17
individual 1:16, 1:50
inform 87:22
information 28:17, 30:17, 48:5, 48:7, 50:6, 50:9
injuries 101:11
inspector 18:5
instances 68:7
instantaneous 85:1
instead 88:23
instruct 64:3
insubordination 25:12
intelligent 11:6
intention 43:11
interested 117:16
internal 114:24, 114:25, 115:1, 116:9
interrogating 97:24

intersection 33:21
interview 14:5
investigated 5:25
investigation 116:9, 116:12, 116:17
investigations 50:1
involved 97:2
involving 9:7
irrelevant 26:12
issue 21:14, 22:10, 22:23
issues 14:25, 25:12, 102:5

75:10, 80:13, 93:10
looking 38:21, 42:2, 42:7, 52:14, 52:22, 61:6, 88:19
looks 78:13
lost 93:13, 94:6, 97:10, 97:12, 104:6, 104:13, 104:19, 107:3
lot 99:19
Mr. M 1:37
Macomb 1:23, 117:3
magazine 69:2, 69:6, 69:18, 69:20
magazines 52:11, 69:13, 69:9, 69:18, 69:20, 69:25
maintain 102:6
male 28:13, 103:3
ma'am 113:7
man 11:7, 34:24, 42:18, 49:5, 63:9, 65:1, 105:21
management 23:1, 23:11, 24:6
manner 30:3, 62:22
Map 2:14
maps 29:12
March 14:24
mark 76:6, 109:6
mine 9:9
marked 76:8, 76:11, 108:14, 109:18, 109:22
May 1:5, 1:37
mass 67:7, 67:9
matched 46:19
material 69:23
matter 9:24, 10:4, 48:3, 51:6, 64:23, 85:3, 85:6, 106:22
mean 5:12, 6:22, 19:21, 24:23, 25:24, 29:9, 34:1, 37:14, 38:18, 45:13, 47:14, 48:4, 98:12

*This page reproduces four transcript index pages (125, 126, 127, 128), each in two columns.*

## Page 125

Miranda 97:24
missing 70:4, 70:6
Mission 115:23,
116:1
Mmhmm 4:13,
53:18, 75:12,
88:11, 94:18
Mmmm 93:20
moans 93:14
Monday 3:3
monitor 34:4
months 13:22, 14:23
move 35:18, 35:23,
37:21, 38:1, 41:22,
54:8, 54:9, 54:10,
72:17, 96:3, 100:3,
111:19
moved 37:23, 41:14,
60:5, 60:17, 73:14,
73:21, 73:23,
74:21, 100:6,
107:16, 111:17
movement 38:3,
38:5
moving 31:9, 39:24,
40:5, 42:22, 41:19,
41:23, 44:19,
51:12, 51:15,
51:16, 52:9, 54:11,
56:7, 57:1, 58:18,
58:20, 60:8, 60:10,
60:12, 63:1, 63:5,
71:19, 72:1, 72:18,
73:24, 81:10,
82:11, 82:15,
84:20, 84:21,
86:15, 86:17,
86:19, 87:2, 87:4,
88:3, 86:18, 89:15,
92:21, 100:9
multiple 47:15,
47:20, 47:21
mumbled 93:13
mumbling 93:14,
94:13
Murray-wright 12:2,
12:24
Myself 19:5, 40:12,
40:16, 41:11, 43:2,
58:7, 60:18, 75:13,

66:14, 90:4, 107:2,
113:6

< N >
name 3:13, 4:21,
15:17, 18:3, 23:17,
23:23, 27:16,
55:20, 109:18,
112:22
named 9:12, 9:20
narcotics 18:6
natural 11:16
Near 33:21, 34:3,
35:23, 35:24,
36:13, 37:18, 78:2,
78:3, 79:14, 79:22,
90:16, 90:17,
90:19, 90:21
necessarily 67:16,
67:17
need 10:20, 11:1
needed 15:4, 15:5,
99:8
new 70:17, 70:18
next 11:5, 42:24,
77:20, 81:17, 82:1,
83:15, 88:25, 89:7,
89:22, 89:25,
92:11, 102:23
night 60:7, 91:6,
91:8, 91:10,
11:5:14
nine 65:2
No. 1:11, 4:23, 9:24,
10:25, 13:5, 13:15,
16:25, 19:23,
20:23, 21:2, 26:1,
29:13, 34:14,
40:10, 45:12,
40:15, 54:4, 59:12,
60:6, 62:7, 62:19,
63:10, 78:8, 84:10,
84:23, 92:3, 92:23,
95:6, 97:6, 97:20,
98:5, 98:11, 98:12,
99:8, 99:9, 100:15,
100:22, 101:15,
113:3
nods 10:23

noise 93:2
noises 93:8
None 26:2
Nope 18:14
nor 117:15
normal 11:16, 16:23
north 38:8, 38:14,
63:24
Notary 1:22, 117:2
Nothing 3:9, 21:2,
24:19, 30:10,
93:13, 93:14,
95:23, 102:19,
113:3, 117:6
notice 39:21, 26:22,
35:25, 26:2, 88:14
noticed 57:12
notified 28:12
Number 20:3, 76:8,
76:11, 101:18
Nursing 13:13,
13:16, 13:17

< O >
Oak 23:20
oath 116:6
object 38:25, 40:3,
82:4, 95:25
Objection 4:5, 6:5,
6:12, 6:21, 7:5,
8:8, 9:1, 9:21,
10:9, 17:6, 20:11,
22:12, 24:9, 24:20,
28:7, 38:9, 41:7,
44:5, 48:1, 49:9,
49:19, 50:21, 51:8,
51:25, 62:4, 67:12,
79:7, 83:11, 84:16,
94:8, 98:16, 100:3,
105:12
objections 53:7
obscure 94:8
observations 80:7
observe 34:5
observed 58:25,
58:25, 82:19
observing 80:10
obviously 21:6,
29:1, 47:14

occasion 23:6
occasionally 26:10
occasions 8:21,
9:25, 68:7, 68:12
occur 28:7
occurred 10:7,
62:21, 103:14
occurrence 22:23,
113:1
occurring 50:10
offense 11:3, 11:18
offhand 45:24
office 23:19
Officer 1:13, 1:14,
1:15, 1:48, 1:49,
3:15, 3:17, 9:9,
9:8, 9:17, 14:3,
15:23, 19:5, 19:7,
21:3, 22:11, 22:24,
26:20, 39:25,
47:16, 48:20,
76:11, 101:5,
101:15, 110:6,
113:15
officers 29:21, 63:7,
63:13, 102:24,
103:7, 103:11,
107:18, 113:13,
114:4, 114:14
often 21:19
on-duty 91:21
Once 6:15, 8:13,
8:15, 21:20, 21:21,
25:19
one. 91:13
ones 103:22, 113:13
onto the 56:24
open 88:12, 89:19
opinion 17:11
opposed 102:2, 89:9
opposite 81:12,
86:13
others 18:20
otherwise 115:19
Overtop 43:6, 43:9,
78:10
ow 107:2
own 17:16, 79:22,
80:2, 109:21

125

## Page 126

< P >
p.m. 115:8, 116:23
P382:51 1:41
P47966 1:30
pages 117:7
paper 75:23, 75:25
parked 73:21
parking 33:14
part 7:17, 24:14
particular 21:1
parties 117:15
partner 25:2, 25:22,
29:15, 30:6, 30:18,
43:2, 45:1, 58:7,
58:10, 58:10, 59:11,
62:10, 62:17,
62:18, 64:6, 64:7,
64:12, 64:25, 65:4,
68:5, 71:4, 72:1,
75:18, 75:19, 77:1,
84:22, 86:14, 89:6,
90:2, 90:8, 91:12,
95:19, 99:10,
111:19
partners 64:25
party 10:2, 48:15
passenger 28:23,
29:6, 29:6, 29:14,
34:22
pat 90:6, 99:16
patrol 15:23, 15:25,
20:20, 20:23, 70:2
patted 92:21, 92:24,
93:7
pavement 33:14
paying 36:1
PCR 109:24, 110:2
pedal 39:25, 40:11,
42:18, 43:17
pedaled 43:20
pedaling 41:4, 42:20
pen 77:14
pending 9:17
people 17:16, 18:25,
20:2, 20:4, 20:8,
20:24, 24:21,
26:17, 31:8, 32:10,
44:2, 46:13, 47:15,
47:21, 59:24, 78:2,

94:15, 97:7, 103:3
per 33:10, 98:24
period 15:7, 20:15,
23:4, 23:14
peripheral 52:6,
53:21, 53:24, 54:2,
54:7, 54:12, 54:15,
54:17, 58:12, 57:6
person 7:15, 10:8,
25:18, 25:23,
30:24, 34:8, 37:3,
39:25, 40:5, 41:28,
42:11, 46:12,
46:18, 47:3, 47:5,
48:23, 79:3, 79:6,
90:7, 94:5, 97:25,
101:4, 102:6,
104:12, 113:5
Personal 1:5, 1:37,
91:19
personally 9:12
persons 19:19, 59:6
phone 91:8, 91:10,
91:15
photographs 112:3
physical 15:6
pick 16:21, 17:15
picked 16:25, 17:1,
17:3
pictures 108:11,
111:11, 111:13,
111:15
pinpointing 105:16,
107:4
pissed 105:25
place 7:23, 19:16,
23:17, 23:23,
39:21, 77:6, 115:7,
117:12
places 94:6
placing 90:5
Plain 16:6, 16:7,
16:12, 16:14,
18:22
plaintiff 1:33, 10:3
Plaintiffs 1:10
play 12:24, 13:1,
13:3
plea 7:7, 7:8, 7:14,
47:21, 59:24, 78:2,
10:7

Please 3:13, 11:17,
53:10, 78:7, 99:19,
111:12
point 74:2, 41:21,
60:16, 77:17,
83:19, 85:22,
93:20, 103:16,
104:1, 105:11,
105:17, 114:9
pointing 43:13, 58:8,
59:21, 66:9, 70:21
Pos 19:1, 19:4
position 15:22, 18:9,
32:19, 38:21, 40:8,
40:16, 41:2, 45:20,
51:12, 55:20,
82:19, 101:19
positioned 38:17
positioning 42:5
positions 20:20
positive 42:8
possibility 47:9,
47:10, 48:19, 52:3,
104:24
possible 30:17,
87:23
Possibly 45:19
pow 81:4
Preliminary 2:16,
109:24, 109:25
Prep 91:3, 91:4,
91:6, 91:23, 92:1
prepare 110:24
prepared 110:21
presence 54:3
PRESENT 2:20,
64:10
press 46:102:16,
102:20
Pretend 38:22, 39:7
pretty 24:1, 43:20,
61:5, 60:10
previous 44:9
previously 52:21
Prior 5:8, 10:18,
27:7, 28:8, 37:10,
110:12, 113:7
priority 16:13
private 25:3
privilege 116:18

Probably 8:22,
16:22, 24:15,
57:14, 95:17,
95:20
Probation 7:11,
7:16, 23:14, 23:18,
24:15
problems 25:11
procedure 95:23
process 14:5, 14:7,
14:21, 99:19
produced 108:14,
108:16
program 24:23
protect 113:6
protocol 30:11, 68:9
provide 115:16
proximity 59:14
psychiatrist 15:9,
15:14, 22:10,
22:22
psychologist 22:10,
22:22
Public 1:22, 117:2
pull 48:17
pulled 37:24, 43:1,
49:1, 56:19, 59:20,
74:18, 90:20, 92:8,
92:10, 92:12,
92:14, 103:2,
101:18
pulling 45:2
pulse 99:4, 99:6,
100:14
punch 98:10
pursuant 1:25
put 17:23, 102:16,
102:20
puts 83:23

< Q >
qualified 102:7
question 5:13, 11:5,
11:9, 11:20, 26:8,
26:14, 29:25, 39:2,
40:6, 51:5, 52:21,
53:10, 56:22, 57:9,
59:7, 74:16, 84:12
priority 16:13
questions 10:21,

126

## Page 127

rectangles 76:13
referring 64:2
reflect 110:11
reflectors 46:7
regard 115:12,
101:18, 102:8
regarding 50:6
relation 51:21,
59:16, 64:13, 65:4,
72:20, 85:1
relative 9:6, 25:11,
29:9, 91:3, 91:4,
91:6, 91:23, 92:1,
92:2
radioed 90:2, 90:22,
91:2
ran 63:21, 77:19,
82:10, 112:21
rather 92:13
Re-ask 53:12, 53:16
78:9
reach 95:5
reaching 87:9, 87:19
reaction 68:3
read 53:9, 84:11,
97:15, 97:17
ready 29:10, 53:17,
57:5
Really 17:11, 29:22,
35:8, 41:13, 43:16,
80:18, 82:8, 86:4,
94:13, 95:9,
101:20, 102:9,
104:21, 108:21
reason 108:1
reasons 108:11, 113:4
recess 19:16
recollection 52:4,
67:2, 80:23, 85:17,
85:25, 87:12,
109:8
recommendation
15:3, 15:5
Record 2:16, 3:13,
7:18, 10:18, 11:1,
19:12, 19:16,
39:22, 53:5, 115:6,
115:8, 116:23
recorded 114:22,
115:19, 117:7

represents 76:23,
77:10, 77:15
reprimanded 8:7
reprimands 8:24,
25:11
required 110:5
respond 11:11
responder 101:2,
101:16, 101:24
responding 28:5
responsive 84:13
rest 79:21, 79:23,
80:1
resting 45:14, 45:17
retraining 21:13,
21:19, 22:7
review 50:3, 108:6,
112:2, 112:19
reviewed 108:10,
111:4, 111:11
revolver 62:12,
69:14, 63:16
revolvers 69:17
ride 39:17
riding 28:21, 30:1,
34:8
robbers 84:11, 91:15,
97:17, 97:24
Road 1:32, 13:18,
24:1, 24:2
Robert 1:7, 1:30,
1:38
rode 38:14, 42:25,
59:19, 61:10,
61:12, 60:19
role 15:22, 18:9
roll 60:19
rolled 93:1, 99:20,
99:24, 99:25,
100:3, 100:8
rolling 18:24, 34:15,
49:3, 69:14
rotation 16:23
rough 76:12
route 29:2
routinely 63:6, 63:17
Royal 23:19
rubbing 87:10
Rule 68:16, 112:9
Rules 1:26, 10:14,

52:19
run 31:14, 71:20,
72:7, 73:7, 81:8,
81:9, 81:12, 83:8,
112:2, 113:7,
113:8
running 29:17,
23:19, 59:25, 73:6,
73:9, 78:17, 77:4,
81:16, 81:22, 82:1,
82:2
runs 16:13, 74:1,
77:16, 63:1

< S >
safety 95:19
sat 29:14
saw 36:16, 36:23,
42:14, 44:10, 57:5,
58:16, 63:23,
64:12, 82:7, 84:4,
91:24
saying 4:9, 25:9,
28:4, 32:17, 38:16,
43:3, 57:21, 63:10,
68:7, 68:8, 78:3,
88:7, 103:25,
104:2, 104:4,
104:5, 104:10,
104:15, 105:8,
105:17, 107:8
says 105:10
scale 75:3
scene 28:8, 29:5,
29:15, 30:21,
30:23, 45:8, 45:11,
48:17, 49:18, 50:1,
50:7, 52:5, 63:14,
63:17, 74:25,
75:10, 76:16,
89:24, 101:17,
103:20, 104:1,
105:10, 114:4
scenes 47:15, 47:20,
47:23
School 12:1, 12:2,
13:3
schooling 12:21,
13:7

127

## Page 128

scout 38:7, 43:14
scream 107:6
screaming 105:5,
105:15, 114:11
screening 14:7
se 98:24
sea. 33:10
seat 31:12, 34:22,
58:12
seated 31:8, 33:8,
33:11
second 19:13,
37:17, 51:7, 53:2,
59:22, 72:2, 80:14,
80:16, 80:21, 81:1,
83:23, 89:6
seconds 43:6, 46:3,
80:17, 81:1, 85:3,
85:6, 92:8
security 13:11,
13:14, 13:25
seeing 31:4, 42:13,
85:8, 85:15
seem 81:3, 85:10,
53:9
seemed 92:13,
93:10, 94:25
seems 78:2:8
seen 26:17, 46:5,
46:7, 47:7, 56:25,
57:11, 72:17,
62:24, 94:6, 94:15,
98:19, 115:10
sent 21:13, 22:9,
23:19
sentence 7:10
separate 22:4
September 14:17
sequence 89:1
Sergeant 17:24,
18:10, 18:25, 19:2,
19:3, 19:11
series 16:6, 16:8,
16:9, 16:11, 16:15,
16:21, 100:20,
served 7:10
shape 29:11
share 27:12
Shawn 1:15, 1:49
shoot 34:16, 57:5,

583, 58:4, 57:18,
68:13, 74:7, 80:23,
104:18, 108:1
shortly 92:18
shot 25:17, 25:23,
56:13, 57:10, 58:1,
73:22, 98:25, 99:3,
99:5, 99:7, 99:9,
105:24
six-month 15:7
sizeable 20:2
slow 102:21
somebody 26:3,
95:24, 96:4, 96:24,
97:9, 101:24,
110:24, 111:2
somehow 80:1, 87:3
someone 17:11,
28:22, 27:1, 89:22,
92:4, 92:7, 97:22,
101:14, 101:16,
101:21, 106:10
sometime 103:24
Sometimes 48:5,
49:6, 48:9, 69:2,
69:20, 91:16,
91:20, 97:14,
107:2
Started 21:9, 40:10,
54:10, 56:25, 57:1,
57:18, 60:8, 71:18,
71:19, 71:20,
72:17, 73:8, 73:9,
80:13, 81:10,
82:11, 93:5,
starting 68:16
starts 39:25, 72:7
State 1:23, 3:13,
117:3
stated 62:13, 62:15
statement 36:12,
36:18, 108:2,
108:17, 109:4
statements 99:23,
108:15, 114:23,
115:18
STATES 1:1
stationary 31:9,
31:10
stay 17:5, 20:9, 35:7,
90:19, 90:21, 92:4

128

Stealth 29:19, 29:20,
  29:24, 30:1
Steel 28:13, 33:20,
  33:23, 33:24
stenographically
  117:8
stick 75:20, 76:2,
  76:13, 77:15
stock 13:15
stood 61:11
stop 11:21, 30:24,
  34:2, 34:13, 44:16,
  52:15, 52:17, 57:9,
  57:11, 67:15,
  67:18, 74:5, 74:11,
  79:11, 81:7,
  100:21, 102:11,
  102:14
stopped 12:21, 13:6,
  35:23, 51:15,
  51:16, 51:20,
  51:21, 52:8, 57:13,
  72:21, 72:22, 78:3,
  78:12, 79:13, 85:7,
  85:13, 85:19,
  85:20, 85:21,
  85:22, 86:5
stopping 51:24
straight 36:8
street 33:17, 33:18,
  33:19, 56:8, 56:9,
  61:21
strike 20:24, 30:4,
  103:24
struck 36:20
studies 12:19, 12:20
study 12:17
subject 10:4, 113:6
sued 4:3, 4:9, 4:20,
  5:5, 9:19
suffered 101:24
suit 9:13, 9:20
Suite 1:23, 1:43
Supervisor 17:15,
  17:17, 17:19,
  17:21, 17:23, 21:4,
  90:3, 103:17
Supervisors 107:25
supposed 68:14,
  96:23, 110:3,

110:8
suspect 54:11
suspended 6:9,
  7:22, 8:5
suspension 8:7,
  8:25
sworn 3:8, 117:5
synopsis 110:2
system 23:9, 23:10

< T >
TABLE 2:1
talked 15:14, 15:16,
  24:24, 62:20,
  95:19, 97:2,
  114:16
tap 67:5, 67:7, 67:9,
  67:10, 67:17,
  67:21, 67:22, 68:1,
  68:5, 68:11, 68:15,
  68:17
taught 67:5, 67:7,
  67:9, 67:20, 67:24,
  68:1, 101:18,
  101:19, 102:5,
  102:16
team 115:23, 116:1
techs 107:22
Ten 1:32, 57:21,
  61:13
term 29:21
terms 13:7, 29:11,
  61:8, 85:14, 89:6
testified 3:10, 39:1,
  40:4, 52:14, 97:1,
  115:10
testify 41:8, 112:23,
  117:5
testifying 9:5, 80:6
testimony 9:13,
  53:20, 72:5, 73:1,
  74:3, 95:8, 115:11
117:11
testing 14:9, 14:19,
  15:3, 15:6, 15:12
tests 15:6
therapist 15:9, 22:9
22:21
they've 48:14

thigh 43:14, 45:17
Thirty 16:6, 16:8,
  16:9, 16:11, 16:15
  18:2, 19:19, 20:9,
  46:3
Thornton 19:3, 19:11
though 46:6, 102:19
thousands 26:18
threat 67:10, 67:15,
  67:19, 68:4, 88:14,
  93:16, 93:25, 96:1,
  96:10
three 4:1, 5:24, 9:11,
  18:25, 19:4, 33:17,
  53:6, 66:16, 66:25
  67:3, 70:21, 71:23,
  73:25, 80:25, 81:5,
  85:10, 86:6, 89:25
Threw 72:19, 72:23,
  82:20, 83:23,
  85:18
throughout 22:2
throw 73:17, 83:22,
  87:21
throwing 83:20,
  84:5, 86:7
tight 79:5
till 15:24, 92:7
tire 38:15, 38:19,
  39:23, 39:13,
  39:18, 40:2, 42:22
title 18:9
Today 15:25, 71:1,
  76:4, 87:24,
  105:19, 108:7
together 60:14,
  60:5
took 14:23, 19:16,
  39:21, 43:14, 77:6,
  103:18, 107:24,
  108:1, 111:15,
  115:7
top 36:14, 43:9,
  51:4, 72:23
TORKELSON 1:22,
  117:2, 117:22
touch 49:13, 77:23
toward 40:5, 40:9,
  43:2, 43:11, 43:12,
  72:8

towards 37:23, 38:8,
  39:24, 59:1, 60:8,
  60:18, 68:4, 72:10,
  72:11, 74:21
traded 70:17
trained 21:18, 26:21,
  67:15, 67:18,
  67:22, 100:23,
  100:24, 100:25,
  101:2, 101:10,
  101:23, 102:9,
  102:12, 102:19
training 16:3, 21:3,
  21:18, 68:13
transcribed 117:8
transcript 115:10,
  117:10, 117:11
transpired 110:12
trauma 101:3,
  101:11, 101:25,
  102:2, 102:4
tried 76:19, 105:10
true 83:1, 110:3,
  110:5, 117:10
trust 76:3
truth 3:9, 117:5,
  117:6
truthful 111:9
truthfulness 111:5
Try 73:7, 99:7, 99:9,
  100:19, 102:21
trying 40:25, 84:14,
  84:15, 86:19, 87:6,
  88:4, 88:6, 88:18,
  89:15, 93:5, 93:11,
  93:22, 94:11,
  94:25, 95:1, 96:13,
  96:16, 102:6,
  103:5, 103:15,
  106:18, 107:13
turn 39:17, 42:18,
  47:23, 72:10, 73:3,
  73:12
turned 10:8, 37:23,
  38:7, 40:10, 41:11,
  59:4, 71:20, 71:21,
  72:11, 72:16,
  72:17, 72:18, 73:6,
  73:9, 73:16, 74:21,
  82:8, 82:11, 82:16,

129

83:5, 83:6, 83:14
turning 73:4
turns 39:25, 48:10,
  72:7, 72:8, 74:1,
  74:5, 83:1, 83:2
Twelve 23:22, 23:24,
  58:2, 61:13, 101:8
twice 8:13, 21:21,
  21:22
Two 3:24, 13:9,
  13:10, 22:1, 22:4,
  22:5, 30:9, 31:8,
  32:10, 35:13, 44:2,
  46:13, 51:7, 55:9,
  59:6, 59:24, 69:25,
  72:2, 77:2, 79:6,
  80:14, 80:21, 81:4,
  81:5, 85:10, 86:6,
  89:25, 114:4,
  114:13
type 12:14, 55:24,
  55:3
typed 111:1, 111:2
types 26:21

< U >
uh-uh 10:24
umbrella 18:23
underneath 36:24
understand 11:21,
  11:25, 39:5, 40:15,
  40:25, 41:3, 52:19,
  56:18, 57:4, 69:22,
  75:5, 82:10
understood 40:6,
  106:7, 108:0
unholster 45:5
unholstered 45:6,
  45:8
unit 16:6, 16:12,
  17:2, 17:13, 18:24,
  18:25, 28:4, 90:3,
  92:8, 92:10, 92:11,
  99:11, 103:2
UNITED 1:1
units 18:4, 18:5,
  18:22, 90:4
until 11:10, 37:21,
  38:1, 92:4, 102:6,

116:18
upset 105:24, 106:8
107:14
using 33:8, 55:9,
  55:22, 76:13

< V >
Various 8:15
vehicles 77:2
verbally 10:21
vicinity 50:20
view 57:3, 58:25,
  74:15, 75:7
violence 6:19, 10:8,
  23:5, 24:16
vision 52:11, 53:22,
  54:3, 54:7, 54:17,
  77:18, 81:20
Vista 28:12, 33:20,
  33:22, 33:23,
  56:10, 60:1
visual 39:8
vitals 100:12
vs 1:11

< W >
Wait 11:9, 44:16,
  53:4
waiting 45:11
walk 89:5, 89:24,
  113:24
walking 31:6
wanted 24:22,
  108:17
watching 34:6,
  93:22
Wayne 12:8, 12:11,
  12:22
weapons 28:15,
  32:2, 49:18, 49:25,
  50:2, 50:10, 50:12,
  50:20, 52:2, 62:8,
  70:18, 86:13, 90:7,
  96:22, 99:17
week 21:21, 21:22
weeks 22:1, 22:5
West 1:32
Whatever 11:22,

70:16, 81:4, 92:11,
  115:17
whether 53:15, 96:2
  101:25
whoever 17:15
whole 3:9, 14:21,
  107:9, 117:5
whom 108:4
will 11:15, 11:17,
  11:23, 26:13,
  32:24, 116:16
Winchester 55:7
wind 94:16
withdraw 53:12,
  53:16
within 59:22, 72:2,
  78:5, 78:19, 80:14,
  80:21, 93:14, 92:8
without 8:7
WITNESS 2:4, 4:10,
  4:12, 8:2, 9:6,
  9:16, 9:24, 18:1,
  44:7, 76:5, 103:9,
  103:11, 108:24,
  112:11, 112:13,
  113:18, 113:20,
  114:10, 114:20,
  117:12
witnesses 103:8
Woodward 1:23,
  1:43, 23:24, 24:1
word 105:16
words 10:22, 11:1,
  11:6, 15:1, 24:13,
  28:5, 81:25, 83:17,
  109:21, 103:22
work 13:19, 20:14,
  91:15
worked 16:4, 16:5,
  17:12, 19:9
Working 4:24, 13:9,
  16:14, 18:22,
  18:23, 19:19,
  19:20, 20:9
works 20:15
wound 87:11, 102:3,
  102:18, 102:20
wounds 93:13,
  93:15, 96:20,
  93:24, 100:17

written 5:21, 68:16,
  114:22, 115:13,
  115:18

< Y >
year 7:11, 12:13,
  21:22, 22:2, 22:5
yearly 21:20
years 4:1, 9:11,
  12:11, 16:16,
  16:17, 16:18, 65:2,
  101:9
yelling 32:21
Yep 10:21, 18:16,
  80:24, 100:5,
  102:25, 105:23,
  112:13
yourself 25:17

130



# TRI-COUNTY COURT REPORTERS, INC.

(248)608-9250 Fax (248)608-9252

www.tri-countycourtreporters.com

## Transcript of the Testimony of

# ADRIAN SINGLETON

### Date:  April 28, 2011

## Mary E. Hill

v

## Police Officers Dew, Singleton, and Geraud

SHEET 1 PAGE 1

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARY E. HILL, As Personal Representative
of the Estate of ROBERT DWAYNE HILL,
Deceased, and ALBERT BURSEY,

              Plaintiff,

                               CASE NO:10-cv-11427

vs

POLICE OFFICER JELANI DEW,
POLICE OFFICER ADRIAN SINGLETON,
and POLICE OFFICER SHAWN GERAUD
In Their Individual Capacities,

              Defendants.
_____/


The deposition of ADRIAN SINGLETON,

taken before me, Susan M. Hans, CER-8085, on April 28, 2011,

at 660 Woodward Avenue, Suite 1650, Detroit, Michigan,

commencing at or about 9:45 a.m.

APPEARANCES:

        ROBERT M. GIROUX, ESQUIRE
        FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX
        19390 West Ten Mile Road
        Southfield, MI 48075
        248-355-5555

        Appearing on behalf of the Plaintiff.

        JANE KENT MILLS, ATTORNEY AT LAW
        CITY OF DETROIT LAW DEPARTMENT
        660 Woodward Avenue, Suite 1650
        Detroit, MI 48226
        313-237-5060

        Appearing on behalf of the Defendants.

SHEET 2   PAGE 2

2

1                    INDEX
2   WITNESS: ADRIAN SINGLETON              PAGE
3   Direct Examination by Mr. Giroux          3
4
5
6
7                  * * * * *
8              INDEX OF EXHIBITS
9   EXHIBIT
10  No. 1 - Activity Log              97
11  No. 2 - Preliminary Complaint Record   97
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

PAGE 4

4

1   A   It was an incident involving other officers.
2   Q   You were a witness?
3   A   Yes.
4   Q   What other officers was it involving?
5   A   Julian Morgan.
6   Q   Was he alleged to have done something wrong?
7   A   Yes.
8   Q   Okay. You were not alleged to have done something wrong?
9   A   No.
10  Q   Have you ever been sued?
11  A   No.
12  Q   Have you ever been a plaintiff in a lawsuit?
13  A   No.
14  Q   So you've never been in any litigation at all, except for
15      this case?
16  A   Yes.
17  Q   Okay. What was the other deposition?
18  A   It was an allegation of a house being burned down or
19      something of that matter. I was just the witness in that
20      one, also.
21  Q   Okay. How long ago was that?
22  A   About 12 years ago now.
23  Q   Did you review anything before the deposition started
24      today?
25  A   No, I didn't.

---

PAGE 3

3

1              April 28, 2011
2             Detroit, Michigan
3               9:45 a.m.
4
5
6          ** ** ** ** ** **
7            ADRIAN SINGLETON
8   was thereupon called as a witness herein and, after having
9   been first duly sworn to tell the truth, the whole truth and
10  nothing but the truth, was examined and testified as follows:
11         ** ** ** ** ** **
12           DIRECT EXAMINATION
13  BY MR. GIROUX:
14  Q   Please state your full name for the record.
15  A   Adrian Singleton.
16  Q   Adrian, do you have a middle name?
17  A   Yes. It's Darcy, D-A-R-C-Y.
18  Q   Have you had your deposition taken before?
19  A   Yes.
20  Q   How many times?
21  A   Two.
22  Q   When was the last time?
23  A   Six or seven years ago.
24  Q   And in connection with what were you deposed six or seven
25      years ago?

---

PAGE 5

5

1   Q   Did you review anything before the deposition was to
2       start a couple of days ago?
3   A   Yes.
4   Q   What did you review?
5   A   My preliminary complaint record.
6   Q   Relative to the subject shooting?
7   A   Yes.
8   Q   Okay. You reviewed it that day, I suspect, once or
9       twice; is that correct?
10  A   Yes, I read it over once.
11  Q   Okay. And you were supposed to be deposed on earlier
12      dates, and things got moved around or scheduling got
13      mixed up; do you recall that?
14  A   Yes.
15  Q   Did you see the PCR on those dates?
16  A   No, I didn't.
17  Q   Okay. Did you testify with -- I keep calling it I.A. but
18      I know that it's not technically called I.A.
19  A   Yes. It's Force Investigations, something like that.
20  Q   Right. So there's a department called Force
21      Investigations?
22  A   Yes. I believe it's a part of Internal Affairs, I
23      believe.
24  Q   Okay. Did you testify for a Force Investigation inquiry
25      into this shooting?

SHEET 3   PAGE 6

6

1  A  Yes.
2  Q  Okay.  Do you know when that was?
3  A  It was several months ago.
4  Q  Several months ago?
5  A  Yes.
6  Q  Was it in this year, 2011?
7  A  Yes, I believe so.
8  Q  Okay.  And did you testify --
9  A  No, no.  It might have been at the end of the last year
10    sometime.
11  Q  Okay.
12  A  I don't quite remember.
13  Q  That's all right.  It's the end of April now,
14    essentially.  Do you believe it was in the last six
15    months?
16  A  Yeah, maybe in the last six months.
17  Q  Okay.
18  A  It might have been in 2011.
19  Q  All right.
20  A  It might have been end of last year.
21  Q  All right.  And your partner -- You sat through your
22    partner's deposition the other day?
23  A  Yes.
24  Q  That was, I believe, Monday and today's Thursday, right?
25  A  I believe that's correct.

PAGE 7

7

1  Q  Okay.  And how long have you two, you and Officer Dew,
2    been partners?
3  A  Eight or nine years.
4  Q  All right.  Are you friends?
5  A  Yes.
6  Q  Good friends?
7  A  Yes.
8  Q  Do you hang out socially outside of work?
9  A  Not a lot.  Occasionally.
10  Q  Occasionally?
11  A  Yes.
12  Q  Okay.  I think he said he was married.  Was he married?
13  A  Yes.
14  Q  Are you married?
15  A  Yes, I am.
16  Q  Do the four of you hang out?
17  A  No.
18  Q  So just you two?
19  A  Yes.
20  Q  Okay.  Do you have any hobbies together?  Or is it just
21    social stuff; barbecues, going to watch the ball game?
22  A  Just social things like that.
23  Q  Okay.  No hobbies like building anything, traveling,
24    boating?  I don't know.
25  A  No.

PAGE 8

8

1  Q  Do you play sports together; softball teams, flag
2    football teams, anything like that?
3  A  No.
4  Q  Okay.  Where did you go to high school?
5  A  I went to Detroit Mumford.
6  Q  Okay.  When did you graduate?
7  A  1995.
8  Q  And did you go to college after that?
9  A  No, I didn't.
10  Q  What did you do after that?
11  A  I worked for the Kmart Corporation as a processing
12    receiver.
13       MS. MILLS:  As a what?
14       THE WITNESS:  Processing receiver.  I
15    loaded trucks and took inventory, until I got hired by
16    the Detroit Police Department.
17  Q  (Continuing by Mr. Giroux):  Okay.  How long were you
18    with Kmart, approximately?  I know it was a long time
19    ago.
20  A  Three years.
21  Q  Okay.  And while working there, you decided you wanted to
22    be a police officer?
23  A  Yeah.
24  Q  Any special reason?
25  A  My father was a police officer, so I grew up on it.

PAGE 9

9

1  Q  Is he still a police officer?
2  A  He's deceased.
3  Q  Okay.  I'm sorry about that.  How long was he a police
4    officer?
5  A  32 years.
6  Q  Okay.  What was his first name?
7  A  Arnold.
8  Q  Same last name?
9  A  Last name Payne.  Payne, P-A-Y-N-E.
10  Q  All right.  And you I applied for a position with the
11    Detroit Police Department?
12  A  Yes.  That's correct.
13  Q  Did you apply anywhere else?
14  A  No, I didn't.
15  Q  All right.  Were you accepted the first time?
16  A  No, I wasn't.
17  Q  Okay.  How many times did you apply?
18  A  I twice, twice.
19  Q  Okay.  The first time, did you just get a rejection?  Or
20    "We're full"?  Or "We don't have any space"?
21  A  I was going through the processing and I got a ticket
22    and . . .
23  Q  Okay.
24  A  My application was recycled because of that.
25  Q  All right.  What kind of ticket?

SHEET 4  PAGE 10

10

1  A  It was just like a seatbelt ticket, I believe.
2  Q  Really?  They stopped your processing because of a
3     seatbelt ticket?
4  A  Yes.
5  Q  All right.  And did they tell you that you had to wait a
6     certain period before you reapplied?
7  A  I believe it was like six months or something like that.
8  Q  Okay.  Were there any other holdups with the processing
9     the first time?
10 A  It was one more, and it was something to do with my last
11    name.  I used Payne all the way through high school, and
12    then when I applied for the police department I had a
13    birth certificate that said Payne and Singleton on it.
14    And they deactivated my application because of that until
15    I got it fixed, so that was like another six months.
16 Q  Your birth certificate says that you're Adrian Payne and
17    Singleton?
18 A  It did.
19 Q  Okay.  What's wrong with that?
20 A  At the time.  I'm not sure.
21 Q  Okay.  And so it was a seatbelt ticket issue, and also
22    there was some confusion as to what your last name was?
23 A  My last name, yes.
24 Q  Okay.  And you believe that's because your high school
25    transcripts and your information about you being a young

PAGE 11

11

1     man said Payne, but your birth certificate said Payne
2     Singleton?
3  A  Right.
4  Q  Okay.  Were there any other holdups in the processing of
5     your initial job application and going through the
6     process of trying to get hired?
7  A  I believe that was all.
8  Q  Okay.  They didn't tell you anything else?
9  A  No.
10 Q  All right.  And then you had to wait six months and then
11    reapply?
12 A  Yes.
13 Q  Who told you that?
14 A  Recruiting.
15 Q  Okay.  And then did you reapply?  Obviously, you
16    reapplied because you're a police officer today.  Was
17    there any problems with the second processing?
18 A  No.
19 Q  Okay.  Went through smoothly?
20 A  Yes.
21 Q  Okay.  Did you have to go through exams and mental or
22    psychological testing or profiling?
23 A  There were a couple; a physical test, two written tests,
24    and there was a psychological exam at the end.
25 Q  Okay.  Any problems with any of that processing?

PAGE 12

12

1  A  No.
2  Q  All right.  Did you play sports in high school?
3  A  No.
4  Q  Did you play sports outside of high school?
5  A  Yes.
6  Q  Was it in a league?
7  A  No.  It was recreational.
8  Q  Okay.  Do you have any martial arts training?
9  A  No, I don't.
10 Q  Okay.  Do you have any training in any sort of physical
11    defense or tactics, other than that which you've received
12    through the Department?
13 A  No, I don't.
14 Q  Okay.  I assume, since you're a police officer, you've
15    never been arrested for anything involving theft or
16    dishonesty --
17       MS. MILLS:  Let me object that it's -- I'm
18    sorry.  I'll let you finish your question.
19 Q  (Continuing by Mr. Giroux):  -- is that correct?
20       MS. MILLS:  Let me object that the
21    question is overbroad and the information is
22    inadmissible.  But you can answer the question.
23       THE WITNESS:  That's correct.
24 Q  (Continuing by Mr. Giroux):  Okay.  All right.  What's
25    the date that you started with the police department, if

PAGE 13

13

1     you know, approximately?
2  A  3-1-99.
3  Q  And did you go to the Academy after that?
4  A  Yes.  That's the day I started at the Academy.
5  Q  Okay.  And did you just go to the Academy once?
6  A  Yes.
7  Q  All right.  And after the Academy, did you start working?
8  A  Yes.
9  Q  In what capacity; patrol?
10 A  Patrol.
11 Q  All right.  Have you been in patrol ever since?
12 A  Yes.
13 Q  Okay.  But you did work for a period of time on that
14    special unit that your partner testified about on Monday?
15 A  Yes.
16 Q  What was that called again?
17 A  Special Operations.
18 Q  Special Operations.  And who put you on Special
19    Operations?
20 A  Sgt. Donald Coleman.
21 Q  And was the sergeant a friend of yours?
22 A  No, not at the time.
23 Q  Okay.  Is he now?
24 A  Yes.
25 Q  Okay.  Do you hang out outside of work?

SHEET 5   PAGE 14

14

1  A  From time to time.
2  Q  Okay. Is he about the same age, give or take?
3  A  No. He's older.
4  Q  Older gentlemen?
5  A  Yes.
6  Q  All right. Who took you off of Special Operations?
7  A  I was taken off twice. One was by a Sgt. Rodney Jackson.
8  Q  Okay. And the second time, who took you off?
9  A  It was a Lt. Darryl Brown (ph).
10        MS. MILLS: Darryl who?
11        THE WITNESS: Brown.
12  Q  (Continuing by Mr. Giroux): All right. And then were
13     you told the first time why you were being taken off of
14     that Special Operations unit?
15        MS. MILLS: Let me object to relevance.
16     You can answer the question.
17        THE WITNESS: Yes, I was.
18  Q  (Continuing by Mr. Giroux): Tell me why.
19  A  I believe it was more like a nepotism situation. He
20     didn't feel -- The sergeant didn't feel like he was
21     getting the same attention as other sergeants. He was
22     upset that we didn't hang out with them after work, and
23     things of that nature, and that's why we were removed.
24  Q  Let me just back up and make sure I understand. And I
25     may be mistaken, but I thought nepotism dealt with family

PAGE 15

15

1     relations within the --
2  A  Hm-hmm, no.
3        MS. MILLS: Let me just interrupt you for
4     a second. For the court reporter's sake, make sure you
5     wait until he finishes the question.
6        THE WITNESS: Okay. I'm sorry.
7  Q  (Continuing by Mr. Giroux): So whether I have the
8     meaning of the word incorrect or you do, let me just
9     check and see, using different words. Was there an
10     allegation that Sgt. Rodney, or others, had concerns that
11     people who were related worked together and were playing
12     favorites?
13  A  Well, no. Playing favorites, the other officers, is why
14     I say that.
15  Q  Without being family related?
16  A  Without being family relations. Just persons working
17     with each other.
18  Q  Okay. So if I say favoritism, you understand what --
19  A  Yeah. That's fine. Favoritism.
20  Q  All right. So you believe -- Strike that.
21        Sgt. Rodney told you that he believed
22     there was favoritism occurring in the Special Operations
23     unit and wanted you out?
24  A  Yes.
25  Q  Okay. And he believed you were getting favoritism from

PAGE 16

16

1     somebody else?
2  A  Yes.
3  Q  Who?
4  A  The supervisors.
5  Q  Who?
6  A  The Sergeant, Donald Coleman.
7  Q  Okay. Anybody else?
8  A  My partner, Jelani Dew.
9  Q  Well, you guys were --
10  A  We were working with each other.
11  Q  Yeah. They would expect you guys to be close, right?
12  A  Right.
13  Q  What type of favoritism can occur?
14  A  I'm not sure.
15  Q  Were you just nice to each other? Or assignments? I
16     mean, can you control assignments?
17  A  I'm not sure exactly what it was.
18  Q  Okay. That's all he said to you, was something -- And I
19     know you don't remember the exact words, but something
20     having to do with too much favoritism?
21  A  Correct.
22  Q  Okay. And then how did you get back on?
23  A  I was brought up by another sergeant.
24  Q  Who?
25  A  His name was Jason Thornton (ph).

PAGE 17

17

1  Q  Okay. And how long did you stay the second time,
2     approximately? This is, I know, some time ago.
3  A  Three years.
4  Q  Okay. Were you taken off a second time?
5  A  Yes.
6  Q  All right. And you said Lt. Darryl Brown took you off?
7  A  Yes.
8  Q  Did he explain to you why?
9        MS. MILLS: Let me again object to
10     relevance. You can answer.
11        THE WITNESS: It wasn't initially
12     explained to me, but it was later found out that he
13     just --
14        MS. MILLS: Let me interrupt you for a
15     second. The question was, "Did he explain to you why?"
16        THE WITNESS: No, he didn't.
17  Q  (Continuing by Mr. Giroux): Okay. Did anybody, at any
18     time, tell you why you were taken off that second time?
19  A  No.
20  Q  Did you ever have an understanding as to why you were
21     taken off, whether it's based on conversation, paperwork,
22     or just your belief based upon what you saw and heard?
23  A  Yes.
24  Q  What was your understanding?
25  A  He was the new supervisor of the unit and he was just

SHEET 6  PAGE 18

18

1    bringing in his own people.
2  Q  Okay. Have you been in patrol ever since then?
3  A  Yes.
4  Q  Okay. And when did that Special Operations unit
5    assignment end, approximately? And I know you probably
6    don't have the --
7  A  '07, '08. Something around there.
8  Q  Okay. All right. Have you ever been disciplined at
9    work?
10       MS. MILLS: Let me object to relevance.
11   But you can answer the question.
12       THE WITNESS: Yes.
13  Q  (Continuing by Mr. Giroux): How many times?
14  A  I have two reprimands. I believe, one is for court
15    appearance and one is for, I want to say, being late.
16  Q  Okay. When you say "court appearance," does that mean
17    not showing up?
18  A  I was late to court.
19  Q  Okay. And late enough that it affected the case?
20       MS. MILLS: Let me object. Calls for
21   speculation. You can answer.
22       THE WITNESS: No, it didn't affect the
23   case. But, you know, they checked the times that you
24   punch on the subpoena sometimes.
25  Q  (Continuing by Mr. Giroux): Okay.

PAGE 19

19

1       MS. MILLS: Let me interrupt. I
2   apologize, Bob. I think you said two reprimands; one for
3   a court appearance and one --
4       THE WITNESS: Yes.
5       MS. MILLS: -- for being late?
6       THE WITNESS: Late. Just being late to
7   roll call.
8       MS. MILLS: Late to roll call.
9  Q  (Continuing by Mr. Giroux): All right. The court
10    appearance; was it 36? Was it District Court? Was it
11    Circuit Court?
12  A  I believe it was --
13  Q  Or Criminal Court?
14  A  I believe it was 36.
15  Q  Okay. And who reprimanded you?
16  A  I don't recall.
17  Q  Who was your super --
18  A  I don't recall who was acting.
19  Q  Ten years ago?
20  A  Maybe, about eight.
21  Q  Okay. All right. And the late for roll call; when was
22    that?
23  A  That would be five years ago.
24  Q  Okay. So based upon your statement about these two, and
25    only two, reprimands, is it correct to say you've never

PAGE 20

20

1    been suspended?
2  A  No, I was suspended. I have been suspended.
3  Q  How many times?
4       MS. MILLS: I continue my objection to
5    relevance. You can answer.
6       THE WITNESS: Just once.
7  Q  (Continuing by Mr. Giroux): When was that?
8  A  That was in 2008, I believe.
9  Q  For what?
10  A  '07, '08. It was for a domestic violence situation I had
11    with my wife.
12  Q  Were you ever charged?
13       MS. MILLS: Let me object to relevance.
14   You can answer.
15       THE WITNESS: No.
16       MS. MILLS: Meaning charged criminally?
17       MR. GIROUX: Yes.
18  Q  (Continuing by Mr. Giroux): Did you have to fill out a
19    police report?
20  A  Did I have to fill one out?
21  Q  Like answer one. Were you interviewed by a police
22    officer?
23  A  No.
24  Q  Okay. Was your wife interviewed by a police officer?
25       MS. MILLS: Objection. Calls for

PAGE 21

21

1    speculation.
2       THE WITNESS: Yes.
3  Q  (Continuing by Mr. Giroux): What's her name?
4  A  Diedra, D-I-E-D-R-A, Giddens, G-I-D-D-E-N-S.
5  Q  You're still married?
6  A  Yes.
7  Q  Okay. Is this your only marriage?
8  A  Yes.
9  Q  And Officer Dew's wife's name?
10  A  It's Lawanda (ph).
11  Q  Lawanda Dew?
12  A  Yes.
13  Q  The domestic violence situation, it didn't result in
14    charges, right?
15       MS. MILLS: Asked and answered. You can
16   answer.
17       THE WITNESS: No, it did not.
18  Q  (Continuing by Mr. Giroux): Okay. So how did you get in
19    trouble?
20       MS. MILLS: You mean internally, with the
21   Department?
22       MR. GIROUX: Yes, ma'am.
23       MS. MILLS: Okay. You can answer, if you
24   know.
25       THE WITNESS: I'm not sure.

SHEET 7   PAGE 22
22

1  Q  (Continuing by Mr. Giroux): I mean, how did anybody find
2     out?
3        MS. MILLS: Objection. Calls for
4     speculation.
5  Q  (Continuing by Mr. Giroux): If you know.
6  A  Find out?
7  Q  About the domestic violence situation, as you described
8     it?
9  A  Because the police were called.
10 Q  Okay. Do you know who --
11       MS. MILLS: Do you know who was --
12       THE WITNESS: You mean the officers?
13 Q  (Continuing by Mr. Giroux): Yes. Do you know what
14    officers came to your house?
15 A  No, I don't.
16 Q  Did they come to your house? Or a public place?
17 A  No, they came to my house.
18 Q  Can you tell me what was initially alleged?
19       MS. MILLS: Let me object to relevance.
20    And I think it's bordering on invasion of privacy. But
21    you can answer that question.
22       THE WITNESS: You know what, I'm not sure
23    what was alleged. I was never told.
24 Q  (Continuing by Mr. Giroux): Did you know your wife was
25    calling -- Did she call the police?

PAGE 23
23

1  A  Yes.
2  Q  Did you know she was calling the police?
3  A  No.
4  Q  Okay. I assume you weren't taken into custody; they saw
5     that you were a police officer?
6        MS. MILLS: Well, I think it's a two part
7     question. Was he taken into custody? You can answer
8     that question.
9        THE WITNESS: I was taken to the station.
10 Q  (Continuing by Mr. Giroux): Okay. You told them you
11    were -- They knew -- Did they know you?
12 A  No, I didn't know them. But I did notify them I was a
13    police officer.
14 Q  Okay. And they took you down to the station?
15 A  Yes.
16 Q  What station?
17 A  It was Number 6. I guess it's Northwest District now.
18 Q  Okay. Who told you you could go home?
19 A  One of the supervisors.
20 Q  Do you know who?
21 A  I don't recall.
22 Q  Okay. So that's how the Department found out and how you
23    got in trouble?
24       MS. MILLS: Objection. Calls for
25    speculation.

PAGE 24
24

1  Q  (Continuing by Mr. Giroux): If you know.
2  A  It wasn't a secret from them. That's how I guess they
3     knew. I mean, the police were called out to our home.
4  Q  Okay. So then what happened at work? What happened at
5     work?
6  A  What do you mean, what happened at work?
7        MS. MILLS: You mean regarding the
8     discipline?
9  Q  (Continuing by Mr. Giroux): I assume a supervisor or a
10    manager called you up and called you into the office and
11    said, "Hey, look, you had this arrest and we don't act
12    like this," or "This is a problem because you're a police
13    officer." What happened? I don't -- I've never been
14    through this.
15       MS. MILLS: Well, let me object. I think
16    he's answered that he was suspended. Are you asking him
17    to elaborate on that? Or are you asking him --
18 Q  (Continuing by Mr. Giroux): Who called you in and talked
19    to you about this?
20 A  I had -- I don't recall who it was. But I had a trial
21    board inquiry.
22 Q  Okay. See, I didn't know that. That's kind of what I'm
23    looking for. So then a trial board inquiry. I assume
24    you had representation, like a Union person?
25 A  Yes.

PAGE 25
25

1  Q  Okay. And then is it -- Like do you sit in a room and
2     talk to the panel? Or how does it happen?
3  A  There was a panel, but I never went in and talked to
4     them.
5  Q  Okay. Any reason why not?
6        MS. MILLS: Let me object. First of all,
7     it's irrelevant. And the question may call for you to
8     reveal attorney-client communications. If you can answer
9     without doing so, you may.
10       THE WITNESS: I can't.
11       MS. MILLS: You cannot?
12       THE WITNESS: I cannot.
13 Q  (Continuing by Mr. Giroux): Okay. Would it be correct
14    to say then that your wife was not injured?
15 A  No, she was not.
16 Q  So that would be correct to say?
17 A  Yes.
18 Q  All right. Have you been suspended on any other
19    occasions?
20       MS. MILLS: Again, object to relevance.
21    You can answer.
22       THE WITNESS: No, I have not.
23 Q  (Continuing by Mr. Giroux): All right. Have you been
24    disciplined in any other way, shape, or form, other than
25    the two reprimands you told me about and the one

SHEET 8   PAGE 26

**26**

1   suspension?
2   A   No, I haven't.
3   Q   Okay. Have you had any citizen complaints filed against
4       you?
5           MS. MILLS: Objection to relevance. You
6   can answer.
7           THE WITNESS: Yes, I have.
8   Q   (Continuing by Mr. Giroux): How many, if you know?
9   A   More than one, less than ten.
10  Q   Is that as accurate as you can be today?
11  A   Yes.
12  Q   There's a big difference between two and eight or two and
13      nine.
14          MS. MILLS: That's not a question. That's
15  a comment.
16  Q   (Continuing by Mr. Giroux): You really don't know if
17      it's two or if it's nine or eight?
18  A   No, I'm not sure.
19  Q   Is it closer to ten? Or closer to one?
20  A   I'm not sure.
21  Q   Do you know what any of them were for?
22          MS. MILLS: Objection to relevance.
23          THE WITNESS: Maybe, demeanor.
24  Q   (Continuing by Mr. Giroux): Maybe demeanor? Or yes,
25      demeanor?

PAGE 28

**28**

1   Q   Okay. Do you keep copies of the citizen complaints?
2   A   No, I don't.
3   Q   Do you keep track of them in any way, shape, or form?
4   A   No.
5   Q   Okay. Do you have to respond to them, either verbally or
6       in writing?
7   A   Yes.
8   Q   Which way?
9   A   Sometimes we do them verbally. Sometimes we do them in
10      writing.
11  Q   Okay. And do you believe that for all the citizen
12      complaints you've received that you've responded to them?
13  A   Yes, I believe so.
14  Q   Okay. And would that be just to a supervisor? Or is
15      there a different section for complaints?
16  A   I believe I gave them to Internal Affairs.
17  Q   Okay. And that's where your responses go?
18  A   I believe so, yes, sir.
19  Q   Did any of these complaints turn into anything more than
20      their complaint and your response?
21          MS. MILLS: Again, object to relevance.
22  You can answer.
23          THE WITNESS: They were all unfounded.
24  Q   (Continuing by Mr. Giroux): So there's a finding?
25  A   Yes.

PAGE 27

**27**

1   A   Demeanor, procedure.
2   Q   These are citizens who are complaining, right, not
3       coworkers?
4   A   Yes.
5   Q   Okay. Do you remember that one was for demeanor?
6   A   One, dealing with demeanor. And one I know,
7       specifically, was for procedure.
8   Q   What do you mean by "procedure"? How would a citizen
9       know what your procedures are supposed to be?
10          MS. MILLS: Let me object. Lack of
11  foundation and calls for speculation.
12          THE WITNESS: I'm not sure. That's just
13  how they have it -- they had it listed on the complaint.
14  Q   (Continuing by Mr. Giroux): Well, what do they say you
15      did wrong, procedurally?
16  A   I don't recall.
17  Q   Okay. In terms of your demeanor, what did the citizen
18      say you did wrong?
19  A   I don't recall.
20  Q   Okay. Do you remember any of the others?
21  A   No.
22  Q   Have you ever seen your employee file?
23  A   No, I haven't.
24  Q   Have you ever asked for it?
25  A   No.

PAGE 29

**29**

1   Q   Okay. By I.A.?
2   A   That's correct.
3   Q   All right. And before they were determined unfounded,
4       did any of them involve more than just the citizen
5       complaint and then your response?
6           MS. MILLS: Let me object. Calls for
7   speculation. You can answer.
8           THE WITNESS: Okay.
9   Q   (Continuing by Mr. Giroux): I assume that they can ask
10      for partner statements or witness statements or those
11      types of things looking for corroboration for your
12      version of events; is that correct?
13          MS. MILLS: Same objection. You can
14  answer.
15          THE WITNESS: Yes.
16  Q   (Continuing by Mr. Giroux): Okay. Did any of that occur
17      in any of those?
18          MS. MILLS: Objection. Calls for
19  speculation.
20          THE WITNESS: I don't recall.
21  Q   (Continuing by Mr. Giroux): Okay. You're going off duty
22      or away or on leave?
23  A   Excuse me?
24  Q   I was told the other day that we had to get your
25      deposition in quickly because you were going on leave.

SHEET 9   PAGE 30

                                                              30

1  A  Yes.
2         MS. MILLS: You can answer.
3  Q  (Continuing by Mr. Giroux): What's the leave for?
4         MS. MILLS: Objection to relevance. Let
5  me go off the record.
6         (At or about 10:16 a.m. a short discussion
7              was held, off the record, and the
8              deposition resumed at or about 10:18 a.m.)
9  Q  (Continuing by Mr. Giroux): The question pending was why
10  were you going on leave?
11  A  For a medical issue.
12  Q  Okay. A physical medical issue? Or mental medical
13  issue?
14         MS. MILLS: Let me object that it's an
15  invasion of his privacy. And I will instruct him not to
16  answer anything further.
17  Q  (Continuing by Mr. Giroux): Okay. So you won't answer
18  that question, whether it's physical or mental, correct?
19  A  Correct.
20  Q  Okay. And that's based upon your Counsel's advice,
21  right?
22  A  Yes.
23  Q  Okay. When is it going to start?
24         MS. MILLS: When is what going to start;
25  the leave?

PAGE 31

                                                              31

1         MR. GIROUX: Yeah. I assume he's got the
2  condition right now.
3         MS. MILLS: Okay.
4         MR. GIROUX: I don't think you can time
5  these things. I can't tell you that next week I'm going
6  to have a physical or mental condition.
7         MS. MILLS: No. I didn't understand your
8  question. When is the leave going to start is the
9  question.
10         MR. GIROUX: That's not the test. The
11  test is whether or not he understands the question.
12         MS. MILLS: No, no, no. I -- Fine. Was
13  your question, "When does the leave start?"
14         MR. GIROUX: Yes, ma'am.
15         MS. MILLS: Okay. You can answer that
16  question.
17         THE WITNESS: The fourth of May.
18  Q  (Continuing by Mr. Giroux): Okay. When will it be over?
19  When will you return?
20  A  I'm not sure yet.
21  Q  All right. Have you been told you have to take this
22  leave? Or is it your decision?
23         MS. MILLS: You can answer.
24         THE WITNESS: Yes, I have to take a leave.
25  Q  (Continuing by Mr. Giroux): You've been told you have to

PAGE 32

                                                              32

1  take the leave?
2  A  Yes.
3  Q  Okay. By your supervisor? Or others?
4  A  Others.
5  Q  Who is your supervisor right now?
6  A  Lt. Bobby Johnson, Robert Johnson.
7  Q  And was he your supervisor at the time of the shooting?
8  A  Yeah.
9  Q  Okay. Does your leave, or the reasons for your leave,
10  have anything at all to do with the subject shooting?
11         MS. MILLS: You can answer that question.
12         THE WITNESS: No.
13  Q  (Continuing by Mr. Giroux): Do they have to do with any
14  shooting?
15         MS. MILLS: You can answer that question.
16  Q  (Continuing by Mr. Giroux): Besides Mr. Hill, have you
17  ever shot anybody while in the line of duty?
18         MS. MILLS: You can answer.
19         THE WITNESS: No.
20  Q  (Continuing by Mr. Giroux): Besides Mr. Hill, have you
21  ever shot anybody, at any time, whether you were in the
22  line of duty or not?
23  A  No.
24  Q  Have you ever been injured on the job?
25         MS. MILLS: You can answer.

PAGE 33

                                                              33

1         THE WITNESS: No.
2  Q  (Continuing by Mr. Giroux): Okay.
3  A  Oh, I'm sorry.
4         THE WITNESS: Can I --
5         MS. MILLS: Yes.
6         THE WITNESS: I sprained my back in an
7  on-duty accident.
8  Q  (Continuing by Mr. Giroux): Car accident?
9  A  Yes.
10  Q  Did you miss time from work?
11  A  I was just restricted for a few days.
12  Q  Were you the driver?
13  A  Yes.
14  Q  Was Mr. Dew with you?
15  A  Yes.
16  Q  Are you always the driver when you two drive together?
17  A  Yes.
18  Q  Has he ever been the driver, that you can recall?
19  A  Once or twice.
20  Q  That's it, in eight years?
21  A  Yes.
22  Q  Is there a reason for that?
23  A  No. I just -- That's our thing; I drive, he's the jump
24  man.
25  Q  He's the jump man?

2:10-cv-11427-AC-DAS   Doc # 19-4   Filed 07/25/11   Pg 12 of 15   Pg ID 157

SHEET 10   PAGE 34

34

1  A  Yes.
2  Q  Okay. The date that you're coming back from leave, does
3     that have to be approved by your superiors?
4         MS. MILLS: You can answer.
5         THE WITNESS: It has to be approved
6     through our medical station.
7  Q  (Continuing by Mr. Giroux): Okay. In other words, you
8     have to be cleared before you can come back to the job?
9  A  Correct.
10 Q  Are you on patrol right now?
11 A  Yes.
12 Q  Did you work last night?
13 A  Yes.
14 Q  Patrolling? Or at a desk?
15 A  Patrol.
16 Q  With Officer Dew?
17 A  Yes.
18 Q  Robert Johnson, Lt. Robert Johnson, did not tell you you
19    had to take the leave, as I understand your testimony;
20    would that be correct?
21 A  Yes.
22 Q  Okay. Someone superior to him told you you had to take a
23    leave; is that correct?
24 A  No.
25 Q  Someone in a different department told you you had to

PAGE 35

35

1     take the leave?
2  A  No.
3  Q  The Chief?
4  A  No.
5  Q  Someone not in the police department told you you had to
6     take the leave?
7  A  That's correct.
8  Q  Is it somebody with authority such that they can tell you
9     that you have to take the leave?
10        MS. MILLS: Let me object. Vague and
11    ambiguous, the word "authority." You can answer the
12    question, if you understand it.
13        THE WITNESS: Authority, as far as?
14 Q  (Continuing by Mr. Giroux): Authority over the
15    Department?
16 A  No.
17 Q  Authority over your supervisor?
18 A  No.
19 Q  Did you fight the leave?
20 A  No.
21 Q  Did you request it?
22        MS. MILLS: You can answer.
23        THE WITNESS: Yes.
24 Q  (Continuing by Mr. Giroux): Is it bigger than a
25    breadbox? That's a joke. You don't have to answer that.

PAGE 36

36

1         Is it a paid leave?
2         MS. MILLS: Objection to relevance. You
3  can answer. You can answer.
4         THE WITNESS: No.
5         MS. MILLS: Excuse me for a second. Let
6  me tell the front desk where I am.
7         (A short break was taken, off the record,
8         at or about 10:26 a.m., and the deposition
9         resumed at or about 10:26 a.m.)
10 Q  (Continuing by Mr. Giroux): Are you going to be
11    remaining in town during your leave?
12        MS. MILLS: You can answer that.
13        THE WITNESS: Yes.
14 Q  (Continuing by Mr. Giroux): Will you be available for
15    trial during your leave, if it's still going on?
16        MS. MILLS: Well, let me object. I
17    don't -- Let me see when the trial date is.
18        MR. GIROUX: I think it's this year.
19        MS. MILLS: It's this Fall. Let me object
20    that it calls for speculation. Unless you know when your
21    trial date is. I don't even know, myself.
22 Q  (Continuing by Mr. Giroux): Assuming the trial date is
23    this Fall, or this year, will you be available for trial
24    if you're still on leave?
25        MS. MILLS: Objection. Calls for

PAGE 37

37

1  speculation.
2         THE WITNESS: Yes.
3  Q  (Continuing by Mr. Giroux): Besides working patrol and
4     the Special Operations unit, have you had any other
5     assignments?
6  A  No.
7  Q  Okay. Do you have any special certification or training,
8     outside of the standard that is required for a patrolman?
9  A  I had some hard hands training.
10 Q  Some what?
11 A  It's like grappling.
12 Q  Okay. You have to name that name again because the court
13    reporter's got to --
14 A  I'm sorry. Grappling.
15 Q  Before that.
16 A  It's called hard hands.
17 Q  H-A-R-D hands?
18 A  Yes. H-A-R-D hands.
19 Q  Okay. Sometimes there's like, I don't know if they call
20    them acronyms, or whatever. But I just wanted to make
21    sure it was just the word hard. And what is -- you said
22    it's grappling?
23 A  Yes, grappling.
24 Q  Is that training within the Department that you can take
25    if you want?

SHEET 11   PAGE 38

38

1  A  Yes.
2  Q  There are like instructors that you work with?
3  A  Yes.
4  Q  Okay. How long have you been taking that type of
5     training?
6  A  I took it twice.
7  Q  Okay. Something you like and you're going to do again?
8  A  I'm not sure I'll do it again.
9  Q  Okay. Are you now qualified to train other people?
10 A  No, not in that.
11 Q  Okay. You ever been a field training officer or a
12    supervisor?
13 A  No.
14 Q  Do you recall the subject shooting?
15 A  Yes.
16 Q  Okay. Where were you when you were dispatched to the
17    call?
18 A  I believe, I was at the station or leaving the station.
19 Q  All right. Do you know if you had a prior call before
20    that?
21 A  I don't know.
22 Q  Have you seen your activity log for the time surrounding
23    the subject event?
24 A  No, I haven't.
25 Q  Okay.

PAGE 39

39

1       MS. MILLS: Let's go off the record for
2     just a second.
3       (At or about 10:30 a.m., a short break was
4        taken, off the record, and the deposition
5        resumed at or about 10:31 a.m.)
6  Q  (Continuing by Mr. Giroux): Before I go into the
7     shooting, let me back up. When you're on leave, are you
8     going to be getting any sort of training of any kind for
9     police work?
10      MS. MILLS: You can answer.
11      THE WITNESS: No.
12 Q  (Continuing by Mr. Giroux): Are you going to be getting
13    training of any kind, for any kind of work?
14 A  No.
15 Q  Have you been back to college or any schooling while a
16    police officer?
17 A  No.
18 Q  Okay. Do you have aspirations to be a supervisor or a
19    lieutenant or a higher position -- or to have a higher
20    position within the department?
21 A  Not at this time.
22 Q  Okay. Have you ever applied for a higher position or a
23    promotion?
24      MS. MILLS: Objection to relevance. You
25    can answer.

PAGE 40

40

1       THE WITNESS: Yes.
2  Q  (Continuing by Mr. Giroux): How many times?
3  A  Twice.
4  Q  What position?
5  A  Sergeant.
6  Q  Okay. That's the next natural step?
7  A  Yes.
8  Q  Okay. Do you know why you were denied? Or why someone
9     else got it in place of you?
10 A  Could you ask the question one more time?
11 Q  Sure. I assume someone else got the position that was
12    open?
13 A  Yes.
14 Q  Do you know why you did not? Was that ever explained to
15    you on either occasion?
16 A  Yes.
17 Q  Why?
18 A  Positions are filled by the highest test scores, I
19    believe.
20 Q  Okay. Someone had a higher test score?
21 A  Yes.
22 Q  All right. Going back to the subject occurrence. How
23    long did it take you to get to the scene of this call
24    that turned out to be Mr. Hill?
25 A  Less than five minutes.

PAGE 41

41

1  Q  Okay. I assume, more than a minute?
2  A  Yes.
3  Q  Okay. So the range, the reasonable range, would be one
4     to five minutes to get there?
5  A  That's correct.
6  Q  Okay. How far away were you when you first saw Mr. Hill?
7  A  Half a city block.
8  Q  Using football vernacular or measurements, can you tell
9     me 20 yards? 40 yards?
10 A  I would say he was -- I'll use houses. I would say he
11    might have been seven houses.
12 Q  Okay. Was he on his bike, as your partner indicated?
13 A  Yes, he was.
14 Q  Was he leaning to one side, like a person sits on the
15    seat and holds themselves up with a leg?
16 A  When I first seen him, he was in motion.
17 Q  Okay. He was riding?
18 A  Yes, he was riding.
19 Q  In what direction?
20 A  He was riding east.
21 Q  Was anybody around him?
22 A  Not at the time I first seen him, no.
23 Q  Okay. You were approaching. You saw him from about
24    seven houses away, approximately. Did you continue to
25    drive in his direction the whole time?

SHEET 12   PAGE 42

42

1 A   No, I didn't -- Yes.
2 Q   Okay. And did you continue to drive in his direction
3    until the car ultimately came to a stop, whether you were
4    in it when it stopped or not?
5 A   Can you reask the question?
6 Q   Sure. Did you continue -- Did the car continue in his
7    direction from that point in time until it came to a
8    stop, whether or not you were in the car when it stopped
9    or not?
10 A   Yes.
11 Q   Okay. While you were driving in his direction, do you
12    know how fast you were going, initially? And when I say
13    "initially," I mean at the moment you saw him. That's
14    where we'll start this.
15 A   From the seven houses away?
16 Q   Yes, sir. And approximately.
17 A   15, 20 miles an hour.
18 Q   Okay. Did you have lights and sirens on?
19 A   No.
20 Q   Did you have a dash cam?
21 A   No.
22 Q   Don't all marked police cars have dash cams now?
23 A   They do not.
24 Q   I'm sorry?
25 A   I said, they do not.

PAGE 43

43

1 Q   Okay. Is it your testimony that the one you were driving
2    on the night of the Hill shooting did not?
3 A   I believe it did not have a camera.
4 Q   You think it was all set up, meaning the wiring going to
5    the trunk and the dashboard, but there was not a camera
6    attached to it?
7 A   No. I'm sorry. There wasn't a computer.
8 Q   What does that mean?
9 A   The camera is run through the computer.
10 Q   Okay.
11 A   And I believe there was no computer in that vehicle.
12 Q   Okay. So you believe there was a camera, it was hooked
13    up, but not to a computer such that it could, I guess,
14    capture the scene?
15 A   I believe so.
16 Q   Okay. Did you know when you were driving that car that
17    night that it didn't have a computer so the camera
18    couldn't work?
19 A   I knew it didn't have a computer.
20 Q   Okay.
21 A   At the time I wasn't aware that the camera didn't work
22    without the computer.
23 Q   All right. Okay.
24       MS. MILLS: I'm sorry, could you read back
25    his answer?

PAGE 44

44

1       MR. GIROUX: He knew it didn't have a
2    computer.
3       MS. MILLS: No, no. Let me have her read
4    it back to me.
5       (At which time the court reporter played
6       back the answer.)
7       MR. GIROUX: Officer Singleton, can you do
8    me a favor and try -- You're very soft-spoken. And when
9    I heard the recording, I'm afraid that most of your dep
10    so far is probably going to sound like that. If you
11    could, if I'm not being too much of a bother, could you
12    just lean into -- Where is the microphone, by the way?
13       THE COURT REPORTER: Right there.
14       MR. GIROUX: Just generally, there. Just
15    either lean in or raise you're voice as best you can.
16    Sorry about that.
17 Q   (Continuing by Mr. Giroux): Was it your belief while
18    driving that night that your car did have a dash cam that
19    was recording the scene in front of the car?
20 A   I don't recall.
21 Q   Who told you after the shooting that the car did not have
22    the dash cam that was recording the scene in front of the
23    car?
24 A   I don't recall.
25 Q   Did somebody?

PAGE 45

45

1 A   Not immediately after the shooting, no.
2 Q   Well, didn't you look for it?
3       MS. MILLS: Look for what?
4 Q   (Continuing by Mr. Giroux): A recording.
5 A   I don't have access. Only a supervisor can access it.
6 Q   Did you suggest to your supervisor while you were filling
7    out your PCR, or after you were filling out your PCR,
8    "Hey, let's get the tape"?
9 A   No, I didn't.
10 Q   Okay. Did you suggest to anybody that night, meaning
11    after the shooting, "Hey, I want to see what the dash cam
12    showed"?
13 A   No, I didn't.
14 Q   At any time after that day, did you ever say to your
15    supervisor, or to anybody else, "Let's look at the dash
16    cam video"?
17 A   No, I didn't.
18 Q   Is that true up until today's date?
19       MS. MILLS: Objection to relevance. You
20    can answer.
21       THE WITNESS: Could you reask that
22    question, the last one?
23 Q   (Continuing by Mr. Giroux): Yes. Is that true up until
24    today's date, that as we sit here today you've never
25    asked anybody in the Department if there was a recording

SHEET 14   PAGE 50

**50**

1  Q   Okay. The whole time?
2  A   Yes. As I recall, yes.
3  Q   Okay. Did you jump out of a moving police vehicle?
4  A   Yes, I did.
5  Q   Okay. Did you jump out of your police vehicle while it
6       was moving in the direction of Mr. Hill?
7  A   Yes.
8  Q   Okay. Did you also have your gun drawn before you took a
9       step out of your police cruiser?
10 A   Yes.
11 Q   Okay. Was it -- Are you right-handed or left-handed?
12 A   Right-handed.
13 Q   Do you know if Officer Dew is right-handed or
14      left-handed?
15 A   I believe he's right-handed.
16 Q   Okay. Did you have your gun in your right hand, your
17      hand on the steering wheel, just before you jumped out of
18      your police cruiser?
19 A   Yes.
20 Q   Okay. What type of gun did you have at that time?
21 A   Glock, model number 22.
22 Q   All right. How much ammunition did you have in it at the
23      time?
24 A   I believe, 15 rounds.
25 Q   All right. One in the clip? Or one -- I should say, one

PAGE 51

**51**

1       in the --
2  A   Fourteen in the magazine and one in the chamber.
3  Q   One in the chamber?
4  A   Yes.
5  Q   Does the magazine hold only 14?
6  A   It depends on your magazine.
7  Q   All right. The magazine you had that night, did it hold
8       only 14?
9  A   Yes.
10 Q   Okay. Did you fire any shots before you jumped out of
11      the vehicle?
12 A   No.
13 Q   Okay. Were you wearing a vest?
14 A   Yes.
15 Q   A bulletproof vest?
16 A   Yes.
17 Q   Was Officer Dew wearing a bulletproof vest?
18 A   I believe so.
19 Q   Is that standard? Or was that standard for you two
20      working patrol at night?
21 A   It's standard for you to wear your vest.
22 Q   Okay.
23 A   At all times.
24 Q   And you believe --
25 A   On duty.

PAGE 52

**52**

1  Q   And you believe both of you were, at the time?
2  A   Yes.
3  Q   Okay. Did you know Mr. Hill before the shooting?
4  A   No.
5  Q   Did you know anything about him or his name?
6  A   No, I didn't.
7  Q   Did you know anybody that, as it turns out, was his
8       family or friends?
9  A   No.
10 Q   You knew nothing about this person before -- Strike that.
11          As we sit here today, you know nothing
12      about this person, other than he's the guy you shot; is
13      that right?
14 A   That's correct.
15 Q   Okay. While you were approaching him, at any time --
16      Strike that.
17          When you were initially approaching him
18      from about seven houses away, and for the next two or
19      three houses, did you see a gun on him?
20 A   Not in the range of those seven houses.
21 Q   Okay. When was the first time you saw a gun anywhere on
22      him?
23 A   I began going east on Buena Vista from Steel.
24 Q   And how far away was he when you began going east,
25      approximately?

PAGE 53

**53**

1  A   Two or three car lengths.
2  Q   Two or three car lengths?
3  A   Yes.
4  Q   It was nighttime?
5  A   Yes.
6  Q   Was the area well lit?
7  A   Yes.
8  Q   Okay. And from two to three car lengths, did you see a
9       gun?
10 A   Yes, I did.
11 Q   Describe where you saw it, please.
12 A   It was on the right side in his waist band on his back,
13      on the right side.
14 Q   Did you see a holster?
15 A   Yes.
16 Q   Was it in the holster?
17 A   Yes, it was.
18 Q   What kind of holster?
19 A   It was a black holster.
20 Q   Okay. But I mean, did you -- I don't know anything about
21      names of holsters or types. Can you describe it? I
22      mean, is it something of a type that you've seen before?
23 A   I have seen them before. But I'm not sure exactly what
24      they're called, like if they have a particular name.
25 Q   Okay. So you believe it was black. You believe it was a

SHEET 15   PAGE 54

54

1   shoulder holster?
2  A   No. It was a waist -- it was in a waistband.
3  Q   A waist holster. Okay. Was the gun open?
4  A   Yes, I could see the handle.
5  Q   Okay. In other words, it wasn't under a coat?
6  A   No.
7  Q   Okay. Is there a term for that that police officers use?
8      Is it "open concealment" or "open position"? I don't
9      know if there's a term.
10 A   It was -- The gun wasn't initially open. I seen him --
11     While he was riding the bike, I seen his shirt raised and
12     I seen the weapon on his lower back.
13 Q   All right. My question was is there a term -- If
14     someone's carrying a gun in a holster that's open, that
15     you can see it, is there a term that police officers use
16     for that?
17 A   Yes.
18 Q   What is it?
19 A   Open carry.
20 Q   Open carry. That's what it was. Okay. Now, when you
21     saw Mr. Hill and you were, I think you said about three
22     car lengths away, two to three car lengths away, you saw
23     a gun in a holster on him, correct?
24 A   Correct.
25 Q   Would you call that an open carry?

PAGE 55

55

1  A   No. Because as he was riding I seen -- As he was moving,
2      the motion of his bike, his shirt raised up and I seen
3      the gun on his back.
4  Q   Okay. You understand that's different than what your
5      partner said Monday?
6  A   I don't recall what my partner said.
7  Q   Okay. But if it was open to the public, that would be
8      called an open carry, like if it wasn't concealed under a
9      shirt or in pants?
10 A   I believe that's the correct term.
11 Q   Now, you didn't know if he had a permit, correct?
12 A   Correct.
13 Q   You and your partner didn't talk about that, correct?
14 A   No.
15 Q   And you didn't know who he was so you couldn't run any
16     information on him, right, through dispatch or anywhere
17     else?
18 A   Right.
19 Q   Okay. You didn't know if he had fired it or used it at
20     any time before your arrival, right?
21 A   Correct.
22 Q   Okay. You didn't know if it was loaded at any time
23     before your arrival, correct?
24 A   Correct.
25 Q   Before he -- Did he see you at some point, or your

PAGE 56

56

1      cruiser --
2          MS. MILLS: Objection. Calls for --
3  Q   (Continuing by Mr. Giroux): -- as far as you could tell?
4          MS. MILLS: -- calls for speculation. You
5      can answer.
6          THE WITNESS: Yes, I do believe he did see
7      it.
8  Q   (Continuing by Mr. Giroux): Because he looked at you?
9  A   Yes. He looked over his shoulder.
10 Q   Okay. At any time prior to him looking over in your
11     direction, he was not holding a weapon or pointing a
12     weapon or using the weapon; can we agree to that?
13         MS. MILLS: Objection. Compound. You can
14     answer.
15         THE WITNESS: No, I didn't see him holding
16     the weapon.
17 Q   (Continuing by Mr. Giroux): Okay. Can we agree that he
18     was not threatening anybody with the weapon, prior to him
19     seeing you; can we agree to that?
20         MS. MILLS: Objection. Calls for
21     speculation.
22         THE WITNESS: No. Not at the time I seen
23     him, no.
24 Q   (Continuing by Mr. Giroux): We can agree with that?
25 A   Yes.

PAGE 57

57

1  Q   Okay. Did you see the same two people that your partner
2      saw, a man and a woman to this person's -- well, in this
3      person's vicinity?
4  A   I seen two males.
5  Q   Okay. Can you describe their whereabouts when you were
6      about two to three car lengths away, relative to either
7      your car or Mr. Hill?
8  A   They were in the vicinity of Mr. Hill in the middle of --
9      standing in the middle of the street on Buena Vista.
10 Q   Okay. So if you're traveling in the direction of
11     Mr. Hill with your cruiser, he's essentially straight
12     ahead there, to your right to some degree; would that be
13     correct?
14 A   Slightly to the right.
15 Q   Okay. And how many feet to the right from Mr. Hill?
16 A   A foot or two. One or two feet.
17 Q   Okay. And there did not appear to be any problem or
18     distress with those three persons; is that correct?
19 A   That's correct.
20 Q   Okay. No one appeared to be in harm's way, agreed?
21 A   No.
22 Q   You don't agree?
23 A   I didn't see anybody in harm's way.
24 Q   Okay. You do agree?
25 A   Yes.

SHEET 16  PAGE 58

58

1 Q  Why didn't you turn your lights and sirens on?
2 A  You only need to put lights and sirens on when your
3    effecting a traffic stop on a vehicle.
4 Q  Okay. Is that the entire reason not to turn on the
5    lights and sirens?
6 A  Yes.
7 Q  Okay. There was no other strategy to it, agreed?
8 A  Strategy, as to what?
9 Q  There was no other strategy to your decision not to run
10   lights and sirens. It was simply because you were not
11   making a traffic stop.
12 A  Correct.
13 Q  Okay. Who would be the person to turn on the lights and
14   sirens; you or your partner?
15 A  I believe, it's usually me.
16 Q  Okay. Because you're the driver, usually?
17 A  Yes.
18 Q  Okay. Can you describe these two males, not Mr. Hill,
19   for me?
20 A  I really don't recall their physical descriptions --
21 Q  Okay. At all?
22 A  -- at this time. No.
23 Q  Can you tell me if they were African-American? Or white?
24   Or some ethnicity?
25 A  They were two African-American males.

PAGE 59

59

1 Q  Can you give me -- Do you recall approximate ages or
2    anything else?
3 A  I don't recall.
4 Q  Okay. How about Mr. Hill, can you recall him on that
5    bike, in terms of appearance?
6 A  He might have been in his 30s.
7 Q  Okay.
8 A  Like early 20s, late -- I mean, late 20s, early 30s.
9 Q  Okay. Did he appear to be an African-American male?
10 A  He was an African-American male.
11 Q  About how old?
12 A  Late 20s early 30s.
13 Q  Okay. When you jumped out of your police cruiser, how
14   fast was your cruiser going, approximately?
15 A  Five or seven miles an hour, something around there.
16 Q  Okay. Did you fall when you jumped out of your police
17   cruiser at five to seven miles per hour?
18 A  No, I don't.
19 Q  Did you have to take a couple of steps because of your
20   momentum?
21 A  No.
22 Q  Okay. So did you jump out and stand still?
23 A  No, I didn't stand still.
24 Q  Did you jump out and start moving toward Mr. Hill?
25 A  Not toward him.

PAGE 60

60

1 Q  Away from him?
2 A  Yes.
3 Q  Okay. You jumped out of the left side of the vehicle.
4    Did you start moving to your left? Or to your rear? Or
5    a combination?
6 A  Probably, to the left and to the rear.
7 Q  Okay. So a little to the left and a little to the rear?
8 A  Yes.
9 Q  Do you know how many feet you moved?
10 A  I don't recall.
11 Q  Okay. Did you fire shots at Mr. Hill?
12 A  Yes, I did.
13 Q  How many?
14 A  I don't recall how many shots I fired.
15 Q  How long after you jumped out of the cruiser and landed
16   your first foot on the pavement did you shoot your first
17   shot, approximately?
18 A  Almost instantaneously.
19 Q  Okay. Have you ever been told, based upon an accounting
20   of your bullets, how many shots you fired?
21 A  No.
22 Q  Have you ever been told, based upon the evidence at the
23   scene, how many shots you fired?
24 A  No.
25 Q  Were you confronted with that information in any way,

PAGE 61

61

1    shape, or form at the investigation hearing, or whatever
2    you called that hearing that I.A. has, or that
3    subdivision of I.A. has?
4 A  No.
5 Q  Okay. Did you ever ask anybody?
6 A  No.
7 Q  Did you ever ask your supervisor to find out, "Hey, how
8    many did I shoot?" Or any information more specific
9    about this occurrence?
10 A  No, I didn't.
11 Q  Okay. You ever ask your supervisor, or anybody else,
12   whether it be a friend or someone you respect in the
13   Department, whether they thought what you did was
14   appropriate or not?
15     MS. MILLS: Objection to relevance. You
16 can answer.
17     THE WITNESS: No, I didn't.
18 Q  (Continuing by Mr. Giroux): Okay. Did you ever seek
19   anybody's advice, a superior or a friend, in terms of
20   what you might have been able to do differently?
21 A  No.
22 Q  Okay. Why did you shoot at Mr. Hill?
23 A  Because Mr. Hill pointed a gun at me.
24 Q  Mr. Hill ever fire a shot out of the gun that you saw him
25   with?

SHEET 17 PAGE 62

62

1 A No.
2 Q Okay. Did you ever see him fire the gun; in other words,
3 muzzle flashes or anything else?
4 A No.
5 Q Did you ever hear him fire the gun?
6 A No.
7 Q Okay. As of today's date, do you know if that gun was
8 loaded?
9 A I'm not sure.
10 Q Okay. You've never inquired about that?
11 A No.
12 Q You've never asked your supervisor to find out if it was
13 loaded?
14 A No.
15 Q When was the first time that you say Mr. Hill pointed a
16 gun at you? Where were you?
17 A I was still in the scout car.
18 Q Okay. How far from him were you, in terms of either car
19 lengths, which you used before, or feet, if it's closer
20 now?
21 A Ten or twelve feet.
22 Q Okay. Why did you not stop the car with the brake?
23 A Mr. Hill pointed the gun, the first thing that went
24 through my mind was I didn't want to be trapped in the
25 car if he started shooting, so I jumped out of the car.

PAGE 63

63

1 Q Okay. Was it your intention to let the car continue to
2 move at him?
3 A No.
4 Q Did you know the car was going to continue to move after
5 you jumped out?
6 A I don't think it was on my mind at the time.
7 Q Okay.
8 A I didn't want to get trapped in the car, like I said.
9 Q The car did continue to move after you jumped out, right?
10 A Yes.
11 Q And it went forward and it hit a bike and a car, right?
12 A Yes.
13 Q The bike it hit was the bike that Mr. Hill had been
14 riding on, right?
15 A Yes.
16 Q And --
17 A I don't think it hit it. I think it rolled on top of it.
18 It was already on the ground.
19 Q Okay. Whether or not it hit it, you don't know. We can
20 agree that it ended up over top of the bike?
21 A Correct.
22 Q That's what you saw while you were there, right?
23 A Yes.
24 Q And we can agree that your police cruiser did damage to
25 that other car, meaning there had to be some physical

PAGE 64

64

1 impact between the two?
2 MS. MILLS: Let me object. Compound and
3 Lack of foundation.
4 Q (Continuing by Mr. Giroux): You can answer.
5 A I don't recall if there was any damage to the other
6 vehicle from my scout car.
7 Q Do you recall seeing it hit, or hearing it hit, that car?
8 A No.
9 Q Okay. Did you look around after the shooting and see
10 that you had hit that car with your cruiser?
11 A I seen the vehicle -- my vehicle at rest on that vehicle.
12 Q They were up against each other, in other words?
13 A Yes.
14 Q Okay. And you, being an intelligent person, reasonably
15 believed or concluded that your car came to at stop
16 because it ran into an object that was stationary,
17 meaning that other car?
18 A That's correct.
19 Q Okay. Has anybody ever criticized you for jumping out of
20 a moving vehicle while you're carrying a weapon?
21 A No.
22 Q Not a supervisor? Not in this I.A. investigation? No
23 one has said that that was an improper thing to do, true?
24 A No.
25 Q True?

PAGE 65

65

1 A Nobody has told me there was any problems.
2 Q Okay. Was Mr. Hill on his bike turning towards you when
3 you say he was pointing the gun at you?
4 A He was already off his bike. He had dropped his bike at
5 that time.
6 Q Okay. So how many --
7 A He was standing.
8 Q All right. How many car lengths away was he when he got
9 off? Did he get off his bike or jump off his bike or
10 take a step off his bike?
11 A He jumped off the bike and pushed it to the ground.
12 Q Okay. Where was he when he did that?
13 A He was still in the street.
14 Q Okay. Relevant to that other vehicle, where was he?
15 A Area of the trunk.
16 Q The hood, you mean? Or behind the car at the trunk?
17 A Yeah. I'm sorry. He was in the area of the hood.
18 Q Okay.
19 A The vehicle was facing west.
20 Q All right. So he's in the area of the hood of the car on
21 his bike when he gets off of it, right?
22 A Correct.
23 Q Does he jump or step off of the bike?
24 A He got off it abruptly. I say he jumped off of it --
25 Q Okay.

SHEET 18 PAGE 66

66

1 A -- and threw it to the ground.
2 Q All right. Did he throw it to the ground in your
3 direction? Or his direction?
4 A He just threw the bike to the ground.
5 Q Okay. But if you're holding the bike at the seat, or
6 near the seat and the handle bars, and let's say I got a
7 bike, I can either push the top portion that I'm holding
8 onto in your direction such that it topples over in your
9 direction, or I can back up and throw it down in my
10 direction such that it falls down in my direction.
11 THE COURT REPORTER: Mr. Giroux, one
12 moment, please.
13 MR. GIROUX: Sure.
14 MS. MILLS: We'll take a ladies room break
15 for a minute.
16 MR. GIROUX: Sure.
17 (A short break was taken, off the record
18 at or about 11:06 a.m., and the
19 deposition resumed, at or about
20 11:10 a.m.)
21 Q (Continuing by Mr. Giroux): Do you recall which way he
22 pushed the bike?
23 A The bike was facing the front tire, facing north, and the
24 rear tire facing south, pushed to the ground, fell to the
25 side, the handle bars down to the ground.

PAGE 67

67

1 Q Towards your cruiser? Or away from your cruiser?
2 A Towards my cruiser.
3 Q Okay. Did he step to the side of the vehicle he was near
4 before he pulled his gun?
5 A He was still in front of the vehicle.
6 Q Okay. So he's still in front of the vehicle in front of
7 the hood of the car, and that's when you say -- and he
8 was off his bike, and that's when you say he pulled his
9 gun and pointed it at your cruiser?
10 A Correct.
11 Q Okay. You were how far away at that point?
12 A Ten or twelve feet.
13 Q Okay. Was he pointing at you? Or pointing it at your
14 partner?
15 A I believe he pointed it at the scout car.
16 Q Okay. Just in the direction of the windshield, I assume
17 you're talking about?
18 A Yes.
19 Q Okay. When you were jumping out of your cruiser --
20 Strike that.
21 Before you jumped out of the cruiser, did
22 you try to apply the brake?
23 A No.
24 Q Okay. Before you jumped out of the cruiser, did you try
25 to put the car in gear -- I'm sorry, into some other

PAGE 68

68

1 gear?
2 A No, I didn't.
3 Q Okay. You never tried to put it in park?
4 A No, I didn't.
5 Q Okay. You never tried to put it in neutral?
6 A No.
7 Q Okay. When you were jumping out of the car and then you
8 were standing up, where was he? Or was he in the same
9 location?
10 A He had moved. When I actually got out of the car, he had
11 moved little bit north.
12 Q Would that be to your left, if you're facing him?
13 A To the left. He was still --
14 Q To your left. Because it would be his right. If you're
15 facing each other --
16 A Facing -- When I exited the vehicle, I believe we were
17 almost directly in front of one another.
18 Q Right. I was going to say, if you're getting out and
19 moving a little bit to your left and he's moving a little
20 bit his right, you guys kind of were moving in the same
21 direction, right?
22 A Correct.
23 Q All right. So he moved to your left, which would be his
24 right?
25 A Right.

PAGE 69

69

1 Q Just pretend you're him and I'm you, and I'm going this
2 way and your going that way. See what I mean?
3 A Yes.
4 Q Okay. You believe that's correct?
5 A Yes.
6 Q All right. And was he still pointing in your direction?
7 Or was he not pointing the gun at all anymore?
8 A He was still pointing it.
9 Q Okay. Was he pointing in your direction? Or the
10 direction of your partner?
11 A I believe, he was still pointing in the direction of the
12 scout car.
13 Q Okay. Still at the windshield, approximately?
14 A Yes.
15 Q Okay. When you shot at him the first time, you remember
16 making a decision to shoot, right?
17 A Yes.
18 Q It's because he was still pointing his gun in the
19 direction of the car, the windshield, right?
20 A He was pointing in the direction of myself.
21 Q Okay. Not your partner?
22 A And also my partner.
23 Q Okay. So he was facing you?
24 A Yes.
25 Q Did he have the gun at his side? Or did he have it up,

SHEET 19 PAGE 70

70

1 kind of like you had yours up?
2 A Well, he had his raised before I had mine raised.
3 Q One arm or two arms, did he use?
4 A One arm.
5 Q Okay. Right arm or left arm, did he use?
6 A Right.
7 Q Okay. Did he appear to use it, like use the site, like
8 he had it at face or eye level?
9 A No, he didn't have it at eye level.
10 Q Shoulder level?
11 A No.
12 Q Somewhere between waist and shoulder then?
13 A In this area, his torso area.
14 Q Okay. Do you know what type of shirt he was wearing?
15 A I don't recall at this time.
16 Q Okay. Did you notice anything about his clothes at any
17 time before the shooting?
18 A I don't recall exactly what he had on. I was fixated on
19 the gun he had on his waist.
20 Q Okay. You made a decision to shoot while you were
21 standing on the pavement, which would be the street; is
22 that right?
23 A I'm not sure exactly when my first foot hit. It could
24 have been close to the curb, near the sidewalk.
25 Q I understand. But you were still on the street

PAGE 71

71

1 somewhere?
2 A Yeah. On the street.
3 Q Okay.
4 A The street and then the curb and the sidewalk, right
5 here.
6 Q Okay. So you're in between your vehicle and the curb on
7 the street?
8 A Yes.
9 Q All right. And how are you holding the gun when you
10 first shoot at him?
11 A Two hands, I believe.
12 Q Two hands out in front of you?
13 A Yes.
14 Q Is there a name for that?
15 A I don't recall at this time what it's called.
16 Q Okay. Did you use the site on the gun?
17 A No, I didn't.
18 Q Okay. So it was somewhere about shoulder level?
19 A Possibly, chest. I didn't have it up to my eye.
20 Q Okay. Somewhere between your chin and the --
21 A Neck, chest area.
22 Q -- sternum. Okay. So he's still facing you, pointing
23 the gun in the general direction of the three of you, the
24 three being you, the car, and your partner, right?
25 A Correct.

PAGE 72

72

1 Q And you're shooting at him, right?
2 A Yes.
3 Q Is there a steady sequence to your shots, however many
4 there were? Or did you pause and then begin shooting
5 again, at any time?
6 A Steady sequences.
7 Q Do you know how long your steady sequence of shots
8 lasted?
9 A Seconds.
10 Q Okay. How long does it take to shoot that particular gun
11 until it's empty?
12 MS. MILLS: Object. Lack of foundation.
13 Q (Continuing by Mr. Giroux): If you know.
14 A I don't know.
15 Q How quick does it shoot?
16 A As fast as you can pull your finger.
17 Q I'm not a gun person, which probably doesn't surprise
18 you. But is it automatic? Semiautomatic? Do you hold
19 the trigger down? Do you repeat the trigger pull?
20 A You have to repeat the trigger pull.
21 Q Okay.
22 A It's a semiautomatic.
23 Q Semiautomatic, repeat the trigger pull. But after the
24 first one, is it easier to pull, if you know?
25 A I'm not sure. I'm not sure.

PAGE 73

73

1 Q Okay. Do you know how many pounds of pressure to pull
2 your trigger on that gun?
3 A I don't recall.
4 Q Okay. Was that Department issued?
5 A Yes.
6 Q Did you make any changes or modifications to it at any
7 time while you were working?
8 A No.
9 Q Okay. Do you believe you shot all of your shots in a
10 period of less than two seconds?
11 A I don't recall.
12 Q Okay.
13 MS. MILLS: Can you keep your voice up,
14 Officer?
15 THE WITNESS: Yes. I'm sorry.
16 Q (Continuing by Mr. Giroux): Let's do it this way. Just
17 count with me. One-one thousand, two-one thousand,
18 three-one thousand, four-one thousand, five-one thousand;
19 that's five seconds. Do you believe that you got all
20 your shots off in less than five seconds?
21 A Yes.
22 Q Can you be anymore accurate than that?
23 A Half that time.
24 Q Do you think it's half that time? Want me to do it
25 again?

SHEET 20   PAGE 74

74

1  A   No. I believe it might have been half that time. It
2      seemed like that was pretty long right there.
3  Q   Okay. So you believe you got your shots off in,
4      approximately, two to three seconds?
5  A   That's correct.
6  Q   Okay. Do you know if you shot him? If any of your shots
7      took effect, I should say?
8  A   I was never told.
9  Q   You don't know if you hit him?
10 A   No.
11 Q   Okay. You were always aiming at the front of him, some
12     portion; I assume, center mass?
13 A   Yes.
14 Q   Okay. Describe for me, please, what he did in response
15     to you getting out of the car and you shooting at him, if
16     you saw him do anything after that?
17 A   Exited my scout car. Mr. Hill was still aiming in my
18     direction. At that time, I began firing shots at
19     Mr. Hill.
20 Q   Say that last part again?
21 A   I said, as I exited the scout car.
22 Q   Right. Mr. Hill was still aiming at him, began firing.
23 A   After I exited the scout car, I then began firing my
24     department-issued weapon.
25 Q   That was what it was, department-issued weapon. Okay.

PAGE 75

75

1      Then what?
2  A   Mr. Hill kind of backpedaled, and at that time I was
3      still firing. And then I observed him run around that
4      vehicle that was sitting there, and he fell to the ground
5      and threw the gun out of his hand -- the gun came out of
6      his hand. He fell to the ground.
7  Q   Okay. You think when he fell the gun came out as a
8      result of the fall?
9  A   Yes.
10 Q   Okay. Did he end up at the back of that vehicle then, by
11     the time he hit the ground?
12 A   Yes.
13 Q   Okay. Was he stumbling as he was moving in that
14     direction?
15 A   No. I don't recall him stumbling.
16 Q   Okay. So you saw him. And I'm going to be him, so
17     assume the car is here, okay?
18 A   Hm-hmm.
19 Q   You see him move to his right. He's still facing in the
20     direction of the three of you. He's got his gun pointed
21     in that general direction, right?
22 A   Correct.
23 Q   You start firing at him. He starts backpedaling along
24     that car, right?
25 A   Correct.

PAGE 76

76

1  Q   Still holding his gun, still facing you, right?
2  A   Correct.
3  Q   At some point, he starts to turn, would it be to his
4      left, as he gets to the back of that vehicle and that's
5      where he stumbles and falls?
6          MS. MILLS: Objection. Lack of
7      foundation. He didn't say he saw him stumbling.
8  Q   (Continuing by Mr. Giroux): You can answer.
9  A   I seen Mr. Hill running. I believe, he turned to his
10     right.
11 Q   Turned to his right. So away from the car? Here's the
12     car. I'll be him.
13 A   Hm-hmm.
14 Q   This way would be to his right, which would be away from
15     the car.
16         MS. MILLS: I'm sorry. Away from the
17     police car? Or the other car?
18         MR. GIROUX: No. Away from that car that
19     he was in front of.
20 Q   (Continuing by Mr. Giroux): So this way would be to the
21     right, turning his back on that car. This way would be
22     to the left, kind of facing the car before he heads in
23     the other direction.
24 A   I want to say he spinned to his right.
25 Q   Okay. So you think he backpedaled along the side of the

PAGE 77

77

1      car, turned to his right?
2  A   Yes.
3  Q   Okay. And then did he start to run away?
4  A   Yes. He started running east.
5  Q   Okay. So he started running across the back of that car?
6  A   No. He started running along the side of the car. The
7      car was facing -- the front of the car was facing west.
8      The back of the car was facing east.
9  Q   Okay.
10 A   He ran towards the back of the vehicle.
11 Q   Okay. How many backpedal steps did he take,
12     approximately, as far as you could observe?
13 A   I don't recall.
14 Q   Okay. Did he get halfway down the car backpedaling and
15     then turn and cover the rest of the distance of the car?
16     Or can you describe it in another fashion?
17 A   Maybe -- I don't recall.
18 Q   Okay. When he turned and started running away from you,
19     did you start to run after him?
20 A   No.
21 Q   What did you do?
22 A   As he ran, I believe I backpedaled a little bit.
23 Q   Okay. So were you --
24 A   But I didn't go forward at that time, no.
25 Q   Okay. So from the time you started shooting to the time

SHEET 21    PAGE 78

78

1  you stopped, you were still moving to some degree to your
2  left and backwards?
3  A  Yes.
4  Q  Okay. So that was the direction of your steps. Now,
5  would it be correct to say that you only took one or two
6  steps by the time you were done shooting?
7  A  I don't recall how many steps I took.
8  Q  Okay. But I think you said you weren't running but you
9  were moving; is that correct?
10 A  I was moving, but I don't recall how many steps I took.
11 Q  I understand. But you weren't running?
12 A  No, I wasn't running.
13 Q  Okay. You were doing a crossover, I assume, with your
14 steps so you could face the target and move at the same
15 time?
16 A  I don't recall exactly what my feet were doing.
17 Q  Okay. When you finish shooting, were you on the
18 sidewalk? Or still on the street?
19 A  I believe there was grass past there. Maybe on the
20 grass, near the sidewalk.
21 Q  Okay. Did you ever review, or see with your eyes, the
22 sketches done of the scene?
23 A  No.
24 Q  Did you stop moving to your left and backwards when you
25 saw Mr. Hill trying to run away from you? Or did you

PAGE 79

79

1  keep moving away still?
2          MS. MILLS: Let me object. Lack of
3  foundation. You can answer.
4          THE WITNESS: Can you reask the question,
5  please?
6  Q  (Continuing by Mr. Giroux): Sure. You said you saw
7  Mr. Hill backpedal while holding that gun along the side
8  of the car, right?
9  A  Correct.
10 Q  He was still facing you, obviously, that's why you used
11 the term backpedaling, right?
12 A  Correct.
13 Q  At some point, along the side of that car, and you
14 couldn't be specific where, he turned to his right and
15 started to run away from you. Do you remember that?
16 A  Yes.
17 Q  Okay. When you saw him turn around and run away from
18 you, did you stop moving to your left and rear? Or did
19 you continue to move?
20 A  I don't recall whether I stopped or not.
21 Q  Okay. At some point you stopped, obviously.
22 A  Yes.
23 Q  Why did you stop?
24 A  I stopped when I seen Mr. Hill fall to the ground.
25 Q  Okay. And could you see him fall? Or was he blocked by

PAGE 80

80

1  the car?
2  A  I seen him fall -- I seen him begin to fall, and I seen
3  the gun come out of his hand. But I actually didn't see
4  his body hit the ground.
5  Q  Because the car blocked your view?
6  A  Blocked my vision, yes.
7  Q  Okay. Was he near the back of the car when he fell?
8  A  He was behind the vehicle. I'm not sure how many feet,
9  though. I know he was in the rear of that vehicle,
10 somewhere.
11 Q  Okay. Was it within another car length of the back of
12 that vehicle? Can you say that much?
13 A  Yes.
14 Q  Okay. When he was backpedaling, did he have any
15 difficulty backpedaling, that you could see?
16 A  No, not that I could see.
17 Q  When he turned and started to run, was he having any
18 difficulty or uncoordination, as far as you could tell,
19 making that maneuver?
20 A  No.
21 Q  Was he moving quickly, as far as you could tell?
22 A  Yes.
23 Q  Did you ever see the look on his face, whether he was
24 scared or angry or showed any emotion at all?
25          MS. MILLS: Let me object. First of all,

PAGE 81

81

1  it's compound. Second of all, it calls for speculation.
2  You can answer.
3          THE WITNESS: No, I don't recall any
4  facial expressions on him.
5  Q  (Continuing by Mr. Giroux): Okay. Did you ever see your
6  partner on the other side of your squad car during the
7  shooting?
8  A  I knew he was there. I do remember seeing him. But I
9  wasn't focused on him.
10 Q  Okay. So you had a sense and some peripheral vision
11 telling you he was there?
12 A  Yes.
13 Q  Okay. Was he adjacent to you, on the other side of your
14 squad car that was now up ahead of you a little bit?
15 A  I believe he was a little in front of.
16 Q  A little in front of what?
17 A  I believe he was to the side of me but he was a couple
18 steps ahead of me.
19 Q  Of you?
20 A  Yes.
21 Q  Okay. So he was essentially adjacent to you, meaning to
22 your side?
23 A  Right.
24 Q  There's obviously enough distance between the two of you
25 to fit a car and then some steps for both of you heading

Case 4:16-cv-13475-TGB-RSW ECF No. 13-18, PageID.1616 Filed 11/08/19 Page 93 of 184

SHEET 22 PAGE 82

82

1 in your different directions, right?
2 A Yes.
3 Q And you believe that he was, from that position, a couple
4 of steps ahead of you?
5 A Yes.
6 Q Okay. Notwithstanding his position, as far as you could
7 see it on that side of the squad car, you were still the
8 closest person to Mr. Hill because of the way that you
9 saw him go around that car; do you agree with that?
10 A Yes.
11 Q Okay. You never saw Mr. Hill turn twice, did you? You
12 just described the one time; is that correct?
13 A That's correct.
14 Q Okay. Why would he have any reason to point a gun at you
15 or shoot you, if you know?
16 MS. MILLS: Objection. Calls for
17 speculation.
18 THE WITNESS: I'm not sure.
19 Q (Continuing by Mr. Giroux): Did you see a crime being
20 committed, as far as you knew, at any time before he
21 pointed a gun at you, according to you?
22 A Other than having the gun on him, no, I didn't.
23 Q Okay. When you saw the gun, why didn't you just stop the
24 car and order commands to him?
25 A Partner got out and asked Mr. Hill to stop. At that

PAGE 83

83

1 time, he began to pedal off on the bicycle.
2 Q How long before you got out did he get out?
3 MS. MILLS: I'm sorry. Would you repeat
4 the question? I didn't hear you.
5 MR. GIROUX: Yeah.
6 Q (Continuing by Mr. Giroux): How much time before you got
7 out of the car did he get out of the car?
8 A Seconds.
9 Q Okay. How fast were you going when he got out of the
10 car?
11 A Five to seven miles an hour.
12 Q Okay. So were you idling? Or did you have your foot
13 accelerator?
14 A I don't recall.
15 Q So it's your testimony that before Mr. Hill saw you,
16 and/or before he pulled a gun, your partner got out of
17 your car while it was going five to seven miles an hour,
18 true?
19 MS. MILLS: Objection. Compound.
20 THE WITNESS: Yes, that's correct.
21 Q (Continuing by Mr. Giroux): Okay. He got out before
22 Mr. Hill pulled the gun, while you were going five to
23 seven, and he yelled an order or a command to Mr. Hill;
24 is that what you saw?
25 MS. MILLS: Objection. Compound.

PAGE 84

84

1 THE WITNESS: Yes.
2 Q (Continuing by Mr. Giroux): What command did you hear
3 him yell to Mr. Hill before Mr. Hill pulled the gun,
4 according to you?
5 A I don't recall exactly what he said.
6 Q Generally or approximately, what was the message?
7 A I don't recall exactly what he said.
8 Q Okay. Can you describe in any way what message he was
9 trying to convey without saying -- or without recalling
10 the words. In other words, "Stop," or "Don't move," or
11 "Police, drop the bicycle," or anything at all?
12 A I don't recall what he said.
13 Q Okay. Did you two talk at all before he jumped out of
14 your moving vehicle?
15 A No.
16 Q He didn't --
17 A My partner.
18 Q What does he call you?
19 A Sing.
20 Q Sing?
21 A Sing, S-I-N-G.
22 Q Sing? Short for Singleton?
23 A Yes.
24 Q Okay. Did he say, "Sing, I'm getting out"? "Sing, I'm
25 doing this"?

PAGE 85

85

1 A He just said, "You got to watch it. He got a gun."
2 Q Okay. He said, "Sing, watch it. He's got a gun," and
3 he --
4 A I'm not sure that's what he said, verbatim. I do recall
5 him saying, "Watch it. He got a gun."
6 Q Okay. And then he jumped out?
7 A Yes.
8 Q Okay. And then he yelled commands, but you don't know
9 what they were?
10 A Correct.
11 Q Okay. And how long after did he yell commands that you
12 believe you saw Mr. Hill pull the gun?
13 A Seconds.
14 Q Okay. How many seconds, approximately?
15 A Four or five seconds.
16 Q Okay. What did the two men that you saw, what did they
17 do when you were at that distance, when you saw your
18 partner jump out of the police cruiser?
19 A I really don't recall what they did. My squad car was
20 blocking my vision. I'm not sure what they did, exactly.
21 Q Okay. Did you see them ever move from that position that
22 they were in, close to Mr. Hill, when he was in front of
23 that car parked in the street?
24 A They were in the area of the middle. They were standing
25 in the middle of Buena Vista --

2:10-cv-11427-AC-DAS   Doc # 19-5   Filed 07/25/11   Pg 11 of 15   Pg ID 171

SHEET 23  PAGE 86

PAGE 86                                                                    86

1  Q  Right.
2  A  -- to the right of my partner.
3  Q  Right. That's where you saw this initially, right?
4  A  Right.
5  Q  Did you ever see how they got from that position to any
6     other position?
7  A  No. I don't recall.
8  Q  Okay. Did they yell anything at the scene before the
9     shooting, to your knowledge?
10 A  No. I don't recall.
11 Q  Did they say or yell anything at the scene during the
12    shooting, to your knowledge?
13 A  I don't recall.
14 Q  Did they say anything or yell anything to you, or
15    generally, after the shooting while at the scene?
16 A  I don't recall. I didn't have any contact with them.
17 Q  Okay. Did you hear them yell at your partner?
18 A  I don't recall.
19 Q  Okay. Before any other police officer arrives, did you
20    see any other, I'll ca'l them lay witnesses, or
21    bystanders, there at the scene?
22 A  Just those two subjects.
23 Q  Right. Besides them?
24 A  No.
25 Q  Okay. Before any police officer arrives, do you hear

PAGE 87                                                                    87

1     anybody at the scene say anything, other than your
2     partner?
3  A  No.
4  Q  Okay. You and your partner did not communicate during
5     the shots, agreed?
6  A  Are you talking about during the shots?
7  Q  Yes.
8  A  Like as we're actually firing?
9  Q  Yes.
10 A  No.
11 Q  Okay. That all happened -- He's on his side of the car
12    shooting; you're on your side of the car shooting, right?
13 A  Yes.
14 Q  Okay. Did he start shooting before you? After you? Or
15    at the same time as you?
16 A  I'm not sure.
17 Q  Okay. Did you ever shout any commands to Mr. Hill, at
18    any time?
19 A  As I was backpedaling, I did. I told him to stop.
20 Q  Is that it?
21 A  Yeah. Put his gun down.
22 Q  Okay. I need to know. Did you say, "Stop, put your gun
23    down," while you were back pedaling and shooting?
24 A  Yes.
25 Q  Okay. So you were shooting, and in the process of

PAGE 88                                                                    88

1     pulling the trigger you said, "Stop and put you're gun
2     down"?
3  A  Yes.
4  Q  Okay. How far was Mr. Hill -- Strike that.
5        How fast was Mr. Hill running after he
6     turned to run and then started running; fast? Medium?
7     Slow?
8  A  Slow.
9  Q  What caused him to fall, if you could tell from your
10    observations?
11 A  I didn't see why he fell.
12 Q  Okay.
13 A  Because he was behind that car.
14 Q  Did you approach him -- Let me go back. What I mean by
15    that is, you might have seen him trip over something; you
16    might have seen a shot take effect; you might have seen
17    him bump into the car. I don't know. I wasn't there.
18    So I'm looking for anything like that, if you could tell
19    what caused him to fall.
20 A  I'm not sure.
21 Q  Okay. Was he near anything when he fell, other than the
22    back of that car?
23 A  Not that I recall.
24 Q  Okay. And you were standing there watching him fall,
25    right?

PAGE 89                                                                    89

1  A  Back, near my scout car, on the sidewalk.
2  Q  Right.
3  A  While I was backpedaling, yes, I observed him fall.
4  Q  Okay. That's where you were. Were you standing when you
5     saw him fall?
6  A  No. I was still backpedaling.
7  Q  Well, how far from you car did you end up away?
8  A  One or two squares on the sidewalk.
9        MS. MILLS: One or two what? I didn't
10    hear you.
11        MR. GIROUX: Squares on the sidewalk.
12 Q  (Continuing by Mr. Giroux): And that's where you stood
13    still until you started to approach Mr. Hill?
14 A  Right.
15 Q  All right. How long did you stand still before you
16    started to approach him?
17 A  Not long, because my partner began to approach him and I
18    came around on my left side.
19 Q  You came around on the left -- your left side of that
20    vehicle?
21 A  Yes.
22 Q  Okay. So you stood there for a moment. As he's falling,
23    you decide I can stop moving now, right?
24 A  After I seen him fall.
25 Q  Right.

2:10-cv-11427-AC-DAS  Doc # 19-5  Filed 07/25/11  Pg 12 of 15  Pg ID 172

SHEET 24  PAGE 90

90

1  A  Yes.
2  Q  Okay. So he starts going down. You don't see him hit
3      the ground, but you know at that point you can stop
4      moving, right?
5  A  Yes.
6  Q  You wait for a moment. You see your partner going around
7      the right side of that parked car, and then you decide to
8      approach this Mr. Hill person, right?
9  A  Correct.
10  Q  Okay. Did you hear the gun hit the cement and then
11      bounce away, or move away, from Mr. Hill or ...
12  A  I seen the gun come out of his hand.
13  Q  Before he hit the ground?
14  A  Yes.
15  Q  Okay.
16  A  And I seen what area it landed.
17  Q  Okay. Did he throw it?
18  A  I don't think he threw it. I think as he was falling it
19      came out of his hand. It kind of came back over his
20      head.
21  Q  When he was running away, did he have his hand up in the
22      air? Or did he have them in a running position, meaning
23      to his side, kind of like a runner holds them?
24  A  I don't recall.
25  Q  Okay. When he fell, did he fall face forward?

PAGE 91

91

1  A  I believe he fell on his back.
2  Q  So he's running away from you --
3  A  Hm-hmm.
4  Q  -- going behind the car and he falls backwards?
5  A  I believe so.
6  Q  Okay. Did you ever see him have a backpack on?
7  A  He had a -- I wouldn't call it a backpack; it was more
8      like a satchel.
9  Q  Did he have it around both shoulders?
10  A  No, it wasn't over both shoulders. It was like over his
11      body, maybe over one shoulder.
12  Q  Okay. So it was a strap that ran across his body,
13      beginning from one shoulder to the other side of his
14      body, at the waistline?
15  A  Yes.
16  Q  Okay. And there was a bag attached to the strap of some
17      kind?
18  A  Yes.
19  Q  Okay. And did that stay on him the whole time?
20  A  No. I don't recall it being on him.
21  Q  How did it come off?
22  A  I don't recall.
23  Q  Okay. But it was on him when you saw him on the bike?
24  A  Yes.
25  Q  And was the back portion of it to his right waist or to

PAGE 92

92

1      his left waist?
2  A  I believe it was in the left front.
3  Q  Okay. Front and left side of his waist?
4  A  Yes.
5  Q  Okay. And was that on him when he fell?
6  A  No, I don't believe so.
7  Q  Okay. So if he fell backwards, he fell backwards in the
8      direction of you, right?
9  A  He didn't fall in the direction of me.
10      MS. MILLS: Can you keep your voice up,
11      please?
12  Q  (Continuing by Mr. Giroux): Did he fall backwards in the
13      direction of the back of the car?
14  A  I believe he fell on the right of the car.
15  Q  Okay. So head falling down towards the car?
16  A  Yes.
17  Q  Okay.
18  A  Or body -- or his body fell -- was falling east. His
19      body was facing east -- his head was facing east as he
20      fell.
21  Q  His body was facing east as he fell?
22  A  His head. His head was facing east.
23  Q  Okay. Did he land face up or face down?
24      MS. MILLS: Objection. Calls for
25      speculation. Unless you saw him land.

PAGE 93

93

1      THE WITNESS: The car was in my way.
2  Q  (Continuing by Mr. Giroux): Okay.
3  A  I really don't recall which direction he fell.
4  Q  And you ran around your left side of that parked car and
5      saw him; was he laying face up or face down?
6  A  He was face up.
7  Q  Okay. Was your partner at him yet, meaning at his side,
8      over him?
9  A  He was almost at him.
10  Q  Okay. So neither of you had touched the body by the time
11      you saw him laying face up?
12  A  No.
13  Q  Okay. Tell me everything that happened after that point.
14  A  My partner handcuffed him, checked him for weapons, and
15      at that time I asked for an EMS, supervisor, and
16      additional units.
17  Q  How did you do that?
18  A  I used my shoulder mic.
19  Q  Okay. Did you hear Mr. Hill say anything while on the
20      ground?
21  A  No, at that time I did not. I walked away to go find out
22      where the gun went.
23  Q  Did he appear alive?
24  A  I'm not sure.
25  Q  Did he appear conscious?

SHEET 25  PAGE 94

**94**

1  A  I'm not sure. Like I said, I walked away. Immediately,
2     as my partner cuffed, him I walked away and asked for EMS
3     and went to go recover the weapon.
4  Q  Did you see a wound on Mr. Hill?
5  A  No I didn't.
6  Q  Did you see any bleeding on Mr. Hill?
7  A  No.
8  Q  How close did you get? What's the closest you ever got
9     to Mr. Hill? And you and I are about, I don't know, five
10    and a half, six feet away from each other.
11 A  Seven feet.
12 Q  Okay. And you saw no bleeding and no signs of injury?
13 A  No.
14 Q  Okay. Did you see him move at all?
15 A  No.
16 Q  Did you hear him gasping for air?
17 A  No. I didn't get that close.
18 Q  Were his eyes open or closed?
19 A  I didn't get that close to see if his eyes were open.
20 Q  Was he reaching for anything? Doing anything?
21 A  I don't recall. Like I said, once my partner cuffed him,
22    I walked away and called for EMS.
23 Q  How did your partner cuff him?
24 A  What do you mean?
25 Q  How did he cuff him? He was laying face up. How does he

PAGE 95

**95**

1     get cuffs on him?
2  A  He was cuffed to the rear.
3  Q  So did he --
4  A  He rolled him to the side.
5  Q  Your partner did?
6  A  Or rolled him over on his stomach, yes.
7  Q  You saw that?
8  A  Yes.
9  Q  Okay. You saw your partner roll this man over on his
10    side. Did he say anything when he rolled him over?
11 A  Not that I recall.
12 Q  Okay. Did you and your partner communicate at all?
13 A  I told him I was going to go find the gun, and as I
14    walked away, I called for EMS and supervisor and other
15    units.
16 Q  Okay. So other than that, your partner and you didn't
17    talk at all?
18 A  No.
19 Q  Okay. Did you hear Mr. Hill say anything when he was
20    being turned over?
21 A  No, I didn't.
22 Q  Did he move when he was turned over?
23 A  I don't recall.
24 Q  Did he resist at all when he was being turned over?
25 A  I don't recall.

PAGE 96

**96**

1  Q  Did you see your partner pat him down?
2  A  Yes.
3  Q  Was that before or after the cuffs were on?
4  A  After.
5  Q  Okay. Did you see your partner ask him any questions
6     before he put cuffs on him?
7  A  No.
8  Q  What happened after you went to find the gun?
9  A  I found the gun. I stood there. And shortly after,
10    other units started to arrive.
11 Q  All right. Then what happened?
12 A  After other units arrived, a supervisor came and took my
13    weapon from me. And then I was taken to the homicide
14    section.
15 Q  All right. Then what happened?
16 A  Then I -- That's where I completed my PCR.
17 Q  Okay. How long after you got to the station did you
18    prepare your PCR?
19 A  Some 15 minutes, something like that.
20 Q  All right. Did you reflect upon the events before you
21    authored your PCR?
22 A  Yes.
23 Q  Okay. And did you write it truthfully and accurately, to
24    the best of your abilities?
25 A  Yes.

PAGE 97

**97**

1  Q  Did you sign it?
2  A  Yes.
3  Q  Was it true ask accurate when you signed it?
4  A  Yes.
5  Q  Other than your PCR statement and the testimony you gave
6     at the hearing regarding this shooting, have you given
7     any other statements written, oral, or otherwise?
8  A  No.
9  Q  Have you ever told anybody what happened, besides an
10    attorney working for you or your union rep?
11 A  No.
12 Q  Before Mr. Hill got off the bike, at all times his hands
13    were on the handlebars?
14 A  Before he dropped the bike?
15 Q  Yes.
16 A  Yes.
17 Q  Okay. When I say handlebars, I mean the grips that are
18    at the end of the handlebars; do you understand that?
19 A  Hm-hmn.
20 Q  Yes?
21 A  That's correct, yes, sir.
22 Q  All right. Let's mark this.
23        (Deposition Exhibit Numbers 1 and 2 were
24        marked for identification.)
25        MR. GIROUX: Do you have the PCR that he

SHEET 26   PAGE 98

98

1 reviewed before the dep?
2        MS. MILLS: Yeah. Is that the one with
3 the staples in it?
4        MR. GIROUX: Yes. Do you not want that
5 one marked?
6        MS. MILLS: No, no. That's fine. PCR.
7 This is highlighted, his name.
8        MR. GIROUX: Is that okay with you?
9 That's two.
10 Q   (Continuing by Mr. Giroux): Sir, I have marked as
11 Deposition Exhibit Number 1 this two page document. Do
12 you have it in front of you?
13 A   Yes, I do.
14 Q   Could you describe in your own words what that document
15 is, please?
16 A   It's a Detroit Police Department activity log.
17 Q   Okay. And is it your activity log for the shift during
18 which you shot Mr. Hill?
19 A   I believe. Yes, it is.
20 Q   Is it true and accurate?
21 A   Yes.
22 Q   Let me see it real quick. Who wrote this?
23 A   My partner.
24 Q   All right. And how does it work; at the end of the
25 shift, do you review it with him? Do you go over the

PAGE 99

99

1 things that you did?
2 A   Sometimes.
3 Q   Okay. What is standard procedure?
4 A   As far as reviewing the run sheet?
5 Q   Yes. At the end of your shift.
6 A   You just look it over after he's done with it, and if
7 everything's okay, you sign it.
8 Q   Okay. Did you sign this one?
9 A   Yes.
10 Q   Okay. So you reviewed this at the end of your shift and
11 you signed it as it was accurate and true, to the best of
12 your knowledge, at that time?
13 A   Right.
14 Q   Okay. And is that a copy of your signature on it?
15 A   Yes, it is.
16 Q   All right. I've marked as Deposition Exhibit Number 2
17 another two page document that I believe you have in
18 front of you; is that correct? Is this the same as that?
19 A   Yes, it is.
20 Q   All right. Could you put in your own words -- Could you
21 describe in your own words what that document is, please?
22 A   This is my preliminary complaint report --
23 Q   All right. And what is a preliminary complaint report
24 supposed to be?
25 A   It states the facts that happened at the incident which

PAGE 100

100

1 occurred on Buena Vista and Appoline.
2 Q   Okay. Is that as accurately as you can describe it at
3 this time?
4 A   Yes.
5 Q   All right. And is that your preliminary complaint report
6 regarding the shooting of Mr. Hill?
7 A   Yes, it is.
8 Q   All right. And did you sign that document?
9 A   Yes.
10 Q   And does it contain a copy of your signature?
11 A   Yes.
12 Q   Did you review anything else, either earlier today or
13 yesterday or in the last couple of weeks, to get ready
14 for your deposition today? And by review, I don't mean
15 talking to your attorney or talking to any union
16 representative. I just mean looking at documents or
17 things.
18 A   No.
19 Q   Have you described as accurately as possible how this
20 shooting occurred, as you saw it?
21 A   Yes.
22 Q   I think I'm done. Just hang on one second. I had
23 something but I can't find it. Hang on. I've got to
24 make a phone call.
25        (At or about 11:59 a.m., a short break was

PAGE 101

101

1 taken, off the record, and the deposition
2 resumed at or about 12:01 p.m.)
3        MR. GIROUX: I have no more questions.
4        MS. MILLS: No questions.
5        (At which time the deposition concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

3    MARY E. HILL, as personal
     representative of the Estate of
4    ROBERT DWAYNE HILL, Deceased,
     and ALBERT BURSEY,
5
             Plaintiffs,
6
     v                                     File No. 10-CV-11427
7
                                           HON. AVERN COHN
8    POLICE OFFICER JELANDI DEW,
     POLICE OFFICER ADRIAN SINGLETON,
9    and POLICE OFFICER SHAWN GERAUD
     in their individual capacities,
10
             Defendants.
11
     _____/
12

13            DEPOSITION OF ALBERT MACK BURSEY III

14      Taken by the Defendants on the 24th day of June, 2011, at

15      3855 Cooper Street, Jackson, Michigan, at 2:00 p.m.

16

17   APPEARANCES:

18    For the Plaintiffs:      MR. ROBERT M. GIROUX, JR. (P47966)
                               and
19                             MR. STEPHEN MICHAEL SMOLENSKI (P73374)
                               Fieger Fieger Kenney Johnson & Giroux PC
20                             19390 West Ten Mile Road
                               Southfield, Michigan 48075
21                             (248) 355-5555

22    For the Defendants:      MS. JANE K. MILLS (P38251)
                               City of Detroit Law Department
23                             660 Woodward Avenue, Suite 1650
                               Detroit, Michigan 48226
24                             (313) 237-5060

25



**Network**Reporting

— STATEWIDE COURT REPORTERS —

800-632-2720

HILL VS DEW, ET AL                    DEPOSITION OF ALBERT MACK BURSEY III

Page 2

```
 1  RECORDED BY:           Marcy A. Klingshirn, CER 6924
                           Certified Electronic Recorder
 2                         Network Reporting Corporation
                           Firm Registration Number 8151
 3                         1-800-632-2720
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            TABLE OF CONTENTS
 2                           PAGE
 3
    Examination by Ms. Mills. . . . . . . . . . . . . 5, 131
 4  Examination by Mr. Giroux . . . . . . . . . . . . . 113
 5
 6
            EXHIBIT INDEX
 7                         PAGE
 8
    Deposition Exhibit 1 marked  . . . . . . . . . . . . 37
 9    (7-18-08 Witness Statement, three pages)
    Deposition Exhibit 2 marked  . . . . . . . . . . . . 86
10    (7-18-08 Witness Statement, one page)
    Deposition Exhibit 3 marked  . . . . . . . . . . . . 88
11    (photos)
    Deposition Exhibit 4 marked  . . . . . . . . . . . . 88
12    (photos)
    Deposition Exhibit 5 marked  . . . . . . . . . . . . 88
13    (photos)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              Jackson, Michigan
 2          Friday, June 24, 2011 - 2:34 p.m.
 3          MS. MILLS:  Let the record reflect that this is
 4  the deposition of Albert Bursey -- am I pronouncing your
 5  name correctly? --
 6          MR. BURSEY:  Yes.
 7          MS. MILLS:  — being taken pursuant to Notice and
 8  to be used for all purposes permitted by the Federal Rules
 9  of Civil Procedure.
10          Mr. Bursey, my name is Jane Mills.  I represent
11  the Defendants in this lawsuit that you've brought along
12  with Mary Hill.  I'm going to ask you some questions about
13  your background and then about the incident involving you
14  and Mr. Robert Hill.
15          MR. BURSEY:  Yes.
16          MS. MILLS:  If you answer my questions, I'll
17  assume that you understood me.  So if you don't understand,
18  ask that I repeat or rephrase the question.  Okay?
19          MR. BURSEY:  Yes.
20          MS. MILLS:  All right.
21          REPORTER:  Do you solemnly swear or affirm the
22  testimony you're about to give will be the whole truth?
23          MR. BURSEY:  Yes.
24              ALBERT MACK BURSEY, III
25          having been called by the Defendants and sworn:
```

Page 5

```
 1                  EXAMINATION
 2  BY MS. MILLS:
 3  Q   State your full name for the record, please.
 4  A   Albert Mack Bursey.
 5  Q   Spell your middle name.
 6  A   M-a-c-k, the III.
 7  Q   And we are currently at the Jackson Prison in Michigan; is
 8      that correct?
 9  A   Yes, RGC Center.
10  Q   RGC Center.
11  A   Yes.
12  Q   And why are you incarcerated at the present time?
13  A   Because I got arrested for having some drugs on me -- in my
14      possession.
15  Q   Okay.  This is a prison rather than a jail, so I assume
16      you've been convicted of a drug offense?
17  A   Yes.
18  Q   I mean, the reason that you're here now?
19  A   Yes.
20  Q   You were convicted of a drug offense?
21  A   Yes.
22  Q   Okay.  And what exactly was the charge and conviction
23      against you, the reason that you're here now?
24  A   Delivery and -- delivery and manufacturing with guidelines
25      zero to nine, but I got on zero to nine county time.  But he
```

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

**Page 6**

1        -- I got sentenced to 18 months to prison.
2    Q   Zero to nine months?
3    A   In county time.
4    Q   In county time. But you were sentenced to come to prison
5        instead of the county?
6    A   Yes.
7    Q   And do you know why that is?
8    A   No, I do not. I don't know what to say.
9    Q   All right. Well, if you have some idea, I think it's an
10       appropriate question. Why do you think you were sent to
11       prison rather than to the county jail?
12           MR. GIROUX: Hang on. Go off the record, please.
13           (Off the record)
14   Q   Mr. Bursey, I was asking you about your sentence that you're
15       serving right now. You've testified that you were sentenced
16       to zero to nine months county time; correct?
17           MR. GIROUX: No, that was the guideline.
18   A   No, that was my guidelines.
19   Q   Pursuant to the guidelines, correct. But your sentence was
20       what?
21   A   A year and a half in MDOC.
22   Q   And where were you when you were -- when you committed the
23       act or allegedly committed the act?
24   A   In Traverse City at American Hotel on Front Street.
25   Q   Are you challenging your conviction?

**Page 7**

1    A   I don't know. It's kind of hard to say.
2    Q   Did you plead guilty to an offense?
3    A   Yes, I took a plea.
4    Q   Was the charge reduced in exchange for your pleading guilty?
5    A   Yes. You mean as far as it was by charge they dropped them
6        all down to one?
7    Q   Yes.
8    A   Yes.
9    Q   Okay. And at the present time -- you are not attempting to
10       appeal or challenge your conviction at the present time?
11   A   No.
12   Q   All right. We're going to get into a few more background
13       things, but let me ask you some other questions. I want to
14       ask you about your relationship with Robert Hill. Is
15       Robert -- or excuse me. Was Robert Hill a relative of
16       yours?
17   A   Yes.
18   Q   And what was his relation to you?
19   A   My cousin.
20   Q   All right. So it would be his mother and your mother --
21   A   Are sisters.
22   Q   -- were sisters. His mother's name was Mary Hill?
23   A   Yes.
24   Q   And your mother's name?
25   A   Valerie -- do I use the maiden name or her new name?

**Page 8**

1    Q   What was her maiden name and then tell me her new name?
2    A   Valerie Baker and Phillips.
3    Q   Okay. Valerie Baker was her maiden name?
4    A   Yes.
5    Q   And now her name is Valerie Phillips?
6    A   Yes.
7    Q   And Valerie Phillips is your mother?
8    A   Yes.
9    Q   Is Valerie Phillips still alive?
10   A   Yes.
11   Q   All right. Now, I know that Robert was your cousin. And I
12       want to ask you about your relationship particularly in the
13       last few years of Robert's life. How would you describe
14       your relationship with Robert?
15   A   Beautiful the last few years I was with him.
16   Q   Okay. Did you live with Robert Hill in the last few years
17       that he was alive?
18   A   Yes, sort of, because I would stay at my mama house and,
19       like, he would always stay over at my mama house majority of
20       the time.
21   Q   So you were staying with your mother?
22   A   Yes.
23   Q   And Robert would also stay there sometimes?
24   A   Yeah, between his mother house and my mama house.
25   Q   Did you know anything about Robert's family relationships,

**Page 9**

1        for example, if he'd ever been married, if he had any
2        children?
3    A   I know he had children.
4    Q   Okay. How many children did Robert have that you were aware
5        of?
6    A   That I'm aware of, it was two. I think it was three, but I
7        know he had two sons.
8    Q   What are the names of the sons that you were aware of?
9    A   Franklin Hill.
10   Q   How old is Franklin Hill?
11   A   Franklin got to be about 18 or 19 now. I can't -- I don't
12       know exactly now.
13   Q   Do you know Franklin Hill's mother's name?
14   A   Yes, I do know it.
15   Q   And, Mr. Bursey, for any of these questions, if you don't
16       know the answer, you can tell me that. Okay?
17   A   Yeah. I do know, but it's just not in my head right now.
18   Q   Okay.
19   A   I probably can come back to it.
20   Q   And the second son of Robert Hill that you know of is who?
21   A   I know his first name is Wayne.
22   Q   Wayne?
23   A   I don't know what his last name is.
24   Q   Okay. How old is Wayne?
25   A   Wayne should currently be about 17; 16 to 17.

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

Page 10

1  Q   And who is Wayne's mother?
2  A   I can't remember her name either.
3  Q   When is the last time you saw Franklin Hill?
4  A   I believe it was early in the year last year.
5  Q   Early 2010?
6  A   Yes. No; no. It was -- I think it's either Thanksgiving or
7      Christmas.
8  Q   Of 2010?
9  A   Yes.
10 Q   And where was Franklin when you saw him?
11 A   Was it my grandmother's house? I believe my grandmother's
12     house. He came for the holiday. That's why I don't know
13     which one, whether it was Thanksgiving or Christmas he came
14     for the holiday.
15 Q   Okay. And your grand mother is who?
16 A   Lois Baker.
17 Q   Lewis or Lois?
18 A   Lois.
19 Q   Lois. And when is the last time you saw Wayne?
20 A   Sometime middle parts of last year I stopped at his house.
21     I will always stop and check on him.
22 Q   Middle of 2010?
23 A   Yeah.
24 Q   Okay. Now, you mentioned that Robert may have had one more
25     child. What makes you say that?

Page 11

1  A   Because I -- I kind of remember about I think I was hearing
2      about him say he got another child or he was saying he had
3      another child.
4  Q   Boy or girl?
5  A   I think it was a girl, if I'm hearing right.
6  Q   Did you ever see this child?
7  A   No, I never seen. I just remember a girl, a girlfriend that
8      he used to have that he ran into later on in life and she,
9      like, "You know I still got your daughter." And they's
10     always having this conversation about him having a child,
11     but I don't even think it really hit the light.
12 Q   Do you know whether Robert had ever seen this child?
13 A   No, I don't know if he ever seen her or not; probably off a
14     picture or something. I don't know that he seen recently --
15     you know what I'm saying? -- or recent like.
16 Q   Do you know how old this child would be now?
17 A   In the teens.
18 Q   What is the name of this child's mother?
19 A   Oh, my goodness. I can't remember her name. I cannot
20     remember her name. Lashana or Shani.
21 Q   Lashon!?
22 A   Shani or Shana or something like that.
23 Q   Do you know Shani or Shana's last name?
24 A   Nope.
25 Q   Did you ever hear of Robert Hill being under an order by the

Page 12

1      Friend of the Court to support his children? Did he ever
2      talk about that?
3  A   Child support?
4  Q   Uh-huh (affirmative).
5  A   Not that I know of.
6  Q   He never discussed that with you?
7  A   No.
8  Q   Did he ever discuss with you whether he was supporting his
9      children even if the court was not involved?
10 A   I mean, I know when he would take them things -- you know
11     what I'm saying? He would -- like, he would get little
12     jobs. I remember the last job I remember he was working for
13     some -- I think he was riding around working for banks
14     taking pictures. I think he'll get his kids whatever he
15     could when he could.
16 Q   And what do you mean when you say he would get his kids
17     whatever he could when he could?
18 A   Like gifts or buy them, like, little things, provided some
19     clothes or whatever he kid. That's around the time we would
20     be together. I'd buy my kids little things; he'd buy his
21     kids a few things.
22 Q   Was Robert Hill ever married?
23 A   Not that I know of. I don't remember him being married.
24 Q   What do you know about -- and you started talking about
25     that -- Robert Hill's employment? Robert was shot in July

Page 13

1      of 2008; is that correct?
2  A   Yeah, he was working currently.
3  Q   Okay. Where was he working then if he was working?
4  A   He was working at the -- you know, a little construction
5      site on Joy Road and south of the freeway in the projects.
6      He was doing the manholes.
7  Q   What do you mean doing --
8  A   Installing manholes, getting ready so they can rebuild the
9      projects right there.
10 Q   Okay.
11 A   He was --
12 Q   When you say "installing manholes," do you mean digging
13     manholes or --
14 A   Yeah.
15 Q   -- or cleaning out manholes that exist?
16 A   They was digging them and building the foundation for them,
17     putting -- you know, building the foundation to make
18     manholes in the projects.
19 Q   And where was this located?
20 A   On Joy Road in Southfield.
21 Q   How long had he been working in that job?
22 A   If I can estimate, within four or five months; four or five
23     months. That's as long as I can remember that he was
24     working.
25 Q   Do you remember the name of the company he worked for?

2:10-cv-11427-AC-DAS   Doc # 19-2   Filed 07/25/11   Pg 6 of 20   Pg ID 111

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

Page 14

1  A    No. I know I was trying to get in there.
2  Q    Did Robert have any special skill like licenses or
3       journeyman or anything like that?
4  A    Not that I know of. I don't know if he got him a
5       certificate.
6  Q    What other jobs or employment did Robert have for the time
7       that you have known him?
8  A    The only other thing I know, when I used to catch little
9       roof jobs, I hook him up. He can work with me doing little
10      roof jobs. And then this one job he was trying to get me
11      where he would ride around and take pictures of houses.
12 Q    And was that what you were talking about for banks?
13 A    Yes. You know how ban`cs have a lot of houses and then he'd
14      be a person that ride around and take pictures of all the
15      old houses. He was doing that for a minute.
16 Q    What bank did he work for?
17 A    I don't know. I know they just sent him far out, because he
18      had his license and everything.
19 Q    What type of license are you talking about?
20 A    Driver's license.
21 Q    Okay. Tell me what you know about -- more detail about
22      Robert's living arrangements. You mentioned that Robert was
23      living with his mother. Was he living there full time or
24      was he come over there and stay a little while and then stay
25      elsewhere?

Page 15

1  A    Well, he actually stayed on -- it was on Belfast and
2       Livernois where he was paroled to.
3  Q    Okay.
4  A    And, you know, he would go, you know, as far as to change
5       his clothes to my mother's house around the corner on
6       Woodrow Street, or he -- majority of the time if he going to
7       east side to his mother's house out on the east side. But
8       it'd be mostly between my mama house, his mother house and
9       his house.
10 Q    Now, you say Belfast and Livernois. Do you know what street
11      he lived at?
12 A    On Belfast.
13 Q    On Belfast?
14 A    Yes.
15 Q    Did he live with anyone?
16 A    No, he stayed by hisself.
17 Q    Was it a apartment or a house?
18 A    It was a house.
19 Q    Was it a house he was renting? A house he owned?
20 A    It was a house he was sort of renting from a friend of his.
21 Q    When you say "sort of renting," what do you mean?
22 A    He would pay him -- he didn't have -- I guess it wasn't
23      never no set price. You know what I'm saying? But, like I
24      say, he was having a house and I get out of prison and he
25      was like, "Okay. Well, you can stay here. Just pay me such

Page 16

1       and such."
2  Q    Something informal is what you're saying?
3  A    Yes.
4  Q    Okay. And his mother's house, Robert's mother's house, on
5       the east side, where was that located? What street, if you
6       know?
7  A    Was it Glenwood? I think it was Glenwood off of Gratiot or
8       something. I don't know exactly the address.
9  Q    Okay. And your mother's house when Robert would stay there,
10      where did your mother live at the time?
11 A    5752 Woodrow Street.
12 Q    5752 Woodrow?
13 A    Yes.
14 Q    Woodrow Wilson or just Woodrow?
15 A    Woodrow Street.
16 Q    Woodrow Street. And did you say Woodrow or Woodruff?
17 A    Woodrow.
18 Q    Woodrow. Okay. And as far as you know -- Robert was not
19      living with anyone when he was at his house at Belfast, as
20      far as you know?
21 A    No.
22 Q    What do you know about Robert's criminal background around
23      the time -- or I should say before he died?· Were you aware
24      that he had spent time in prison?
25 A    Yes.

Page 17

1  Q    How long did he spend in prison all together, if you know?
2  A    Twelve years.
3  Q    Do you know what he spent 12 years in prison for?
4  A    Exactly, no, I do not; no.
5  Q    Do you know, if not exactly, generally what he spent 12
6       years in prison for?
7           MR. GIROUX: ·Form; foundation.
8  A    No. I don't know that at all really.
9  Q    You never discussed that with him?
10 A    No.
11 Q    Would you say that you and Robert were close at the time of
12      his death?
13 A    Yes, very close. Ever since he been out, he -- just me and
14      him was like this (indicating) since he's been out. I
15      thought he was going to be upset for him being locked up for
16      12 years and we ain't never -- I never got to see him or
17      write him. But since he came out, we just hooked up like
18      that, and we basically together always.
19 Q    When did he get out of prison?
20 A    2004. I don't know exactly what month.
21 Q    So it's your testimony that Robert was out of prison from
22      2004 until he died in July of 2008?
23 A    Yes.
24 Q    And during that four-year period, Robert was doing what with
25      his time?

2:10-cv-11427-AC-DAS Doc # 19-2 Filed 07/25/11 Pg 7 of 20 Pg ID 112

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

Page 18

1  A   Trying to work and get back with his kids. We hung very
2      much together. If he wasn't working or with his kids or at
3      my mama house or his mama house, we were together.
4  Q   Do you know whether Robert was on parole at the time of his
5      death in July of 2008?
6  A   I don't know. I don't remember exactly when he came off
7      from parole.
8  Q   If I told you that he was on parole until May 17th of 2011,
9      would that surprise you, or you have no knowledge of it?
10 A   I don't know how the parole stuff go.
11 Q   Okay. Did you and Robert ever discuss the conditions of his
12     release from prison? He was in for 12 years and then he's
13     out. But did you two ever talk about his parole? Did he
14     have a parole officer/probation officer? Was he under
15     restrictions? Were they telling him things he couldn't do?
16 A   He would always tell me that he had to see his parole
17     officer, you know. He'd have to see -- he would go see a
18     parole officer.
19 Q   Okay.
20 A   And I took him probably once to see him. That's all I can
21     remember.
22 Q   Do you know how often he saw his parole officer?
23 A   No, not off -- no.
24 Q   Did Robert and you ever discuss the restrictions of his
25     parole? For example, that he should not have guns, he

Page 19

1      should not use drugs, he should not associate with felons?
2      He ever talk to you about that?
3  A   No, he never tell me about that. But I always heard that.
4      You know what I'm saying? Being in Detroit, I constantly
5      hear parolees telling "we can't have no guns" or "we can't
6      do this." But he didn't never tell me about the rule. I
7      guess he basically got no --
8  Q   What was your knowledge about these type of conditions
9      generally? I understand you didn't hear it from Robert,
10     but --
11          MR. GIROUX: Form; foundation.
12 Q   What is it that you knew? You started to talk about it.
13     You're not supposed to have any guns.
14 A   That's the only one I really heard that, if you was on
15     parole, you ain't supposed to be around no weapons. I
16     didn't hear about the -- I just heard that when I got in
17     jail myself, that a felon ain't supposed to be around a
18     felon and all that stuff. I thought they could drink. I
19     didn't know that drinking was one.
20 Q   Okay. So you just recently heard that yourself?
21 A   Yes.
22          MR. GIROUX: What about the felons and the
23     drinking?
24          THE WITNESS: About the drinking, yeah, and the
25     hanging around felons.

Page 20

1  Q   When were you yourself sent to prison for this sentence
2      you're serving now?
3  A   May 20th.
4  Q   Of what year?
5  A   Of 2011.
6  Q   Okay. And what is the expected date of your release? I
7      know you told me a number of months, but do you know what
8      month and date, year you're supposed to get out?
9  A   My minimum is -- will be September 5th, 2012.
10 Q   All right. Let me ask you about Shaneica Fitzgerald. And I
11     have her name spelled S-h-a-n-e-i-c-a. Does that sound
12     right?
13 A   Yeah; yeah.
14 Q   What is your relationship with Shaneica Fitzgerald?
15 A   It's my ex-girlfriend.
16 Q   When were you going with Shaneica Fitzgerald?
17 A   A few years ago around -- it was a few years, like, five,
18     six years around --
19 Q   Five or six years ago or you went with her for five or six
20     years?
21 A   I went with her for, like, about five or six years. I think
22     we broke up last year; summer of last year.
23 Q   Summer of 2010?
24 A   Yeah. Well, it sort of being this -- kind of like for the
25     last two or three years, but we've been like sticking

Page 21

1      together, working together.
2  Q   Since you broke up, you've been working together?
3  A   Yes, up until I got incarcerated.
4  Q   Did you ever live with Shaneica Fitzgerald?
5  A   Yes.
6  Q   When did you live with her?
7  A   2008; it was on and off. I would live with her and then I
8      would go back to my mother house and then I would live with
9      her and then I'd go back to my mother house.
10 Q   And what would cause you to go -- leave Shaneica and go back
11     to your mom's house?
12 A   Whenever we have a discrepancy, you know, I usually go back.
13 Q   When you were living with her, where were you living?
14 A   At the apartment building on -- I think it's Buena Vista and
15     Avalon.
16 Q   Near where the shooting happened?
17 A   Yes, right there.
18 Q   How long did Shaneica stay at that apartment?
19 A   I think we were there for, like, somewhere between 8, 9, 10
20     months, like a year within -- less than a year.
21 Q   During 2008 -- maybe 2007, 2008; does that sound right?
22 A   Yes. Within that time because I think she -- she moved
23     probably about a -- well, she actually moved that month
24     after the accident -- between that month. So it's been a
25     year up until that time.

**Network**Reporting

— 1-800-632-2720 —

2:10-cv-11427-AC-DAS   Doc # 19-2   Filed 07/25/11   Pg 8 of 20   Pg ID 113

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  Q    Okay. Do you have any children with Shaneica Fitzgerald?
2  A    No.
3  Q    Okay. Sheritta Bursey, who is that? And --
4         MS. MILLS: Sorry. For the court reporter,
5         S-h-e-r-i-t-a.
6  Q    Is that spelled --
7  A    -- -i-t-t-a.
8  Q    -- -i-t-t-a. Your lawyer has it wrong. Who is Sheritta
9         Bursey?
10 A    My older sister.
11 A    Let me spell it again. S-h-e-r-i-t-t-a?
12 A    Yeah.
13 Q    And have you lived with Sheritta Bursey lately -- your
14        sister?
15 A    Well, the house -- the house we still were staying is like a
16        studio upstairs from downstairs, so we stay in the same
17        house but it's like separate.
18 Q    Separate places in the same house?
19 A    Yeah.
20 Q    Got it. When's the last time you lived with your sister
21        Sheritta Bursey?
22 A    When I got incarcerated.
23 Q    Okay. Just up until May?
24 A    Yes.
25 Q    Okay.

**Page 24**

1         recently have. But if somebody said "What do you do?
2         What's your occupation?" what would you say?
3  A    Cook.
4  Q    And have you cooked for restaurants or --
5  A    Restaurants.
6  Q    Okay. What restaurants have you cooked for?
7  A    Hockeytown, Comerica -- no. Hockeytown, Fox Theater, Red
8         Lobster, Olive Garden, Sinbad's, Fuddruckers, Lucy's Tavern
9         in Grosse Pointe.
10 Q    L-u-c-y-'s?
11 A    Yes. Comerica headquarters.
12 Q    Is that the one right off of Woodward and Jefferson?
13 A    No. It's a --
14 Q    Is it like a cafeteria?
15 A    Yes, the cafeteria at Comerica headquarters. I think that
16        was Newburgh and Six Mile, I think. That was the year --
17 Q    Tell me about your educational background. Did you graduate
18        from high school?
19 A    No.
20 Q    Did you attend high school?
21 A    Yes.
22 Q    How far did you go?
23 A    Tenth grade in Henry Ford High. Then I got my GED. I took
24        the test, but they can't find it on record.
25 Q    Did you take a course to study for the GED?

| Page 23 | Page 25 |
|---|---|

**Page 23**

1  A    Up to March, because I got incarcerated in March.
2  Q    On this charge that you're in for now?
3  A    Yes.
4  Q    Incarcerated March 2011; correct?
5  A    March 6th, 2011.
6  Q    And then sentenced to this prison in May?
7  A    May 20th.
8  Q    Got it. Where were you incarcerated before you were sent
9         here?
10 A    Traverse City County Jail.
11 Q    Have you ever been known by any other names, Mr. Bursey?
12 A    No.
13 Q    And that includes nicknames, aliases, anything else.
14        Everybody calls you Albert?
15 A    Yeah. Besides joking with me, call me Eddie Griffin or
16        something. I mean, I never heard that so much over the last
17        five years. That's what they call me here.
18 Q    Okay. Let's see. Okay. Now, as you told me, your last
19        address before you were incarcerated in March of this year
20        was with your mom?
21 A    Yes.
22 Q    And that was on Glenwood?
23 A    No. That's 5752 Woodrow Street.
24 Q    If I were to ask you what your occupation is -- and I'm not
25        talking about what job you currently have or what job you

**Page 25**

1  A    Yes.
2  Q    So you don't know if you passed or not? They just couldn't
3         find your record?
4  A    No, they can't find my record. I took the test, and my
5         teacher said I passed. And I didn't never receive no paper.
6         Every time I try to go find out about it, they say it's not
7         on record.
8  Q    When did you take your test?
9  A    Had to be '94 at a church, Church of God and Christ Mt. Zion
10        on Seven Mile.
11 Q    And why did you stop going to school in the tenth grade?
12 A    I think I just stopped going. I think I probably started
13        working that year or something, if I can recall, at Burger
14        King on Eight Mile and Mendoza. I can't remember exactly.
15        That's a long time ago.
16 Q    Were you ever expelled from school or suspended from school?
17 A    Yes; yes.
18 Q    Okay. Let me ask about expulsions first. When were you
19        expelled from school? And "expelled" meaning kicked out.
20 A    Oh, no. I ain't never been kicked out of school.
21 Q    Okay. Then you mean suspension?
22 A    Suspended, yeah.
23 Q    Okay. When were you suspended from school, told you can't
24        come back for a certain period of time?
25 A    Three days or something. Oh, that was when I was little. I

**Network**Reporting

1-800-632-2720

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

|  | Page 26 |
|---|---|
| 1 | think that was only in elementary school. |
| 2 Q | And what did you do to cause them to suspend you? |
| 3 A | I don't remember. I don't know. I can't remember that. |
| 4 Q | But you were never expelled, kicked out of school? |
| 5 A | No. |
| 6 Q | I'm going to ask you this question. We'll take the answer |
| 7 | off the record. I'm going to ask your Social Security |
| 8 | number, but I'll tell her to stop typing. Okay? |
| 9 A | Okay. |
| 10 | (Off the record) |
| 11 Q | What is your date of birth? |
| 12 A | 5-4-76. |
| 13 Q | And your current age? |
| 14 A | 35. |
| 15 Q | Have you ever been married? |
| 16 A | Yes. |
| 17 Q | Once or more than once? |
| 18 A | Once. |
| 19 Q | Once was enough? |
| 20 A | No. |
| 21 Q | What was your wife's name? |
| 22 A | La'Keisha Anderson. |
| 23 Q | Can you spell La'Keisha for me? |
| 24 A | L-a-'-K-e-i-s-h-a. |
| 25 Q | Are you still married to her? |

|  | Page 27 |
|---|---|
| 1 A | No. |
| 2 Q | When were you married to La'Keisha? |
| 3 A | I think I got married September 24th, '97, and divorced |
| 4 | March 1st, 2005. |
| 5 Q | Does La'Keisha Anderson still live in Detroit? |
| 6 A | Yes, ma'am. |
| 7 Q | And you said this was your only marriage; correct? |
| 8 A | Yes. |
| 9 Q | And do you have children? |
| 10 A | Yes. |
| 11 Q | How many children do you have? |
| 12 A | Three. |
| 13 Q | What are their names and ages? |
| 14 A | Zhanee, Z-h-a-n-e-e, next name M-a-c-k- -- |
| 15 Q | Okay. Let's start with Zhanee. |
| 16 A | Okay. Zhanee Macksyn Bursey. |
| 17 Q | Okay. This is one. I got it. |
| 18 A | M-a-c-k-s-y-n Bursey. |
| 19 Q | And how old is Zhanee? |
| 20 A | She'll be 14 July 21st this year. |
| 21 Q | Who is Zhanee's mother? |
| 22 A | I mean, July 29th. La'Keisha. |
| 23 Q | Okay. Your next child? |
| 24 A | Allisha, A-l-l-i-s-h-a, Dann, D-a-n-n, Bursey. |
| 25 Q | How old is Allisha? |

|  | Page 28 |
|---|---|
| 1 A | She's 9 March 28th. |
| 2 Q | And who is her mother? |
| 3 A | La'Keisha. |
| 4 Q | And your next child? |
| 5 A | Albert Mack Bursey IV. |
| 6 Q | And is La'Keisha his mother, too? |
| 7 A | Yes. |
| 8 Q | How old is Albert? |
| 9 A | 7. |
| 10 Q | Okay. For purposes of discovery, I want to ask you a few |
| 11 | questions about your criminal record. I know that you -- |
| 12 | we've talked about what you're in for now. Other than the |
| 13 | most recent conviction that you had for a drug offense, have |
| 14 | you ever been convicted of a felony before this? |
| 15 A | No. |
| 16 Q | This was your first felony? |
| 17 A | Yes. |
| 18 Q | Other than this conviction, have you been convicted of any |
| 19 | other crimes including misdemeanors other than the one that |
| 20 | you're here for now? |
| 21 A | You talking like tickets? |
| 22 | MR. GIROUX: No, not moving violations; like civil |
| 23 | infractions. |
| 24 A | No. |
| 25 Q | No. A criminal conviction. |

|  | Page 29 |
|---|---|
| 1 | MR. GIROUX: If you're unclear, you can ask |
| 2 | because I don't want you to make a mistake. But she's |
| 3 | looking for crimes. |
| 4 | THE WITNESS: Like a larceny? Under $100 it's a |
| 5 | misdemeanor? |
| 6 | MR. GIROUX: That's a crime. |
| 7 Q | Right; right. |
| 8 A | Okay. Yeah. |
| 9 Q | It may be a small crime, not a felony, but a crime. |
| 10 A | I think I was -- I think a larceny when I was 17, I think. |
| 11 Q | And did you receive any sentence for that? |
| 12 A | Probation. |
| 13 | MR. GIROUX: Do you know what the conviction was |
| 14 | for? |
| 15 | THE WITNESS: A larceny under $100. |
| 16 | MR. GIROUX: That was the charge or the |
| 17 | conviction? Do you know? |
| 18 | THE WITNESS: I got it right here. |
| 19 | MS. MILLS: Let's go off the record for a second. |
| 20 | (Off the record) |
| 21 Q | I was asking you questions about your criminal background, |
| 22 | and you apparently brought a document or some documents into |
| 23 | this room where we have the deposition. I'm just going to |
| 24 | describe the titles and the page length of each, and I'll |
| 25 | ask you a couple questions. And then you wait for your |

2:10-cv-11427-AC-DAS Doc # 19-2 Filed 07/25/11 Pg 10 of 20 Pg ID 115

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

Page 30

1  attorney to tell you whether you can answer. Okay?
2  Apparently there are three documents, first a Pre-Sentence
3  Investigation Report, ten pages in length; second, a
4  Sentencing Information Report, two pages in length; third, a
5  Basic Information Report, one page in length. Okay. Now,
6  my first question is, did you review this document before
7  today's deposition?
8  A   Yeah.
9          MR. GIROUX: Well, hang on. He's obviously read
10 it at some point in time.
11         MS. MILLS: I'm asking if he reviewed it before
12 today's deposition. Excuse me.
13 Q   Did you review it for today's deposition?
14 A   No.
15 Q   When is the last time that you looked at the document?
16 A   When I received it.
17 Q   When did you receive it?
18 A   May 20th, 21st.
19 Q   Why did you bring it to your deposition today?
20 A   Because I just always keep my paperwork in my hand, all my
21 court papers. I just received that one yesterday.
22 Q   Was this another copy of what you received May 20th, 2011?
23 A   Yes.
24 Q   Who gave it to you?
25 A   Classification at MDOC.

Page 31

1  Q   And what is Classification at MDOC?
2  A   Once they actually classify you for this 30-day quarantine
3  process before they send you to whatever prison they going
4  to send you to.
5  Q   When did your 30-day quarantine begin?
6  A   May 24th.
7  Q   So they are planning to be done with your 30-day quarantine
8  today; is that right?
9  A   Yes.
10 Q   Is this -- this is the last day?
11 A   I mean, my 30-day -- 30-day was yesterday.
12 Q   Okay. And then where are they planning to send you now that
13 your 30 days is up?
14 A   I don't know. We don't know until they come and tell you to
15 pack up.
16 Q   Okay. So you're expecting that to happen any day now?
17 A   Any day now.
18         MS. MILLS: And, Counsel, you're objecting to my
19 seeing it why, just for purposes of the record?
20         MR. GIROUX: I believe it's a privileged document,
21 and I don't believe it's discoverable. And the only reason
22 he even pulled it out was because you wanted to be clear on
23 a criminal charge that he was telling you about, a larceny.
24 And he was correct. It was larceny under $100. It was an
25 offense dated 4-4-97 and a conviction/plea date of 11-5-97.

Page 32

1          MS. MILLS: Okay.
2          MR. GIROUX: I believe there are privileges that
3  attach to this document. I think he has to meet with
4  professionals to go through a screening process. I think he
5  has -- in addition to his general background information, I
6  think there's health information that he discloses. I think
7  there's all kinds of information that he has reportedly
8  disclosed that's not discoverable and/or it's privileged.
9  And I haven't seen this document before today, and I can't
10 just let him turn it over because I'd have to do the
11 research and see if it's even discoverable.
12         MS. MILLS: Okay. Well, let me ask this question.
13 Q   Perhaps we can make arrangements for you to give this lawyer
14 a copy of the document. Not me, give it to him, so that,
15 when we have an argument or fight about it in court, he will
16 have a copy of what you brought here today. Is that fair?
17 A   Yeah.
18 Q   Okay.
19         MR. GIROUX: I suspect I can take it with me,
20 can't I?
21         THE WITNESS: Yes.
22         MR. GIROUX: You can give me anything you want.
23 I'm your lawyer.
24         THE WITNESS: Yeah; uh-huh.
25         MR. GIROUX: I can copy it and send you one back

Page 33

1  through the mail.
2          THE WITNESS: Uh-huh (affirmative).
3          MS. MILLS: All right.
4  Q   So the record should reflect just for purposes of this case,
5  Mr. Giroux will be taking the document that we're talking
6  about today?
7  A   Yes.
8  Q   Okay. Thank you. Let me not skip around. Let me finish
9  with this, what I'm talking about. I was asking you about
10 other criminal charges/convictions.
11 A   Right.
12 Q   We know about the drug offense for which you are here now.
13 A   Yeah.
14 Q   You talked about larceny under $100 at the age of 17.
15 A   Yes.
16 Q   Okay. Are there any other criminal convictions that you
17 have had, either misdemeanors or felonies?
18 A   No.
19 Q   Now, I presume you've been arrested before, because you're
20 here in prison.
21 A   Yeah.
22 Q   How many times have you been arrested before?
23 A   I don't know. Like I say, probably eight.
24 Q   Of the eight arrests -- eight or so arrests that you've had,
25 how many were after you were an adult, 18 years old?

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

| Page 34 | Page 36 |
|---|---|

Page 34

1  A   All of them, I believe.
2  Q   What -- for what reason have you been arrested?  And if you
3      want to talk about them in groups or if you remember all of
4      them?
5  A   All of them?  Some were driving on probably a suspended
6      license or some, no insurance or probably one -- I think they
7      all was about driving; all driving.
8  Q   Okay.  So the only times you've been arrested are for
9      driving on a suspended license, no proof of insurance --
10 A   Or something like that.
11 Q   -- and the drug arrest you had in Traverse City?
12 A   Yes.
13 Q   And the larceny arrests; correct?
14 A   Yes.
15 Q   And you've never been arrested for any other reason?
16 A   No.
17 Q   I want to ask you about incarcerations.  Were you ever
18     incarcerated other than what you told me about being locked
19     up in the Traverse City Jail and here?  Have you ever been
20     incarcerated before?  And let's include in that police
21     precincts, county jails, prisons.
22 A   Yes.
23 Q   Okay.  How many times have you been incarcerated other than
24     the one we've already discussed, the Traverse City to here?
25 A   I did two or three months in Macomb County.  I don't know

Page 35

1      exactly how many, but two or three months in Macomb County.
2  Q   For what?
3  A   Something to do with driving, unpaid tickets.  And I did, I
4      think it was, two or three months in Oakland County Jail.
5  Q   For what?
6  A   Unpaid tickets.  Now, I don't want to get confused, but each
7      one of them probably was from not dealing with the probation
8      from the larceny, which probably gave me the two months.
9      But it's, like, kind of off on the same category.
10 Q   Okay.  And those incarcerations were all at the county jail?
11 A   Yeah, those two.
12 Q   Are there any more than those two or three that we talked
13     about; unpaid tickets, driving offenses and a probation
14     offense for the larceny?
15 A   I think I was transported to the Fifth -- I got arrested in
16     Westland and got transported to the Fifth Precinct.
17 Q   In Detroit's Fifth Precinct?
18 A   Yes, just to get transported to Macomb Jail.
19 Q   Sounds like nobody wanted to keep you.
20 A   I don't know --
21 Q   Why were you arrested in Westland?
22 A   Was driving in the car with my cousin Robert Hill.  He was
23     driving, and we was going down into the road and got pulled
24     over.  And they claim that the plates didn't match, but they
25     actually did and later on said they did.  And they arrested

Page 36

1      him, because I was moving from Inkster to Detroit -- you
2      know what I'm saying?  I had some stuff I was taking to
3      Detroit.  And I had the kitchen knives and forks and the
4      dishes and all that in there.  So they arrested Robert for
5      the kitchen knives, and they arrested me because I had a
6      warrant which was, I think, the warrant they got me in
7      Macomb County.  They released him the next day and they just
8      kept me on the warrant.
9  Q   And that's the Macomb County driving offense we already
10     talked about?
11 A   Yeah.  That's what I'm trying to figure out.  I don't know
12     if the Macomb County was the driving or was it because I
13     failed to do the probation from the larceny from when I was
14     younger.
15 Q   Okay.  Now, do you have a current Michigan driver's license?
16 A   Not a driver's license, no.
17 Q   Have you ever had a driver's license?
18 A   Yes.
19 Q   When's the last time you had one?
20 A   I think my driver license got suspended in 2001, I believe.
21 Q   For unpaid tickets or for something else?
22 A   Yeah, probably unpaid tickets.
23 Q   Did you ever get a Michigan State ID after that?
24 A   Yes.
25 Q   And you have that?

Page 37

1  A   Yes.
2  Q   You don't have it with you?
3  A   No.
4  Q   What is your height and your weight, sir?
5  A   5'11", 167 pounds.
6  Q   Okay.  Let's at long last talk about the incident of July
7      18th, 2008.  You remember what happened?
8  A   Yes.
9  Q   Before we get into what happened, did you ever give a
10     statement to anyone about what happened after the fact?
11 A   Yes, I remember giving a statement.
12 Q   Okay.  Who have you given statements to?
13 A   I can't remember the officer's name.
14 Q   Was it a Detroit police officer?
15 A   I believe so.  There was a lot of officers pulling up.
16 Q   Is this the statement you're talking about or are you
17     talking about just talking to somebody at the scene?
18 A   Yes, when they set me in a car.  I know they set me in a car
19     and the officer kept waking me up and asking me questions
20     then another -- a lady came and sat in the car in there.
21     Yeah, I think that's it.
22         (Deposition Exhibit 1 marked)
23 Q   Okay.  Let me show you what I've had marked as Exhibit 1 and
24     ask you if you've ever seen this document before?
25         MS. MILLS:  And just for the record, it is titled

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

| | Page 38 |
|---|---|
| 1 | "Witness Statement" and it's dated July 18th, 2008, 5:22 |
| 2 | a.m. |
| 3 A | Uh-huh (affirmative). |
| 4 Q | Does that sound about like the time you were sitting in the |
| 5 | car or was it later? |
| 6 A | It seemed like it's like a hour later off my confirmation, |
| 7 | but it could be. |
| 8 Q | Okay. Do you remember giving a statement to a Detroit |
| 9 | police officer or two Detroit police officers? |
| 10 A | I remember giving that statement to the two officers in the |
| 11 | car, yes. It was a lady -- |
| 12 Q | Okay. While you were seated in the car? |
| 13 A | Yes. |
| 14 Q | Okay. And look at the bottom of the page. Is that your |
| 15 | signature? |
| 16 A | Yes, ma'am. |
| 17 Q | Okay. Is anything else on this first page in your |
| 18 | handwriting? |
| 19 A | It don't look like my handwriting. Is this supposed to be |
| 20 | my handwriting or something? |
| 21 Q | No; no. I'm asking you if you recognize anything else on |
| 22 | there besides your signature as being in your handwriting. |
| 23 | I don't know what your answer is. It may not be. It may |
| 24 | be. I don't know. |
| 25 A | No, this don't look like my -- I can't remember writing |

| | Page 39 |
|---|---|
| 1 | nothing, but I don't think I -- but it's my signature. |
| 2 | That's my signature. |
| 3 Q | Okay. Got it. Okay. Now, we're going to put this aside |
| 4 | just for a minute and then I'll talk about what happened and |
| 5 | we'll come back to this. Tell me what you remember about |
| 6 | that day before your cousin got shot. I mean, what did you |
| 7 | do that day? Did you work that day? |
| 8 A | Yes. |
| 9 Q | Okay. Where were working at the time? |
| 10 A | Arted Chrome Plating. |
| 11 Q | And how do you spell Arted Chrome? |
| 12 A | A-r-t-e-d Chrome Plating. |
| 13 Q | Okay. And where are they located? |
| 14 A | On Woodward and -- I believe that's Piquette; Woodward and |
| 15 | Piquette. |
| 16 Q | And what did you do for Arted Chrome Plating? |
| 17 A | Nickel plated and chrome plated little washers, screws, |
| 18 | bolts, you know, some stuff like that. |
| 19 Q | How long had you been working for them? |
| 20 A | Probably about a year and a half up until that time. |
| 21 Q | Do you remember what hours you worked that day? |
| 22 A | Yes. |
| 23 Q | What hours did you work? |
| 24 A | From 6:00 in the morning to 4:00 in the afternoon. |
| 25 Q | All right. Now, at 4:00 p.m. you got off work. What |

| | Page 40 |
|---|---|
| 1 | happened next? Did you leave work at 4:00 that day or did |
| 2 | you leave -- |
| 3 A | Probably a hour early, if I remember right. |
| 4 Q | Okay. What did you do next? |
| 5 A | Went home, changed up. |
| 6 Q | And home would have been the Woodrow Street house? |
| 7 A | Yeah. |
| 8 Q | Okay. Went home, changed, and then what did you do? |
| 9 A | Just kicked it with Robert for a minute. |
| 10 Q | Now, at the time you were living at Woodrow, you were not |
| 11 | living with Shaneica; is that right? |
| 12 A | That's kind of hard to say. I was staying at both houses, |
| 13 | because me and her worked together. |
| 14 Q | Oh, she worked at Arted Chrome as well? |
| 15 A | Yeah; yeah. We worked together. There was only, like, nine |
| 16 | people in there. So a lot of times I would stay over at her |
| 17 | house so I can ride to work with her. |
| 18 Q | Did you work with her that day? |
| 19 A | Yes. |
| 20 Q | All right. So when you left work, did you leave with |
| 21 | Shaneica? |
| 22 A | Yes. |
| 23 Q | And then you went -- |
| 24 A | She dropped me off. |
| 25 Q | She dropped you off at your home. All right. So then you |

| | Page 41 |
|---|---|
| 1 | go home, change clothes, and then you say you kicked it with |
| 2 | Robert. When is it that you first had contact with Robert |
| 3 | that day? |
| 4 A | When I got to my mother house, he was there. |
| 5 Q | Okay. And that's the Woodrow address? |
| 6 A | Yes. |
| 7 Q | Robert was already there? |
| 8 A | Uh-huh (affirmative). |
| 9 Q | "Yes"? |
| 10 A | Yes. |
| 11 Q | Okay. And so now this is maybe 4:00 in the afternoon, 5:00 |
| 12 | in the afternoon? |
| 13 A | Yes. |
| 14 Q | How long did you stay at your mother's house with Robert? |
| 15 A | Probably within an hour or two just eating and ironing |
| 16 | clothes to change and getting ready for the day. |
| 17 Q | And what were you guys going to be doing next? |
| 18 A | He was going to work. I think he was either going to work |
| 19 | or getting off from work, and I was just going to chill over |
| 20 | a few people's house before I go back to the home home or |
| 21 | Shaneica house. |
| 22 Q | Okay. So you were just going to go around and visit |
| 23 | friends? |
| 24 A | Yeah. |
| 25 Q | All right. So now it's 4:00 or 5:00 in the afternoon, |

**Network**Reporting

1-800-632-2720

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  you're eating, you're changing clothes. Robert, you say,
2  was going to go to work; correct?
3  A  I believe he was either going to work or he was coming from
4  work.
5  Q  Okay. And you were going to go visit some friends?
6  A  Yes.
7  Q  Do you know who you were going to go visit?
8  A  No, just -- I just was kicking it with people in the
9  neighborhood, you know.
10  Q  Okay. So what happened -- at some point you left your
11  mother's house?
12  A  Yes.
13  Q  What time did you leave the house?
14  A  I don't know exactly what time.
15  Q  Do you know if it was dark out?
16  A  No, it was still light out when I left.
17  Q  Okay. And this is happening in July.
18  A  Yes.
19  Q  Was it dinnertime?
20  A  Payday. It was a payday, so I remember I was --
21  Q  Do you remember the names of any of the friends you went to
22  visit?
23  A  Just basically neighborhood, little homeboys; Stretch.
24  Q  What's Stretch's real name?
25  A  I don't know. They got so many street names. It's hard to

**Page 43**

1  get a person's real name.
2  Q  Okay. Well, tell me the street names of the people you went
3  to go see.
4  A  I was on Barton -- on Barton and Belfast.
5  Q  Okay.
6  A  Right off of Livernois.
7  Q  So these are people you knew from the neighborhood?
8  A  Yes.
9  Q  Who besides Stretch?
10  A  Guy called Little Brandon, Q, just a few guys that I
11  always -- we stand outside all day.
12  Q  Okay. Do you know anybody's real name?
13  A  I think Little Brandon's real name was Brandon.
14  Q  Brandon what?
15  A  I don't know by last name.
16  Q  Okay. How long you known these guys, Stretch, Little
17  Brandon, Q?
18  A  For, like, years, but I didn't know your last name unless we
19  went to elementary school together.
20  Q  All right. So you -- when you say you went to visit
21  friends, were you just hanging out outside? Did you go to
22  someone's house?
23  A  Yeah, just hang out or sit on the porch -- on they porch
24  or --
25  Q  Okay. Whose house were you at?

**Page 44**

1  A  It was -- I think it was a house that we were fixing up. It
2  was a house that we was fixing up on Barton. I can't
3  remember the address. But it was a house that we was fixing
4  up for this Mexican guy.
5  Q  Okay. So was it a house that belonged to anybody that
6  you were hanging out with?
7  A  No. It was just a house that we was fixing up at the time.
8  We sit on the porch, just roll in for a second, say, "What's
9  up, man?" Everybody be in and out.
10  Q  Okay. So now it's 5:00, 6:00 o'clock at night. How long
11  did you hang out with your friends?
12  A  Probably 'til it started probably getting dark.
13  Q  Okay.
14  A  And then I believe -- if I can recall it right, I believe
15  Shaneica came and picked me up.
16  Q  At Barton and Belfast?
17  A  Yeah.
18  Q  Okay. So you hung out until it's dark.
19  A  Yeah.
20  Q  Shaneica came and picked you up. What kind of car was
21  Shaneica driving, she was driving a car?
22  A  No. She couldn't have came and picked me up, because her
23  car wasn't working then.
24  Q  What type of car did she have?
25  A  A little Honda Civic. So she didn't pick me up. I'm trying

**Page 45**

1  to think how did I get over to her house?
2  MR. GIROUX: Don't worry about it. If you don't
3  remember, you don't remember.
4  THE WITNESS: Yeah. I can't -- yeah, I can't
5  remember.
6  MR. GIROUX: It's okay. I don't want you
7  guessing.
8  THE WITNESS: Yeah.
9  MR. GIROUX: If you guess wrong, it's just going
10  to make you look bad.
11  Q  At any rate, you somehow made it over to Shaneica's house?
12  A  Yeah.
13  Q  Did you go to Shaneica's house by yourself?
14  A  Yes.
15  Q  Okay. Did Shaneica go with you to her house?
16  A  No, she was already there.
17  Q  Do you know if you walked, took the bus; you have no idea
18  how you got there?
19  A  No, I can't remember how I got there.
20  Q  Do you know what time you got to Shaneica's house?
21  A  Exactly what time, no.
22  Q  Even roughly? It was after dark?
23  A  8:00.
24  Q  Or was it after dark or was it still light?
25  A  It seemed like it was getting late, like, 8:00; 7:00, 8:00.

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

### Page 46

```
1        Within 7:00 and 9:00 time.
2    Q   Was it dark out yet?
3    A   I can't remember.
4    Q   All right.  When you got to Shaneica's house, was anybody
5        else there?
6    A   Her and her kids.
7    Q   Did Shaneica expect you to come over?
8    A   Yeah.
9    Q   Did you tell her you were coming over or you planned it
10       ahead of time?
11   A   Yeah, I called her and told her I was coming.
12   Q   Okay.  And when you got to Shaneica's house 7:00, 9:00
13       o'clock at night, what happened next?
14   A   It was like I was at home.  I made it home.
15   Q   What did you do?
16   A   Watched TV, eat.
17   Q   All right.  Was anybody else there besides you, Shaneica and
18       her children?
19   A   No, not at the house.
20   Q   Did you have any argument with Shaneica that day?
21   A   I don't -- yeah, probably later on, but we argued every day.
22       It was like we argued every day.  It wasn't rough, but we
23       just argued every day.  That's how we talked to each other.
24   Q   And what were you arguing about?
25           MR. GIROUX:  Which day?
```

### Page 47

```
1    Q   Well, let's start with the day that the shooting happened.
2        What were you arguing with her about that day?
3           MR. GIROUX:  Form; foundation.  If you recall.
4    A   I don't remember.  Probably because I was out, I mean,
5        probably because I didn't come home or something.
6    Q   What type of things did you and Shaneica argue about
7        generally?  You say that you argued --
8    A   Me hanging out.
9    Q   Okay.  Did the argument become physical?
10   A   No.
11   Q   Did you ever have an argument with Shaneica that became
12       physical, not just that day?
13          MR. GIROUX:  Form; foundation.
14   A   Not that I know of.
15   Q   I didn't hear your answer.
16   A   Not that I know of.  I never hit her, if that's what you're
17       saying.  Like, you know, we didn't have no fight.
18   Q   All right.  So you were arguing about you were hanging out,
19       and how long did this argument last?
20          MR. GIROUX:  Form; foundation.  I think he said he
21       didn't remember.  He said "probably."
22   A   I don't remember -- I don't remember how long it -- it
23       was -- that's what I'm saying, it was like spaz.  It was
24       like nothing seriously.  She yelled at me, I yelled at her;
25       nothing serious.
```

### Page 48

```
1    Q   Okay.  Just raised voices, that was it?
2    A   Yeah.
3    Q   Nobody touched anybody?
4    A   Unh-unh; no.
5    Q   Okay.  Was anybody else around besides her children?
6           MR. GIROUX:  Asked and answered.
7    Q   And I'm specifically talking about while you're arguing now.
8    A   I don't know.  I wasn't really paying attention to, like,
9        everybody.  I know there's always people.  In that complex,
10       there was always people just constantly just always out.
11   Q   Were you arguing with her inside of her house or outside of
12       her house?
13   A   Just, like, right there by the car.  You know what I'm
14       saying?  Our car is parked in front of the door.  Just right
15       there at the car.
16   Q   Okay.  So you were outside; that's what you're saying?
17   A   Yeah.
18   Q   Okay.  When you were outside arguing with Shaneica -- I'm
19       sorry for messing up her name -- did anybody else -- was
20       anybody else around that you saw?  And I'm not talking about
21       her children.  I'm talking about neighbors.
22   A   Yeah, there was neighbors out.  They always out.  They 24/7
23       they sit right there down at this end, and there's a bunch
24       of guys just standing right on the corner.  They stand there
25       all day 24/7 right there.
```

### Page 49

```
1    Q   Did any of the neighbors get into your business with
2        Shaneica; in other words, try to jump in when this
3        argument's going on?
4    A   This one guy had walked up to me because he knew her and
5        then, when he seen who I was, he was like, "Oh, that's your
6        all -- that's your all business," and then he walked off.
7    Q   Did you think he was coming up to help her?
8    A   Yeah, because we was arguing, and she kept getting in my
9        face.  So he walked over there like, "What's going on?"  And
10       then he looked and seen, he's, like, "Oh, that's you all.
11       You all silly" --
12   Q   Do you know who this guy was?
13   A   No.  It was some friend of hers that she grew up in her
14       neighborhood with.  I think his name was Tink.
15   Q   Tank?
16   A   Tink or Tank or something.  I don't know.  That's my first
17       time -- I always seen him riding, but I ain't never, you
18       know, had no -- we ain't never was able to communicate with
19       each other.
20   Q   Before Tink or Tank realized it was you, did he say
21       anything?  For example, "Shaneica, you okay?"
22   A   Yeah, I think that's -- I think that's probably what he
23       said.  Something like, "You okay?"  And then she's like,
24       "Yeah, I'm cool" or something.  I can't remember exactly
25       what she said, but it sort of went like that.
```

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

## Page 50

1  Q   And then he went on about his business?
2  A   Yeah, he went right back to the little group he was standing
3      at.
4  Q   Did anybody else interrupt you two or get into your
5      business, try to talk to either one of you while you're
6      having this argument?
7  A   No.
8  Q   Did anybody tell you and Shaneica to stop or, "Don't bring
9      this mess over here. Stop whatever you're doing. We don't
10     want to hear that"?
11 A   No, not that I know of.
12 Q   Okay. Were you drinking at the time of this argument?
13 A   Not at that time. I drunk earlier before I got over there.
14 Q   What did you have to drink that day?
15 A   Probably about a little liquor; probably about a half a
16     pint, probably a tall can.
17 Q   Half a pint of what?
18 A   I think it was Jose Cuervo. He have some Cuervo.
19 Q   And what is Jose Cuervo? What type of liquor is it?
20 A   Tequila.
21 Q   And a tall can of beer?
22 A   Yeah.
23 Q   "Tall can" meaning how --
24 A   Twenty-four ounce.
25 Q   Twenty-four. Is that all you had?

## Page 51

1  A   Yes.
2  Q   When did you have all this to drink?
3  A   Around the time I was kicking it on -- no, that's wrong. It
4      had to be, like, 5:00, 6:00, 7:00; right before I went over
5      her house.
6  Q   5:00 to 7:00 p.m.?
7  A   I mean, it was around that time.
8  Q   Would you say you were feeling the effects of the alcohol
9      after you had the half pint and the tall can of beer?
10 A   No; unh-unh.
11 Q   Okay. All right. So you and Shaneica are -- you're
12     arguing. This person intervenes but then backs off. What
13     happened next?
14 A   Then that's it. I went in the house.
15 Q   Okay. What time is this?
16 A   I can't remember exactly what time it was.
17 Q   Did she go into the house with you?
18 A   Yeah, she came in and went back out, came in, went back out,
19     because she was kicking it with one of the girls that's
20     standing outside. I think she was -- no, she'd walk in and
21     talk to them.
22 Q   Okay. So both of you were going in and out of the house; is
23     that what you're saying?
24 A   I came -- I didn't go in and out. I went in probably once
25     or twice, but she was coming in and out because her friend

## Page 52

1      would be out there.
2  Q   Do you know the name of the friend that was outside?
3  A   I think her friend name was Friend. I think that was her
4      name, Friend. That's what she called her, Friend.
5  Q   Friend? Did you ever see this person before?
6  A   Yes.
7  Q   All right. So now about what time is it when you went in?
8  A   I can't remember exactly what time it was.
9  Q   Okay. Did there come --
10        MR. GIROUX: Let's take a break for a minute.
11     We've been going for over an hour, I think.
12        MS. MILLS: Sure. Okay.
13        (Off the record)
14 Q   You testified that you went back into the house and Shaneica
15     was going in and out to see her friend named Friend?
16 A   Yes.
17 Q   Okay. Do you know about what time it was you went into the
18     house and stayed?
19 A   No.
20 Q   Okay. Did you ever come back out again?
21 A   I know I came -- I know I came back out, because we were
22     talking. After we were arguing, we was talking. So I came
23     back out. I don't know what time it was.
24 Q   Okay. Did you ever -- strike that. Did you have a cell
25     phone at that time?

## Page 53

1  A   Unh-unh (negative).
2  Q   You did not?
3  A   No.
4  Q   Did you have a phone inside of Shaneica's house?
5  A   Unh-unh (negative).
6  Q   You have to say "yes" or "no."
7  A   No.
8  Q   So no cell phone, no house phone and Shaneica did not have a
9      phone?
10 A   Yeah, Shaneica had a phone.
11 Q   Do you know about how many people were standing outside
12     while you guys were arguing?
13 A   No, not exactly. There was a lot of people.
14 Q   More than ten would you say?
15 A   Well, I don't know if it was more than ten. Probably close
16     to around that much if not more than ten. There was a lot
17     of people. There's always a lot of people out there; a lot.
18 Q   All right. How is it that Robert came to the scene?
19     Because I understand he came there.
20 A   Well, he had -- he was in a ride -- he caught a ride over
21     there. As a matter of fact, when he got off work -- this is
22     how he explained it to me. He had got off work, and he rode
23     over there with a friend -- another friend of ours named
24     Khari.
25 Q   Khari?

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

| Page 54 | Page 56 |
|---|---|
| 1  A   Yeah. | 1  A   He's my friend. |
| 2  Q   Can you spell Khari's name? | 2  Q   All right.  So they asked you to go kick it with them and |
| 3  A   K-h-a-r-i. | 3       you said what? |
| 4  Q   And what's Khari's last name? | 4  A   I said, no, I'm going to stay here. |
| 5  A   I don't know that. | 5  Q   All right.  So did they leave then? |
| 6  Q   Okay.  So Robert Hill came by with Khari? | 6  A   They asked me for some money, and so I jumped in the |
| 7  A   Uh-huh (affirmative). | 7       Commander with them and we rode around the corner to the gas |
| 8  Q   "Yes"? | 8       station.  I had a $50 bill.  I remember.  I jumped in the |
| 9  A   Yes. | 9       car; we rode around to the gas station.  I gave -- no, I had |
| 10  Q   Okay.  And when did Robert tell you this? | 10       a $50 and a $10 bill.  I gave Khari -- no.  I gave Robert |
| 11  A   No.  He -- they pulled up. | 11       the $10.  And Khari's, like, "I'm the one driving.  Give me |
| 12  Q   Okay.  You saw -- | 12       some money."  I said, "All I have is a $50 bill left."  So I |
| 13       MR. GIROUX:  He saw -- | 13       jumped in the truck with them, and we rode to the gas |
| 14  Q   -- Robert and Khari pull up in a car? | 14       station right there on Grand River in Meijer's. |
| 15  A   Yeah.  In a Commander, a black Commander. | 15  Q   What type of station was it? |
| 16  Q   And who was driving? | 16  A   Oh, gas station right on 96 and Grand River.  I don't know |
| 17  A   Khari. | 17       the name of it.  Amoco or something.  I don't know the name |
| 18  Q   This is a Jeep? | 18       of it. |
| 19  A   Yes. | 19  Q   Okay. |
| 20  Q   What time did they come over? | 20  A   But I got change for the 50, and then I gave Khari $10.  And |
| 21  A   I don't know exactly the time, but it was dark when they | 21       then we pulled back into the apartment and then I got out. |
| 22       pulled up. | 22       And then Rob got out.  Rob got out because he seen the girls |
| 23  Q   Okay.  And what prompted Robert to come by with Khari? | 23       standing out.  There was some girls out on the -- by the |
| 24       MR. GIROUX:  Form; foundation. | 24       apartment building -- |
| 25  Q   If you know. | 25  Q   Okay. |

| Page 55 | Page 57 |
|---|---|
| 1       THE WITNESS:  Answer that? | 1  A   -- down there where Shaneica was.  And he walked up on the |
| 2       MR. GIROUX:  Yeah.  What that means is and why she | 2       sidewalk with me, and he was talking to me.  And I said, |
| 3   said "if you know," like if he explained it or if you knew | 3       "Well, you know I'm about to move back home."  He was |
| 4   because of some prior agreement.  But if you're just going | 4       telling me he was about to move back to his mother house. |
| 5   to guess as to why he came over -- | 5  Q   Uh-huh (affirmative). |
| 6       THE WITNESS:  Oh.  Oh, no.  I know. | 6  A   And gave me a hug.  And then he was asking who the girls are |
| 7  A   They came over.  They said they wanted me to hang out with | 7       down there that was with Shaneica.  I was like, "I don't |
| 8       them because they knew I got paid.  He's, like, "Well, I | 8       know.  It's one of her friends that she be talking to."  And |
| 9       know you got some money.  Come on.  Hang out with us."  And | 9       then he jumped in the truck, said he will back.  He was |
| 10       he had half a pint of -- he had half a pint of some type of | 10       standing away like he wanted to ditch Khari because Khari |
| 11       liquor, and I took it from him.  Because I said, "Man, you | 11       wanted to hang out with him, and they wanted me to hang out |
| 12       all are driving.  You don't need to be driving drinking," | 12       because after I got paid. |
| 13       and I took it from them.  When I snatched it, the bottle was | 13  Q   Okay. |
| 14       empty.  And they was, like, "I know you got some money. | 14  A   So he jumped in the truck with him, and then he had pulled |
| 15       Give us some money."  They was wanting me to go hang out | 15       off. |
| 16       with them.  I was, like, "No, I'm going to stay here."  They | 16  Q   All right.  And this was -- it's already dark out, but you |
| 17       wanted me to hang out with them.  I didn't. | 17       don't know what time it is? |
| 18  Q   Okay.  And describe how you know Khari.  I mean, you knew | 18  A   It was dark.  I don't remember what time it was, but it had |
| 19       Khari before this day; right? | 19       to be late now that I'm estimating the time. |
| 20  A   Yes, I knew Khari for some years. | 20  Q   Okay.  So now Robert and Khari drive off in the truck. |
| 21  Q   And tell me how you knew Khari. | 21  A   Uh-huh (affirmative). |
| 22  A   Because he stayed around the corner from me when I was | 22  Q   And you're still outside; correct? |
| 23       married back in the days when I stayed on Plymouth and | 23  A   Yeah. |
| 24       Auburn he stayed. | 24  Q   Shaneica's outside with you? |
| 25  Q   Was he your friend or he was Robert's friend? | 25  A   Yes. |

**Network**Reporting

——— *1-800-632-2720* ———

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

## Page 58

1  Q   And all the other people are still outside?
2  A   Yeah.
3  Q   Okay. Did there come a point in time when Robert came back?
4  A   Yup.
5  Q   How long was he gone?
6  A   It seemed like he -- it seemed like he -- it was some, like,
7      some quicksilver. You know what I'm saying? Because he
8      said he rode his bike over there. And then I was like, no,
9      you couldn't ride your bike that fast, probably Khari to
10     drop you off. So I'm like, "You just that quick?" And he
11     came rolling up on his b'ke. I can't remember. It was less
12     than an hour.
13 Q   Now, where did -- strike that. Do you know where Robert and
14     Khari left when -- where they went when they left the last
15     time?
16 A   No. Khari was saying he was going home to go to bed. And
17     when Robert got out his --
18 Q   Where did Robert keep his bike?
19 A   His bike was at his friend house, whoever had -- he had it
20     over to his friend house.
21 Q   And it was his bike?
22 A   Yeah, old cruiser.
23 Q   Okay. So now Robert came back on a bike. Was anybody with
24     Robert?
25 A   Unh-unh (negative).

## Page 59

1  Q   "No"? You have to say "yes" or "no" for the court reporter.
2  A   No. Oh, no. I'm sorry.
3  Q   Did Robert have anything with him?
4  A   Yes.
5  Q   What did he have with him?
6  A   He had his book bag around his neck.
7  Q   And what was in the book bag?
8  A   Well, there was a gun in there because, when he got off the
9      bike, he set the bag -- when he got off the bike, he set the
10     bag on the ground. And I came over, "Man, what you got?"
11     And he took a gun out and put it in his holster.
12 Q   What type of gun?
13 A   I think it was a 9.
14 Q   Nine millimeter?
15 A   Yes.
16 Q   Handgun?
17 A   Yes.
18 Q   Okay. So you saw him take the gun out of the book bag and
19     put it in his holster?
20 A   Yeah. He took it out and looked at it and then put it in
21     his holster.
22 Q   Did you see anything else in the book bag?
23 A   That was it. There wasn't nothing else in there, because I
24     looked in there. Yeah, I was looking around. It was
25     nothing -- yeah, a sweater was in there. He had a hoodie is

## Page 60

1      in there, because then later on before he left he took his
2      hoodie out and put it on.
3  Q   All right. Now, did anybody say anything about that gun
4      besides you? Did any of those people standing outside --
5  A   When he took his gun out the book bag and put it on in
6      his -- everybody just ran.
7  Q   They ran?
8  A   Everybody that was standing down there ran. Everybody that
9      was at the corner just ran. And then after two, three
10     minutes later, everybody just came back to where they was
11     and they was, like -- they were just standing there. And
12     then me, him and Shaneica was talking and laughing.
13 Q   Okay. Let me slow you down for a second. When Robert took
14     his gun out of the book bag and put it in his holster, did
15     he say anything?
16 A   No. Just like, "What up, dawg?" He was tipsy. He was
17     like, "What up, dawg?"
18 Q   Okay.
19 A   So I guess the way he moved -- the way he moved when he --
20     because he was leaning against the building, and he reached
21     down and he took the gun out and he looked at it like
22     (indicating). When he took the gun -- when they seen that
23     chrome come out the bag, everybody just scattered.
24 Q   And you quoted him as saying "What up now?" or "What's up
25     now?" Was he talking to those other people?

## Page 61

1  A   No; no. He was just like, "What up, dawg?" He was saying
2      like "What up" like a bar, because he was telling me that he
3      about to -- "I'm going to ditch Khari and I'll be back."
4  Q   Did you think it was strange that everybody ran once they
5      saw Robert pull that gun out?
6  A   No, not on that corner, because that's what I'm saying is
7      there's always so much stuff going on, they probably thought
8      it was somebody coming to get them. They already got a sign
9      hanging up there "Arrest in peace" so -- one of their boys
10     where they always be at. And then right there, it's just so
11     much stuff that goes on every day right there. I figure,
12     when they seen the gun and they -- by me and Shaneica
13     arguing, they probably thought -- because they was saying to
14     me that we was arguing, so I called him and he came over
15     there with a gun. That's what I heard after this situation
16     happened, but it was never no situation like that. He came
17     over there, he hugged and kissed me, he hugged and kissed
18     her. He wanted to find out who the girls was, and he was
19     just trying to hang with us. But everybody scattered when
20     they seen the gun.
21 Q   Okay. And did -- did you sense the people who were running
22     were feeling threatened by this?
23 A   No.
24     MR. GIROUX:  Form; foundation.
25 A   No. I don't think -- no, they weren't no threatened. It

2:10-cv-11427-AC-DAS Doc # 19-2 Filed 07/25/11 Pg 18 of 20 Pg ID 123

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

## Page 62

1    was just like me. If he up a gun, my first instinct is to
2    run. Now, I might look around the corner when I get so far,
3    and it's, "Oh," you know, and he put it and then everybody
4    come back out. But a gun? When you first see a gun? Yeah,
5    run.
6  Q   Okay. But you didn't run because you knew Robert?
7  A   Yeah, I know what's up. Shaneica didn't run. And as a
8    matter of fact, I don't even think Friend ran.
9  Q   Okay.
10 A   I think she just sat in her chair.
11 Q   Did you see -- strike that. Did you hear anybody in the
12    crowd talking about, "Oh, my god, he's got a gun." Did you
13    hear anybody say anything?
14 A   No. I think everybody just ran.
15 Q   Okay.
16 A   Because it's a house -- there was a house -- like, if I'm
17    right here against the building like where he was when he
18    pulled up and a car righ; here, right across the street is a
19    little lot where a house supposed to be, and then it's a
20    house. There was a lot of people on that porch, too. I
21    don't know those people.
22 Q   Okay.
23 A   Those people even ran.
24 Q   So everybody ran.
25 A   Everybody just ran.

## Page 63

1  Q   Except you, Shaneica and this Friend?
2  A   Friend. Yup. And then everybody that was sitting down
3    there with them came back. They gradually came back and
4    they came back.
5  Q   Let me ask you this. You said a lot of things are going on
6    on that corner. What do you mean by that?
7  A   Guys just be out there. I just be hearing a lot of gunshots
8    and police constantly pulling up. I don't know what's going
9    on exactly.
10 Q   Is there a lot of drug dealing on this corner?
11 A   I don't know. I just know the police is constantly pulled
12    up. They done pull up so many times that they came and
13    knocked on our door previous times while I was standing
14    there with Shaneica. They just come and knock on the door
15    like they raid the whole building. And I let them in, like,
16    once or twice, you know.
17 Q   Okay. So let's pick it up from the point where now he put
18    the gun in his holster, everybody ran and now everybody's
19    slowly coming back. What happened next?
20 A   Me and him and Shaneica was just hugging and laughing and
21    talking, and Shaneica was, like, "You might as well ride
22    them on a bike and take them back home with you." And then
23    I was like, "No, I'm staying here." He's like, "No, I know
24    you all in love." I think she was -- I honestly think she
25    was still talking to her mom on the phone. But they --

## Page 64

1    people was saying that she was who called the police on him.
2  Q   Shaneica was who called the police?
3  A   Yeah, because she was on her phone, but she was talking to
4    her mother at the time.
5  Q   Where was Robert's bike when he pulled the gun out of the
6    bag?
7  A   It was right next to him on the sidewalk. He -- when he
8    pulled up, the way he pulled up, he pulled up like he fell
9    off the bike, but he --
10      MR. GIROUX: She just asked you where the bike
11    was.
12 A   Right next to him.
13 Q   Okay. He's relieved I'm finally getting into what we are
14    here about, I guess. He was on the bike like straddling it
15    when he pulled up? You know, like --
16 A   Yeah, he was off.
17 Q   Okay. And so tell me how he went about pulling the gun out
18    of the bag. Did he put the bike down?
19 A   When he got off the bike, he leaned against the building and
20    reached in the bag, took the gun out, looked at it and put
21    it in his holster.
22 Q   Okay. He leaned the bike against the building?
23 A   No. He just got off the bike and let it fall.
24 Q   Okay. So now the bike is on the ground?
25 A   Yeah.

## Page 65

1  Q   And he -- then he reached in and got the gun and put it in
2    his holster?
3  A   Uh-huh (affirmative). Reached in the bag.
4  Q   All right. So now the three of you, you, Shaneica and
5    Robert, are talking. Were is Friend? Where is this --
6  A   She still was sitting in the chair.
7  Q   Okay. So now what happened?
8  A   Everybody just came back to where they was and was doing
9    back all the talking everybody was doing. Everybody was
10    back in they position.
11 Q   Okay. How close was Robert to the bike at this point?
12 A   He sort of walked away from the bike, because he was walking
13    and hugging Shaneica and me together, like, "Oh, look at you
14    all love birds," and we was walking sort of the back of her
15    car.
16 Q   Okay.
17 A   And then he just kicked it with me, and then he came to me
18    again when she -- when she got away from us -- she walked,
19    like, toward the street, you know. She was talking to her
20    mother.
21 Q   Okay.
22 A   And he was just talking to me saying, "Well, yeah, you know
23    I'm just about to go and move back to the house." And, you
24    know, and then he's like, "I'm going to get ready to go to
25    the crib." But we sat out there for I can't remember

**Network**Reporting
1-800-632-2720

17 (Pages 62 to 65)

HILL VS DEW, ET AL            DEPOSITION OF ALBERT MACK BURSEY III

### Page 66

1    exactly how long.

2 Q   Okay. So now at some point is he getting ready to go home

3    now?

4 A   Yeah, he gets back on his bike.

5 Q   Okay. And where were you when he got back on his bike?

6 A   Still on the sidewalk against -- by our door and the car.

7 Q   And was Robert in the street with his bike?

8 A   Yup, he was riding his bike in circles right in the street.

9 Q   Okay. And where was Shaneica?

10 A   I think she was either -- she was closer to the sidewalk if

11    she wasn't still in the street. I think she was close to

12    the sidewalk on the other side of the street.

13 Q   Did Robert have the gun in his holster while he was riding

14    his bike around in circles?

15 A   Yup.

16 Q   Okay. What happened next?

17 A   He was constantly riding his bike in circles, and I

18    proceeded to walk to the corner and --

19 Q   Where were you going?

20 A   Just looking around the corner, because there's a lot of

21    people out that late. And I always watch my surroundings.

22    So, you know, I don't be still, so I always walk. So I was

23    looking. Because I know all these guys standing at the

24    corner, and the end of the building is right here

25    (indicating).

### Page 67

1 Q   How long were you -- strike that. How far away were you

2    from Robert now? He's riding in circles. You're looking

3    around the corner. How far away are you two? And if you

4    want to tell me in car lengths if that helps you?

5 A   I was at the back of her car and he was riding around at the

6    front of the car. I was at the back on the -- the back of

7    the passenger side and he was riding around in circles in

8    the front of her car.

9 Q   Was her car parked on the corner or near the corner?

10 A   It was about three cars off the car -- from the fire

11    hydrant, about two cars off the corner.

12 Q   Okay. So now what happens next? You're looking around the

13    corner. What's the next --

14 A   I didn't never make it to the corner. I heard a clun, clun

15    (indicating) sound. And I'm thinking -- I'm thinking that's

16    him, you know, ran into her car.

17 Q   Okay. And you got to slow down. "Clun, clun," I don't know

18    if you could spell that. What did it sound like to you?

19 A   It sounded like he ran into her car. Like -- I'm like,

20    "That drunk fool just run into her car."

21 Q   Okay. Sounded like bike ran into the car?

22 A   Yeah.

23 Q   What happened next?

24 A   And then I turned around.

25 Q   Okay.

### Page 68

1 A   And when I turned around, I seen it was the police car that

2    ran into the back of his bike and -- which made the front of

3    his bike run into her car, and they jammed it.

4 Q   Okay. Now slow down just for a second. Did you see the

5    police car hit Robert's bike? Did you actually see the

6    impact happen?

7 A   I didn't see the impact. I seen the rest of the impact. I

8    didn't see the clun, clun (indicating) sound.

9 Q   Okay. All right. Where was the bike in relation to the

10    police car when you turned around?

11 A   Getting crushed.

12 Q   Okay. Was the bike being rolled over by the police car when

13    you saw it?

14 A   Yes.

15 Q   Where was Robert?

16 A   Falling over the hood. Kind of in a jumping way like he was

17    jumping off his bike in the same portion because if he got

18    a --

19      MR. GIROUX: That's okay. Just answer the

20    question.

21 Q   Okay. And what's the next thing you saw happen?

22 A   Flashes. They got out their car --

23 Q   Did you see the police officers get out of their car?

24 A   Yes.

25 Q   Okay. And let me back it up for a moment. When you turned

### Page 69

1    around, were the police already out of the car or were they

2    getting out of the car? Do you understand my question?

3 A   Once I turned around, it was all in a motion; the car was

4    stopping and they was getting out.

5 Q   Okay. Was the car still rolling while they were getting

6    out?

7 A   It rolled into a stop on top of her car.

8 Q   Okay. So as the police were getting out of the car, was the

9    car still moving?

10 A   No. They -- it was stopped -- they car stopped on top of

11    her car.

12 Q   Okay. I understand that. But what I'm trying to figure out

13    is the police --

14 A   They car couldn't move no more.

15 Q   Okay. Hang on a second. Bear with me. I understand that

16    the police got out of their car. Did you see the police

17    after they were already out of the car?

18 A   Not up close. I just seen them behind the door.

19 Q   Okay. Did you see the police inside the car?

20 A   No.

21 Q   So the first time you saw the police they were already

22    outside the car?

23 A   They were stepping out. The door -- when I turned around,

24    the doors that -- as soon as I turned around, --

25 Q   Right.

HILL VS DEW, ET AL                                           DEPOSITION OF ALBERT MACK BURSEY III

| Page 70 | Page 72 |
|---|---|

Page 70

1  A    -- the police car stopped.  It came to a dead stop.
2  Q    Okay.
3  A    And they, doors opened, and they stepped out of them doors
4       real fast.
5  Q    Okay.
6  A    They didn't come off from behind their doors.  They just
7       stepped out their doors.
8  Q    All right.  And just -- I want to make sure I understand
9       you.  When you turned around, you were seeing the police
10      stepping out of the car?
11 A    Yes.
12          MR. GIROUX:  Hang on.  Is that -- go ahead.
13 Q    And the car, the police car, was it still rolling or was it
14      stopped when they were stepping out of the car?
15 A    It was stopped.
16          MR. GIROUX:  Asked and answered.  He said it was
17      stopped three times now.  It was on top of the other car.
18      Sorry.  On top of the other car's bumper.
19 Q    How close were you to the police car when you saw the police
20      officers stepping out of the car?
21 A    Directly at the back of Shaneica car.
22 Q    Okay.  But how close were you to the police car?  Do you
23      understand my question?
24          MR. GIROUX:  The length of her car.
25 A    The length of her car.

Page 71

1          MS. MILLS:  Okay.  And I have to object to counsel
2       prompting.  And I think he's doing just fine.
3  Q    Were you one car away --
4          MR. GIROUX:  I thought he was.  He said like six
5       times he was at the passenger back side of --
6  Q    I want to know in feet how --
7  A    I was directly at the back of her car.
8  Q    Hang on a second.  Hang on.  I don't mean to be rude.  It's
9       for the court reporter's sake.  If you can tell me in feet
10      how close were you to the police car when you saw the
11      officers stepping out of the police car?
12          MR. GIROUX:  Don't guess or speculate.  If you
13      know or can give a reasonable estimate, give it.  But don't
14      guess or speculate.
15 A    I was at the back -- I was at her bumper, and the police
16      car -- I was at the back of her bumper, and the police car
17      was at the front of her bumper.
18 Q    Got it.
19 A    We was diagonally directly across from each other.  The feet
20      would be her car.
21 Q    Did you hear the police officers say anything at this point?
22 A    No.
23 Q    Okay.  What was Robert doing as the police officers were
24      getting out of the police car?
25 A    Falling off of her hood towards the ground like him

Page 72

1       protecting his sore, a way which you always do when anything
2       come down to him with having a sore, like, his --
3  Q    You -- and just let me describe.  You're putting your hand
4       by your --
5  A    His groin area.  He had a sore -- a problem with his groin
6       area.
7  Q    Okay.
8  A    So if anything ever came to, he always sort of protected.
9       So he was falling off the bike on her car and falling
10      towards the ground.
11 Q    Were his hands near his waist?
12 A    No.  He was on a bike so his hands was all like this
13      (indicating) when he was falling.
14 Q    Okay.  When you --
15 A    He went to protect hisself from the fall.
16 Q    Okay.  Well, you were making motions a moment ago, and you
17      had your hands near your waist.
18 A    No.  I said whenever he -- I was just telling you that's
19      where his --
20          MR. GIROUX:  He was pointing to his left groin.
21 A    -- that's where his problem is.  He had a groin problem.
22 Q    Okay.  Which side did he have the gun holster on?  Which
23      side of his body?
24 A    I don't know exactly.  I don't know exactly what side it was
25      on.

Page 73

1  Q    Do you know if Robert was right-handed or left-handed?
2  A    I think he was left-handed like me.  I believe he was
3       left-handed.
4  Q    Is it possible that he had the holster on the left side or
5       you're just not sure?
6  A    I don't know.  I don't know where it was at this time.
7  Q    Okay.  So now you saw Robert falling over the hood of the
8       car.  And you said a moment ago "like he was jumping off."
9       What were you talking about then?
10 A    Meaning like, if I'm about to get smashed between a parked
11      car and a car that's crushing the back of my bike, I'm going
12      to put forth some type of effort protect myself.  So I go to
13      jump because he had -- his bike was a old bike with the long
14      handlebars that come up like this (indicating).  So his
15      hands was up on his handlebars like this.
16 Q    Right.
17 A    But as his bike was getting crushed, he leaped up like this
18      (indicating).
19          MR. GIROUX:  For the record, the witness is --
20 A    He was all -- that's when he was --
21          MR. GIROUX:  -- starting to stand up out of his
22      chair with his hands above his shoulders moving in a upward
23      direction.
24 Q    What happened after you saw --
25          MR. GIROUX:  Did I describe that correctly, Mr.

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

| Page 74 | Page 76 |
|---|---|
| 1  Bursey? | 1  It was years ago, so it probably not in sight now. It was |
| 2      THE WITNESS: Yes. | 2  documented. |
| 3      MR. GIROUX: Thank you. | 3      MR. GIROUX: The only thing I see is just above |
| 4 Q  What happened after you saw Robert jumping up? What did you | 4  his waistline on the right side. |
| 5    see happen with Robert? | 5      THE WITNESS: Is that it right there? |
| 6 A  That's when all the gunshots went off. | 6      MR. GIROUX: Yeah. I don't know. |
| 7 Q  Okay. Did you see the shots take effect? | 7      THE WITNESS: Yeah, somewhere around there. |
| 8 A  Yes. And I sort of -- I seen -- when I seen all the flash, | 8 A  It's documented. I went to the hospital, so it's |
| 9    flash, flash, flash, flash, I did like this (indicating). | 9  documented. |
| 10 Q  And just for the record, you're covering your head? | 10 Q  Okay. And I see -- and I don't mean to be rude, so don't be |
| 11 A  Yes. | 11  offended. I see, like, some dark spots here. Are those |
| 12 Q  Okay. | 12  moles? |
| 13 A  To kind of towards the side. | 13 A  It went like this. It was like a sort of slight laceration |
| 14 Q  Okay. So when you were covering your head, were you | 14  that went like that. So it was kind of like split when it |
| 15    watching Robert? | 15  happened. |
| 16 A  I stopped watching him once I started seeing that. Once | 16 Q  Okay. You can pull your shirt down. Thank you. |
| 17    they started shooting, they was directly behind him. And | 17      MR. GIROUX: Tuck it in so you don't get in |
| 18    once they started shooting all towards his back, I did like | 18  trouble. That's what happened last time. |
| 19    this (indicating), and I caught two -- | 19      THE WITNESS: Oh, when the shirt came out? |
| 20 Q  Okay. That's when you covered your head? | 20      MR. GIROUX: Yeah. I couldn't figure out. I'm, |
| 21 A  -- that's when I caught two grazes. | 21  like, I didn't see him take his shirt off, and then I'm, |
| 22 Q  Okay. And do you -- you're wearing a shirt now, but are the | 22  like, yeah, I did. |
| 23    grazes, as you described them -- have they made any mark on | 23 Q  Were you facing the officers or did you have your back to |
| 24    you? | 24  the officers? |
| 25 A  I don't know if they still there. | 25 A  I was facing them until they started shooting, and I tried |

| Page 75 | Page 77 |
|---|---|
| 1 Q  And when you say "grazes," what are you referring to? | 1  to -- I just did like this (indicating). |
| 2 A  The bullet wound. | 2 Q  Okay. |
| 3 Q  You were shot? | 3 A  I just tucked. |
| 4 A  Yeah. | 4      MR. GIROUX: For the record, the witness is |
| 5 Q  How many times were you shot? | 5  putting his, I guess, forearms to his head above his ears |
| 6 A  I believe it was one. I v ent to the doctor, and I think | 6  and pulling himself in a tuck position and turning slightly |
| 7    they said it was one or two. | 7  to the side. |
| 8 Q  What doctor did you go to? | 8 Q  Where was Shaneica when this is going on? |
| 9 A  It was St. John's. I believe it was St. John's. | 9 A  On the other side of the -- I think that's when she actually |
| 10 Q  Which side of your body were you shot? On which side of | 10  was on the sidewalk on the other side of the street. |
| 11    your body were you shot? | 11 Q  What happened next? |
| 12 A  Back right side. | 12 A  I was stepping -- I was stepping towards -- like, if this is |
| 13 Q  Okay. Now, if you would raise your shirt so I -- and you | 13  (indicating) the back of her car, I was stepping towards the |
| 14    can stand up so I can see better -- where it was that you | 14  street way, and I had to step over my cousin because he |
| 15    were shot? | 15  fell. Like, his head -- his head from his chest up fell |
| 16 A  Kind of like right somewhere around here. It was years ago, | 16  right where my feet were, so I had to step over him. By |
| 17    so it probably healed up. Somewhere along here. | 17  this time, the officers came around the car and they forced |
| 18 Q  Okay. And I -- why don't you turn so your counsel can see? | 18  me into going on the sidewalk. They kept forcing me back to |
| 19      MR. GIROUX: That's okay. I already saw it. Now | 19  the sidewalk to where Shaneica was. |
| 20    you got to tuck your shirt back in so you don't get in | 20 Q  Now, when you stepped over your cousin, did you see the gun? |
| 21    trouble. | 21 A  No. |
| 22 Q  Okay. I don't want you to get in trouble. But can you put | 22 Q  Did you see the holster? |
| 23    your hand where you were shot? | 23 A  No. I didn't see anything. |
| 24 A  Somewhere -- there's supposed to be a bruise somewhere | 24 Q  Was your cousin wearing a hoodie at this point? |
| 25    around here. I don't -- I can't tell exactly where it was. | 25 A  I can't remember if he had the hoodie on or not. I don't |

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  know if he had his t-shirt on. I was distraught. You know,
2  I was just looking at him. I was just staring at him, and I
3  kept asking the officer to touch him. I just saying, "Touch
4  him. Can you just touch him, see if he alive?"
5  Q  Was he face up or face down?
6  A  Face down. He was face down.
7  Q  Face down. Okay. What did you know about your -- strike
8  that. You have testified today that you saw your cousin
9  with a gun; correct?
10 A  Yes.
11 Q  You saw him take the gun out?
12 A  Yes.
13 Q  You saw him put the gun in his holster?
14 A  Yes.
15 Q  And you saw a bunch of people run away when he first took
16 that gun out?
17 A  Yes.
18 Q  Okay. Were you asked about whether you ever knew your
19 cousin to carry a gun when you gave a statement?
20 A  Yes.
21 Q  What did you know about your cousin carrying guns or a gun
22 before that day?
23 A  I know that he had a gun but it was jinky. I don't even
24 think it worked. I think he had just ran into it or some
25 type, but I don't know how he got it, but he had it.

**Page 79**

1  Q  Okay. So you knew before this day that your cousin had a
2  gun?
3  A  Uh-huh (affirmative).
4  Q  "Yes"?
5  A  Yes.
6  Q  And you knew your cousin carried a gun on his person?
7  A  Yes.
8  Q  Did you ever discuss with your cousin why he was carrying a
9  gun on his person?
10 A  No.
11 Q  Okay. Now, if you want to look at your statement now, we're
12 on page two. Almost at the bottom of the page -- reading
13 upside down -- question, "Did your cousin carry a gun?" And
14 what was the answer on this page?
15 A  "Not that I know of."
16 Q  Okay. Did you -- do you recall the officer asking you that
17 question, "Did your cousin carry a gun?" Or did you --
18 strike that.
19 A  I kind of -- I was -- when they said -- once they --
20       MR. GIROUX: Hang on. The question is, do you
21 remember the officer asking you these questions?
22 A  I can't really remember him asking me all these questions.
23 I just have --
24       MR. GIROUX: That's the only question on the table
25 right now.

**Page 80**

1  Q  Okay. What did -- why did you sign your name to the bottom
2  of page one, two and three of this document?
3  A  Because I wanted to get out the car and see my cousin,
4  because he was still laying on the ground, and they had me
5  in the car for a long time.
6  Q  Okay. But why did you sign your name? What was the purpose
7  of signing your name?
8  A  Because I wanted to get out the car.
9  Q  Okay. Did you discuss this statement with the officers
10 before you got out of the car?
11 A  I don't remember. I just remember -- I just remember
12 sitting in the car. I kept dozing off. The officer kept
13 getting in the car, waking me up and telling me, "Hold on.
14 I got to ask you some questions" while I was standing there
15 looking at my cousin. So I guess, once they finally got
16 done with this process, I wanted to get out the car.
17 Q  Did they ask you to read over the statement?
18 A  I don't remember. I wanted to get out the car. That's only
19 thing I can remember is sitting in that car for a long time
20 looking at a bunch of officers on this side. I just wanted
21 to get out the car to see if my cousin was alive. That was
22 the only thing I was concerned with.
23 Q  Okay. And I understand you want to get out of the car, but
24 I'm trying to pin down the mechanics of this statement. Is
25 your testimony that you were seated in a police car while

**Page 81**

1  the statement was being taken?
2  A  Yes.
3  Q  How many officers were in the car with you?
4  A  I think it was one officer and it was one lady.
5  Q  And was one of them asking you questions or were two of them
6  asking you questions? How did it work?
7  A  It was -- the lady, I believe, was asking me questions, and
8  the officer was just in the car.
9  Q  Okay. And as you were being asked questions, was someone
10 writing things down?
11 A  I think it was the lady. I can remember one -- I think it
12 was a man officer and a lady officer. I don't know if she
13 was writing or recording or whatever.
14 Q  Okay. At some point, this paper was put in front of you so
15 that you could sign your name. Would you agree with that?
16 A  Yes.
17 Q  Did you agree with this statement when you signed your name
18 two or three times?
19 A  I don't remember if I agreed with it. I just remember
20 signing my name. I remember being woke up and signing my
21 name so I can get out the car.
22 Q  Three times. Three times?
23 A  I signed it three times?
24 Q  Yeah. I'm asking you. Did you? I see three times your
25 signature; one, two, three. Do you remember signing this

HILL VS DEW, ET AL                                          DEPOSITION OF ALBERT MACK BURSEY III

Page 82

1    statement in three different places?
2  A  No. I think, if I did sign it three, I signed it all in the
3     car. I didn't do it nowhere else. I just signed them
4     all -- signed all they said sign. I wanted to get out the
5     car. They told me that's the only way I can get out the
6     car.
7  Q  Really? They told you you couldn't get out of the car?
8  A  No. I don't know if they said, but that's the only way I
9     figure -- I kept asking, "When can I get out the car?"
10    "Well, you got to hold on. You got to hold on. You got to
11    wait. You got to wait. You got to hold on. You got to
12    hold on. Wake up. Wake up. Hold on. Hold on. Wake up.
13    Wake up."
14 Q  Okay. All right. So you -- did you know whether your
15    cousin had any drugs on his person that day in that black
16    bag?
17 A  No.
18 Q  You said you looked in the black bag after you saw him take
19    the gun out and you saw the hoodie inside.
20 A  Uh-huh (affirmative).
21 Q  You recall that testimony?
22 A  Yeah, if that was a hoodie; a hoodie, a towel or something.
23    It was just -- I believe it was a hoodie.
24 Q  Okay.
25 A  That's a long time ago.

Page 83

1  Q  The bag was confiscated and it contained cocaine. Does that
2     surprise you?
3  A  No. Because my cousin ain't dealing with no cocaine ever,
4     never. He ain't cocaine -- he ain't never deal with no
5     cocaine.
6  Q  When you say he never dealt with it, are you saying he never
7     used it or he never sold it?
8  A  He never used it, never sold it. Ever since he been out of
9     prison, he been with me and he ain't never had no -- no
10    cocaine.
11 Q  So you're surprised -- you would be surprised to hear that
12    cocaine was found in the bag?
13 A  Yes. It would make me wonder -- okay -- where -- when did
14    this one happen? When did -- when did cocaine come into
15    play?
16 Q  You ever seen that backpack before? The book bag that he
17    had? You ever see it before that day, I mean?
18 A  I can't recall. If anything, it was just probably me
19    sitting in the house or something.
20 Q  Okay. What happened after the officers let you out of the
21    car?
22 A  I went towards where everybody was, and the police officer
23    still forcing me to go toward the sidewalk where my sisters
24    and family was now there. And then the news -- I tried to
25    get on the news.

Page 84

1  Q  You tried to get it on the news?
2  A  In the camera; in the camera and show them my bruises. And
3     the cameraman kept turning the camera so I couldn't get on
4     the camera then.
5  Q  What news reporter or channel or whatever were you trying to
6     get on camera with?
7  A  I just remember the man that walked up to me asked me for a
8     picture was Bill Proctor. And my family kept telling me to
9     get on the news and say it. And every time I tried to step
10    or get in front of the camera, they kept turning the camera.
11    And then he just broke the camera down and took it away so I
12    couldn't get on there.
13 Q  Channel 7 sound right, Bill Proctor?
14 A  Bill Proctor. I can't remember the number.
15 Q  Okay.
16 A  He gave me his card; Bill Proctor. That's why I remember
17    that part.
18 Q  Did you ever see a story air on the news about this? About
19    the shooting?
20 A  Not -- I heard it was on the news, but I seen the article in
21    the newspaper.
22 Q  Did you ever see a television news story about this?
23 A  No, not that I know of.
24 Q  Where did you see the article in the newspaper?
25 A  Somebody brought me a article from the newspaper. It was

Page 85

1     talking about Kym Worthy going through something with some
2     police stuff. I can't -- it was just a little -- a small
3     little clip, and it just had a picture of -- I don't even
4     think it had a picture. I think it just had his name or I
5     think it might have had a picture of her car in here. It
6     was a little, small article about like 40, 50 words; a
7     little bitty small article.
8  Q  Let me ask you another question about statements. I asked
9     you earlier if you gave statements to anybody, and you said
10    you gave a statement to Detroit Police and that's the one
11    where you were in the car; correct?
12 A  Uh-huh (affirmative).
13 Q  "Yes"?
14 A  Yes.
15 Q  And is that the statement we've been talking about that's
16    been marked as Exhibit 1, the one where your name is on it?
17 A  Yes.
18 Q  Okay. Did you ever give any other statements to Detroit
19    Police?
20 A  No. I never talked to nobody else that I know of.
21 Q  Do you remember talking to the Detroit Police and they
22    recorded you -- they tape recorded? Does that sound --
23 A  This is what was recorded.
24 Q  Well, let me ask the question this way. Do you remember
25    talking to the Detroit Police where somebody was tape

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

| | Page 86 |
|---|---|
| 1 | recording or recording what you're saying? |
| 2 A | When I -- this is what I remember the lady said I'm going -- |
| 3 | I think she said, "I'm going to record. We're going to |
| 4 | record this and we have to ask you some questions." And the |
| 5 | whole time I was just basically just looking ahead. I don't |
| 6 | remember no other time. |
| 7 | MS. MILLS: Let me have this marked, if you don't |
| 8 | mind, as Exhibit 2. |
| 9 | (Deposition Exhibit 2 marked) |
| 10 Q | Let me show you what we've had marked as Exhibit 2. And |
| 11 | this is a witness statement case progress, July 18th, '08, |
| 12 | 5:30 a.m., and has your name "Albert Mack Bursey." Do you |
| 13 | see that? |
| 14 A | Yes. |
| 15 Q | And there's a question on this, "Do you mind if your |
| 16 | statement is recorded?" Answer, "no." Is that your |
| 17 | signature below that? |
| 18 A | Yes. |
| 19 Q | Okay. Do you remember anybody discussing -- and I'm sorry |
| 20 | if I asked the question before. But do you remember if |
| 21 | anybody asked if they could tape record or record -- not |
| 22 | just write down a statement, but actually be tape recording |
| 23 | what you're saying? |
| 24 | MR. GIROUX: Asked and answered. |
| 25 A | Is -- the lady that's in the car said she was recording, I |

| | Page 87 |
|---|---|
| 1 | believe. |
| 2 Q | Okay. Do you remember giving a recorded statement anywhere |
| 3 | else other than in the police car, like, later? |
| 4 A | No. I remember trying to ask somebody something as soon as |
| 5 | I got out the car, but they wouldn't give me no answers to |
| 6 | anything. |
| 7 | MR. GIROUX: I think she means at the police |
| 8 | station. Did you go to the police station? |
| 9 A | No. |
| 10 Q | Do you remember seeing any tape recording devices in the |
| 11 | car? |
| 12 A | When I was in the car, the only thing I looked at was my |
| 13 | cousin on the ground and all the movements my family was |
| 14 | making so I can see was he still alive or dead. |
| 15 Q | What family members were there? |
| 16 A | I believe my three sisters. |
| 17 Q | Okay. Give me their names real quick. |
| 18 A | Sheritta Bursey, Albina Bursey. |
| 19 Q | Spell Alveta -- Alvina? |
| 20 A | A-l-b-i-n-a. |
| 21 Q | Okay. |
| 22 A | And Brandi Baker. |
| 23 Q | B-r-a-n-d-y? |
| 24 A | -- -d-i. |
| 25 Q | -- -d-i. Brandi Baker? |

| | Page 88 |
|---|---|
| 1 A | Yeah. |
| 2 Q | And all three of them were at the scene? |
| 3 A | I think they came to the scene while I was in the police |
| 4 | car. |
| 5 Q | And do you know how they came -- how they knew to come |
| 6 | there? Did you call them? |
| 7 A | No. |
| 8 Q | Do you know who told them about what happened? |
| 9 A | No. I instantly was took to the police car and been in |
| 10 | there that whole time. |
| 11 Q | Let me ask if any of these pictures are familiar to you. |
| 12 | Does any of this look familiar to you? Does this look like |
| 13 | the area right here? |
| 14 A | Yes, that's exactly where it happened. |
| 15 | MS. MILLS: Okay. Would you mark this as 3, |
| 16 | please? And let's mark this one as 4. And we're almost |
| 17 | done, Mr. Bursey. This one is 5. |
| 18 | (Deposition Exhibits 3, 4 and 5 marked) |
| 19 Q | Okay. Let me show you what we've had marked as Exhibit 3. |
| 20 A | Okay. |
| 21 Q | And there's two pictures on this page. |
| 22 A | Yes. |
| 23 Q | And is your girlfriend's apartment.-- |
| 24 A | Right here (indicating). |
| 25 Q | Okay. You're pointing to the picture at the bottom? |

| | Page 89 |
|---|---|
| 1 A | Yes. |
| 2 Q | And you pointed to a particular window. Is that her |
| 3 | apartment or it's just that building? |
| 4 A | That's her apartment. |
| 5 Q | Okay. Does either one of these pictures show where you were |
| 6 | standing when the police car drove up? |
| 7 A | Yes; yes. |
| 8 Q | Can you tell me where you were standing? |
| 9 A | Directly right here on the sidewalk at the back of her car |
| 10 | or her bumper. I was getting ready to go up to this corner |
| 11 | to look behind here, which is down this street because it's |
| 12 | always dark. |
| 13 Q | Okay. And that would be behind the bumper of the Honda on |
| 14 | the sidewalk? |
| 15 A | Yes. |
| 16 Q | Okay. In Exhibit 3. Thank you. |
| 17 A | Is the -- did I make a -- |
| 18 Q | I don't want -- it's my only one. |
| 19 | MR. GIROUX: Hang on. Did you say behind the |
| 20 | bumper or next to or the side? |
| 21 | THE WITNESS: Right there at the -- this the |
| 22 | bumper. I was right here. I was right here on the bumper |
| 23 | at the back of the car, but -- |
| 24 | MR. GIROUX: To the side of it? |
| 25 | THE WITNESS: I was on the -- yeah, sort of on the |

HILL VS DEW, ET AL                                       DEPOSITION OF ALBERT MACK BURSEY III

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  side, because I didn't go -- I didn't drop down the street.
2  I was sort of at the back of it. I was directly at the back
3  bumper, the back side of right there. I was right there
4  (indicating).
5      MR. GIROUX: Thank you.
6  Q    Got it. I'm not going to mark it, because it's my only one.
7  Let me show you Exhibit 4 and ask if you recognize the photo
8  at the top?
9  A    Do I recognize the gun that's in the photo?
10 Q    Yes. Is that the gun your cousin had in his bag and later
11 in the holster or do you not recognize it?
12 A    It's been awhile. If it's gray -- only way I can be able to
13 honestly say that's the gun is by I know his gun. The gun
14 didn't work. If that's the gun that does not work, that's
15 his gun because his gun did not work. So I can't say if
16 that's it, because there ain't no telling what --
17 Q    When he pulled the gun out and everybody ran, was that the
18 same gun that you were familiar with him having?
19 A    Yes, the one that I know had.
20 Q    And when you say the gun did not work, what do you base that
21 on?
22 A    It doesn't work.
23 Q    What do you base it on? Did you ever try to use it?
24 A    I have, yeah. I done held it before, you know.
25 Q    Okay.

**Page 91**

1  A    And I know he had it. And a friend of mine shot it on the
2  Fourth of July, and he's the one told us that it didn't
3  work. You got to cock it to shoot it, cock it, shoot it.
4  Q    Okay. Let me make sure I understand what you're saying.
5  You yourself have or have not fired this gun?
6  A    No, I didn't never get a chance to fire it, but that's the
7  gun that don't work.
8  Q    Okay. You heard from a friend --
9  A    No, I sat there watching him.
10 Q    Okay. You watched a friend shoot this gun?
11 A    Yes.
12 Q    And you said you have to cock it in order to shoot it?
13 A    Yeah. He said that and he showed us, like, this is the only
14 way it works.
15 Q    Did your friend shoot the gun in front of you?
16 A    Yes.
17 Q    So you saw the gun did work?
18 A    Yes.
19 Q    But you had to cock it first?
20 A    You have to cock it in order to shoot it every time.
21 Q    Okay. But it does fire?
22 A    Yes.
23 Q    Exhibit Number 5 in the top picture, do you recognize what's
24 there?
25 A    That bag?

**Page 92**

1  Q    Yes. Do you recognize that bag? Is that the book bag or
2  backpack that your cousin was wearing or had that evening?
3  I don't know if you recognize it or not.
4  A    It looks like the bag.
5  Q    Okay. That's fine.
6  A    It looks like the bag, but it -- the bag that he had didn't
7  have anything in it, because I went in the bag. Once he
8  took his gun out, I went in the bag. There was nothing in
9  there but, like, something like a towel. There wasn't
10 nothing else in there.
11 Q    Did you search the bag?
12 A    Yes. I briefly went through it. And it was like -- I think
13 it was either a towel or it was some type of cloth. That's
14 why I figure it was either a sweater or a towel or
15 something.
16 Q    Did you take this towel or sweater out?
17 A    No. I lifted it up and put it back in there.
18 Q    Okay. Did you completely --
19 A    But is there anywhere I can --
20 Q    I'm sorry. Go ahead.
21 A    I want to ask you something about the first page or
22 something.
23 Q    Well, hang on a sec. Did you remove the towel or the cloth
24 from the bag? You took it completely out?
25 A    Not completely out.

**Page 93**

1  Q    Okay.
2  A    But I know the bag, the type of bag he had, it was real
3  light where you could tell if there was anything in there,
4  like, anything else with real weight you could tell. But it
5  was a light, like -- you know how you got certain duffel
6  bags that's heavy and then you got certain duffel bags that
7  don't have no foundation to them, they're just with some
8  thin, like that.
9  Q    Well, cocaine doesn't weigh much, does it?
10 A    No, not that I know of. But it --
11 Q    And let me tell you why I'm putting this aside. I'm not
12 sure that your attorney wants you to testify beyond
13 answering my questions. He can come back and ask you
14 questions. Okay? Is that fair?
15      MR. GIROUX: Are we going to give those exhibits
16 to the court reporter?
17      MS. MILLS: Sure. Absolutely. I'm just trying to
18 get through these. Okay?
19 Q    When I'm done, he has a chance to ask you whatever you want.
20 A    About the --
21 Q    Whatever you want. Okay?
22 A    Okay.
23 Q    Did you hear anything about your cousin's gun being stolen?
24 Did you ever hear that?
25 A    No.

**NetworkReporting**

1-800-632-2720

HILL VS DEW, ET AL                                           DEPOSITION OF ALBERT MACK BURSEY III

| Page 94 | Page 96 |
|---|---|

**Page 94**

1  Q   Did he ever tell you where he got the gun?

2  A   No.

3  Q   You did or did not see your cousin pull the gun out of the

4      bag?

5  A   I seen him pull it out and put it in his holster instantly.

6  Q   What do you know about somebody saying -- somebody calling

7      the police saying that there is a man with a gun?  Did you

8      ever hear that?

9  A   I heard it afterwards that a call was made that it was a guy

10     on a bike with a gun.

11 Q   Okay.  You heard after the fact?

12 A   Yes.

13 Q   That someone had called the police or 911 to report?

14 A   Yes.

15 Q   To report what?

16 A   That it was a guy on a bike with a gun.

17 Q   And who did you hear that from?

18 A   I can't remember.  I think it was -- I can't remember

19     exactly who it was.  It's a long time ago.

20 Q   Okay.  That's fair.  Okay.  We were talking a moment ago

21     about your being shot.  You said you had medical treatment

22     at St. John Hospital?

23 A   Yes.

24 Q   How long after this shooting was it that you had this

25     medical treatment?

**Page 95**

1  A   A few hours.

2  Q   How did you get to the hospital?

3  A   A family member.  I can't remember.

4  Q   Somebody drove you there?

5  A   Yes.

6  Q   Did you tell the police when you were in the car that you

7      had been shot?

8  A   Yeah -- no, I didn't, because I didn't even notice.  I

9      didn't know until I was up out the car and I was feeling the

10     stinging.

11 Q   How long were you in the car?

12 A   I can't remember, but it was a long time.  To day -- 'til

13     almost it was day outside.

14 Q   So would you say more than an hour?

15 A   Yes.

16 Q   And for that more than an hour time, you did not know that

17     you had been shot?

18 A   Yup, I did not know.

19 Q   Okay.  And you suddenly noticed you were shot when?

20 A   Once I got out the car, because I walked up to a sergeant or

21     somebody that was in charge and I was trying to show it to

22     them, and they did not pay me no attention.  Because I kept

23     walking up to them saying, "Document this.  Document this.

24     I need to document this."  They didn't want to.  They didn't

25     pay me no attention.  I tried to get on the news, and they

**Page 96**

1      kept turning the camera away from me.

2  Q   All right.  Well, let me ask if you know any of these

3      people, and then I think we may be about ready to rock and

4      roll.  Chari, C-h-a-r-i, "friend of decedent Robert Hill."

5      Is that the friend that you were talking about?

6          MR. GIROUX:  Khari.

7  A   Khari.

8  Q   Khari?  Am I mispronouncing it?

9          MR. GIROUX:  Yeah.

10 A   Khari.

11 Q   Okay.  Khari is the person that picked up Robert and took

12     away that you talked about earlier?

13 A   Yeah.

14 Q   Okay.  And it's spelled here C-h-a-r-i.

15 A   Unh-unh (negative).  It's K-h-a-r-i.

16 Q   It's K?  Okay.  Thank you.  "Henry Hill, father of decedent

17     Hill, knows about the injuries."  This is your uncle?

18 A   Yes.

19 Q   And how was he involved in this?  Was he one of the family

20     members that came up to the scene?

21 A   I don't think he made it there.  I can't remember.

22 Q   "Sherry White, aunt of decedent Hill."

23 A   I don't know if she made it there either.  Did they make it

24     to the hospital or --

25 Q   Well, I'm trying to figure out what involvement they had, if

**Page 97**

1      any.  Were they at the scene?  Were they at the hospital?

2      What -- you tell me what you know about Sherry White's

3      knowledge or involvement of this.

4          MR. GIROUX:  If you don't know --

5  Q   Did you see her?

6  A   I don't know.

7  Q   Okay.  That's fine.  "Cynthia Hill, sister to decedent

8      Hill"?  Was she one of the people present at the scene?

9  A   I don't think so.

10 Q   Did you see her at the hospital or --

11 A   I didn't go to the hospital.

12 Q   Did you give any statements to anybody else besides the

13     police?  I meant to ask that question.  Such as the Wayne

14     County Prosecutor's office or any of the family members or

15     press?  Did you actually give a --

16 A   I tried to talk to the head officer.  I asked two or three

17     officers for the head officer in charge, and they pointed

18     the person out.  I tried to talk to him and get their name.

19     They wouldn't -- they walked away from me and didn't say

20     anything.

21 Q   Okay.  Question, did you try to talk to the head officer

22     after you had been sitting in that car giving your

23     statement?

24 A   Yes; yes.

25 Q   Okay.  What more is it that you wanted to say that was not

HILL VS DEW, ET AL                    DEPOSITION OF ALBERT MACK BURSEY III

| Page 98 | Page 100 |
|---|---|

**Page 98**

1  in the statement?
2  A  I just wanted to ask what had happened --
3  Q  Did you have any more information?
4  A  -- as far as the bullets.
5      THE WITNESS: Is that what -- can I tell her?
6      MR. GIROUX: I'm sorry?
7      THE WITNESS: As far as how I was asking about
8  those bullets?
9  Q  Okay. You wanted to talk to the head officer.
10 A  And let him know that I got grazed.
11 Q  Okay. And was the head officer the same person that was in
12    the car interviewing you?
13 A  No.
14 Q  It was somebody else?
15 A  It was somebody else.
16 Q  Okay. Why did you not go back to the car and tell the
17    officers who had interviewed you you had been --
18 A  Because the people that they -- because they got out the
19    car. They got out the car and walked -- they got out the
20    car and walked towards where was all the other officers.
21 Q  Right.
22 A  When I -- when the situation happened, one police car pulled
23    up. By the time they put me in the car and had me sitting
24    there for a long time, about five more cars, if I'm
25    correctly estimating, pulled up. And there was a bunch of

**Page 99**

1  officers and then a whole lot of people came up, like, a
2  bunch of women and men in plain clothes, and they was
3  talking to each individual officer.
4  Q  Right.
5  A  So I went to ask. I'm, like, "Why is all these officers
6  here? What are they talking about?" And none -- there was
7  nobody here when this incident happened.
8  Q  Did it occur to you that they were trying to investigate the
9  shooting; that's why there were so many people there?
10 A  Yes, I figured that.
11 Q  Okay.
12 A  I figured it was investigating.
13 Q  But you did not go back to the officers who interviewed you
14    in the car and say, "I want to tell you something else"?
15 A  They would not let me over there. They had -- they pushed
16    me out of the taped area.
17 Q  Okay. Where they taped it off so they can preserve the
18    evidence?
19 A  Yes.
20 Q  Got it. So we talked about talking to the officers in the
21    car, and you tried to talk to the head officer in charge.
22 A  Yes.
23 Q  You tried to talk to Bill Proctor?
24 A  Yes.
25 Q  Did you talk to anybody else about what happened while you

**Page 100**

1  were still at the scene?
2  A  No; not that I know of, no.
3  Q  Did you ever talk to any other family members about what
4  happened such as --
5  A  Probably like my sister or -- yeah, I talked to them
6  eventually when I got to they house and explained to them
7  what happened.
8  Q  Did you tell them anything other than what you've told me
9  today?
10 A  No, not that I know of.
11 Q  Did you ever talk to anybody from the Wayne County
12    Prosecutor's office?
13 A  No.
14 Q  Did you ever talk to any other press people besides Bill
15    Proctor, either TV or print media? Did you talk to anybody
16    else with the press?
17 A  No.
18 Q  Okay. Let me finish this up. You did not go to the
19    hospital yourself?
20 A  Yes, a few hours after the incident.
21 Q  Okay. St. Johns for yourself. You did not go to Sinai
22    Grace where Robert was taken; is that correct?
23 A  No.
24 Q  When did you first learn that Robert had passed?
25 A  Once I seen Khari go down on his knees when I was sitting in

**Page 101**

1  the police car.
2  Q  Okay. Once you saw what now?
3  A  Once I seen Khari go down on his knees. Once I seen my
4  sister go over to Khari and say something to him, he went
5  down on his knees. And that's when I was in the car. And I
6  kept telling them I want to get out now.
7  Q  Khari? I must be slow today.
8  A  The guy that brought -- Khari is the guy in the Commander.
9      MR. GIROUX: He went home.
10 A  He went home and --
11 Q  Okay. Okay. Got it. So Khari came back to the scene?
12 A  Yes.
13 Q  So you believed Robert was dead while he was still at the
14    scene?
15 A  Yes. I believe he was dead on contact, instantly.
16 Q  What does Franklin Hill, son of decedent Hill, have to say
17    about the incident? I mean, he may talk about his
18    relationship with his father, but was he present at the
19    scene --
20 A  No.
21 Q  -- or right after? How about Priscilla Ares?
22      MR. GIROUX: Form, foundation for the last two
23    questions; the question about when Mr. Hill died, form and
24    foundation. That was two questions ago if you wanted to fix
25    it.

Page 102

1      MS. MILLS: Okay.
2   Q   Priscilla Ares, mother of decedent son Franklin Hill, was
3       she present at the scene that you recall?
4   A   No.
5   Q   Did you ever talk to Priscilla Ares about what happened?
6   A   Yes.
7   Q   And you told her basically what you told me today?
8   A   Yes.
9   Q   Did you talk to Franklin Hill about what happened?
10  A   Yes.
11  Q   And you told him basically what you told me today?
12  A   Yes.
13  Q   And you should -- I'm sorry. Dwayne Brown, son of decedent
14      Hill, he was not present at the scene?
15  A   No.
16  Q   Did you talk to him later about it?
17  A   Yes.
18  Q   Aisha Brown, A-i-s-h-a, mother of Dwayne Brown, did you talk
19      to her about that?
20  A   No, I have never even spoke to her.
21  Q   Okay. And she was not at the scene?
22  A   No.
23  Q   Valerie Phillips, decedent Hill's aunt with whom he
24      residing, do you know if she has any personal knowledge
25      about what happened at the scene?

Page 103

1   A   My mother? No, just what I told her.
2   Q   Just what you told her. Okay. Dr. Carl Fowler is listed as
3       Plaintiff Bursey's family physician, your family physician.
4       Information includes your medical condition before the
5       shooting and after the shooting. Question, how long had Dr.
6       Fowler been your physician before this?
7   A   I can't remember exactly.
8   Q   Did you have any medical conditions before this?
9   A   No.
10  Q   Were you ever injured by a gunshot wound or assault or
11      stabbing or anything like that before this incident?
12  A   Yes.
13  Q   Okay. Once or more than once?
14  A   Once.
15  Q   When were you injured before by assault?
16  A   I was stabbed about a inch from my heart. I believe it was
17      2003 -- by my ex-wife.
18  Q   And did you have to have surgery?
19  A   No.
20  Q   You treated at a hospital for that?
21  A   Yes.
22  Q   Where did you treat?
23  A   I can't remember. Was it Henry Ford Receiving? I can't
24      remember.
25  Q   All right. With regard to you, do you know which of the

Page 104

1       officers shot you?
2   A   No. But off of estimation, it was -- from the angle, it was
3       the passenger.
4   Q   The passenger side officer?
5   A   Yes.
6   Q   Did you see either of the officers aiming at you?
7   A   The -- my -- my -- I was diagonally from the passenger.
8   Q   Okay. And my question is, did you see any of the -- let me
9       finish the question just for the court reporter's sake. Did
10      you see the officer aiming at you as opposed to aiming at
11      something else or someone else?
12  A   I was in his -- I was in the range. I was in the -- I was
13      in the passenger's gunshot range.
14  Q   Okay. You may have been in his gunshot range or his line of
15      fire.
16  A   In his line of fire.
17  Q   But my question is, did you see the passenger officer
18      deliberately aiming at you?
19          MR. GIROUX: Well, he can't say whether or not the
20      guy meant to aim at him.
21  Q   No. You can tell -- you can tell me what you saw.
22  A   I don't know that. I don't know -- I don't know if he
23      deliberately --
24          MR. GIROUX: Objection; form; foundation. You
25      can't get into the officer's mind and decide why he's

Page 105

1       pointing at a given direction. All he can tell you is what
2       direction he pointed in.
3           Sir, you can tell the attorney what direction he
4       was pointing in. You can't tell the attorney why he was
5       pointing in your direction or not in your direction.
6   Q   And I don't want to know why someone else did something,
7       because you would be speculating. Did you see the officer
8       or officers aim their weapons?
9   A   Yes.
10  Q   Okay. Where did you see the officer -- strike that. What
11      did you see the officers aiming at?
12  A   Robert.
13  Q   And not you?
14  A   I was right -- I was in the crossfire.
15  Q   Okay. So you did not see the officer aiming at you, but you
16      were in the crossfire; is that what you're saying?
17          MR. GIROUX: Form; foundation. He can't know what
18      he's aiming at. How can he get into somebody's mind?
19  A   I honestly don't know if the officer was pointing at me. I
20      just know his gun was pointing at me. He probably wasn't --
21      didn't mean to shoot me, but he -- his gun was pointing at
22      me and another officer's was pointing -- they both was
23      pointing to Robert. But I was -- by me being right here
24      (indicating) at this angle at the back right of her car and
25      Robert being at the front left of her car, I was right there

HILL VS DEW, ET AL

DEPOSITION OF ALBERT MACK BURSEY III

## Page 106

1    in the angle of getting grazed.
2  Q  When you told me earlier that you were covering your head --
3    remember you told me that? -- what prompted you to do that?
4  A  The shots. Once I heard all the -- once they just started
5    unloading their clips, I just instantly covered. I didn't
6    even have no chance to run, because normally you run when
7    you hear gunshots. But I was there. I couldn't move. And
8    obviously if did run, I probably would have got shot.
9  Q  How many shots did you hear fired?
10  A  I can't remember. I believe it was more than -- I believe
11    it had to be more than six apiece.
12  Q  Okay. So 12?
13  A  Somewhere around that range.
14  Q  Okay.
15  A  It was a lot of shots; lots of shots.
16  Q  Were any of those other people -- remember you talked about
17    all the people that were outside? Were they outside when
18    the police pulled up, if you know?
19  A  I can't remember where everybody went. Only the -- only the
20    last few faces I can remember seeing was my face, Robert
21    face when he's falling, the two officers and then the
22    officers forcing me to go on the sidewalk with Shaneica. I
23    didn't see anybody else.
24  Q  Okay. I'm on the last part of this, and I want to ask about
25    your damages. It was your testimony you suffered emotional

## Page 107

1    distress because of this; correct?
2  A  Yes.
3  Q  And I want to kind of clarify this. Did you suffer
4    emotional distress because of what happened to your cousin,
5    because of what happened to you or a combination of the two?
6  A  Kind of like both. You know what I'm saying? I actually
7    seen him get shot and killed right in my face and to
8    actually -- it's still stuck in my head that, if I would
9    have moved a inch more, that could have been my life.
10  Q  Did you have any psychological or psychiatric evaluation or
11    treatment because of your emotional distress?
12  A  Every time I try to go to the hospital, they -- I couldn't
13    stay there long enough to get it. You know what I'm saying?
14    I would go and the doctors would try to set me up for it,
15    but upon sitting there, I couldn't -- I leave. I couldn't
16    sit there long enough. It's too stressful.
17  Q  Okay. Now, you told me you went to St. John's, I think, for
18    them to look at the gunshot wound.
19  A  Yes.
20  Q  Did you go to St. John's once or more than once?
21  A  I went once and -- as a matter of fact, yeah. I went once,
22    and they treated me. And then they referred me to go --
23    they told me I should go see a psychiatrist or somebody like
24    that. So I ended up going to -- I believe it was Henry Ford
25    Hospital.

## Page 108

1  Q  Okay.
2  A  Or, no, Receiving; Detroit Receiving, I went. And I sat
3    there. They had me sitting there like two hours, and then I
4    just got up and left. I couldn't --
5  Q  Going back to St. John, you were seen in the emergency room;
6    correct?
7  A  Yes.
8  Q  Did they admit you to the hospital or treated you in the ER?
9  A  They treated me and, like, just bandaged it up a little bit
10    and gave me, like, three pieces of paper, which I can't
11    remember what they had on it, and then I left.
12  Q  And the three pieces of paper included this referral to this
13    psychologist?
14  A  I don't know what it included. It could have been just
15    paper from them from seeing me.
16  Q  You never returned to St. John's Hospital because of this?
17  A  (Shaking head negatively)
18  Q  Okay. And so I understand you went to Detroit Receiving to
19    see a psychologist or psychiatrist. You waited but it took
20    too long, so you didn't see anybody?
21  A  Yes.
22  Q  Did you ever actually see anybody because of the emotional
23    distress from this?
24  A  (Shaking head negatively)
25  Q  You have to answer out loud for --

## Page 109

1  A  No.
2  Q  Okay. If you need to take a break, that's fine. We're just
3    about done.
4        MR. GIROUX: You want a break?
5  Q  You want to go on or you want to take a break?
6  A  Yeah, I could use the bathroom.
7        (Off the record)
8  Q  All right. Did you have any medical treatment anywhere else
9    other than St. John because of your injuries in this case,
10    physical or psychological?
11  A  No.
12  Q  The Complaint indicates that your damages include loss of
13    personal freedom and liberty. And I'd like you to expand on
14    that. Were you ever arrested in connection with this
15    incident?
16  A  No; I didn't see anybody, no.
17  Q  Were you ever detained against your will in relation to this
18    incident?
19        MR. GIROUX: And other than what he's described in
20    the police car?
21        MS. MILLS: Well, I don't think I've ever asked
22    this question. And I'll ask it this way.
23  Q  Were you -- were you willing to give a statement to these
24    officers or you did not want to talk?
25  A  I don't remember. I just -- I wanted to get out of the car.

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

---

Page 110

1   I kept telling them I wanted to get out the car. They said,
2   "No, you can't leave until we get a statement from you."
3 Q   Did you voluntarily give a statement or did you --
4 A   I don't know.  I did that to get out the car.  Once they
5   shot him and pushed me on the sidewalk, they instantly took
6   me to a car.  And they had me sitting there for a long time.
7   And cars kept pulling up.  And then they kept coming, waking
8   me up saying, "Hold on.  We need a statement.  Hold on.  We
9   need a statement."  They would not let me get out the car
10   until after I made a statement.
11 Q   Okay.  Let me ask this question.  Did they ask you if you
12   wanted to give a statement?  Did they ask you that question?
13 A   I don't remember.  I don't remember none of that.
14 Q   As you told us today, you wanted to talk to the police about
15   this; isn't that true?
16 A   No.  I wanted to talk to a officer to let them know that I
17   was grazed.
18 Q   Okay.  So you wanted to talk to the police about this; isn't
19   that true?
20 A   Yes.
21 Q   How long did you -- strike that.  Did you have bandages or
22   something put on your grazed wound?
23 A   I don't remember what it was they gave me.  They just
24   treated it, put something on there and gave me some papers
25   and sent me.

---

Page 111

1 Q   Okay.  Did they have to sew you up, suture you?
2 A   No, it wasn't that.  It was just a laceration.  It just
3   split my -- they didn't -- it wasn't that bad where they had
4   to sew it up.
5 Q   They cleaned it?
6 A   Cleaned it up, yes.
7 Q   Did they put a bandage on it or did they just clean it and
8   let you put your shirt on and go home?
9 A   I can't remember.  I can't remember what they did to it.
10 Q   Did they --
11 A   I was --
12 Q   -- see -- I didn't mean to interrupt.  Did they give you any
13   pain medication or any drugs at the hospital because of this
14   injury?
15 A   I think -- I don't know.  I think they gave me something to
16   eat -- to take then.  I don't think they gave me nothing to
17   leave with.
18 Q   Did you ever treat with your personal physician because of
19   injuries from this incident?
20 A   No.
21 Q   You also indicate in the Complaint that you sustained
22   economic damages.  Well, excuse me.  I take that back.  Let
23   me make sure I'm clear on this.  Did you lose any wages or
24   salary because of this incident -- your injuries in this
25   incident?

---

Page 112

1 A   Yes.
2 Q   Okay.  What wages or salary did you lose?
3 A   Well, my boss laid me off because the incident happened.
4 Q   He told you, "I'm going to lay you off because you were" --
5 A   Because I was in the situation and needed to get myself
6   together.  He didn't want me to work like that.
7 Q   Okay.  And how long were you laid off for?
8 A   I think about two weeks; two or three weeks.
9 Q   And did you return to work after two to three weeks?
10 A   Yes.
11 Q   How much would you say you lost from salary for that two to
12   three weeks?
13 A   Probably less than $1,000.  I can't recall exactly.
14 Q   Can you tell me in your own words what you believe the
15   officers did wrong as it pertains to you?
16 A   Could you explain just --
17 Q   Sure.  You have sued three Detroit police officers, two that
18   were involved in the shooting and another office who came up
19   after the fact.  I'd like for you to tell me in your own
20   words what you believe the officers did wrong as it pertains
21   to you, not as it pertains to Robert.
22       MR. GIROUX:  Form; foundation.
23       THE WITNESS:  Can --
24       MR. GIROUX:  I know you don't know the legal terms
25   and the legal causes of action.  But in your own words if

---

Page 113

1   you think you can answer it, go ahead.
2 A   Why do I feel they were wrong?
3 Q   Toward you, yes.
4 A   By when they pulled up, they didn't have no lights on, they
5   didn't get out the car and say anything to us and to get out
6   and instantly started shooting.  They pulled up and got out
7   and instantly started shooting.  No words, nothing came out
8   of they mouth but nothing.
9 Q   Do you know why they instantly started shooting?
10 A   I only -- my assumption to this was I figured that whoever
11   the officers were --
12       MR. GIROUX:  Hang on.  Form; foundation.  Do you
13   know?  Did the officers tell you why they did that?
14       THE WITNESS:  Oh, no.
15 A   No, the officers didn't tell me anything.  I didn't talk to
16   them.
17       MS. MILLS:  Thank you.  I have no further
18   questions.  Thank you very much, sir.
19       MR. GIROUX:  Albert, I have a few questions for
20   you.  Okay?
21       THE WITNESS:  Yes.
22       EXAMINATION
23 BY MR. GIROUX:
24 Q   You were near the back side of your girlfriend's car in
25   front of the apartment building?

---

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

| Page 114 | Page 116 |
|---|---|
| 1  A    Yes. | 1    the officers? |
| 2  Q    Okay. You were talking to Robert? | 2  A    Yes. |
| 3  A    Yes. | 3            MS. MILLS: Objection; leading and compound. |
| 4  Q    Your girlfriend was on the other side of the street near the | 4  Q    Okay. He's continually going away from the officers, |
| 5       sidewalk? | 5        because it looked like he had jumped. His hands were in the |
| 6  A    Yes. | 6        air as he was getting shot; is that right? |
| 7  Q    Everything was calm and quiet? You were just talking to | 7  A    Yes. |
| 8       Robert? | 8            MS. MILLS: Same objection. |
| 9  A    Yes. | 9  Q    He did not have a gun in his hands; is that true? |
| 10  Q    You didn't know the police were pulling up and about to | 10  A    Yes. |
| 11       smash into Robert's bicycle? | 11            MS. MILLS: Objection; calls for speculation. |
| 12  A    No. | 12  Q    Did you look and see that he had no gun in his hands? |
| 13            MS. MILLS: Object; leading and compound. | 13            MS. MILLS: Objection; leading. |
| 14  Q    You heard a crunch. I can't make that sound that you made, | 14  A    I know he didn't have a gun in his hand because he was |
| 15       but you heard something that sounded like a metal crunch? | 15        falling off the bike, and his hands were on the handlebars. |
| 16  A    Yes. | 16        But as the bike was getting collapsed, he was falling. Now, |
| 17  Q    You turned immediately and saw the police car, and it was at | 17        I don't know how you can be getting crushed and reach down |
| 18       a stop because it had run into both Robert's bicycle and | 18        and then grab a gun and -- it's impossible. |
| 19       your girlfriend's car, which had been parked? | 19  Q    Okay. |
| 20            MS. MILLS: I'm going to continue my objection to | 20  A    It's impossible. |
| 21       leading, compound and calls for speculation and foundation. | 21  Q    But instead of talking about what's possible or impossible, |
| 22  Q    Is that -- was my statement correct, sir? | 22        let's just talk about what you saw. You saw that Robert did |
| 23  A    It -- I can -- | 23        not have a gun in his hand; right? |
| 24  Q    Do you remember what I said? | 24  A    Yes. |
| 25  A    Yes. But the car -- what stopped the police car is landing | 25            MS. MILLS: Objection; leading. |

| Page 115 | Page 117 |
|---|---|
| 1    on top of my girlfriend's car. | 1  Q    Okay. You saw that Robert was jumping and falling across |
| 2  Q    Right. That's what I was trying to say. | 2        the hood of that car with his hands up above his heads and |
| 3  A    That's what stopped it. | 3        they were empty? |
| 4  Q    That's what you saw as soon as you turned around? | 4            MS. MILLS: Objection. |
| 5  A    Yes. | 5  Q    I'm sorry. His hands up above his head, singular, and his |
| 6  Q    Okay. Is that right? | 6        hands were empty? |
| 7  A    Yes. | 7            MS. MILLS: Objection; leading and compound. |
| 8  Q    Okay. And you saw that first. You thought "Oh, my gosh" or | 8  A    Yes. |
| 9        something like that; right? | 9  Q    Is that right? |
| 10            MS. MILLS: Same objection. | 10  A    I seen him falling, yes. |
| 11  Q    You thought like, "What's going on"? | 11  Q    Okay. And he was apparently taking bullet strikes or you |
| 12  A    Yes. | 12        believed he was? |
| 13  Q    Okay. You then see -- within a second or less than a second | 13            MS. MILLS: Objection; calls for speculation, lack |
| 14        after that, you then see the doors on the police car open | 14        of foundation. |
| 15        up? | 15  A    Yes. |
| 16  A    Yes. | 16  Q    You then realize -- and all of this is occurring in, like, a |
| 17  Q    And you see officers get out from the car, draw their guns | 17        second or two; right? |
| 18        and start shooting? | 18  A    Yes. |
| 19  A    Yes. | 19  Q    You realize, hey, this one officer who is diagonally from me |
| 20  Q    Okay. In the direction of the front of your girlfriend's | 20        is actually pointing in my direction and you cover and tuck |
| 21        vehicle? | 21        and turn slightly to the side? |
| 22  A    Yes. | 22            MS. MILLS: Objection; leading, compound. |
| 23  Q    Okay. Now, sprawled out across and falling across the hood | 23  A    As soon as I started hearing the shots, I instantly did like |
| 24        of your girlfriend's vehicle is Robert who has his face and | 24        this (indicating). I didn't have enough time to run, so I |
| 25        chest more in the direction of the car and his back towards | 25        just curled myself. I didn't even get a chance to turn -- |

**Network**Reporting

*1-800-632-2720*

Page 118

1 turn back or around or anything. I just curled myself.
2 That's what I instantly did once I -- and all I just seen
3 was the flash, flash, flash, flash, flash, flash. I did
4 like that.
5 Q Okay. Now, you started -- after you tucked and the shots
6 were --
7 A Stopped.
8 Q -- stopping, you were then walking behind the car to see how
9 Robert was, what the heck is going on and you saw him
10 sprawled out on the ground face down?
11 A Yes.
12 Q Okay. You stepped over his head and shoulders to see if he
13 was okay, and the police officers came to you right away and
14 moved you over to the sidewalk?
15 A Yes.
16 Q Okay. They then went back to him?
17 A No. They backed me -- I stepped over him backwards like
18 when -- from this angle, after those shots went --
19 Q That's okay. I just want to know what the officers did.
20 A They forced me to the sidewalk and they stayed there facing
21 me.
22 Q That's all I needed to know for right now. Okay?
23 A Uh-huh (affirmative).
24 Q In terms of Robert, now, before you saw the police smash
25 into him with their car while he was on his bicycle, he was

Page 119

1 calm?
2 A Yes.
3 MS. MILLS: Objection; leading and compound.
4 A Yes.
5 Q Did he have a weapon in his hands?
6 A No. He --
7 MS. MILLS: Objection.
8 A He was on a bike riding in a circle.
9 MS. MILLS: Objection. I'm sorry for this.
10 Objection. At what point? Because he's already testified
11 about him putting the gun in his hand, pulling it out and
12 scaring half the people on the street.
13 MR. GIROUX: Yeah, hours before. Thank you.
14 MS. MILLS: Not hours.
15 MR. GIROUX: Do you get to shoot people for
16 pulling out a gun before police arrive?
17 MS. MILLS: If you aim it at them, you do.
18 MR. GIROUX: And if you don't, you get to make it
19 up?
20 MS. MILLS: This is an interesting and amusing
21 side bar, but I just made a --
22 MR. GIROUX: Is that what you get to do --
23 MS. MILLS: I just made an objection for the
24 record.
25 MR. GIROUX: -- if you're a police officer? You

Page 120

1 just make up stuff after you shoot somebody dead, like, 12
2 times?
3 MS. MILLS: My objection was for -- Counsel --
4 A Robert's gun never was pointed up or pulled up towards
5 anything.
6 MS. MILLS: My objection --
7 Q We're going to cover it in a minute. She's just trying
8 to --
9 MS. MILLS: My objection was for the record.
10 MR. GIROUX: Your objection was nonsense. It
11 wasn't even a legal objection.
12 MS. MILLS: Luckily you're not the judge in the
13 case.
14 MR. GIROUX: I don't know if that's luckily or
15 not, but I am not. I agree with that.
16 Q All right. Getting back to that, prior to the police
17 crashing into Robert's bicycle and your ex-girlfriend's car,
18 you had been talking to him; right?
19 A Yes.
20 Q You guys were joking around; right?
21 A Yes.
22 Q And you were looking at him while you were talking to him
23 from time to time, looking in his direction. He was riding
24 around in a circle in a small area?
25 A Uh-huh (affirmative).

Page 121

1 Q Right?
2 A Yes.
3 Q He didn't have the gun out at that point, did he?
4 A No.
5 Q It had been in the holster for quite some time, hadn't it?
6 A Yes.
7 MS. MILLS: Objection; leading.
8 A Ever since he -- it had been in the holster ever since he
9 had got off the bike and put it in the holster. He never
10 did pull the gun out again, ever.
11 Q Right. And that was like more than an hour before the
12 police ran into him, wasn't it?
13 A Yeah. Less than -- within 30 minutes to a hour he was
14 standing there talking after he -- with us. And then he got
15 on the bike, ran in a circle for like 20, 30 minutes, then
16 the police pulled up. That's when --
17 Q They crashed into him.
18 A -- they crashed into him and he was falling off and they
19 shot him up.
20 Q And then shot him to death. Okay. So you see he's riding
21 around for about 20 minutes, doesn't have his gun out, he's
22 holding onto his handlebars of his bicycle; right?
23 A Uh-huh (affirmative).
24 Q Is that a "yes"?
25 A Yes.

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

| Page 122 | Page 124 |
|---|---|
| 1  Q   You guys are talking.  Everything's calm; right? | 1           MS. MILLS:  I'm sorry.  You interrupted his |
| 2  A   Yes. | 2      answer.  He was -- |
| 3  Q   Your girlfriend's on the other side? | 3  A   I don't even remember them even saying anything after they |
| 4  A   Uh-huh (affirmative). | 4      shot him. |
| 5  Q   Okay?  "Yes"? | 5  Q   Okay.  But I just want to -- I just want to focus on before |
| 6           MS. MILLS:  You have to say "yes" just for the | 6      they shot him.  Did the police ever identify themselves at |
| 7      court reporter's sake. | 7      all? |
| 8  A   Yes.  Sorry. | 8  A   No. |
| 9  Q   There's nothing bad going on, no one's in harm's way; right? | 9  Q   Did they ever shout commands to Robert? |
| 10          MS. MILLS:  Objection; calls for speculation. | 10 A   No. |
| 11 A   No. | 11 Q   Did they ever shout commands to you or to anybody else? |
| 12 Q   You agree with that statement? | 12 A   No. |
| 13 A   Yes. | 13 Q   So this was completely -- strike that.  Let me ask it a |
| 14 Q   Okay.  Everything's calm? | 14     different way.  You believed that one of the bullets from |
| 15 A   Yes, everything was all right. | 15     the passenger side officer's gun struck you in the side of |
| 16 Q   Okay.  And the next thing you know while you're kind of near | 16     your body; is that correct? |
| 17     the back end of your girlfriend's car is you hear this | 17 A   The back side, yes. |
| 18     crunch and you turn and you look and you say to yourself, | 18 Q   Were you scared while the shooting was going on? |
| 19     "What the heck is going on?" or something like that; is that | 19 A   Yes. |
| 20     right? | 20 Q   Were you in shock thereafter? |
| 21 A   Yes. | 21 A   Yes. |
| 22 Q   Okay.  And you saw Robert gunned down while he was unarmed. | 22 Q   Could you believe that all of this had just happened? |
| 23     He didn't have a gun in his hands; right? | 23 A   No. |
| 24          MS. MILLS:  Objection; leading. | 24 Q   What was going through your mind at that point? |
| 25 A   Yes.  He did not have nothing in his hands. | 25 A   Well, my whole focus when -- from when I stepped over my |

| Page 123 | Page 125 |
|---|---|
| 1  Q   Okay.  And the police officers didn't have any reason to | 1      cousin was him.  I could never take my eyes off of him. |
| 2      shoot him, did they? | 2      Because to me, it was like they shot him so many times, he |
| 3  A   No. | 3      was instantly dead when they shot him.  He was instant -- he |
| 4           MS. MILLS:  Objection; calls for a legal | 4      had to be instantly dead -- because they unloaded -- it |
| 5      conclusion. | 5      sounded like they unloaded they clips in his back. |
| 6  Q   And no one was in harm's way when the police officers | 6  Q   But you don't know if he instantly died.  You don't know |
| 7      started shooting him? | 7      when his heart stopped, do you? |
| 8           MS. MILLS:  Objection; calls for speculation. | 8  A   I don't know when it stopped, but I kept asking them, "Can |
| 9  Q   Is that right? | 9      you touch him?  "Just can you please touch him and check on |
| 10 A   No. | 10     him, please?" |
| 11 Q   Is that correct? | 11 Q   You don't know when his brain stopped working, do you? |
| 12 A   Yes. | 12 A   No. |
| 13 Q   Okay.  And they shot him mostly in the back when he facing | 13 Q   You just know they shot him a whole bunch of times for no |
| 14     away from them, because that's the position that he was in | 14     reason; right? |
| 15     when he dove away? | 15 A   Yes. |
| 16 A   Yes. | 16          MS. MILLS:  Objection; argumentative and leading. |
| 17          MS. MILLS:  Objection; calls for speculation. | 17 Q   Did you see any reason for them to shoot him? |
| 18 Q   And the police officers -- at no time before the shooting, | 18          MS. MILLS:  Objection; irrelevant. |
| 19     did they ever yell "Stop, police" or did they ever identify | 19 A   No. |
| 20     themselves? | 20 Q   Was he dangerous on that bike? |
| 21 A   No. | 21 A   No. |
| 22          MS. MILLS:  Objection; compound. | 22          MS. MILLS:  Objection; calls for speculation. |
| 23 Q   Did the police ever identify themselves before the shooting? | 23 Q   Was he threatening anybody while on that bike? |
| 24 A   No.  I don't remember them -- | 24 A   No. |
| 25 Q   Did they ever shot commands to Robert? | 25 Q   Were they -- were the police officers saving or rescuing |

NetworkReporting

1-800-632-2720

Page 126

1   anybody?
2   A   No.
3        MS. MILLS: Objection; calls for speculation.
4   Q   Was there anyone to be saved or rescued?
5        MS. MILLS: Objection; calls for speculation.
6   A   No.
7   Q   If the police officers didn't show up, would he have just --
8        was his intent just to go home?
9        MS. MILLS: Wait a minute. Wait a minute.
10  A   A few more minutes.
11       MS. MILLS: I'm sorry. I just wanted to make sure
12  I understand this question. Calls for speculation if it is
13  as you state.
14  Q   You can answer.
15  A   I feel like -- I feel like, if the police didn't show up, he
16       was anywhere from five to -- anywhere from one to ten
17       minutes to pulling off, riding over my mama house and going
18       to bed.
19  Q   Right. That's what the intention was of the night; right?
20  A   Yup, he --
21       MS. MILLS: Objection; calls for speculation.
22  Q   You were getting ready to go to bed?
23  A   Uh-huh (affirmative).
24  Q   Is that a "yes"?
25  A   Yes.

Page 127

1   Q   He was getting ready to go home and go to bed?
2   A   Yup.
3        MS. MILLS: Objection; calls for speculation.
4   A   Yes.
5   Q   Is that part of the winding down of the evening that you saw
6        and experienced?
7   A   Yes.
8   Q   Was that kind of the winding down of the conversation that
9        you guys were having?
10  A   Yes.
11  Q   Had you been out with him before?
12  A   Was --
13  Q   Like on prior days, on prior occasions?
14  A   Oh, yes. We always -- we always hung out. We always hung
15       out.
16  Q   Okay. Could you tell that the evening was winding down and
17       you guys were getting ready; to go home and to see each other
18       the next day or whenever?
19  A   Yes, there wasn't no situation. Like I said, after the --
20       after he pulled his gun out and everybody had scattered,
21       instantly, less than two, three minutes, everybody that ran
22       basically came back to right where they were and we went to
23       laughing and giggling, me, him and her, just laughing and
24       giggling.
25  Q   Okay. But that was about an hour approximately before the

Page 128

1   police arrived?
2   A   Yes.
3   Q   Okay. But at the time the police are arriving, that's the
4        point in time -- is that where you sensed that the night was
5        winding down for you and Robert?
6   A   It was over with. Everything was over with. He was about
7        to pull off.
8   Q   Okay. That's all I wanted to know.
9   A   He just was riding in circles.
10  Q   In terms of your injuries and damages, do you have
11       nightmares about this occurrence?
12  A   Yeah; it's sort of like, yes.
13  Q   Do you know what flashbacks are?
14  A   When you think about the past?
15  Q   When you're doing something and you don't know why
16       something's popping into your head and it's about a past
17       experience, that's kind of like a flashback; where you're
18       remembering it even though you weren't trying to remember
19       it. Do you ever have this incident pop into your head where
20       you're just --
21  A   Yeah; yes. It be like different incidences. It's like I'm
22       35 years old, and I really wasn't even having dreams. I
23       wasn't even really having dreams.. But it seem like ever
24       since then, it's like I've been having like lots of dreams.
25       And then, like, if I was to get in a situation with

Page 129

1   police -- not getting in a situation but like if ever a
2   situation where police pulled up where somewhere I'm at --
3   the way Detroit police is, they instantly get out, they
4   point their gun, "Don't move. I got a itchy trigger finger.
5   I'll shoot." You know what I'm saying? So it just
6   instantly makes me stiffen up whenever I see them. I'm not
7   scared of them, but it's just an instinctive thing figuring
8   that because my life was that close to -- I could have died.
9   So every time I see a officer and they be on that
10  roughhousing, it just always intimidates me.
11  Q   Since the shooting that you were involved in as you've
12       described it, do you feel anxiety?
13       MS. MILLS: Objection; leading.
14  Q   That's like apprehension, fear, uneasiness, don't feel
15       right. Do you have feelings of anxiety?
16  A   No. Just basically be -- it's like I'm -- it's like I'm
17       just basically stressed because there's not that many men in
18       my family that's left. When Robert did his 12 years and got
19       out, me and him hooked up. And I always wanted to be in his
20       life. So once we hooked up, we was real close. And then
21       the only other men in my family left is my two brothers in
22       California.
23  Q   I just want to focus on your psychological, if any, feelings
24       about what happened.
25  A   I try my best not to think about it.

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

Page 130

1  Q    Why?  What happens when you think about it?
2  A    Because that was my heart.
3          (Witness crying)
4  Q    I'm sorry.
5  A    That was my -- he was my heart.
6  Q    He was your heart?
7  A    That's all I had.
8  Q    Okay.  You're crying now.  And I don't mean to embarrass
9       you, but do you cry about this at all?
10 A    No, not around nobody.  Like not around my kids, because
11      they ask me where is they Bobby at.  I mean, he was good.
12      He did 12 years, but he didn't do nothing.  He got his life
13      and he was working.  And that was his first time ever he
14      even come over there.  The only reason he came over there
15      because he seen girls out there, and he was just wondering
16      to see if he could talk to somebody.  But I guess by him
17      being drunk and the way he pulled up, everybody had ran,
18      thought he was on something else, but everybody came back
19      out and the situation died.  It just died down.  And an hour
20      later with the police, they response, they pulled up and
21      just run him over and shoot him up.  They didn't say
22      nothing.  They didn't say nothing.  They just got out and
23      started shooting and then go push me all on the sidewalk.
24          MR. GIROUX:  Okay.  I don't have any more
25      questions.  Thank you, Albert.

Page 131

1  A    If they would have said something, he would have stopped.
2       He wasn't like that.  If they would have said, oh -- he
3       would have took his lumps like he had.  He would have took
4       it.  He wouldn't have pulled no gun.  He wouldn't have did
5       anything.  That's like he is.  He just got -- he did 12
6       years.  He'd have gave more.  They didn't say anything.
7       They didn't say a word.  They got out their car and
8       instantly started shooting.  And I'm figuring it's probably
9       because all them guys that's down on that corner all the
10      time, that's why they probably did that.  They probably
11      figured, "This that guy we keep arresting and he keep
12      getting out of jail whoever he is.  He on a bike.  We're
13      going to get him tonight."  And them officers pulled up and
14      they shot my cousin thinking it was one of them guys out
15      there.  My god, it was the first time he even come over
16      there.
17              EXAMINATION
18 BY MS. MILLS:
19 Q    Were the police in the car until it stopped?
20 A    Until what stopped?
21 Q    Until the police car stopped.
22          MR. GIROUX:  Asked and answered like three times.
23 A    I can -- when they -- when they car --
24          MR. GIROUX:  He said he saw the car --
25          MS. MILLS:  No; no; no.  I want to know the answer

Page 132

1       to this question.  This particular question I didn't ask.
2  Q    I just want to know if the police officers, the two
3       officers, were still in the car until it came to a stop.
4       That's all I want to know.
5          MR. GIROUX:  Well, if they didn't get out --
6  A    It was -- I -- I could -- can I answer it?
7  Q    No.  You can answer the question, please.
8  A    I'll answer it like this.
9  Q    It's a "yes" or "no" question.
10         MR. GIROUX:  No.  You can answer it any way you
11      want.
12 A    I have to answer like this.  It was within a matter of one,
13      two, three seconds that their car -- the police car stopped.
14      And when it stopped, it was on top of Shaneica's car.
15 Q    Okay.  Listen to --
16 A    So they were out instantly.
17         MR. GIROUX:  No, don't interrupt him.
18 Q    -- listen to my question.
19         MR. GIROUX:  Don't interrupt him.  Go ahead,
20      finish your answer.
21 Q    I want to know --
22         MR. GIROUX:  No.  Do not interrupt him.
23 Q    Are you finished with your answer?
24         MR. GIROUX:  No.  Finish your answer.
25 A    They -- they -- the police car stopped on top of her car and

Page 133

1       it -- they was out instantly.
2  Q    Okay.
3  A    So upon stopping, they jumped out that quick.
4          MS. MILLS:  Okay.  And I'm going to object,
5       because the answer was not responsive.
6  Q    My question is, were the police in the car until it stopped?
7  A    I came to -- yes; yes.  They have to basically been in the
8       car 'til it stopped.
9          MR. GIROUX:  And you've answered it.
10 Q    Did you see the police still in the car -- still inside of
11      the car when it came to stop?
12 A    No, they was getting out.  All that happened in one instant.
13      When I turned around, they was -- the car was stopping and
14      they was out.  They stopped and they jumped out behind they
15      doors and started shooting.  See, if you -- if you ask the
16      question right, --
17         MR. GIROUX:  That's okay.  Albert -- Albert --
18 A    -- you calculate it and see that --
19         MR. GIROUX:  Albert.
20 Q    Okay.  And that -- I think you --
21         MR. GIROUX:  Stop.
22 Q    I think you've done a great job of explaining it to me.
23         MR. GIROUX:  We don't care what you think.  Just
24      ask your next question.
25 Q    It sounds like the car was coming to a rolling stop --

HILL VS DEW, ET AL                                           DEPOSITION OF ALBERT MACK BURSEY III

Page 134

1           MR. GIROUX:  Don't -- don't answer that.
2           MS. MILLS:  I haven't finished the question.
3           MR. GIROUX:  That's okay.
4    Q     It sounds like the car was coming to a rolling stop and the
5           police jumped out.
6           MR. GIROUX:  Don't answer that question.
7    Q     Is that correct?
8           MR. GIROUX:  Don't answer that question.
9           MS. MILLS:  On what basis?
10          MR. GIROUX:  He's answered it six times.  It's not
11          going to be the last.
12          MS. MILLS:  He has not answered this question.
13          MR. GIROUX:  Yes.  I'll go back and show you six
14          times.
15          MS. MILLS:  I've not asked that question.
16          MR. GIROUX:  He said the car was stopped and then
17          the police got out.  The doors opened --
18   Q     Okay.  Do you agree with that statement by your counsel?
19   A     Yes.
20   Q     Okay.  So when the police car crashed --
21          MR. GIROUX:  Not only does he agree, but he said
22          it six times.
23   Q     When the police car hit your girlfriend's car, the officers
24          were still in the car?
25          MR. GIROUX:  That's what he said.  This would be

Page 135

1           seven or eight times.
2           MS. MILLS:  I just want to make sure this is true.
3           MR. GIROUX:  This would be eight times now.
4    A     That was they cue to get out the car.
5    Q     Okay.  So I just want to make sure I'm understanding this.
6           Do you know whether the police --
7           MR. GIROUX:  Really?  Eight times it takes you to
8           understand something?
9    Q     I want to make sure -- I want to ask you this.  Did the
10          police appear to be injured?
11   A     No, because they wasn't driving that fast.
12          MR. GIROUX:  Stop.  Just -- just answer the
13          question.
14   Q     Okay.
15   A     No.
16   Q     So how fast was the car going when it came to a stop -- when
17          it was coming to a stop?
18   A     It had to be less than two or three -- about three, four --
19          within three to five miles.
20   Q     Three to five miles per hour?
21   A     I can't even calculate how fast it is but just enough to
22          bump into a car.  Just bump into the car where their car
23          ended up on top of her car and the bike was under.
24   Q     Okay.
25   A     That's why they had to pull the police car back and try to

Page 136

1           take his bike off from the loose under there.  Those
2           pictures I did not see.
3    Q     Remember when you said you were looking around the corner
4           as --
5    A     No. I said I was walking to --
6           MR. GIROUX:  No, he never said that.
7           MS. MILLS:  I haven't finished my question.
8           MR. GIROUX:  He never said that.
9           MS. MILLS:  I haven't finished my question.  You
10          can object once I ask the question.
11   Q     You talked about how Robert was riding around in circles on
12          this bike; you remember that?
13   A     Yes.
14   Q     And you were looking around the -- you were wanting to look
15          around the corner of the building because of all those guys
16          down there.  You remember that testimony?
17   A     Yes.
18   Q     Okay.  When you were wanting to look around the building at
19          those guys, was Robert in front of you or was he behind you?
20   A     He was behind me.
21   Q     So you would have had your back to Robert as you were
22          looking toward those guys?
23   A     As I was walking away from him.  I was walking towards the
24          back of her car while he was riding around the front side of
25          her car.

Page 137

1    Q     Okay.  So you would not have been able to see what Robert
2           was doing while you were looking around the corner for those
3           guys; is that correct?
4    A     Yeah. I was looking back and forth at him.  But then I just
5           started to walk toward that way and, when I heard the sound,
6           I turned back around because I thought he ran into her car.
7           He was riding in circles.  And by him being tipsy, I'm
8           figuring he's about to hit her car any second now.  He is
9           about to run into her car.
10   Q     Were the police officers in uniform?
11   A     It was dark.  It was hard to tell, but -- it was super dark.
12          I believe -- but the officer that pushed me back, yes, he
13          was in uniform, if I can recall, yes.
14   Q     You didn't have any confusion about them being police when
15          you saw them?
16   A     No, not when I see the car and the police officers and
17          they -- the badges and stuff.
18   Q     Okay.  You said a number of times that you believe Robert
19          was instantly dead.  Did you ever hear Robert say anything
20          after?
21   A     No. He didn't say nothing.  He didn't have no movements in
22          his body or nothing.
23   Q     Were you ever out with Robert before where he pulled his
24          gun and threatened people before this evening?
25   A     No; no.

HILL VS DEW, ET AL                                    DEPOSITION OF ALBERT MACK BURSEY III

Page 138

1  Q   Do you believe the people that ran away after Robert pulled
2      out his gun were frightened?
3  A   No.
4          MR. GIROUX:  Form, foundation.
5  Q   Why did they run away then?
6  A   Because every time --
7          MR. GIROUX:  Form, foundation.  How would he know?
8  A   -- somebody see a gun, they run.  I mean, that's what I -- I
9      mean, every time, whenever you see a gun in the city you
10     run.
11 Q   Because why?
12         MR. GIROUX:  Form, foundation.
13 A   There ain't no telling what will happen with the gun.
14 Q   You might be killed.
15 A   Innocent bystanders get shot in any situation.  You never
16     know.
17 Q   So if you saw somebody pull out a gun --
18 A   I'm running.
19 Q   Because you're scared?
20 A   No, not because I'm scared.  Because I ain't taking the
21     chances.
22 Q   You don't want to get shot.
23 A   I don't want to get shot.  I don't even want to be around a
24     gun.
25 Q   Had the police ever pulled guns on you before?

Page 139

1  A   Yes.
2  Q   How many times?
3  A   Plenty of times.
4  Q   How many?
5  A   More than ten.
6  Q   And these ten or more times that the police have pulled guns
7      on you, was this before or after this incident with Robert?
8  A   I say I didn't -- have more guns pulled on me --
9  Q   By the police?
10 A   -- after the situation.  You know what I'm saying?
11 Q   Okay.  So --
12 A   Basically like if it -- say if it was 15 to 20 times, I say
13     probably 5 or 6 times probably before but then a lot after
14     then.  It seemed like Detroit Police really was cutting down
15     on stuff.  So I understood that they -- when they approach
16     scenes, they approach scenes with gun out now.
17 Q   Okay.  So as many as 20 times the police have pulled their
18     guns on you?
19 A   Yes.
20 Q   And out of the 20 times, about five of those times was
21     before this incident with Robert?
22 A   Yes.
23 Q   Okay.  Let's talk about those five times before the incident
24     with Robert where the police pulled their guns on you.
25 A   Yes.

Page 140

1  Q   What was going on the first time the police pulled their
2      guns on you?
3  A   I pretty much wasn't worried.  You know what I'm saying?
4      Because I had -- the police ain't going to shoot you.
5      That's what I always figure.  The police ain't going to
6      shoot you.  They just protecting theyself.
7  Q   But what prompted them to pull their gun on you the first
8      time?
9          MR. GIROUX:  Form, foundation.  How would he know?
10         MS. MILLS:  I don't know.
11 Q   You tell me.
12         MR. GIROUX:  Don't answer.  You know what?  I'm
13     tired.  Don't answer the question.
14         MS. MILLS:  Okay.  Your objection is you're tired?
15         MR. GIROUX:  He's not going to answer -- yes.  No,
16     my objection is you're harassing the witness now.  We've
17     been here a long time.  You're now asking him to get into
18     the minds of police officers who pulled their guns on him.
19         MS. MILLS:  Are you instructing him not to answer
20     the question?
21         MR. GIROUX:  Yes, I am.
22         MS. MILLS:  Okay.  On the basis of what?
23         MR. GIROUX:  That you're harassing him now.
24         MS. MILLS:  Okay.  And why is it that you say I'm
25     harassing?

Page 141

1          MR. GIROUX:  Because no one could possibly say, "I
2      know that officer pulled his gun for this reason," because
3      you can't climb in someone else's brain and know what
4      they're thinking.
5          MS. MILLS:  You're objecting on --
6          MR. GIROUX:  If you want to ask him a different
7      question, you can ask him a different question.
8          MS. MILLS:  Very well.  You intended to object
9      based on speculation?
10         MR. GIROUX:  I'm done.
11         MS. MILLS:  Okay.
12 Q   Do you know why the police have pulled guns on you as many
13     as 20 times?  And you may not know.
14 A   No.
15         MR. GIROUX:  See what I mean?
16 Q   Have you ever had flashbacks about being stabbed in the
17     chest?
18 A   No, not really.  I done dream -- had a dream about being
19     stabbed but not a flashback.
20 Q   What's the difference between a dream and a flashback?
21 A   Flashback is when you just get a flashback of something.
22     Dream is when you sleep and you have a dream and it be
23     different situations all in one.
24 Q   Were you close to dying when your wife stabbed you in the
25     chest?

**Network**Reporting

*1-800-632-2720*

---

## Page 142

1   A   Not that I know of to my knowledge. All I know is it was a
2       inch from my heart.
3   Q   Did you know that Robert had a brother who was killed?
4   A   Yes.
5   Q   Do you know how he was killed?
6   A   Yes.
7   Q   How?
8   A   He was shot.
9   Q   Was it -- did it involve the police?
10  A   No.
11  Q   Now, last questions are about Robert being drunk that night.
12      What made you believe that Robert was drunk the evening that
13      this happened?
14  A   Because he was drinking from the time when he got off work
15      and probably to the time I seen him. He was drinking little
16      half pints. And I took a little half pint out of his hand
17      when he pulled up.
18  Q   And you took it out of his hand because you thought he'd had
19      enough to drink?
20  A   Yeah, being funny taking it, but it was a empty bottle.
21  Q   Okay. Was there anything in the way Robert was acting that
22      made you think he was drunk; for example, slurred speech,
23      trouble walking, being unusually aggressive? I mean,
24      anything about how he was acting that made you think he was
25      drunk?

---

## Page 143

1   A   No.
2   Q   It was just the amount that he was drinking?
3   A   No, because I don't even know the amount. It was just the
4       time of the day it was. You know what I'm saying? It was
5       like 2:00 o'clock in the morning. It's time to call it
6       quits. It was like 2:00 o'clock. You know what I'm saying?
7       He probably -- he more was to the I want to stay up, but,
8       you know, I'm sleepy. Now, that's why he was like, "Well,
9       I'm about to go home" meaning -- because I just told you he
10      was staying that about moving back home. Now his home was
11      his mama house or my mama house. So he was basically saying
12      I'm about to go -- he's going to my mama house. That's
13      where he was about to ride his bike to.
14  Q   You had -- and excuse me. I'll let you finish your answer.
15      Did you finish?
16  A   Yes.
17  Q   Okay. You had no doubt in your mind that Robert was drunk
18      that evening?
19  A   No, he wasn't drunk. He was -- got a little tipsy, but
20      he wasn't drunk. He didn't get to the point -- we done got
21      drunk together. He wasn't drunk. But he -- he was -- it
22      was more like once your high wear off and you sleepy. It
23      was more like, "Well" -- and it's too late. You can't buy
24      no more -- everything -- the liquor store is closed and your
25      buzz is going down, "I'm sleepy. I might as well go -- and

---

## Page 144

1       you all ain't doing nothing here." That's the -- his --
2       "You all ain't -- you all ain't doing nothing over here.
3       You ain't talking about nothing. I'm about to go home."
4   Q   "They ain't talking about nothing" meaning those people that
5       he was --
6   A   The girls, yeah. You know what I'm saying? Once he
7       actually got a chance to see them up close, "Oh, they ain't
8       talking about nothing."
9                MS. MILLS: Okay. No further questions. Thank
10      you, Mr. Bursey.
11               MR. GIROUX: I have no questions. You're all
12      done.
13               (Deposition concluded at 5:20 p.m.)
14                        -0-0-0-
15
16
17
18
19
20
21
22
23
24
25

---

NetworkReporting

1-800-632-2720

1

2

3

4

5          I certify that this transcript, consisting of 144 pages, is

6     a complete, true and correct record of the testimony of Albert

7     Mack Bursey III held in this case on June 24, 2011.

8          I also certify that prior to taking this deposition, Albert

9     Mack Bursey III was duly sworn to tell the truth.

10

11

12

13

14

15

16

17

18     July 8, 2011                        *Marcy A. Klingshirn*

19                                  Marcy A. Klingshirn, CER 6924
                                   Network Reporting Corporation
20                                  2604 Sunnyside Drive
                                   Cadillac, Michigan  49601-8749
21

22

23

24

25                                    Page 145



**Network**Reporting
— STATEWIDE COURT REPORTERS —
800-632-2720

EXHIbIT 1-C

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY E. HILL, As Personal Representative
of the Estate of ROBERT DWAYNE HILL,
Deceased, and ALBERT BURSEY,

Case No. 10-cv-11427

     Plaintiffs,

Hon. Avern Cohn

-vs-

POLICE OFFICER JELANI DEW,
POLICE OFFICER ADRIAN SINGLETON,
and POLICE OFFICER SHAWN GERAUD
In Their Individual Capacities,



     Defendants.

_____/

ROBERT M. GIROUX (P-47966)
Attorney for Plaintiffs
19390 W. Ten Mile Road
Southfield, MI 48075
(248) 355-5555
r.giroux@fiegerlaw.com
s.stipanovich@fiegerlaw.com

JANE KENT MILLS (P-38251)
Attorney for Defendants
660 Woodward Avenue, Suite 1650
Detroit, MI 48226
(313) 237-5060
millj@detroitmi.gov

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS AND PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

### Plaintiffs' Response to Defendants' Statement of Facts:

    1.    Admitted.

    2.    Admitted.

    3.    Robert Hill did have a gun in his possession but he did not "show it to co-plaintiff

Bursey and others." Instead, Robert took the gun out of his backpack and placed it in his holster.

**(Bursey Deposition, pg 59, line 18-21; Doc 19-2).** Whether other people saw the gun as Robert

1

put it into his holster is immaterial – he did not show it.  Also, Robert did not place the gun in his holster "shortly before the shooting," because he placed the gun in his holster almost an hour before the shooting occurred. (**Bursey Deposition, pg 121, line 13-16; Doc 19-3).**

4.     A number of people who saw Robert holstering his gun *almost an hour before the shooting* ran from the area upon immediately seeing the gun. (**Bursey Deposition, pg 59, line 8; Doc 19-2).**   However, they returned to the area 2-3 minutes afterwards when they saw that Robert had holstered the gun and was just talking and laughing with his Cousin, Albert Bursey, and his cousin's girlfriend, Shaneica Fitzgerald. (**Bursey Deposition, pg 59, line 8-12; Doc 19-2).**

5.     Admitted.

6.     Plaintiffs do not contest this paragraph.

7.     Denied.  First, Officer Singleton himself offers contradictory testimony:   Officer Singleton states that he first saw *the gun in Robert's holster* when the police cruiser was 2-3 car lengths away from Robert. (**Singleton Deposition, pg 59, line 1-3; Doc 19-5).**     Officer Singleton also testified that the police cruiser was travelling 5-7 miles per hour (7.33-10.27 feet per second) when he jumped out of the cruiser and instantaneously started shooting Robert. (**Singleton Deposition, pg 59, line 13-15, pg 60, line 15-18; Doc 19-5).** Given the rate of speed the car was travelling and when Officer Singleton testified he initially saw Robert point the gun at him (10-12 feet away), it would have been impossible for Officer Singleton to have jumped out of the car and begun shooting.  According to the version of events described by Singleton, the car would have made contact with Robert within a second or so of when Singleton claims to have first seen Robert point the gun.  This would not have allowed Singleton time to exit the vehicle and begin shooting Robert in the manner that he has described.

2

Second, witnesses to the incident claim that Robert never un-holstered his gun and never pointed it at the officers. Plaintiff Albert Bursey, who was with Robert the night of the shooting, testified that Robert never had a gun in his hand before he was gunned down by the officers. **(Bursey Deposition, pg 122, line 22-25; Doc 19-3).** Further, Shaneica Fitzgerald, Albert Bursey's then-girlfriend who also witnessed Robert being shot down, has stated that Robert was not holding or pointing a gun at the officers before he was shot down by the officers. **(Plaintiffs' Exhibit A, Affidavit of Shaneica Fitzgerald, ¶ 9).**

8.      Denied. As set forth in paragraph 7, there is conflicting testimony regarding whether Robert had a gun in his hand when Officer Singleton shot him. In fact, the only evidence indicating so is the self-serving testimony provided by Officers Singleton and Dew. Furthermore, the forensic evidence does not support Officer Singleton's proffered reason for shooting Robert. Officer Singleton claims that he shot Robert because Robert was pointing a weapon at him and his partner, Officer Dew. However, all of the gunshot wounds inflicted on Robert entered Robert from the posterior of his body. As stated in the Wayne County Medical Examiner's postmortem report, Robert suffered 5 gunshot wounds: two wounds on both sides of the buttocks near the gluteal fold; a gunshot wound to the lower left back, for which the wound track was back to front; a gunshot wound to the back of his right thigh that completely went through back to front; and a gunshot wound to the palm of his left hand, which left a gaping exit wound on the base of the left index finger. **(Plaintiffs' Exhibit B, Wayne County Medical Examiner's Postmortem Report).** Clearly, Robert was not facing Officer Singleton when Singleton fired at him because *all* of the gunshot wounds entered from the back. This would have made it impossible for Robert to have been pointing a gun at Officer Singleton when he

was shot in the manner described by Singelton and thus discredits Officer Singleton's version of events.

9.      Denied for the reasons set forth in paragraphs 7 and 8.

10.     Denied for the reasons set forth in paragraphs 7 and 8.

11.     Plaintiffs do not contest this paragraph for the purposes of this motion, based on presently available information and evidence.

12.     Denied.  Robert's gun was found by the Detroit Police Department's Evidence technicians 31 feet away from where he was shot down. **(Plaintiffs' Exhibit C, Detroit Police Department Evidence Technician Report, pg 2).** Officer Singleton maintains in his deposition testimony that Robert's gun flew out of his hand as he stumbled and fell after he was shot. **(Singleton Deposition, pg 90, line 10-20; Doc 19-5).** It is highly unlikely that the gun travelled 31 feet solely as a result of falling out of Robert's hand as he was shot down and there is a question of fact as to how the gun came to rest where it did.  Similarly, Defendant Officer Dew maintains that Robert threw the gun over his head as he fell down as a result of sustaining multiple gunshot wounds. **(Dew Deposition, pg 90, line 10-20; Doc 19-7).** Again, Officer Dew's theory is incongruent with the physical evidence of where the gun was located at the scene.

13.     Plaintiffs do not contest this paragraph for the purposes of this motion, based on presently available information and evidence.

14.     Plaintiffs do not contest this paragraph for the purposes of this motion, based on presently available information and evidence.

15.     Denied.   Officer Dew maintains that Robert fell on his back after being shot. **(Dew Deposition, pg 72, line 13-25, pg 85, line 24; Doc 19-7).** He claims that he had to

4

handcuff Robert because Robert could have posed a continuing threat. **(Dew Deposition, pg 96, line 8-11; Doc 19-7).** In order to detain him, Officer Dew testified that he turned Robert over, cuffed him, patted him down, and then rolled him back over onto his back. **(Dew Deposition, pg 92-93, line 24-08; pg 99, line 23-25; Doc 19-7).** However, Bursey testified that he saw Robert fall after he was shot and was adamant that Robert fell face down, which would be consistent with being shot in the back, thus making Officer Dew's version of events questionable. **(Bursey Deposition, pg 78, line 5-6; Doc 19-3).**

16.    Denied for the reasons stated in paragraph 15.

17.    Plaintiffs do not contest this paragraph for the purposes of this motion, based on presently available information and evidence.

18.    Plaintiffs do not contest this paragraph for the purposes of this motion, based on presently available information and evidence.

19.    Plaintiffs do not contest this paragraph for the purposes of this motion, based on presently available information and evidence.

20.    Plaintiffs do not contest this paragraph.

21.    Plaintiffs do not contest this paragraph.

22.    Plaintiffs do not contest this paragraph.

23.    Plaintiffs do not contest this paragraph.

24.    Plaintiffs do not contest this paragraph.

25.    Plaintiffs do not contest this paragraph.

26.    Plaintiffs do not contest this paragraph.

27.    Plaintiffs do not contest this paragraph.

5

28.     Plaintiffs agree that Officer Giraud initially secured the scene. However, it is disputed that he made sure that "nobody entered the scene." By Officer Giraud's own testimony, Emergency Medical Services, Evidence Technicians, other police officers and supervisors entered the scene of the shooting after the perimeter tape was put up. **(Giraud Deposition, pg 42-45; Doc 19-8).**

29.     Plaintiffs do not contest this paragraph.

30.     Plaintiffs do not contest this paragraph.

31.     Plaintiffs do not contest this paragraph.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS:

1.     Early in the morning on July 18, 2008 Robert Hill was fatally gunned down by Officers Dew and Singleton, without provocation as he was just enjoying spending social time with his cousin, Albert Bursey, and Albert's girlfriend, Shaneica Fitzgerald. Officer Dew testified that, as the police cruiser approached Robert, Albert and Shaneica, he witnessed a "calm situation" wherein he saw Robert seated on his bike in a stationary position, talking. **(Dew Deposition, pg 32-33; Doc 19-6).** Specifically, Dew did not witness any raised voices, arguing, or fighting, anything to indicate a heightened level of danger or discord. **(Id.).**

2.     Irrespective of the calm scenario presented to them, the officers responded with deadly force. The police cruiser approached Robert with no lights or sirens, and the officers never announced themselves. **(Bursey Deposition, pg 113; Doc 19-3).** Instead, the officers assaulted Robert by crashing into Robert with the police cruiser, causing him to be thrown off of his bike and begin scrambling over the hood of a parked car. **(Bursey Deposition, pg 67; Doc 19-2).** At the same time, Officers Dew and Singleton exited the police car and instantaneously

6

began to open fire at Robert. **(Id.).** Robert was shot five times, with all bullets entering through the posterior of his body and he died as a result of blood loss due to the inflicted gunshot wounds. **(Plaintiffs' Exhibit B, Wayne County Medical Examiner's Postmortem Report).**

3.    Officers Singleton and Dew maintain that they used deadly force against Robert in self-defense because Robert was pointing a gun at them, claiming to have shot Robert in the front, center mass.  However, contrary to the police officers' version of events, Albert and Shaneica maintain that Robert never had a gun in his hands, and that the officers shot Robert as he was trying to scramble away from their shots. **(Plaintiffs' Exhibit A, Affidavit of Shaneica Fitzgerald; Bursey Deposition, pg 73; Doc 19-2).**

4.    The physical evidence corroborates Albert and Shaneica's testimony. The autopsy identified five gunshot wounds on Robert, all entering through the back-side of Robert's body. **(Plaintiffs' Exhibit B, Wayne County Medical Examiner's Postmortem Report).** Plaintiffs' forensic pathology expert, Dr. Werner Spitz, has opined that, based on the evidence in this case, Robert sustained the gunshot wounds that killed him while he was trying to get away, over the hood of Shaneica's Honda. **(Plaintiffs' Exhibit H, Affidavit of Dr. Werner Spitz).**   The wounds sustained by Robert and the damage to the parked car show that the officers were aiming at a target scrambling over the hood of the car, not one directly in front of them that was facing them. **(Plaintiffs' Exhibit G, Crime Scene Photos of Bullet Holes).**

5.    Officers Singleton and Dew each wrote a preliminary complaint report on the night of the shooting and offered a substantially identical recitation of events. **(Plaintiffs' Exhibit E, Singleton PCR Report; Plaintiffs' Exhibit F, Dew PCR Report).** Although each officer incorporated their respective preliminary reports into their deposition testimony, the officers also offered contradictory versions of events in their deposition testimony:

*Officer Singleton's Version of Events:*

6.     Officer Singleton was the driver of the police cruiser the night of the fatal shooting. **(Singleton Deposition, pg 33; Doc 19-4).** Singleton states that he first saw Robert when the cruiser was about ½ a city block away, about 7 houses. **(Singleton Deposition, pg 41; Doc 19-4).** The cruiser was travelling at 15-20 miles per hour at that point, and the lights and sirens were not engaged on the vehicle. **(Singleton Deposition, pg 41-42; Doc 19-4).** Officer Singleton testified that Robert was riding his bicycle the entire time during which he and Officer Dew were approaching him. **(Singleton Deposition, pg 49-50; Doc 19-4, 19-5).**

7.     Singleton claims he first saw a gun on Robert when the police cruiser was about 2-3 car lengths away from him. **(Singleton Deposition, pg 52-53; Doc 19-5).** Singleton states that he saw the gun in a black holster on Robert's back-right waistband. **(Singleton Deposition, pg 53; Doc 19-5).** Singleton did not know anything about Robert when he approached—he did not know Robert's name, whether Robert had a concealed weapon permit, whether the gun had been fired recently or even if it was loaded. **(Singleton Deposition, pg 55; Doc 19-5).** Officer Singleton admits that there did not appear to be a problem between Robert and two other individuals that he was talking to (Albert and Shaneica) and that no one appeared to be in harm's way when the police officers approached. **(Singleton Deposition, pg 57; Doc 19-5).**

8.     However, in a blink of an eye, the situation turned fatal. Suddenly, Singleton jumped out of the still moving police cruiser, without putting the cruiser in park or otherwise bringing the vehicle to a halt **(Singleton Deposition, pg 61; Doc 19-5)**, and immediately began shooting at Robert. Singleton claims that he jumped out of the car when it was moving between 5-7 miles per hour, moved to the left and rear away from Robert, and started firing *instantaneously.* **(Singleton Deposition, pg 59-60; Doc 19-5).** However, in his Preliminary

8

Complaint Report made the night of the shooting, Singleton claims that he yelled at Robert to "drop his weapon" and fired as a result of Robert not heeding his warning. **(Plaintiffs' Exhibit E, Singleton PCR Report).**

9.      Singleton's alleged reason for open-firing at Robert was that Robert was pointing a gun at him. **(Singleton Deposition, pg 61; Doc 19-5).** Singleton claims that Robert jumped off of his bike and pushed it to the ground in front of the parked Honda, and turned and pointed a gun directly at the officers when they were 10-12 feet away, holding the gun at waist and shoulder-level. **(Singleton Deposition, pg 67, 70; Doc 19-5).**

10.      Officer Singleton claims that he shot Robert because Robert was pointing the gun at him and his partner. However, when pressed, he revised his story to say that Robert was pointing his gun at the squad car, in the direction of the windshield. **(Singleton Deposition, pg 68-69; Doc 19-5).** Officer Singleton exited the police cruiser on the driver's side and moved a few feet to the left **(Id. At pg 60)**; Officer Dew exited the police cruiser on the passenger side and moved a 4-5 feet to the right **(Dew Deposition, pg 41; Doc 19-6)**. This would put the distance between Officers Singleton and Dew at least 10 feet apart, given the width of the car separating them. Given that the officers testified that they were about 10-12 feet away from Robert at the time of the shooting, the officers and Robert would have formed a sort of triangle. Thus, it would have been impossible for Robert to have pointed a gun at Singleton and Dew simultaneously.

11.      Officer Dew, Singleton's partner, got out of the vehicle only a couple of seconds before Singleton did after warning Singleton that Robert had a gun. **(Singleton Deposition, pg 83, 85; Doc 19-5).** However, in the next breath Singleton claims that Robert pulled his gun 4-5 seconds *after Dew exited the vehicle and yelled commands at him*, even though Singleton

9

himself exited the vehicle only seconds after his partner and started open-firing instantaneously. **(Singleton Deposition, pg 85; Doc 19-5).**

12.     Singleton claims that he fired shots in a steady sequence for about 2-3 seconds, while aiming at the front of Robert, center mass. **(Singleton Deposition, pg 72, 74; Doc 19-5).** He states that Robert then began to back pedal besides the side of the parked Honda, and then Robert abruptly turned around and began running East, all the while moving quickly. **(Singleton Deposition, pg 80; Doc 19-5).** Singleton then asserts that Robert slowed down as he ran, fell, and that Robert's gun flew out of his hand as a result of the fall. **(Singleton Deposition, pg 90; Doc 19-5).**

13.     Although Singleton describes that Robert was running *away* from him, Singleton claims that Robert fell onto his back and landed near the rear of the parked Honda, with his head facing East. **(Singleton Deposition, pg 91-92; Doc 19-5).** When Singleton came around the police cruiser and parked Honda, he claims that Robert was lying face-up; nonetheless, Singleton also claims that he never came within 7 feet of Robert after he was shot down. **(Singleton Deposition, pg 93-94; Doc 19-5).** Singleton claims he walked away to find Robert's gun and call EMS, while Dew rolled Robert onto his side and front in order to handcuff him. **(Singleton Deposition, pg 93-94; Doc 19-5).**

*Officer Dew's Version of Events:*

14.     Officer Dew has his own version of events from the night of the shooting, which differs not only from Officer Singleton's version, but is markedly different from the version that Officer Dew himself gave the night of the shooting.

10

According to Dew's deposition testimony, on the night in question, Dew and Singleton responded to a dispatch regarding a male on a bike with a gun. **(Dew Deposition, pg 28; Doc 19-6)**. Dew was the passenger and Singleton was driving the cruiser; the officers approached the scene without engaging their lights or sirens. **(Dew Deposition, pg 29; Doc 19-6)**.

15.     As they approached, Dew saw Robert *sitting stationary on a bike*, talking with two other people, and observed a gun in a holster on Robert's right side.  **(Dew Deposition, pg 31; Doc 19-6)**. Dew described that he saw a very "calm" situation as the police car approached. **(Dew Deposition, pg 33; Doc 19-6)**. Dew claims that he jumped out of the police car when it was 5-6 feet away from Robert and travelling at about 5 miles per hour (7.33 feet per second). **(Dew Deposition, pg 34-35; Doc 19-6)**.

16.     His only explanation for jumping out of the car was that he had *observed* a gun in Robert's holster while Robert was calmly talking to two people, and Dew needed to detain Robert. **(Dew Deposition, pg 44; Doc 19-6)**. Dew then asserts that after he exited the vehicle, Robert turned on his bike and began to pedal away North, towards the sidewalk curb. **(Dew Deposition, pg 42; Doc 19-6)**. According to Dew, Robert then jumped off his bike, pulled his weapon and pointed it at Dew and Singleton.  **(Dew Deposition, pg 43; Doc 19-6)**. However, the crime scene photos show that the front of Robert's bicycle is wedged under the police cruiser with the front *facing the passenger side of the police cruiser;* as such, it would have been impossible for Robert to have been pedaling *away* from Officer Dew before he allegedly threw his bike to the ground. **(Plaintiffs' Exhibit D, Crime Scene Photo of Bicycle)**.

17.     Dew also maintains that he started to fire shots at Robert *within a second or two of jumping out of the vehicle.* **(Dew Deposition, pg 80; Doc 19-7)**. Dew states that Robert was

about 12 feet away at the time, with a gun pointed at the officers. **(Dew Deposition, pg 58; Doc 19-6).**

18.     Dew concurrently maintains that Robert moved East, next to the side of the parked Honda, after Dew began to fire shots. **(Dew Deposition, pg 81; Doc 19-7).** Dew's testimony is internally inconsistent because he is claiming that Robert was pedaling North on his bike towards the curb at the same time that he is claiming that Robert was traversing East along the side of the parked car. Dew asserts that Singleton was out of the car and firing shots at Robert seconds after he was out of the car, that Robert had a gun pointed at both of them, that Robert then turned and ran East, then turned around and fell backwards while throwing his gun over the top of his head. **(Dew Deposition, pg 72; Doc 19-7).**

19.     After Robert was shot down, Dew claims that he "detained" Robert by turning him over onto his front, handcuffing him, and then turning Robert back onto his back. **(Dew Deposition, pg 98-99; Doc 19-7).** Dew claims that he handcuffed Robert because Robert could pose a continuing threat; although Dew admits that he knew Robert had been shot, Dew did not check for vital signs, put pressure on any of Robert's wounds, or attempt to administer CPR. **(Dew Deposition, pg 96, 102; Doc 19-7).**

20.     Dew's recollection of events during his deposition differs from Singleton's recollection, as well as from Dew's own version of events previously recorded in his Preliminary Complaint Report. In his Preliminary Complaint Report, Dew states that he observed Robert riding his bike Eastwards as the police cruiser approached from the West, and that Robert turned his head, observed the officers, and unholstered his weapon while still riding his bike. **(Plaintiffs' Exhibit F, Dew PCR Report).** Dew then claimed that he exited the vehicle and

12

identified himself as the police, at which point Robert got off of his bike, threw it to the ground, and turned and pointed the gun at Dew. **(Id.).** Dew then claims that he open fired. **(Id.).**

*Albert Bursey's Version of Events:*

21. Albert Bursey, Robert's cousin and witness to the entire event, offers a completely different recollection of the events the night Robert was shot down. Albert claims that on that night, he, Robert and Albert's girlfriend, Shaneica Fitzgerald, were talking and laughing before Officers Singleton and Dew arrived outside of Shaneica's apartment building on Buena Vista Street, at the intersection with Appoline Street. **(Bursey Deposition, pg 60; Doc 19-2).**

22. Buena Vista runs East/West, and the apartment building was located on the Northwest corner of the intersection with Appoline. **(Plaintiffs' Exhibit C, Detroit Police Department Evidence Technician Report, pg 5).** Shaneica's car, a Honda Civic, was parked on Buena Vista. **(Id.).** When the officers arrived, Albert was near the back passenger-side of the car, near the sidewalk, and Robert was on his bike near the front driver-side of the car, on the street. **(Bursey Deposition, pg 67; Doc 19-2).**

23. Albert claims he heard a sound "clun clun," which made him think that Robert had run into Shaneica's car. **(Bursey Deposition, pg 67; Doc 19-2).** When he turned around to face East, he saw that a police car had run into the back of Robert's bike, which made the front of Robert's bike jam into Shaneica's car, and that the bike was getting crushed under the police car. **(Bursey Deposition, pg 68; Doc 19-2).** The police car, which at this point was travelling about 5 miles per hour, didn't stop until it came into contact with the Honda. **(Bursey Deposition, pg 115; Doc 19-3).**

13

24.      Albert saw Robert falling/jumping/leaping over the hood of the car. **(Bursey Deposition, pg 68, 70; Doc 19-2).** He knew that Robert did not have a gun in his hands because Robert had both hands on the handlebars. As Robert was falling over the hood of the car to keep from being crushed by the police car, he had his hands up in the air so he did not have time to reach for his gun. **(Bursey Deposition, pg 116; Doc 19-3).**

25.      Albert saw the officers step out of the police car and begin instantly shooting at Robert as Robert was scrambling over the hood of the Honda. **(Bursey Deposition, pg 73; Doc 19-2).** The officers never announced themselves or said anything before they started shooting. **(Bursey Deposition, pg 113; Doc 19-3).** At that point, Albert covered his head, and caught a couple grazes from the flying bullets. **(Bursey Deposition, pg 74; Doc 19-3).** Robert was shot down and he fell where Albert was standing; Robert's head fell where Albert's feet were, behind the rear passenger side of the car. **(Bursey Deposition, pg 77; Doc 19-3).**

*Shaneica Fitzgerald's Version of Events:*

26.      Shaneica was present when Robert was shot and killed by Officers Singleton and Dew. **(Plaintiffs' Exhibit A, Affidavit of Shaneica Fitzgerald).** Prior to the shooting, Shaneica and Albert were talking to Robert Hill as he was sitting on his bike in front of a parked car in front of the apartment building where Shaneica lived at the time of the shooting. **(Id.).** Without warning or notice, a police car pulled up and ran into Robert and his bike while Albert and Shaneica were still in the area. **(Id.).**

27.      It appeared that the police car struck Robert while on the bike and knocked him onto the hood of Shaneica's car. **(Plaintiffs' Exhibit A, Affidavit of Shaneica Fitzgerald).** As he rolled off the side of the hood, the two police officers, who had been in the front seat of the

14

police vehicle, exited the vehicle and started to shoot at Mr. Hill. **(Id.).** The officers fired many shots over a period of a few seconds as Robert ran for several feet and then fell to the ground where he lay bleeding from his gunshot wounds. **(Id.).**

28. Shaneica was shocked by what occurred because there was no advance warning and no reason that she could see for the shooting. **(Plaintiffs' Exhibit A, Affidavit of Shaneica Fitzgerald).** Shaneica maintains that Robert did not hold or point a gun at the officers nor pose a threat of harm to the officers. **(Id.).** Prior to the shooting, the officers did not identify themselves and did not shout any statements, commands or requests. **(Id.).** Robert was doing nothing wrong; he was simply talking while on his bike. **(Id.).**

29. The physical evidence in this case, which interestingly is not cited *at all* by the defendants in their recitation of facts, completely discredits the officers' version of events, while giving weight to Albert and Shaneica's versions. The autopsy report shows that all of 5 of the gunshot wounds that Robert sustained entered from the posterior of his body. **(Plaintiffs' Exhibit B, Wayne County Medical Examiner's Postmortem Report).** This fact in and of itself calls into question the veracity of the officers' version of events as both Officer Singleton and Officer Dew maintain that they shot Robert from the front, center mass.

30. The crime scene photos belie the officers' testimony. The crime scene photo shows Robert's bicycle jammed underneath the police cruiser. **(Plaintiffs' Exhibit D, Crime Scene Photo of Bicycle).** It is clear from this photo that the back end of the bicycle came into contact with the cruiser first as it is solidly wedged underneath the police car, while the front end of the bicycle protrudes out to the right of the car. The bicycle is firmly wedged between the cruiser and Shaneica's Honda. The officers claim that Robert threw his bicycle down and then

15

started running; however, the manner in which the bicycle is wedged underneath the police cruiser indicates that the cruiser hit the bicycle back-end first.

31.     The crime scene photos also show that Shaneica's Honda was riddled with bullets the night of the fatal shooting. **(Plaintiffs' Exhibit G, Crime Scene Photos of Bullet Holes).** The passenger-side windshield of the car shows at least three holes, the right side of the hood of the car shows two holes, and the passenger side rearview mirror shows a bullet hole. This indicates that the officers were shooting at the passenger-side of Shaneica's car, which belies their testimony that they were shooting at Robert, center-mass, while Robert was facing them with a gun aimed at them. Instead, the pictures indicate that the officers were shooting at a target that was scrambling over the hood of Shaneica's car, which is consistent with Albert and Shaneica's memory of what occurred.

32.     Furthermore, plaintiffs' forensic pathology expert, Dr. Werner Spitz, has opined that, based on the evidence reviewed in this case, Robert sustained the gunshot wounds that killed him while he was trying to get away, over the hood of Shaneica's Honda. **(Plaintiffs' Exhibit H, Affidavit of Dr. Werner Spitz).** Robert's gunshot wounds are consistent with this deduction. The shot that Robert sustained in his lower back followed an upward trajectory of approximately 45 degrees, indicating that his upper torso was bent sharply forward, as if he was shot from the rear while scrambling across the hood of the Honda. **(Id. At ¶ 18).** The shot to Robert's left hand is consistent with Albert's description that Robert had his hands raised while attempting to flee from the shots being fired at him. **(Id.).**

33.     The physical evidence found at the scene of the shooting does not match up to Officer Dew and Officer Singleton's version of events. Officer Singleton's gun recovered after the fatal shooting had 1 live round in it and 4 rounds in the magazine. **(Plaintiffs' Exhibit I, Sgt.**

16

**Cashion PCR).** Assuming that Singleton fired the gun when it was fully loaded with 16 rounds, Officer Singleton would have fired 11 rounds. However, the crime scene technicians only found 1 shell casing on Officer Singleton's side of the police cruiser (the driver side). **(Plaintiffs' Exhibit C, DPD Evidence Tech Report, pg 5).** On the other hand, Officer Dew's gun indicates that he only fired 3 rounds, yet 9 shell casings were found on his side (the passenger side) of the cruiser. **(Plaintiffs' Exhibit I, Sgt. Cashion PCR; Plaintiffs' Exhibit C, DPD Evidence Tech Report, pg 5).**

34.     The 2 shell casings found at the scene on the South side of Buena Vista are considerably farther away from the rest of the casings, without any explanation. **(Plaintiffs' Exhibit C, DPD Evidence Tech Report, pg 5).** The locations of the other 8 shell casings suggest that the cruiser had already run into the Honda and come to a stop at the time the officers fired those shots. **(Id.).** A total of 14 shots were fired by Officers Singleton and Dew; however, only 10 casings were recovered from the scene of the shooting. **(Plaintiffs' Exhibit C, DPD Evidence Tech Report, pg 3-4).**

35.     The Evidence Technician Report shows that Robert's gun was located 31 feet away from where Robert was shot down. **(Plaintiffs' Exhibit C, DPD Evidence Tech Report, pg 5).** Robert was shot down where his sandal and wristwatch were recovered, items 9 and 11 on the diagram. Robert's gun was found 31 feet away, item 12 on the diagram. Officers Singleton and Dew maintain that the gun fell out of/Robert threw the gun over his head as he was falling from being shot down, respectively. However, the location of the gun 31 feet away from where Robert fell is suspicious as it could not support either of the officers' version of events.

36.     There has been a lack of any comprehensive investigation into the circumstances surrounding the fatal shooting. Plaintiffs have asked defendants to produce all writings, reports,

17

photographs, recordings and documents created by the Detroit Police Department evidence technicians in connection with the July 18, 2008 fatal shooting, as well as all scientific test results and other documents related to any gunshot residue testing performed in connection with the incident. Yet, according to plaintiffs' forensic expert, David Balash, the investigation into Robert's shooting is notable for its lack of comprehensiveness. **(Plaintiff's Exhibit J, Affidavit of David E. Balash).** There is no indication in the materials received from the Detroit Police Department that any investigation was done into the following relevant areas:

- There is no indication that either officer's weapon was tested to determine which of the recovered bullet casings matched to which weapon;

- There is no indication that any trajectory analysis testing was done as to the bullet strikes on the hood of Shaneica's car and windshield in order to determine the shooting position of the persons firing the shots;

- There is no indication that any testing was done to ascertain the damage to the bicycle that Robert was riding on the night of the shooting.

Investigation into these areas would help to either corroborate or refute the officers' version of events from the night of the shooting. **(Plaintiff's Exhibit J, Affidavit of David E. Balash).**

Respectfully submitted,

/s/ Robert M. Giroux
ROBERT M. GIROUX (P-47966)
Attorneys for Plaintiff
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555

Dated: September 6, 2011

18

EXHIbIT 1-D

- Case No. 10-11427 (E.D. Mich. Oct. 24, 2011)

# Hill v. Dew

- Share
- Save
- PDF

    Creating

    PDFPDF

E.D. Mich.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

Case No. 10-11427

10-24-2011

MARY E. HILL, as Personal Representative of the Estate of ROBERT DWAYNE HILL, deceased, and ALBERT BURSEY, Plaintiffs, v. POLICE OFFICER JELANI DEW, POLICE OFFICER ADRIAN SINGLETON, and POLICE OFFICER SHAWN GIRAUD, Defendants.

---

AVERN COHN

HON. AVERN COHN

## **MEMORANDUM AND ORDER DENYING DEFENDANTS'**

## **MOTION FOR SUMMARY JUDGMENT (Doc. 19)**

## I. Introduction

This is a case under 42 U.S.C. § 1983. Plaintiff Mary E. Hill, as personal representative of the estate of Robert Dwayne Hill and plaintiff Albert Bursey are suing defendants, City of Detroit police officers Jelani Dew and Adrian Singleton. The incident involves the shooting death of Robert Dwayne Hill and the shooting of Albert Bursey by Dew and Singleton. Plaintiff makes the following claims on behalf of Hill:

*1

Plaintiffs also named police officer Shawn Giraud. However, plaintiffs have agreed to dismiss all claims against Giraud. Accordingly, Giraud is DISMISSED.

Plaintiffs' response addresses only claims related to Hill. Moreover, defendants say that they have not received medical records supporting Bursey's allegation that he was shot. Under these circumstances, Bursey's claims are DISMISSED WITHOUT PREJUDICE. Only Hill's claims are addressed in this decision.

I. Violation of § 1983 - unreasonable search and seizure, unlawful use of deadly force
II. Violation of § 1983, § 1985 - conspiracy
IV. Gross Negligence, Assault and Battery, Wrongful Death

Before the Court is defendants' motion for summary judgment. For the reasons that follow, the motion will be denied.

## II. Background

The material facts as gleaned from the parties' papers follow.

Defendants submitted a statement of material facts not in dispute. Doc. 23. Plaintiff submitted a response and statement of additional material facts. Doc. 26. Neither party highlighted their exhibits. Moreover, defendants' brief cited no statutory or case law regarding any of Hill's claims.

In the early morning hours of July 18, 2008, Hill was at the corner of Buena Vista Street and Appoline Street in Detroit. Hill, who was on a bike, was socializing with his friends, Bursey and Bursey's then-girlfriend, Shaneica Fitzgerald. They were outside of Fitzgerald's apartment building. Other unidentified people were also present in the area. At some point Hill took out a gun from a holster and showed it to Bursey and Fitzgerald and others nearby. He then placed it back into the holster. Apparently, the unidentified people ran away. According to Bursey, however, unidentified people returned a few the others returned the to area a few minutes later when they saw the gun was holstered. Someone, however, called the police.

Singleton and Dew responded to the area on a call of an armed man on a bike.

What happened next is hotly contested among the parties.

Singleton, Dew, and Bursey were deposed and their depositions are in the record. Fitzgerald submitted an affidavit.

Singleton says when he approached the area he saw Hill with a gun in his holster. Singleton saw Hill look at him over his shoulder, dismount the bike, and then point the gun at Singleton and Dew while the officers were still in the car. Singleton shot Hill because he "pointed a gun at me." Dew also shot Hill "because he had a weapon and was about to shoot us."

Bursey, however, says that when the police arrived, he, Hill and Fitzgerald were talking by Fitzgerald's parked car on Buena Vista. Bursey was by the back passenger side near the

2

sidewalk. Hill was on his bike near the front driver-side of the car, on the street. Bursey saw the police car run into the side of Hill's bike, pinning Hill between Fitzgerald's car and the police car. Bursey saw Hill fall/jump/leap over the hood of Fitzgerald's car. Bursey saw the police get out of the car and begin shooting Hill, as Hill was scrambling over the hood of the car.

Bursey further says that the office never announced themselves before they began shooting. Bursey says he was grazed by the bullets and that Hill fell where Bursey was standing, behind the rear passenger side of the car.

Bursey further says that Hill did not have a gun in his hands because Hill had both hands on the handlebars.

Fitzgerald confirms Bursey's version of the events before the shooting, i.e. that they were taking by her car and Hill was on his bike. She says that without warning, a police car pulled up and ran into Hill while he was on his bike. The police car stuck Hill and knocked him onto the hood of her car. As hill rolled off the hood, two police officers got out of the car and started to shoot Hill. They fired several shots and Hill fell to th ground.

Fitzgerald also says that Hill did not point a gun nor pose a threat to others. She likewise says that prior to the shooting, the police did not identify themselves and did not say anything before shooting.

Hill was shot five times. The autopsy report shows that all five shots entered from the posterior of his body.

Photos of the scene show Hills bike wedged between the police car and Fitzgerald's. Fitzgerald's car has bullet holes.

Plaintiff retained Dr. Werner Spitz as an expert. Spitz opines that Hill was shot while trying to get away over the hood of Fitzgerald's car.

## III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Telxon Corp. v. Federal Inc. Co., 309 F.3d 386, 391 (6th Cir. 2002).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." Wexler v. White's Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The Court will view "the evidence in the light most favorable to the nonmoving party and decide if it was sufficient to raise a genuine issue of material fact for the jury." Preferred Properties, Inc. v. Indian River Estates, Inc., 276

F.3d 790, 799 (6th Cir. 2002) (quoting EEOC v. Harbert-Yeargin, Ind., 263 F.3d 498. 510 (6th Cir. 2001)). Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## IV. Analysis

### A. Count I - § 1983

Under § 1983, an individual may bring a private right of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes. Blessing v. Freestone, 520 U.S. 329, 340 (1997); Maine v. Thiboutot, 448 U.S. 1, 4 (1980).

To state a claim under 42 U.S.C. § 1983, plaintiff must show that defendants violated a federal constitutional or statutory right while acting under color of state law. Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir.2006). There is no dispute as to the second element of this test. Dew and Singleton were uniformed police officers responding to a call while on duty. They plainly were acting under color of state law. The Court must determine only whether the evidence in the record would allow a reasonable jury to conclude that defendants violated Hill's Fourth Amendment rights. If the Court finds a constitutional violation, the question then becomes whether the right alleged to have been violated was clearly established at the time of the violation. Harlow, 457 U.S. at 818, 102 S.Ct. 2727; Pearson, 129 S.Ct. at 815. In making these determinations on summary judgment, the Court must look at the facts in the light most favorable to the non-moving party.

To the extent plaintiff claims a violation of Hill's Fourteenth Amendment rights, the Supreme Court has expressly held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis in original). Plaintiff's claim falls squarely within the holding of Graham. At the time of the shooting, Hill was a free citizen, not a pretrial detainees. Thus, the Fourth Amendment, not substantive due process, determines plaintiff's entitlement to relief. See Graham, 490 U.S. at 395, 109 S.Ct. 1865; see also Slusher v. Carson, 540 F.3d 449, 454 (6th Cir. 2008).

Dew and Singleton appear to contend that they are entitled to summary judgment on plaintiff's § 1983 claim on the basis of qualified immunity. Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful. Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir.2002). However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper. Poe v. Haydon, 853 F.2d 418, 425-26 (6th Cir.1988). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). "Through the use of qualified immunity, the law shields 'government officials performing discretionary

4

functions ... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 172 (6th Cir.2004) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir.2006).

Dew and Singleton did not cite any case law in their brief other than the standard for summary judgment. As one of the "issues presented," however, they argue they are entitled to summary judgment because they "acted in good faith and in lawful self defense." The Court construes this as presenting a defense based on qualified immunity.

In determining whether a defendant is entitled to qualified immunity, the Court makes two inquiries: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). Although Saucier mandated that these questions be addressed in order, that requirement has since been relaxed. See Pearson, 129 S.Ct. at 818 ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

With regard to the second step,

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640, 107 S.Ct. 3034 (citations omitted).

Applying these principles, plaintiff argues that there is evidence in the record that demonstrates the officers used excessive deadly force and thereby violated Hill's Fourth Amendment rights. In Tennessee v. Garner, the United States Supreme Court established that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Court explained that the reasonableness of the use of a particular level of force is evaluated by balancing " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Id. at 8, 105 S.Ct. 1694 (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)) (further citations omitted). The ultimate question is "whether the totality of the circumstances justified a particular sort of search or seizure." Id. at 8-9, 105 S.Ct. 1694. Necessarily then, even when probable cause to seize a suspect exists, "an officer may not always do so by killing him." Id. at 9, 105 S.Ct. 1694.

The Court agrees with plaintiff. Upon examining the totality of the events on the night of the shooting, a reasonable jury could conclude that the officers' use of deadly force was objectively

unreasonable. Specifically, there is a factual dispute as to whether Hill pointed a gun at Dew and Singleton. Bursey and Fitzgerald say Hill did not point a gun. The officers contend otherwise. Moreover, as explained in plaintiff's papers, the physical evidence tends to corroborate plaintiff's version of the events. Overall, there is a material question of fact as to the reasonableness of the use of fatal force inasmuch as there is a question of fact as to whether Hill posed a threat. Hill's right to be free from deadly force absent posing a threat is clearly established. See Ciminillo v. Streicher, 434 F.3d 461, 468 (6th Cir. 2006) (stating that the court has clearly established that a person has "a right not to be shot unless they are perceived as posing a threat to officers or others") (citing Yates, 941 F.2d at 447). "Taken in the light most favorable to the party asserting the injury, ... the facts alleged show [defendants'] conduct violated a constitutional right[.]" Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Accordingly, Dew and Singleton are not entitled to qualified immunity on plaintiff's § 1983 claim under Count I.

## B. Count II - Conspiracy

In Count II, plaintiff claims Dew and Singleton conspired to violate Hills constitutional rights. Dew and Singleton argue summary judgment is warranted because the complaint does not allege sufficient facts supporting such a claim. Putting aside that this argument is more appropriate under Rule 12(b)(6), this argument fails.

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." Revis v. Meldrum, 489 F.3d 273, 290 (6th Cir. 2007). To prevail on a civil conspiracy claim, plaintiff must show that (1) a "single plan" existed, (2) Singleton and Dew "shared in the general conspiratorial objective" to deprive Hill of his constitutional (or federal statutory) rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to Hill. Hooks v. Hooks, 771 F.2d 935, 944 (6th Cir. 1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." Id.

Here, the complaint contains the following allegations to support a conspiracy claim:

21. Following the unlawful and unconstitutional acts of Defendants Dew and Singleton as described above, Defendant Police Officers Dew and Singleton [together with . . . ] conspired to ratify the acts of Defendant Police Officers Dew and Singleton and further to deny Robert Dwayne Hill and/or his Estate equal protection of law.
22. Immediately following their unlawful and unconstitutional shooting of Robert Dwayne Hill, Defendants Dew and Singleton developed, articulated and agreed upon a plan to cover-up their unlawful actions and/or to devise a falsified version of events which would in their hopes exculpate them from their acts and, consequently, deny Robert Dwayne Hill and/or his Estate certain constitutional rights.
23. The plan and/or conspiracy developed and agreed upon by the Defendant Officers Dew and Singleton included providing a false and fictitious story alleging that Robert Dwayne Hill "produced a weapon and pointed it at the officers," prompting the Defendant Officers to shoot Mr. Hill "in fear of their safety."
24. At the scene of their crime and thereafter, the Defendant Police Officers Dew and Singleton

6

agreed to destroy and/or taint evidence, file false reports regarding how and why they discharged their weapons and involve other police officers in the conspiracy, . . . .
. . . .
26. The conspiracy between Defendants Dew, Singleton. . . included, but is not limited to, agreeing to destroy and/or taint evidence, file false reports, intimidate witnesses and to misdirect the investigation which was to be conducted into the events described above.
27. The conspiracy between Defendants Dew, Singleton . . . as well as the acts that were subsequently committed to carry out the conspiracy, were done for the purpose of depriving, either directly or indirectly, Robert Dwayne Hill and/or his Estate and/or the persons belonging to his Estate of the equal protection of the laws, or of equal privileges and immunities under the laws.
28. The Defendants have in fact filed false reports, tainted evidence, attempted to influence witnesses and attempted to improperly misdirect the subject investigation, all in furtherance of the object of the conspiracy which was to direct blame away from Defendants Dew and Singleton, ratify their unlawful and/or constitutional acts, and deprive Robert Dwayne Hill and/or his Estate due process.

(Complaint, Doc. 19-9).

These allegations are sufficient to state a claim for conspiracy. Moreover, the allegations are supported by the evidence in the record which, when viewed in a light most favorable to plaintiffs, would allow a reasonable juror to infer that defendant Officers Singleton and Dew conspired to deprive Robert Hill of his constitutional rights by falsifying reports and tainting and/or destroying evidence. As explained in plaintiff's papers:

The Court has removed the argumentative language from plaintiff's brief.

First, Robert's gun was found 31 feet away from where he was shot down. Officers Singleton and Dew maintain that Robert's gun flew out of his hand, or that he threw it over his head as he was falling as a result of being shot multiple times. . . . Further, Officer Dew testified that he "detained" Robert by handcuffing him after he was shot, and that in order to do so he had to turn Robert over onto his front, and then turn him back, and then stayed there until other officers arrived at the scene. Officer Singleton claimed that he never came within 7 feet of Robert after Robert was shot down. However, Officer Geraud testified in deposition that, when he first arrived at the scene, Officer Dew and Officer Singleton were only a few feet away from each other. (Geraud Deposition, pg 39; Doc 19-8). When viewed in a light most favorable to plaintiffs, these facts could lead a reasonable juror to infer that the Officers Dew and Singleton had concocted a story to justify their unreasonable shooting of Robert; that Officer Dew retrieved Robert's gun from the holster and that the officers then placed the gun to make it seem that Robert had the gun unholstered when the officers shot him.
Furthermore, . . . Given the number of bullets in the officers' guns after the shooting, the evidence technicians should have found 14 bullet casing[s]. However, only 10 casings were recovered. The casing recovered on the other side of Buena Vista Street indicates that the location of the officers when they were firing the shots may not match up to the version of events they wrote in their reports and testified to. This evidence, viewed in a light most favorable to plaintiffs, could lead a reasonable juror to conclude that the officers moved and/or removed bullet casings from the scene and that the physical evidence at the scene of the crime had been

tampered with. Moreover, the officers' version of how the shooting occurred [appears to differ] with the autopsy report, which unequivocally shows that Robert was shot 5 times in the back. Yet, Officers Dew and Singleton obstinately maintain that they shot Robert in the front, center mass. The discrepancy between the autopsy report and the officer's version of events could lead a reasonable juror to conclude that the officers fabricated their version of events to make it seem like the shooting was justified, and thus
conspired to falsify reports by giving a concocted version of events.

Plaintiff's brief at p. 13-14. Doc. 25.

Overall, the contours of a conspiracy claim have been plead and neither dismissal or summary judgment is appropriate.

## C. Count IV - State Law Claims

Under Count IV, plaintiff asserts several state law claims, including gross negligence, assault and battery, and wrongful death. Resolution of these state law claims requires application of Michigan law on governmental immunity. Michigan courts use different tests for governmental immunity depending on whether the claim asserted sounds in negligence or intentional tort. Odom v. Wayne County, 482 Mich. 459, 470-71 (2008). Regardless of the type of claim asserted, a defendant bears the burden of establishing their entitlement to official immunity from a plaintiff's state law claims. Id. at 479, 760 N.W.2d 217.

Dew and Singleton argue that summary judgment is appropriate on plaintiff's gross negligence claim because they are entitled to governmental immunity. Under M.C.L. § 691.1407, employees of a governmental agency are immune from tort liability if (1) they were acting or reasonably believed they were acting within the scope of their official authority; (2) the governmental agency is engaged in the exercise or discharge of a governmental function; and (3) their conduct does not amount to gross negligence that is the proximate cause of the injury or damage. Odom, 482 Mich. at 470, 760 N.W.2d 217. Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(7)(a); Maiden v. Rozwood, 461 Mich. 109, 122-23, 597 N.W.2d 817 (1999).

Here, viewing the facts in the light most favorable to plaintiff, a reasonable jury could conclude that Dew and Singleton were grossly negligent in the manner in which they shot Hill and this alleged gross negligence proximately caused his death. Dew and Singleton's summary judgment motion on this issue raises the same defenses discussed and rejected above in the Court's analysis of plaintiff's Fourth Amendment claim. Those defenses are similarly unavailing here. See, e.g., Yates v. City of Cleveland, 941 F.2d 444, 447 (6th Cir. 1991) ("An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent."). Whether Dew and Singleton's conduct constitutes gross negligence under Michigan law is a fact question for the jury. As such, summary judgment is not warranted.

As to plaintiff's assault and battery claim, an assault is "an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate

battery." People v. Nickens, 470 Mich. 622, 628 (2004)). Battery is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." Id.

Dew and Singleton argue they are immune from plaintiff's assault and battery claims because they were acting in good faith when they shot and killed Hill. In Odom, supra, the Michigan Supreme Court held that the scope of governmental immunity from intentional torts—e.g. assault and battery—under Michigan law is governed by the Court's previous decision in Ross v. Consumers Power Co., 420 Mich. 567, 363 N.W.2d 641 (1984). Ross extends immunity to governmental employees where the employee was acting within the scope of his or her authority, in good faith, and was performing discretionary acts. See Grawey v. Drury, 567 F.3d 302, 315-16 (6th Cir. 2009). In Odom, the Michigan Supreme Court explained that "there is no immunity when the governmental employee acts maliciously or with a wanton or reckless disregard of the rights of another." Odom, 482 Mich. at 474 (emphasis omitted); accord Flones v. Dalman, 199 Mich. App. 396, 401, 502 N.W.2d 725 (1993). Unlike qualified immunity under federal law, "[t]he good faith element of the Ross test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." Odom, 482 Mich. at 481-82. However, where a defendant's conduct is objectively unreasonable, the jury may infer bad faith. See id. at 475 ("[Wilfulness and wanton misconduct is made out only if the conduct alleged shows an intent to harm, or if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does."); accord Grawey, 567 F.3d at 315-16

Again, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that Dew and Singleton's actions on July 18, 2008 were not taken in good faith. According to Bursey and Fitzgerald, Dew and Singleton shot at Hill, who was not brandishing a gun at the time, and did so without announcing themselves as law enforcement. At a minimum, a jury could determine that such conduct demonstrates a "reckless disregard" for Hill's right to be safe and secure in his person. home. Police officers who demonstrate a reckless disregard or indifference to another's rights do not act in good faith. Odom, 482 Mich. at 475. Accordingly, summary judgment is not warranted on plaintiff's assault and battery claim.

The same is true of plaintiff's claim for damages under Michigan's Wrongful Death Statute, M.C.L. § 600.2922.

--------

## V. Conclusion

For the reasons stated above, defendants' motion for summary judgment is DENIED.

SO ORDERED.

AVERN COHN

UNITED STATES DISTRICT JUDGE

9

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 24, 2011, by electronic and/or ordinary mail.

Julie Owens


Case Manager

---

Copy with Cite
Parenthetical Citation
Copied!

- Share
- Save
- PDF

    Creating

    PDFPDF

Hill v. Dew•Case No. 10-11427, **14** (E.D. Mich. Oct. 24, 2011)
Back to Hill v. Dew

clear

## Insights (0)

Sortdepth of treatmentdepth

- depth of treatment
- date

Insights are analysis of the case shared by the legal community. Publish your analysis using LegalPad now.
New Draft


- Contact
- Features

*10*

EXHIBIT 1-E

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY E. HILL, As Personal Representative
of the Estate of ROBERT DWAYNE HILL,
Deceased, and ALBERT BURSEY,                    Case No. 10-cv-11427

    Plaintiffs,                                 Hon. Avern Cohn

-vs-

POLICE OFFICER JELANI DEW,
POLICE OFFICER ADRIAN SINGLETON,
and POLICE OFFICER SHAWN GERAUD
In Their Individual Capacities,

    Defendants.
_____/

### MOTION TO APPROVE SETTLEMENT AND AUTHORITY TO
### DISTRIBUTE SETTLEMENT PROCEEDS

Plaintiff, Mary Hill, as Personal Representative of the Estate of Robert Hill,

Deceased, by and through her attorneys, Fieger, Fieger, Kenney, Giroux & Danzig,

P.C., and for her motion to approve settlement and authority to distribute settlement

proceeds, states as follows:

1.    The subject lawsuit is a civil rights/wrongful death lawsuit filed by the

Estate of Robert Hill, Deceased, against two City of Detroit Police officers.

2.    Shortly before trial was scheduled to begin in this matter, the parties

agreed to the settle the case by way of binding arbitration. A copy of the Arbitration

Agreement is attached as Exhibit A.

3.    On May 14, 2012, this matter proceeded to arbitration hearing at which

time, counsel for Plaintiff and Defendant called witnesses and submitted proofs. The

arbitration hearing proceeded in a manner consistent with that described in the Arbitration Agreement and there were no objections, before, during or after the hearing.

4.     On May 16, 2012 the arbitrators rendered their unanimous decision which was in excess of the high/low numbers contained in the Arbitration Agreement.  As such and pursuant to the Arbitration Agreement, this matter is settled for the amount of $1,400,000.00.

5.     The Personal Representative of the Estate of Robert Hill, Deceased, is Mary Hill, Robert's mother, who will appear at the motion hearing to provide testimony. In addition, Mr. Hill's two adult sons, Franklin Hill and Dwayne Brown will be present at the motion hearing to provide testimony.

6.     All of the members of the Estate are in agreement with the prospect of settlement through binding arbitration.  Furthermore, all of the members of the Estate are in agreement on the proposed distribution of settlement proceeds.

7.     The Personal Representative of the Estate requests this Court to approve the settlement believing it is in the best interests of the Estate.

8.     The Personal Representative of the Estate further requests that the Court approve the following distribution of settlement proceeds:

a.     $27, 866.54 to Fieger, Fieger, Kenney, Giroux & Danzig, P.C., said sum representing costs expended in pursuing this matter;

b.     $457,377.83 to Fieger, Fieger, Kenney, Giroux & Danzig, P.C., said sum representing attorney fees payable to said Firm pursuant to the agreement between Fieger, Fieger, Kenney, Giroux & Danzig, P.C., and Plaintiff;

c.     $6,000.00 to be paid to Attorney Howard Linden for his fees and costs associated with his work on the probate of this matter;

~2~

d.   $1,508.00 to be paid to Attorney Joelynn T. Stokes for her fees and costs associated with her work as GAL for the minor children of Decedent during the litigation of this matter (who are both now of legal age);

e.   $3,528.00 to be paid to Mary Hill as reimbursement of funeral costs;

f.   $1,700.00 to be paid to Priscilla Ayers as reimbursement of burial costs;

g.   $29,000.00 to be paid to Priscilla Ayers as payment of outstanding child support fees due and owing by Decedent to Priscilla Ayers;

h.   $311,509.85 to be paid to Franklin Hill, son of Decedent;

i.   $311,509.85 to be paid to Dwayne Brown, son of Decedent;

j.   $100,000.00 to Mary Hill, mother of Decedent;

k.   $100,000.00 to Henry Hill, father of Decedent; and

l.   $50,000.00 to be paid to Cynthia Hill, sister of Decedent.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion to Approve Settlement and to Obtain Authority to Distribute Settlement Proceeds on behalf of the Estate of Robert Hill, Deceased, and enter the proposed Order which is attached hereto as Exhibit B.

Respectfully submitted,

s/Robert M. Giroux
Robert M. Giroux
19390 West Ten Mile Road
Southfield, MI 48075
Phone: (248) 355-5555
Fax: (248) 355-5148

Dated: June 11, 2012

### BRIEF IN SUPPORT OF MOTION

In support of her Motion, Plaintiff relies upon Michigan Court Rule 2.420.

Respectfully submitted,

/s/ Robert M. Giroux
Robert M. Giroux
19390 West Ten Mile Road
Southfield, MI 48075
Phone: (248) 355-5555
Fax: (248) 355-5148

Dated: June 11, 2012

### Certificate of Service

I hereby certify that on Monday, the 11th day of June, 2012, a copy of Plaintiff's Motion to Approve Settlement and for Authority to Distribute Settlement Proceeds and Brief in Support, were filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I hereby further certify that all interested parties listed below were also served via first class mail.

/s/Robert M. Giroux
Robert M. Giroux (P-47966)

# Exhibit A

## AGREEMENT TO ARBITRATE

The parties, by their attorneys, agree to submit the case of **Mary E. Hill, as personal representative of the Estate of Robert Dwayne Hill, Deceased, and Albert Bursey v Jelani Dew, Adrian Singleton, and Shawn Geraud**, Wayne County Circuit Court Case No. 10-CV-11427, to arbitration on the following terms and conditions:

1. The parties shall submit to arbitration all matters in controversy raised in the above-named lawsuit.

2. Arbitration shall be conducted in accordance with the Michigan Rules of Evidence, except as may be modified by stipulation of the parties.

3. The matter shall be arbitrated by a panel of three arbitrators, all of whom shall be practicing Michigan Attorneys. The Plaintiffs shall select one arbitrator, the Defendants shall select one arbitrator, and the Plaintiffs and Defendants shall jointly select the neutral arbitrator. Plaintiffs shall pay all fees and costs associated with the arbitrator that they select. Defendants shall pay all fees and costs associated with the arbitrator that they select. All fees and costs of the neutral arbitrator shall be paid fifty percent (50%) by Plaintiffs and fifty percent (50%) by Defendants.

   All other costs and fees, including attorney fees, shall be borne by the party which incurs them.

4. In the event that the neutral arbitrator is unavailable for a hearing on the date set by the parties, either by failure to accept appointment, disqualification, withdrawal, or incapacity, the position shall be filled by agreement of the parties.

5. Pre-hearing briefs shall be required of Plaintiffs and Defendants, and shall be submitted to the arbitration panel prior to commencement of the arbitration.

   Medical records and reports may be used at the hearing in lieu of the personal appearance of physicians, medical care providers or record custodians.

6. The Estate of Robert Dwayne Hill shall recover a minimum amount of **Forty Thousand Dollars ($40,000.00)**; the maximum amount of any award to the Estate of Robert Dwayne Hill shall not exceed the amount of **One Million Four Hundred Thousand Dollars ($1,400,000.00)**.

Agreement To Arbitrate

RE:  MARY E. HILL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
     ROBERT DWAYNE HILL, DECEASED, AND ALBERT BURSEY

Page 2

7.  Plaintiff Albert Bursey shall recover a minimum amount of **Ten Thousand Dollars**
    **($10,000.00);** the maximum amount of any award to Plaintiff Albert Bursey shall not
    exceed the amount of **One Hundred Thousand Dollars ($100,000.00).**

8.  A decision of two of the three arbitrators shall be binding.  Further,

    As to the Estate of Robert Dwayne Hill, any award under  **$40,000.00** shall be
    interpreted to be in the amount of  **$40,000.00;** as to the Estate of Robert Dwayne
    Hill, any award in excess of **$1,400,000.00** shall be interpreted to be in the amount
    of **$1,40,000.00.**

    As to Plaintiff Albert Bursey, any award under **$10,000.00** shall be interpreted to be
    in the amount of **$10,000.00;** as to Plaintiff Albert Bursey, any award in excess of
    **$100,000.00** shall be interpreted to be in the amount of **$100,000.00.**

    There shall be no costs, fees, attorney fees or interest taxable with respect to the
    award rendered by the arbitrators.

    The award of the arbitrators shall represent a full and final settlement of any amounts
    due and owing to Plaintiffs for any and all claims arising out of the incident which
    occurred on or about July 18, 2008 at or near Buena Vista and Appoline; however,
    limited judicial review may be obtained in a Michigan Federal District Court or
    Michigan Circuit Court of competent jurisdiction (*a*) in accordance with the
    standards for review of arbitration awards as established by law; or (*b*) on the ground
    that the arbitrators committed an error of law..

9.  Neither the "high-low" amounts, nor the mediation award shall be disclosed to the
    arbitrators.  Disclosure of the "high-low" amounts or the mediation award to the
    arbitrators shall render the arbitration agreement voidable by any non-disclosing
    party.

10. Discovery proceedings may continue, and each party shall have the opportunity to
    take "discovery only" depositions of the opponent's experts, to the extent that such
    depositions have not already been completed.  The parties shall be able to take
    depositions of parties or witnesses for use as evidence at arbitration, without regard
    to witness availability.

Agreement To Arbitrate
RE:   MARY E. HILL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
       ROBERT DWAYNE HILL, DECEASED, AND ALBERT BURSEY
Page 3

11.   The parties agree that they will faithfully observe the Agreement to Arbitrate and that they will abide by and satisfy the award rendered by the arbitrators. In the event that any party refuses to abide by the arbitrators' decision, the other party may petition the Court to confirm the award and enter judgment thereon.

12.   The proceedings convened by the arbitrators need not be recorded. However, if any party wishes to have the proceedings recorded, then any costs incurred shall be borne exclusively by said party.

FIEGER, FIEGER, KINNEY, GIROUX AND DANZIG, P.C.

BY: _____
       Robert M Giroux (P-47966)
       Attorneys for Plaintiffs
       19390 West Ten Mile Road
       Southfield, MI 48075
       (248) 355-5555

CITY OF DETROIT - LAW DEPARTMENT
Krystal Crittendon, Corporation Counsel

BY: _____
       John A. Schapka (P-36731)
       Attorney for Defendants
       1650 First National Building
       Detroit, Michigan 48226
       (313) 237-3062

_____
Mary E. Hill, as Personal Representative
of the Estate of Robert Dwayne Hill, Deceased

Subscribed and sworn to before me
this _____ day of _____, 2012.

_____
Notary Public, _____ County, MI
My Commission expires: _____

_____
Albert Bursey, Plaintiff

Subscribed and sworn to before me
this _____ day of _____, 2012.

_____
Notary Public, _____ County, MI
My Commission expires: _____

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY E. HILL, As Personal Representative
of the Estate of ROBERT DWAYNE HILL,
Deceased, and ALBERT BURSEY,                          Case No. 10-cv-11427

      Plaintiffs,                                   Hon. Avern Cohn

-vs-

POLICE OFFICER JELANI DEW,
POLICE OFFICER ADRIAN SINGLETON,
and POLICE OFFICER SHAWN GERAUD
In Their Individual Capacities,

      Defendants.
_____/

## ORDER APPROVING SETTLEMENT
## AND DISTRIBUTION OF SETTLEMENT PROCEEDS

This matter having come before the Court by way of Plaintiff's Motion to Approve

Settlement and for Authority to Distribute Settlement Proceeds, the Court having read

the briefs; having had oral argument; and being otherwise fully advised in the premises;

IT IS HEREBY ORDERED that the settlement of $1,400,000.00 proposed

by the parties is approved after the Court having found that this settlement is in the best

interest of the Estate;

IT IS HEREBY FURTHER ORDERED that the settlement proceeds of the above-

cited settlement be distributed as follows:

    a.    $27, 866.54 to Fieger, Fieger, Kenney, Giroux & Danzig,
           P.C., said sum representing costs expended in pursuing this
           matter;

b.    $457,377.83 to Fieger, Fieger, Kenney, Giroux & Danzig,
       P.C., said sum representing attorney fees payable to said
       Firm pursuant to the agreement between Fieger, Fieger,
       Kenney, Giroux & Danzig, P.C., and Plaintiff;

c.    $6,000.00 to be paid to Attorney Howard Linden for his fees
       and costs associated with his work on the probate of this
       matter;

d.    $1,508.00 to be paid to Attorney Joelynn T. Stokes for her
       fees and costs associated with her work as GAL for the
       minor children of Decedent during the litigation of this matter
       (who are both now of legal age);

e.    $3,528.00 to be paid to Mary Hill as reimbursement of funeral costs;

f.    $1,700.00 to be paid to Priscilla Ayers as reimbursement of burial costs;

g.    $29,000.00 to be paid to Priscilla Ayers as payment of outstanding child
       support fees due and owing by Decedent to Priscilla Ayers;

h.    $311,509.85 to be paid to Franklin Hill, son of Decedent;

i.    $311,509.85 to be paid to Dwayne Brown, son of Decedent;

j.    $100,000.00 to Mary Hill, mother of Decedent;

k.    $100,000.00 to Henry Hill, father of Decedent; and

l.    $50,000.00 to be paid to Cynthia

IT IS FURTHER ORDERED that this is a final order and closes the case.

_____
Hon. Avern Cohn,
United States District Court Judge

Dated: _____

EXHIBIT 1-F

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY E. HILL, As Personal Representative
of the Estate of ROBERT DWAYNE HILL,
Deceased, and ALBERT BURSEY,

       Case No. 10-cv-11427

    Plaintiffs,

       Hon. Avern Cohn

-vs-

POLICE OFFICER JELANI DEW,
POLICE OFFICER ADRIAN SINGLETON,
and POLICE OFFICER SHAWN GERAUD
In Their Individual Capacities,

    Defendants.
_____/

## ORDER APPROVING SETTLEMENT
## AND DISTRIBUTION OF SETTLEMENT PROCEEDS

This matter having come before the Court by way of Plaintiff's Motion to

Approve Settlement and for Authority to Distribute Settlement Proceeds, the Court

having read the briefs; having had oral argument; and being otherwise fully

advised in the premises;

IT IS HEREBY ORDERED that the settlement of $1,400,000.00

proposed by the parties is approved after the Court having found that this

settlement is in the best interest of the Estate;

IT IS HEREBY FURTHER ORDERED that the settlement proceeds of the

above-cited settlement be distributed as follows:

a.    $33,142.63 to Fieger, Fieger, Kenney, Giroux &
Danzig, P.C., said sum representing costs expended in
pursuing this matter;

b.      $455,619.13 to Fieger, Fieger, Kenney, Giroux & Danzig, P.C., said sum representing attorney fees payable to said Firm pursuant to the agreement between Fieger, Fieger, Kenney, Giroux & Danzig, P.C., and Plaintiff;

c.      $6,000.00 to be paid to Attorney Howard Linden for his fees and costs associated with his work on the probate of this matter;

d.      $1,508.00 to be paid to Attorney Joelynn T. Stokes for her fees and costs associated with her work as GAL for the minor children of Decedent during the litigation of this matter (who are both now of legal age);

e.      $3,528.00 to be paid to Mary Hill as reimbursement of funeral costs;

f.      $1,700.00 to be paid to Priscilla Ayers as reimbursement of burial costs;

g.      $29,000.00 to be paid to Priscilla Ayers as payment of outstanding child support due and owing by Decedent Robert Hill to Priscilla Ayers;

h.      $309,751.15 to be paid to Franklin Hill, son of Decedent ($75,000.00 of which will be used to fund an annuity);

i.      $309,751.15 to be paid to Dwayne Brown, son of Decedent ($100,000.00 of which will be used to fund an annuity);

j.      $100,000.00 to Mary Hill, mother of Decedent;

k.      $100,000.00 to Henry Hill, father of Decedent; and

l.      $50,000.00 to be paid to Cynthia, sister of Decedent.

IT IS FURTHER ORDERED that this is a final order and closes the case.

S/Avern Cohn
Hon. Avern Cohn,
United States District Court Judge

Dated: July 9, 2012

~2~

EXHIBIT 1-G

## SWORN AFFIDAVIT IN BEHALF OF

### MR. ROBERT SMITH-BEY

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF MUSKEGON   )

I ROBERT SMITH-BEY #365581, being first duly sworn, solemnly disposes and saith, I am a natural born Citizen of The City of Detroit, State of Michigan, in The United States of America.

1.  AFFIANT also attest that he is completely innocent of the charges of assault with the intent to commit murder, that he was tried and convicted for.

2.  I have made several attempts to investigate Police Corruption involving my arresting officers, Adrian Singleton and Jelani Dew.

3.  On 2-5-14, I received a copy of a United States District Court order denying summary judgment; Hill v Dew, 2011 U.S. Dist. Lexis 122640; involving on the part of Dew and Singleton: violation of §1983-unreasonable search and seizure, unlawful use of deadly force; violation of §1983, §1985-conspiracy and Gross negligence, Assault and Battery and Wrongful Death, pertaining to the unlawful shooting of Mr. Robert Dwayne Hill.

4.  I have been litigating my direct appeal in Pro Per, since April of 2014, without the assistance of counsel.

5.  I have limited access to the research sites within the law libraries of the Michigan Department of Corrections.

6.  I have filed innumerable pleadings with the trial court in an attempt to prove my innocence.

7.  In December of 2014, I filed my Pro Per supplemental brief

on appeal with an affidavit explaining that I had been unable

to obtain the necessary documents to properly prepare and file

said brief.

8. All of my pleadings requesting documents have went unfiled

and unanswered in the trial court.

9. In June of 2017, I began corresponding with Ms. Tonya

Scott, by way of United States Postal Service and J-Pay, pertaining

to her researching case #2:10-cv-11427, Hill v Dew.

10. She was able to obtain exculpatory and impeaching evidence

pertaining to officers Dew and Singleton's unlawful shooting of

Mr. Robert Dwayne Hill.

11. In September of 2017, I began receiving the information

of Dew and Singleton's criminal activities.

12. With the assistance of Ms. Scott and my Grandmother,

Mrs. Dorothy Collier, I received the last of the materials that

Ms. Scott was able to obtain on ~~December~~ December 6, 2017.

13. Those materials reveal a pattern of Police Corruption

and Brutality by Dew and Singleton.

14. The information that was obtained by Ms. Scott and is

now in my possession is exculpatory and impeaching in nature.

15. That information was never disclosed to my Defense counsel

before, during or after trial.

16. That information was in the possession of both Dew and

Singleton.

17. That information was suppressed by the prosecution during

trial.

AFFIANT has been engaged in a futile attempt to prove his

innocence and to clear his name.

Pursuant to MCI 750.422 et. seq., AFFIANT ROBERT SMITH-BEY #365581, declares under the penalty of perjury that the abovementioned is true & honest to the best of my knowledge & belief.

Further, AFFIANT saith not.

Subscribed And Sworn To Before Me,

This 12th day, Of Dec 2017

_____
Notary    Public

Sincerely Yours,

Robert Smith-Bey #365581
DATE: Dec. 12, 2017

C. PATRICIO
Notary Public, State of Michigan
County of Muskegon
My Commission Expires 8-3-28
Acting in the County of Muskegon

CC: file

page 3 of 3